## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ACCURIDE CORPORATION,<br>*et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 09-13449 (____)<br><br>Joint Administration Pending |

## DECLARATION OF JAMES H. WOODWARD, JR. IN SUPPORT
## OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, James H. Woodward, Jr., being duly sworn, depose and say:

1. I am the Interim Senior Vice President of Finance and Chief Financial Officer of Accuride Corporation ("**Accuride**"), a corporation organized under the laws of the state of Delaware and the ultimate parent corporation of the other debtors and debtors-in-possession (collectively, the "**Debtors**" or the "**Company**") in the above-captioned chapter 11 cases (collectively, the "**Chapter 11 Cases**"). I am authorized to submit this declaration (the "**First Day Declaration**") on behalf of the Debtors.

2. As Interim Senior Vice President of Finance and Chief Financial Officer of Accuride I am responsible for overseeing the financial activities of the Company, including but not limited to, monitoring cash flow, and tax and financial planning. As a result of my tenure

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Accuride Corporation, a Delaware corporation (9077); Accuride Cuyahoga Falls, Inc., a Delaware corporation (9556); Accuride Distributing, LLC, a Delaware limited liability company (3124); Accuride EMI, LLC, a Delaware limited liability company (N/A); Accuride Erie L.P., a Delaware limited partnership (4862); Accuride Henderson Limited Liability Company, a Delaware limited liability company (8596); AKW General Partner L.L.C., a Delaware limited liability company (4861); AOT Inc., a Delaware corporation (3088); Bostrom Holdings, Inc., a Delaware corporation (9282); Bostrom Seating, Inc., a Delaware corporation (7179); Bostrom Specialty Seating, Inc., a Delaware corporation (4182); Brillion Iron Works, Inc., a Delaware corporation (6942); Erie Land Holding, Inc., a Delaware corporation (8018); Fabco Automotive Corporation, a Delaware corporation (9802); Gunite Corporation, a Delaware corporation (9803); Imperial Group Holding Corp. -1, a Delaware corporation (4007); Imperial Group Holding Corp. -2, a Delaware corporation (4009); Imperial Group, L.P., a Delaware limited partnership (4012); JAII Management Company, a Delaware corporation (N/A); Transportation Technologies Industries, Inc., a Delaware corporation (2791); and Truck Components Inc., a Delaware corporation (5407). The mailing address for Accuride Corporation is 7140 Office Circle, Evansville, Indiana 47715.

with the Debtors, my review of public and non-public documents, and my discussions with other members of the Debtors' management team, I am familiar with the Company's business, financial condition, policies and procedures, day-to-day operations, and books and records. Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtors' employees or retained advisers that report to me in the ordinary course of my responsibilities. I am authorized by each of the Debtors to submit this First Day Declaration. References to the Bankruptcy Code, the chapter 11 process and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel. If called upon to testify, I would testify competently to the facts set forth in this First Day Declaration.

3. On October 8, 2009 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief in the Bankruptcy Court for the District of Delaware (the "**Court**"). The Debtors will continue to operate their businesses and manage their properties as debtors-in-possession. Accuride's non-U.S. subsidiaries and affiliates (the "**Non-Debtor Affiliates**") are not chapter 11 debtors, will continue their business operations without supervision from the Court, and will not be subject to the chapter 11 requirements of the Bankruptcy Code.

4. I submit this First Day Declaration on behalf of the Debtors in support of the Debtors' (a) voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "**Bankruptcy Code**") and (b) "first-day" motions, which are being filed concurrently herewith (collectively, the "**First Day Motions**").[2] The Debtors seek the relief set forth in the First Day Motions with the goal of minimizing the adverse effects of the commencement of the Chapter 11 Cases on their businesses. I have

---

[2] Unless otherwise defined herein, all capitalized terms shall have the meaning ascribed to them in the applicable First Day Motions.

reviewed the Debtors' petitions and the First Day Motions, or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtors' businesses and the success of the Debtors' reorganization.

5.     Part I of this First Day Declaration provides an overview of the Debtors' businesses, organizational structure, capital structure, and significant prepetition indebtedness, as well as a discussion of the Debtors' financial performance and the events leading to the Debtors' chapter 11 filings. Part II sets forth the relevant facts in support of the Debtors' First Day Motions.

**PART I**

**I.     BUSINESS OVERVIEW**

6.     The Debtors are among the largest and most diversified manufacturers and suppliers of commercial vehicle components in North America. The Company's products include wheels, wheel-end components and assemblies, truck body and chassis parts, seating assemblies and other commercial vehicle components. These products are marketed under several well-recognized brands in the industry, including Accuride, Gunite, Imperial, Bostrom, Fabco, Brillion and Highway Original.

**A.     Company History**

7.     Accuride and Accuride Canada Inc. ("**Accuride Canada**") were incorporated in November 1986 for the purpose of acquiring substantially all of the assets of a division of The Firestone Tire & Rubber Company. In 1988, Accuride was purchased by Phelps Dodge Corporation. In November 1997, Accuride entered into a stock subscription agreement with an affiliate of Kohlberg Kravis Roberts & Co. L.P. ("**KKR**") through which KKR acquired a controlling interest in Accuride. In January 2005, a wholly owned subsidiary of Accuride was

merged with and into Transportation Technologies Industries, Inc. ("**TTI**"), resulting in TTI becoming a wholly owned subsidiary of Accuride. On April 26, 2005, Accuride completed the initial public offering of 11 million shares of common stock, which was traded on the New York Stock Exchange under the symbol "ACW." On November 12, 2009, Accuride's common stock was de-listed from the NYSE and began trading under the symbol "AURD" on the Over The Counter Bulletin Board. There are currently approximately 47,506,895 shares of common stock outstanding and one share of Series A preferred stock outstanding.

**B.    Business Operations and Sales**

8.    While Accuride is headquartered in Evansville, Indiana, the Company has approximately 2,266 active employees located in 15 technologically-advanced facilities across the United States, Mexico, and Canada.[3] The Company's U.S. manufacturing operations are located in Alabama, California, Illinois, Indiana, Kentucky, Ohio, Pennsylvania, Tennessee, Texas, Virginia, Washington, and Wisconsin. In addition, the Company has manufacturing facilities located in Canada and Mexico. A corporate organization chart is attached as Exhibit A.

9.    The Company's consolidated net sales were approximately $1.4 billion in 2006, $1.0 billion in 2007, and $931.4 million in 2008. The Company's consolidated net income was approximately $65.1 million in 2006, a net loss of $8.6 million in 2007, and a net loss of $328.3 million in 2008. The Company's consolidated EBITDA was approximately $211.7 million in 2006, $99.3 million in 2007, and $41.7 million in 2008.

10.    The Debtors offer the broadest product line in the North American heavy- and medium-duty wheel industry. The Company is the only North American manufacturer and supplier of both steel and forged aluminum heavy- and medium-duty wheels. The Company

---

[3]    Among the active employees, 1876 are located in the United States, 151 are located in Canada, and 239 are located in Mexico.

produces wheels for buses, commercial light trucks, heavy-duty pick-up trucks, and military vehicles. The Company's line of heavy- and medium-duty wheels accounted for approximately 42% of the Company's 2008 net sales and 47% of the Company's 2007 net sales.

11. The Debtors are a leading North American supplier of wheel-end components and assemblies to the heavy- and medium-duty truck markets and related aftermarket. The Company markets wheel-end components and assemblies under the Gunite brand. The Company produces basic wheel-end systems including: disc wheels, hubs, brake drums, spoke wheel/brake drum assemblies, spoke wheel/brake rotor assemblies, and disc wheel hub/brake rotor assemblies. The Company also manufactures a full line of wheel-end components for the heavy- and medium-duty truck markets, such as brake drums, disc wheel hubs, spoke wheels, rotors and automatic slack adjusters. The Company's line of wheel-end components and assemblies accounted for approximately 23% of the Company's 2008 net sales and 20% of the Company's 2007 net sales.

12. The Company is a leading supplier of truck body and chassis parts to heavy- and medium-duty truck manufacturers, including bus manufacturers. The Company fabricates a broad line of truck body and chassis parts under the Imperial brand name, including bumpers, battery and toolboxes, crown assemblies, bus component and chassis assemblies, fuel tanks, roofs, fenders, and crossmembers. The Company also provides a variety of value-added services, such as chrome plating and polishing, hood assembly, and the kitting and assembly of exhaust systems. The Company specializes in the fabrication of components requiring a significant amount of tooling or customization. The Company's truck body and chassis parts manufacturing operations are characterized by low-volume production runs. The Company's

line of truck body and chassis parts accounted for approximately 12% of the Company's 2008 net sales and 14% of the Company's 2007 net sales.

13.     Under the Bostrom brand name, the Debtors design, engineer and manufacture air suspension and static seating assemblies for heavy- and medium-duty trucks, related aftermarkets, and school and transit buses. The majority of North American heavy-duty truck manufacturers offer the Company's seats as standard equipment or as an option. Seating assemblies are primarily differentiated on comfort, price, and quality, with driver comfort being especially important given the substantial amount of time that truck drivers spend on the road. The Company's line of air suspension and static seating assemblies accounted for approximately 4% of the Company's 2008 net sales and 5% of the Company's 2007 net sales.

14.     The Debtors also produce other commercial vehicle components, including steerable drive axles and gearboxes as well as engine and transmission components. These other product lines accounted for approximately 19% of the Company's 2008 net sales and 15% of the Company's 2007 net sales.

### C.     Customers

15.     The vast majority of the Debtors' sales are to the heavy- and medium-duty truck and commercial trailer original equipment manufacturers ("**OEMs**") and their related aftermarkets. The remainder of sales are made to customers in the light truck, specialty and military vehicle and other industrial markets. The Company markets components to more than 1,000 customers and its customer base includes substantially all of the leading North American commercial vehicle OEMs, such as Daimler Truck North America, LLC, with its Freightliner, Western Star, Sterling, and Thomas Built brand trucks; PACCAR, Inc., with its Peterbilt and Kenworth brand trucks; Navistar Corporation, with its International brand trucks; and Volvo

Truck Corporation, or Volvo/Mack, with its Volvo and Mack brand trucks. In addition, the Company markets to the major aftermarket suppliers, including OEM dealer networks, wholesale distributors, and aftermarket buying groups. The Company's primary commercial trailer customers include leading commercial trailer OEMs, such as Great Dane Limited Partnership and Wabash National, Inc. The Company's largest customers are Daimler Truck North America, PACCAR, Navistar, and Volvo/Mack, which, combined, accounted for approximately 53% of the Company's net sales in 2008. Accuride's largest light truck customer is General Motors Corporation.

### D. Competition, Cyclicality, and Seasonality

16. The Company operates in highly competitive markets. However, no single manufacturer competes with all of the products manufactured and sold by the Company in the heavy- and medium-duty truck market, and the degree of competition varies among the different products that the Company sells. In each of the Company's markets, the Company competes on the basis of price, manufacturing and distribution capabilities, product quality, product design, product line breadth, delivery, and service.

17. The commercial vehicle components industry is highly cyclical, and in large part, depends on the overall strength of the demand for heavy- and medium-duty trucks. These industries have historically experienced significant fluctuations in demand based on factors such as general economic conditions, gas prices, interest rates, government regulations, and consumer confidence. In addition, the Company's operations are typically seasonal as a result of regular customer maintenance and model changeover shutdowns, which typically occur in the third and fourth quarter of each calendar year. This seasonality can result in decreased net sales and profitability during the third and fourth quarters of each calendar year.

## II. OVERVIEW OF THE PREPETITION CAPITAL STRUCTURE

### A. Senior Credit Facility

18.     Accuride and Accuride Canada are borrowers (the "**Borrowers**") under that certain Fourth Amended and Restated Credit Agreement, dated as of January 31, 2005 (as amended or otherwise modified prior to the date hereof, including without limitation, pursuant to that certain First Amendment, dated as of November 28, 2007 (the "**First Amendment**"), that certain Second Amendment, dated as of January 28, 2009 (the "**Second Amendment**"), that certain Third Amendment, dated as of August 14, 2009 (the "**Third Amendment**"), and that certain Fourth Amendment and Canadian Forbearance Agreement, dated as of October 8, 2009 (the "**Fourth Amendment and Forbearance Agreement**"), the "**Credit Agreement**"), among the Borrowers, the lenders party thereto from time to time (the "**Lenders**"), Deutsche Bank Trust Company Americas (as successor to Citicorp USA, Inc.), as administrative agent (in such capacity, the "**Administrative Agent**"), and the other arrangers and agents parties thereto. As set forth in the Credit Agreement, Accuride is the "U.S. Borrower" and Accuride Canada is the "Canadian Borrower."

19.     The senior secured credit facilities provided for under the Credit Agreement (the "**Credit Facilities**") consist of (a) a U.S. term credit facility with an aggregate outstanding balance of approximately $303.5 million, excluding any accrued or paid-in-kind interest, which requires annual amortization payments of 1% per year, with the balance payable on January 31, 2012 (the "**Term Facility**"); and (b) a revolving credit facility in an aggregate principal amount of up to $100 million (comprised of a U.S. revolving credit facility in an aggregate principal amount of up to $76 million (the "**US Revolver**") and a Canadian revolving credit facility in an aggregate principal amount of up to $24 million (the "**Canadian Revolver**"), which matures on January 31, 2011 (the US Revolver and the Canadian Revolver, together, the

"**Revolving Facility**"). In April 2009, Accuride made a draw of $30.3 million under the Revolving Facility, which reduced availability under the Revolving Facility to approximately $5.3 million, excluding $4.2 million of unfunded commitments held by Lehman Commercial Paper, Inc.

20.     Accuride's obligations under the Credit Agreement are guaranteed by all of Accuride's domestic subsidiaries. Accuride Canada's obligations under the Credit Agreement are guaranteed by Accuride and all of Accuride's domestic subsidiaries. The obligations of Accuride and its domestic subsidiaries under the Credit Agreement and the related guarantees are secured by, among other things, a first-priority lien on and security interest in substantially all of the U.S. properties and assets of Accuride and its domestic subsidiaries. The obligations of Accuride Canada under the Canadian Revolver are secured by substantially all of the properties and assets of Accuride Canada.

**B.     Senior Subordinated Notes**

21.     Effective January 31, 2005, Accuride issued $275 million aggregate principal amount of 8 1/2 % Senior Subordinated Notes due February 1, 2015 (the "**Notes**") pursuant to an Indenture, dated January 31, 2005 (the "**Indenture**"), by and among all of Accuride's direct and indirect domestic subsidiaries existing on the issuance date of the Notes and The Bank of New York Trust Company, N.A., as trustee. Interest on the Notes is payable on February 1 and August 1 of each year.[4] The Notes are general unsecured obligations ranking senior in right of payment to all of Accuride's existing and future subordinated indebtedness. The Notes are subordinated to all existing and future senior indebtedness including indebtedness incurred under the Credit Agreement. Although initially issued in a private placement, through

---

[4]     As discussed below, the Company did not make the August 2009 interest payment due on the Notes.

an exchange offer in May 2005, the Notes were registered under the Securities Act of 1933, as amended.

### C. February 2009 Transactions

22. In late 2008, Accuride realized that it would soon be in violation of certain financial covenants under the Credit Agreement in light of continuing deterioration in the Company's business due to, among other things, the recession discussed below. In order to avoid breaching these covenants, in February 2009, Accuride completed a series of transactions to provide the Company with financial covenant relief and enhanced liquidity for fiscal 2009 (the "**February Transactions**").

23. The February Transactions included the Second Amendment and a transaction with Sun Accuride Debt Investments, LLC ("**Sun Capital**"), an affiliate of Sun Capital Securities Group, LLC, in which Sun Capital became the holder of approximately $70 million principal amount of the indebtedness outstanding under the Term Facility (the "**Sun Loans**"). In connection with such transaction with Sun Capital, Sun Capital executed a certain Last-Out Debt Agreement (the "**Last-Out Debt Agreement**").

24. The Second Amendment, among other things, adjusted certain financial covenants under the Credit Agreement applicable to the fourth quarter of 2008 through the fourth quarter of 2010, including senior secured leverage, leverage, interest coverage and fixed charge coverage ratios, and extended the maturity date of the Revolving Facility until January 31, 2011. Accuride was able to negotiate these adjusted financial covenants with the Lenders as a result of Sun Capital's willingness to subordinate its right to payment of the Sun Loans (the "**Last-Out Loans**") to the payment in full of the other loans outstanding under the Term Facility (the "**First-**

**Out Loans**"). Sun Capital also agreed to modify certain voting provisions and other rights of the holder of the Last-Out Loans under the Credit Agreement.

25. Under the Second Amendment, Accuride re-priced the indebtedness outstanding under the Credit Agreement as follows:

(a) Interest on the First-Out Loans and on debt outstanding under the Revolving Facility will accrue at an annual rate of LIBOR plus 500 basis points, with a LIBOR floor of 300 basis points;

(b) Interest on the Last-Out Loans will accrue at an annual rate of (i) LIBOR plus 1000 basis points per annum, with a LIBOR floor of 300 basis points (the "**PIK Rate**"), if interest is payable in kind ("**PIK**") on any relevant interest payment date, or (ii) LIBOR plus 800 basis points per annum, with a LIBOR floor of 300 basis points (the "**Cash Pay Rate**"), if interest is payable in cash on any relevant interest payment date;

(c) Until December 31, 2009, interest on the Last-Out Loans will accrue at the PIK Rate.[5] After December 31, 2009, interest on the Last-Out Loans will accrue at the PIK Rate unless certain conditions shall have been satisfied as of the relevant interest payment date (including (i) average liquidity of the Company, as of the last day of the immediately preceding fiscal quarter, shall have exceeded a certain amount and (ii) Accuride shall have been in compliance with the financial covenants set forth in the Credit Agreement at the end of the most recently ended financial quarter for which financial statements were delivered to the Administrative Agent). If these conditions are not satisfied, interest on the Last-Out Loans will accrue at the Cash Pay Rate and be payable in cash.

26. In connection with the Last-Out Loans and pursuant to a Last-Out Debt Agreement, Accuride issued a warrant (the "**Warrant**") to Sun Capital exercisable for up to twenty-five percent (25%) of Accuride's fully-diluted common stock. Sun Capital exercised the Warrant on September 28, 2009, obtaining 24.5% of Accuride's common stock.

27. In connection with the Last-Out Loans, Accuride also issued a new class of preferred stock (the "**Class A Preferred Share**") to Sun Capital. The Class A Preferred Share grants the holder the right to nominate five directors (the "**Sun Capital Directors**") and

---

[5]     The ability to accrue interest on the Last-Out Loans on a PIK basis was expected to provide enhanced liquidity to Accuride during 2009.

nominate one independent director to Accuride's board of directors (the "**Board of Directors**").

As part of the February Transactions, Accuride also amended its Bylaws to require the approval of two-thirds of the Board of Directors for most significant corporate actions. Accordingly, approval from the Sun Capital Directors is needed in order for the Company to undertake those corporate actions that require approval of two-thirds of the Board of Directors.

## III.  EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A.  Global Economic Crisis and Automotive Industry

28.     In late 2008, the current global economic crisis began, significantly affecting the automotive industry. The purchase of new commercial vehicles is highly-dependent upon macroeconomic factors, such as Gross Domestic Product and interest rates. In addition, the commercial vehicle components industry is highly cyclical and, in large part, depends on the overall strength of the demand for heavy- and medium-duty trucks. These industries have historically experienced significant fluctuations in demand based on factors such as general economic conditions, gas prices, interest rates, government regulations, and consumer confidence. Following the economic recession in 2001 and through 2006, the commercial vehicle industry experienced increasing demand for new vehicles as trucking fleets replaced aging vehicles ahead of new EPA standards effective in January 2007 requiring lower emissions for diesel engines. As forecasted by the industry analysts, including America's Commercial Transportation Publications, industry demand declined in the first half of 2007 by approximately 23% from the previous year as trucking fleets reduced purchases of new vehicles. Beginning in late 2007, trucking fleets began to delay purchases as the freight environment weakened as growth in the U.S. economy began to slow. Following the economic meltdown in late 2008, the already weak freight environment continued to erode which created excess capacity in the trucking industry allowing fleets to further delay new truck purchases. Exacerbated by the

current, unprecedented downturn in U.S. economy and tightened credit terms, demand for commercial vehicles in 2009 is forecasted by industry analysts to decline, for the third consecutive year, to levels not seen since the recession of 1982.

29. The impact of the prolonged and severely depressed demand for trucks and trailers in the commercial vehicle industry has substantially and negatively impacted the Debtors. The Company's enterprise value has substantially dropped and the Company's stock price has fallen from a high of $16.91 in 2007, to a high of $8.93 per share in 2008, to a current price of less than $0.36 per share. The Notes are also selling at a deep discount to face value.

30. In addition, Accuride's production and consolidated net sales volumes are down in all product lines. The Company's consolidated net sales in the second quarter of 2009 were down approximately forty-five percent (45%) as compared to second quarter of 2008. The Company's consolidated gross profit also fell to $55.6 million in 2008, down $30.9 million from the 2007 gross profit of $86.5 million. These decreases are primarily due to reduced sales and operating inefficiencies related to low production volume.

31. In response to the global economic crisis, in September 2008 the Company engaged in a strategic restructuring to reduce expenses, increase competitiveness, strengthen customer relationships and enhance shareholder value. The two key components of the strategic restructuring were a significant reduction in staffing levels and a focus on cost savings primarily related to inventory reductions, headcount and freight costs. The financial benefits associated with this strategic restructuring are expected to begin in fiscal year 2010.

**B.    Credit Agreement Waivers; Bond Forbearance Agreements**

32.    <u>Credit Agreement Waivers</u>.    During the second quarter of 2009, the Company determined that, as of June 30, 2009, it would likely be in violation of certain financial covenants under the Credit Facilities.    As a result, effective on July 8, 2009, Accuride and the Lenders entered into a temporary waiver agreement with respect to the Credit Agreement ("**First Temporary Waiver**").    Pursuant to the First Temporary Waiver, the Lenders agreed to waive Accuride's compliance with certain financial covenants (specifically, the Senior Secured Leverage Ratio, the Interest Coverage Ratio, and the Fixed Charge Coverage Ratio (each as defined in the Credit Agreement)) (the "**Specified Defaults**") under the Credit Agreement for the fiscal quarter ended June 30, 2009, for the duration of the Temporary Waiver Period (as defined in the First Temporary Waiver).    In addition, the First Temporary Waiver required that Accuride (a) pay interest on advances and all outstanding obligations under the Credit Agreement at an annual rate of 2.0% plus the otherwise applicable rate during the Temporary Waiver Period, (b) comply with certain restrictions on incurring additional debt, making investments and selling assets, and (c) maintain a certain minimum liquidity.    The First Temporary Waiver terminated on August 15, 2009.

33.    On August 15, 2009, the Company and the Lenders entered into a Second Temporary Waiver Agreement (the "**Second Temporary Waiver**").[6]    Under the terms of the Second Temporary Waiver, the Lenders agreed to continue to waive the Company's non-compliance with the Specified Defaults through the Second Temporary Waiver Period (as defined in the Second Temporary Waiver).    In addition, the Lenders agreed to waive any default

---

[6]    Contemporaneously with the execution of the Second Temporary Waiver, Accuride entered into the Third Amendment, which provides for the resignation of Citicorp USA, Inc. ("**Citicorp**") as administrative agent and the appointment by the Lenders of Deutsche Bank Trust Company Americas ("**Deutsche**") to serve as administrative agent.    In connection with the Third Amendment, the Company also entered into various documents which transfer the agency and rights with respect to the collateral for the Credit Facilities from Citicorp to Deutsche.

under Section 7.01(e) of the Credit Agreement (a "**7.01(e) Default**") if the Company failed to make the interest payment due and owing on August 3, 2009, to the holders of the Company's Notes. The Second Temporary Waiver requires Accuride to (a) pay interest on advances and all outstanding obligations under the Credit Agreement accrue at an annual rate of 2.0% plus the otherwise applicable rate during the Second Temporary Waiver Period, (b) comply with certain reporting requirements and restrictions on incurring additional debt, making investments and selling assets, and (c) comply with specified minimum liquidity requirements. The Second Temporary Waiver terminated on September 15, 2009.

34.     On September 15, 2009, the Company and the Lenders entered into a Third Temporary Waiver Agreement (the "**Third Temporary Waiver**"). Under the terms of the Third Temporary Waiver, the Lenders agreed to continue to waive the Company's non-compliance with the Specified Defaults, the 7.01(e) Default, and the technical default due to the failure of the Company to pay an interest payment that was due on August 26, 2009, each through the Third Temporary Waiver Period (as defined in the Third Temporary Waiver). Under the Third Temporary Waiver, Accuride agreed to further conditions and restrictions and agreed to comply with specified minimum liquidity requirements. The Third Temporary Waiver Period would have ended on September 25, 2009, unless the Company had entered into a restructuring agreement with at least one of its principal stakeholders. On September 25, 2009, the Lenders agreed pursuant to a letter agreement with the Company to extend such deadline (and thus the Third Temporary Waiver Period) until September 30, 2009. The Third Temporary Waiver terminated on September 30, 2009.

35.     On September 30, 2009, the Company and the Lenders entered into a Fourth Temporary Waiver Agreement (the "**Fourth Temporary Waiver**"). Under the Fourth

Temporary Waiver, the Company agreed to continue complying with the conditions and restrictions of the Third Temporary Waiver, and the Lenders agreed to continue to waive the Company's non-compliance with the Specified Defaults, the 7.01(e) Default, and the technical default due to the failure of the Company to pay an interest payment that was due on August 26, 2009, each through October 5, 2009, unless earlier terminated pursuant to the terms of the Fourth Temporary Waiver.

36.     On October 5, 2009, the Company and the Lenders entered into a Fifth Temporary Waiver Agreement (the "**Fifth Temporary Waiver**," and together with the First Temporary Waiver, the Second Temporary Waiver, the Third Temporary Waiver, and the Fourth Temporary Waiver, the "**Temporary Waivers**").   Under the Fifth Temporary Waiver, the Company agreed to continue complying with the conditions and restrictions of the Fourth Temporary Waiver, and the Lenders agreed to continue to waive the Company's non-compliance with the Specified Defaults, the 7.01(e) Default, and the technical default due to the failure of the Company to pay an interest payment that was due on August 26, 2009, each through October 8, 2009, unless earlier terminated pursuant to the terms of the Fifth Temporary Waiver.

37.     <u>Indenture Forbearance Agreements</u>.   The Company did not make the interest payment to holders (the "**Noteholders**") of the Notes that was due August 3, 2009.[7] Under the terms of the Indenture, the Company had a 30-day grace period to make the interest payment before the failure to make such payment would constitute an Event of Default (as defined in the Indenture).   On August 31, 2009, the Company entered into a forbearance agreement (the "**First Forbearance Agreement**") with an ad hoc committee of certain

---

[7]     The interest on the Notes is due August 1st, or the next succeeding business day following August 1st, which in 2009 was August 3rd.

Noteholders (the "**Ad Hoc Committee**").[8]  Under the First Forbearance Agreement, the Ad Hoc Committee provisionally agreed to forbear from exercising their rights and remedies under the Notes until the earliest to occur of (a) September 30, 2009, and (b) the occurrence of any Termination Event (as defined in the First Forbearance Agreement).  As one condition to such forbearance, Accuride agreed to deliver a final restructuring term sheet (the "**Final Term Sheet**"), in form and substance acceptable to the Ad Hoc Committee and the Lenders, on or before September 15, 2009 (the "**Final Term Sheet Deadline**").  As it became clear that Accuride would not be able to comply with the Final Term Sheet Deadline, Accuride and the Ad Hoc Committee entered into a letter agreement, dated September 15, 2009, pursuant to which the Final Term Sheet Deadline was extended to September 25, 2009.  On September 25, 2009, the Ad Hoc Committee agreed pursuant to a second letter agreement to extend the Final Term Sheet Deadline to September 30, 2009.

38.     On September 30, 2009, the Company entered into a second forbearance agreement with the Ad Hoc Committee (the "**Second Forbearance Agreement**").  Under the Second Forbearance Agreement, the Ad Hoc Committee agreed to continue to forbear from exercising their rights and remedies with respect to the Notes until the earliest to occur of (a) October 5, 2009, and (b) the occurrence of any Termination Event (as defined in the Second Forbearance Agreement).

39.     On October 6, 2009, the Company entered into a third forbearance agreement with the Ad Hoc Committee (the "**Third Forbearance Agreement**," and together

---

[8]     The Ad Hoc Committee consists of Blackrock Financial Management, Inc., Brigade Capital Management, LLC, Canyon Capital Advisors LLC, Principal Global Investors LLC, Sankaty Advisors, LLC, Prospect Funding I, LLC, and Tinicum Incorporated.  As of the Petition Date, the Ad Hoc Committee represented more than one-half of all holders of the notes and at least 70% in principal amount of the Notes.

with the First Forbearance Agreement and the Second Forbearance Agreement, the "**Forbearance Agreements**"). Under the Third Forbearance Agreement, the Ad Hoc Committee agreed to continue to forbear from exercising their rights and remedies with respect to the Notes until the earliest to occur of (a) October 8, 2009, and (b) the occurrence of any Termination Event (as defined in the Third Forbearance Agreement).

## C.   Evaluation of Strategic Alternatives; Restructuring Preparations

40.     Since the first quarter of 2009, the Company has been proactively evaluating strategic alternatives to address ongoing liquidity and financing concerns, including the sale of non-core assets and/or alternative debt structures, such as debt-for-debt or debt-for-equity agreements. In addition, mindful of Sun Capital's role on the Board of Directors, its status as a Lender, Noteholder, holder of the Class A Preferred Share, holder of the Warrant, and holder of common stock, the Board of Directors appointed a special committee of independent directors who are not directly or indirectly affiliated with Sun Capital and who are not members of the Company's management (the "**Special Committee**"). The Board of Directors asked the Special Committee to identify and evaluate strategic alternatives, with the input of management, counsel and its financial advisors, and to recommend an appropriate course of action to the full Board of Directors. Perella Weinberg Partners LP and UBS Securities LLC were engaged as financial advisors in connection with this review. Continuing through the summer of 2009, the Company's representatives held numerous meetings with the Lenders and the Ad Hoc Committee, attempting to negotiate alternatives to a chapter 11 filing.

41.     As described above, the Company has entered into five consecutive Temporary Waivers to avoid defaulting under the Credit Agreement and has entered into the Forbearance Agreements with the Noteholders. The Lenders party to the Temporary Waivers

and the Ad Hoc Committee party to the Forbearance Agreements agreed not to pursue their rights and remedies under the applicable debt agreements while the parties continued to negotiate the terms of an overall restructuring.

### D.    Terms of Global Restructuring Transaction

42.    After several weeks of active and arm's-length negotiations, the Company, in consultation with its advisors, has reached prepetition agreements in principal with a substantial majority of consenting Noteholders and Lenders on a pre-arranged restructuring plan. The terms of the Company's pre-arranged restructuring plan are evidenced by (a) prepetition plan support agreements, together with accompanying term sheets, executed by the Company and Lenders holding approximately 57% in principal amount under the Credit Agreement (the "**Bank Support Agreement**," a true and correct copy of which is attached hereto as Exhibit B), (b) a prepetition restructuring support agreement, together with accompanying term sheets, executed by the Company and Noteholders holding approximately 70% in principal amount of the Notes under the Indenture (the "**Bond Support Agreement**," and together with the Bank Support Agreement, the "**Plan Support Agreements**"), a true and correct copy of which is attached hereto as Exhibit C), and (c) commitments for $140 million in new money. The Plan Support Agreements, together with the applicable terms sheets, provide a strong platform for a consensual pre-negotiated plan of reorganization[9] to be filed by the Debtors in these Chapter 11 Cases and should significantly facilitate these proceedings and the Debtors' objective of preserving and enhancing value for the benefit of their stakeholders.

43.    In addition to the Bank Support Agreement, the Company negotiated with the Lenders and Noteholders for the consensual use of cash collateral and an approximately

---

[9]    In light of the Plan Support Agreements, the Debtors expect to file a disclosure statement and plan as soon as possible, which will comport with the terms thereof.

$50,000,000 debtor-in-possession financing facility, the terms of which are described below. As of the Petition Date, the Company has approximately $12 million in cash on hand, and the Company's businesses continue to generate significant liquidity.

44.     The salient economic terms of the Company's pre-negotiated restructuring plan (which are subject in all respects to the specific terms set forth in the term sheets attached to the Plan Support Agreements and the negotiation and execution of definitive documentation) include, but are not limited to, (a) the amendment of the Prepetition Credit Agreement to modify certain financial covenants and extend its maturity through the end of June 30, 2013, (b) the cancellation of the Notes in exchange for which the holders of the Notes would receive 98% of the issued and outstanding common stock of reorganized Accuride on a fully diluted basis, subject to dilution, including dilution for stock issued upon conversion of the new notes and warrants issued to current stockholders, (c) a $140 million rights offering of new senior unsecured convertible notes[10] to current holders of the Notes, backstopped by certain current Noteholders, which new notes would be convertible into 60% of the common stock of reorganized Accuride (on a fully diluted basis), (d) the repayment of approximately $70 million of Last-Out Loans currently outstanding under the Prepetition Credit Agreement from the proceeds from the rights offering, (e) the receipt by existing equity holders of 2% of the issued and outstanding common stock of reorganized Accuride on a fully diluted basis and warrants exercisable for up to 15% of the issued and outstanding common stock of reorganized Accuride on a fully diluted basis, subject to dilution, including dilution for stock issued upon conversion of the new notes. The warrants will have an exercise price that provides the opportunity for

---

[10]     The new notes are paid-in-kind for the first three years, which reduces cash interest expense for the company and enhances liquidity.

additional recovery to the prepetition equity holders if reorganized Accuride reaches certain equity values.

45.     As of emergence, the Company anticipates that its secured and consolidated debt will be approximately $290.1 million and $435.3 million, respectively, which represents approximately 7.1x and 12.2x net secured and net consolidated leverage, respectively. The restructuring also will allow the Company to preserve and retain significant tax attributes that could meaningfully reduce the Company's post-emergence cash tax obligation for the foreseeable future.

46.     The Company's pre-arranged restructuring plan represents a significant achievement for the Company and should greatly enhance the Company's ability to reorganize successfully and expeditiously.  Through confirmation of a plan implementing the terms of the pre-arranged restructuring, the Company will restructure and substantially deleverage its balance sheet; reduce its cash interest expense to a level that is aligned with its expected future cash flows; retain additional flexibility to invest in growth initiatives to maximize enterprise value; and maintain very favorable pricing to the Company under the Credit Agreement.  Additionally, the Company expects that it will continue to generate significant liquidity from its operations, including during these Chapter 11 Cases.  For all of these reasons, the Company believes that during the course of, and following, these Chapter 11 Cases it will be exceptionally well-positioned going forward.

## IV.     OBJECTIVES OF THE CHAPTER 11 CASES

47.     Notwithstanding the global economic circumstances that contributed to Accuride's current liquidity challenges, Accuride is a global market leader in the manufacture and sale of automotive wheels.  Accuride is among the largest wheel producers in the world, ranking first or second in most markets and product segments, with a broad customer base, low

production costs and diversified product offerings and revenue streams in major regions of the world. Accuride is also generally recognized as a global wheel technology innovator with technologically advanced manufacturing facilities. Similarly, Accuride has an experienced senior management team with significant automotive and best practices experience, as well as a proven track record of restructuring the Company's business.

48. The commencement of the Chapter 11 Cases affords Accuride the opportunity to adjust its debt levels and capital structure in a manner that is commensurate with its projected cash flows. The Debtors expect to accomplish this goal through a process that will be consensual and that has the support of its key constituents.

49. The Debtors' restructuring efforts are designed to result in greater profitability for Accuride and to solidify their position as the market leader in their product categories. Accuride expects to expeditiously emerge from chapter 11 having rationalized its capital structure by reducing debt to levels commensurate with its cash flow generating capacity and industry norms. Reducing leverage should create financial flexibility for future operating requirements and capital expenditures and improve liquidity. I believe that the efforts they have taken, and expect to take, will return the most value to Accuride's stakeholders.

50.     In furtherance of the objective of successfully reorganizing, the Debtors have sought approval of the First Day Motions and related orders (the "**Proposed Orders**"), and respectfully request that the Court consider entering orders granting such First Day Motions.  For the avoidance of doubt, the Debtors seek authority, but not direction, to pay amounts or satisfy obligations with respect to the relief requested in any of the First Day Motions.

51.     I have reviewed each of the First Day Motions and Proposed Orders (including the exhibits thereto), and the facts set forth therein are true and correct to the best of my knowledge, information, and belief.  Moreover, I believe that the relief sought in each of the First Day Motions (a) is vital to enable the Debtors to make the transition to, and operate in, chapter 11 with a minimum of interruption or disruption to their businesses or loss of productivity or value and (b) constitutes a critical element in achieving the Debtors' successful reorganization.

## I.     ADMINISTRATIVE AND PROCEDURAL MOTIONS

### A.     Joint Administration Motion

52.     The Debtors seek the joint administration of their Chapter 11 Cases, twenty-one in total, for procedural purposes only.  Many of the motions, hearings, and other matters involved in these Chapter 11 Cases will affect all of the Debtors.  Thus, I believe that the joint administration of these cases will avoid the unnecessary time and expense of duplicative motions, applications, orders and other pleadings, thereby saving considerable time and expense for the Debtors and resulting in substantial savings for their estates.

### B.     Retention Applications

53.     The retention of chapter 11 professionals is essential to the Debtors' reorganization efforts.  Accordingly, during the filing of these Chapter 11 Cases, the Debtors

anticipate that they will request permission to retain, among others, the following professionals: (a) Latham & Watkins, LLP as co-counsel; (b) Young Conaway Stargatt & Taylor, LLP as co-counsel; (c) Zolfo Cooper, LLC, as restructuring consultants; (d) Perella Weinberg Partners LP, as financial advisors and investment banker; (e) Edward Howard & Co. as corporate communications consultants; (f) Goodmans LLP as Canadian counsel to the Debtors; and (g) Garden City Group, Inc., as noticing, claims and balloting agent. I believe that the above professionals are well qualified to perform the services contemplated by their various retention applications, the services are necessary for the Debtors' reorganization, and that the professionals will coordinate their services to avoid duplication of efforts. I understand that the Debtors may find it necessary to seek retention of additional professionals as these Chapter 11 Cases progress.

### C.    Automatic Stay and Ipso Facto Motion

54.    As described above, the Debtors, together with their non-Debtor global affiliates, have worldwide operations, with facilities located in three countries. Many of the Debtors' creditors and contract counterparties do not transact business on a regular basis with companies that have filed for chapter 11, and are therefore unfamiliar with the scope of the debtor-in-possession's authority to conduct its business. As a result, I believe that these parties are unaware of the protections of the automatic stay and other provisions that assist debtors-in-possession in their reorganization.

55.    Thus, various interested parties may attempt to seize assets located outside of the United States to the detriment of the Debtors, their estates and creditors, or take other actions in contravention of the automatic stay of section 362 of the Bankruptcy Code as it has been described to me. In addition, upon learning of the Debtors' bankruptcy, counterparties to leases and executory contracts may attempt to terminate those leases or contracts pursuant to ipso

_facto_ provisions in contravention of section 365 of the Bankruptcy Code as it is described to me. The Debtors hope that an order enforcing and restating the automatic stay and _ipso facto_ provisions of the Bankruptcy Code as they relate to foreign creditors and contract counterparties from this Court will protect the Debtors from improper actions, particularly actions by unwitting parties in foreign jurisdictions who are not familiar with the Bankruptcy Code or its protections and who might otherwise violate those sections.

### D. Equity Securities Trading Motion

56. The Equity Securities Trading Motion seeks the entry of an order (a) establishing notice and hearing procedures that must be satisfied before certain transfers of equity securities in Accuride Corporation, or of any beneficial interest therein, are deemed effective and (b) establishing notice and sell-down procedures for trading in claims against the Debtors' estates. The Debtors are incurring net operating losses ("**NOLs**") in excess of $165 million, that can be carried forward as valuable tax attributes (the "**Tax Attributes**") because these NOLs can be used to offset income generated by transactions completed during the Chapter 11 Cases. These Tax Attributes could ultimately add up to federal savings of approximately $58 million for the Debtors.

57. It is critical to the Debtors that they are able to preserve these Tax Attributes to avoid irreparable harm which could be caused by unrestricted trading in Accuride Corporation's equity securities and claims against the Debtors. The Debtors would therefore be unable to offset taxable income freely with their Tax Attributes. The Debtors believe that if they filed the Equity Securities Trading Motion in accordance with the usual notice procedures set forth in the Bankruptcy Rules, it is likely that a flurry of trading equity securities or claims of the Debtors could immediately follow. Parties holding such equity securities or claims might rush to

transfer their equity securities or claims before the restrictions on such trading are imposed by this Court. Such trading would put the Tax Attributes in jeopardy. Notably, the Debtors only request this limit for those potential stock trades and claim transfers that pose a risk of an ownership change (as that term is defined in the Equity Securities Trading Motion).

### E. DIP Facility Motion

58. The Debtors seek authority to enter into and borrow under the DIP Facility being offered by the DIP Lenders, as defined in the DIP Facility Motion. With respect to the DIP Facility, the Debtors seek interim and final approval to obtain postpetition secured loans and other financial accommodations in the aggregate principal amount of up to $50 million. For the reasons set forth in the DIP Facility Motion and below, I believe the Court's approval of this First Day Motion is critical.

59. I believe the DIP Facility is necessary for the Debtors to maintain sufficient liquidity so that the Debtors may continue to operate their businesses in the ordinary course of business during the Chapter 11 Cases. In this regard, the use of the DIP Facility will allow the Debtors to preserve and maintain the going concern value of the Debtors' estates, which, in turn, is integral to maximizing recoveries for the Debtors' stakeholders. Further, access to additional financing will provide the Debtors' customers and vendors with the requisite security that the Company will be able to continue conducting its business in the ordinary course without interruption.

60. To secure continued shipment of goods, pay employees and maintain the operation of their businesses as they restructure, the Debtors must have immediate access to continued and additional financing in the form of the DIP Facility. The Debtors believe that such financing will enable them to begin restoring critical relationships and retain employees,

and maintain or restore trade terms with suppliers. Moreover, access to such financing on an interim basis is necessary to avoid immediate and irreparable harm to the Debtors pending the final hearing.

61.     I believe the Debtors made all reasonable efforts to obtain financing on the best terms available in light of market circumstances. Despite their efforts, the Debtors have not been able to obtain postpetition financing or other financing accommodations from any alterative prospective lender or group of lenders on more favorable terms and conditions that those for which approval is sought in the DIP Facility Motion. Specifically, the Debtors were unable to obtain debtor-in-possession financing without providing senior priming liens. The DIP Facility was negotiated in good faith and at arm's length, extensively and diligently considered by the Debtors' management and submitted to the Board of Director's approval. The terms of the DIP Agreement are fair and reasonable in light of current market conditions (particularly the lack of a ready market for any financing, including debtor-in-possession financing) and are in the best interests of the Debtors' estates.

**F.     Motion to File Fee Letter Under Seal**

62.     Pursuant to the motion to file the Fee Letters and the Yield Letter under seal, the Debtors have requested the entry of an order permitting them to file the Fee Letters and the Yield Letter under seal and directing that it shall remain under seal, confidential and not be made available to anyone, except that copies of the Fee Letters shall be provided to any statutory committee appointed in these Chapter 11 Cases, the Administrative Agent, counsel to the ad hoc committee for the holders of 8.5% senior subordinated notes due February 1, 2015, the U.S. Trustee and their legal and financial advisors, all on a confidential basis.

DB02:8768128.3

068746.1001

63.     I believe that the Fee Letters and the Yield Letter contain commercially sensitive information, thus satisfying one of the categories in section 107(b) for sealing documents. The Administrative Agent has represented to the Debtors that the disclosure of the terms of the Fee Letters would prejudice the economic interests of the Administrative Agent. Similarly, the Last Out Lenders have represented to the Debtors that the disclosure of the terms of the Yield Letter would prejudice the economic interests of the Last Out Lenders. Because the Fee Letters and the Yield Letter contain "confidential information" with respect to the Administrative Agent, I believe that the Fee Letters should be sealed as a matter of right.

## II.     BUSINESS OPERATION MOTIONS

### A.     Cash Management Motion

64.     The Debtors seek an order (I) authorizing continued use of existing (a) bank accounts, (b) cash management system, and (c) business forms and checks, (II) authorizing the continuation of intercompany transactions among Debtors and the Non-Debtor Affiliates and according superpriority status to all postpetition intercompany claims ("**Intercompany Transactions**"); (III) authorizing the Debtors to enter into Forward Contracts (as defined below); and (IV) waiving the investment and deposit requirements of 11 U.S.C. § 345(b). As described below, I believe the relief sought in the Cash Management Motion is essential and in the best interests of the Debtors' estates.

65.     <u>Bank Accounts</u>.    Prior to the commencement of these cases, in the ordinary course of business, the Debtors maintained approximately forty-one bank accounts (the "**Debtor Bank Accounts**"). In addition, the Non-Debtor Affiliates maintained ten accounts located at both U.S. and non-U.S. financial institutions, including Royal Bank of Canada, Banorte, Bital, JP Morgan Chase and Fifth Third Bank (the "**Non-Debtor Foreign Bank**

**Accounts**" and, collectively with the Debtor Bank Accounts the "**Bank Accounts**"). The Bank Accounts include those maintained, among others, as concentration accounts, funding accounts, payroll accounts, disbursement accounts and lockbox accounts. Nearly all Non-Debtor Foreign Bank Accounts are managed by the Non-Debtor Affiliates; certain of these accounts are denominated in U.S. currency and others are denominated in the currency of the country or region in which they are maintained.

66.     The Debtors routinely deposit, withdraw, and otherwise transfer funds to, from, and between the Bank Accounts by various methods including checks, automated clearing house transactions, electronic funds transfers and direct deposits. The Debtors generate thousands of checks per month from the Bank Accounts. I believe that the Bank Accounts are generally in financially-stable banking institutions with the Federal Deposit Insurance Corporation ("**FDIC**"), the Federal Savings and Loan Insurance Corporation ("**FSLIC**"), or other appropriate government-guaranteed deposit protection insurance.

67.     Furthermore, the Bank Accounts are part of a carefully constructed and complex, automated cash management system (described more fully below) that ensures the Debtors' ability to efficiently monitor and control all of their cash receipts and disbursements. Closing the existing Bank Accounts and opening new accounts inevitably would disrupt the Debtors' businesses and result in delays impeding the Debtors' ability to transition smoothly into chapter 11, and would likewise jeopardize the Debtors' efforts to successfully reorganize in a timely and efficient manner.

68.     In my opinion, it is thus essential that the Debtors be permitted to continue to maintain their existing Debtor Bank Accounts and, if necessary, open new accounts (and give notice to the U.S. Trustee of such newly opened accounts), wherever they are needed,

DB02:8768128.3

068746.1001

irrespective of whether such banks are designated depositories in the District of Delaware; provided however, that any new bank account opened by the Debtors shall be with a bank that is insured by the FDIC or the FSLIC and organized under the laws of the United States of America or any state therein and shall be designated a "debtor-in-possession" or "DIP" account by the respective bank. The Debtors request that the Debtor Bank Accounts be deemed to be debtor-in-possession accounts, and that their maintenance and continued use, in the same manner and with the same account numbers, styles, and document forms as those employed during the prepetition period, be authorized.

69.     I further believe that the Non-Debtor Foreign Bank Accounts are vital to the Debtors' ongoing business operations because such accounts are integral to the cash management system and the Debtors' financial transactions with their foreign affiliates and vendors. Indeed, non-U.S. operations constitute a material part of the Debtors' business, and, therefore I believe that the Debtors simply cannot operate without the maintenance of their Non-Debtor Foreign Bank Accounts.

70.     Cash Management System. In order to ensure an orderly transition into chapter 11, the Debtors also request authority to continue to use their existing cash management system as required by the Debtors in the ordinary course of business. Prior to the commencement of these cases, the Debtors used a complex, automated, integrated and centralized cash management system to collect, transfer, and disburse funds generated by their operations and to accurately record all such transactions as they are made (the "**Cash Management System**").

71.     As described more fully in the Cash Management Motion, the Cash Management System is complex, automated and computerized, and includes accounting controls

needed to enable the Debtors, as well as creditors and the Court, if necessary, to trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable. When manual transactions are made in the system, the Debtors closely monitor the accounts to ensure the transactions are appropriately documented.

72. I believe that the cash management procedures utilized by the Debtors are ordinary, usual and essential business practices, and are similar to those used by other major corporate enterprises. The Cash Management System provides significant benefits to the Debtors, including the ability to control corporate funds centrally, segregate cash flows, invest idle cash, ensure availability of funds when necessary, and reduce administrative expenses by facilitating the movement of funds and the development of more timely and accurate balance and presentment information.

73. Requiring the Debtors to adopt new cash management systems at this critical stage of these cases would be expensive, would create unnecessary administrative burdens and problems, and would likely disrupt and adversely impact the Debtors' ability to reorganize successfully. Indeed, I believe that requiring Cash Management System changes could irreparably harm the Debtors, their estates and their creditors by creating cash flow interruptions while systems were changed.

74. _Business Forms and Checks_. Prior to the Petition Date, in the ordinary course of business, the Debtors used numerous business forms including, but not limited to, letterhead, purchase orders, invoices, contracts, and checks (collectively, the "**Business Forms**").

75. In order to minimize expenses to their estates, the Debtors also request that they be authorized to continue to use all Business Forms existing immediately prior to the Petition Date, without reference to the Debtors' status as debtors-in-possession. I believe that

DB02:8768128.3

068746.1001

changing Business Forms at this critical, early stage of their Chapter 11 Cases would be expensive and burdensome to the Debtors' estates, disruptive to the Debtors' business operations and would not confer any benefit upon those dealing with the Debtors. Accordingly, I believe it would be appropriate for this Court to authorize the Debtors to use their existing Business Forms without being required to place the label "Debtor-in-Possession," an account type, or a so-called "debtor-in-possession number" thereon.

76.     Intercompany Transactions. The Debtors' books and records also reflect numerous intercompany account balances among various Debtors as of the Petition Date. To ensure that each individual Debtor will not, at the expense of its creditors, fund the operations of another Debtor entity, the Debtors respectfully request that, pursuant to section 364(c)(1) of the Bankruptcy Code, all intercompany claims against a Debtor by another Debtor arising after the Petition Date as a result of intercompany transactions and allocations be accorded superpriority status, with priority over any and all administrative expenses. The Debtors will continue to maintain records of such transfers, including records of all current intercompany accounts receivable and payable.

77.     In addition, in the ordinary course of business, the Debtors may periodically infuse capital into certain of their subsidiaries, including the Non-Debtor Affiliates and the Non-Cash Pool Entities (as defined in the Cash Management Motion). These infusions of capital generally are accomplished through the making of intercompany loans. The Debtors use repayments of such loans as a tax-efficient method of managing cash throughout their worldwide business enterprise. Because the Non-Debtor Affiliates and the Non-Cash Pool Entities are part of the Accuride group of affiliated entities, the entirety of intercompany

transactions among the Non-Debtor Affiliates and the Non-Cash Pool Entities remain within the spectrum of the Debtors' control.

78. I anticipate that the funding needs of the Non-Debtor Affiliates over the course of these cases will not exceed $8.5 million per month. I believe that, in the exercise of the Debtors' reasonable business judgment, preservation of the going concern value of the Company as a worldwide enterprise, including the maintenance of the Non-Debtor Affiliates, is absolutely essential to the success of any reorganization plan for the Debtors. This relief is necessary because certain of the Non-Debtor Affiliates may require intercompany advances in order to maintain their liquidity and going concern value.

79. <u>Forward Contracts</u>. As discussed in the Cash Management Motion, the Debtors' businesses are deeply affected by fluctuations in commodity prices. As international producers of aluminum and steel commercial vehicle components, the Debtors are substantial consumers of raw materials. The largest input cost in producing the Debtors' goods is the cost of metal, but the cost of energy used by the Debtors is also substantial. In general, customers pay for the Debtors' products based on the price of the metal contained in the product. However, the Debtors at times offer their products on a fixed price basis based on forward purchase contracts ("**<u>Forward Contracts</u>**") as a service to major customers. Forward Contracts enable the Debtors to control the risk of metal and other commodities price fluctuations. Under these contracts, the counterparty agrees to supply to the Debtors a fixed quantity of a commodity at a fixed price for a term into the future. The Debtors arrange in advance to pay a fixed price each month for the fixed quantity of the commodity they will receive in a given month. The Debtors can then quote prices to their customers with the knowledge of their future raw materials costs.

80. I believe the most important type of Forward Contracts currently used by the Debtors are the forward purchase contracts for aluminum (the "**Aluminum Forward Contracts**"). The Debtors are currently parties to two Aluminum Forward Contracts that will supply the Debtors with aluminum at a fixed price for several more months. Under the Aluminum Forward Contracts, the Debtors purchase a fixed number of pounds of aluminum based upon 85% of the Debtors' anticipated monthly need for the next several months. The Debtors receive the aluminum on a monthly basis for a certain number of months and for a fixed price. The Debtors entered these Aluminum Forward Contracts at the behest of two of their most important customers, who purchase large quantities of aluminum wheels, bumpers, exhaust stacks and other vehicle components from the Debtors. The Debtors are the preferred providers of aluminum products for these customers, in large part due to the stable pricing the Debtors are able to offer under the Aluminum Forward Contracts. Because the Debtors' current Aluminum Forward Contracts will expire in a few months, I am aware that the Debtors face an immediate need to enter into new Aluminum Forward Contracts. One customer has already threatened to void its existing and future contracts with the Debtors if the Debtors do not enter into another Aluminum Forward Contract immediately. If the Debtors are not authorized to enter into additional Aluminum Forward Contracts, they face the almost certain loss of two critical customers. Furthermore, it is industry convention to offer fixed aluminum prices, and the Debtors will suffer a great competitive disadvantage if they are not able to offer fixed aluminum pricing to their customers.

81. Furthermore, I understand that controlling for the risk of fluctuations in the price of natural gas and other energy sources is also important to maintaining stability in the Debtors' profitability. If the cost of natural gas and energy is higher than assumed when the

DB02:8768128.3

068746.1001

Debtors calculate their profitability, the Debtors may earn less than they expected when they quoted prices and fees to their customers. To control for fluctuations in the price of natural gas and energy, the Debtors have entered into several forward purchase contracts for natural gas and other energy sources (the "**Energy Forward Contracts**"). By fixing the price of natural gas and energy through Energy Forward Contracts, the Debtors can determine the price that they will pay for natural gas and energy at the time that they commit to supply the customers at a certain price.

82. I believe that forward Contracts like those described above permit the Debtors to remain competitive by offering fixed price contracts to their customers, while reducing the risk associated with market fluctuations. Without the ability to enter into Forward Contracts, the Debtors would be unable to control risk in a cost-efficient manner, and therefore would be unable to protect themselves or their customers from raw material and energy price variations. This would subject the Debtors to economic risk to which their competitors are not exposed. Eliminating Forward Contracts would damage the Debtors' competitiveness because the competitors offer customers access to fixed price products. Without selling fixed price products, the Debtors risk losing business to competitors, resulting in reduced production volumes, reduced market share, and reduced operating performance and cash flows.

83. <u>Investment and Deposit Guidelines.</u> As discussed in the Cash Management Motion, the Debtors maintain one repurchase sweep account (the "**Repo Account**"). The Repo Account is an account used to earn a greater rate of interest on excess funds from the Concentration Account (as defined in the Cash Management Motion). The vast majority of the Debtors' other existing bank accounts are zero balance accounts. I believe that the Debtors' use of the Bank Accounts, including the Repo Account, substantially conforms with the approved investment practices I am told are identified in section 345 of the Bankruptcy Code,

and that all deposits and investments into the Repo Account and their other Bank Accounts are safe, prudent and designed to yield the maximum reasonable net return on the funds invested.

### B. Customer Programs Motion

84. The Debtors seek authority, but not direction, to pay amounts related to the Debtors' practices to develop and sustain positive reputations with their customers and in the marketplace for their products (collectively, the "**Customer Programs**") in the ordinary course of business, and to continue their Customer Programs postpetition.

85. An accurate and detailed description of the significant Customer Programs offered by the Debtors is set forth in paragraphs 10 through 16 of the Customer Programs Motion. These programs include (a) customer price adjustments and/or rebates, (b) a preferred vendor program, (c) warranty obligations, (d) marketing programs, and (e) other commitments.

86. The Debtors estimate that prepetition obligations related to customer price adjustments and rebates, which constitute the grand majority of the prepetition obligations under the Customer Programs, totals approximately $4.2 million as of the Petition Date.

87. The markets for certain of the Debtors' products are highly competitive, and the Debtors' Customer Programs are integral to their ability to induce customers to purchase certain of the Debtors' products. I believe that discontinuation of the Debtors' Customer Programs would disrupt business operations, generate adverse publicity, and undermine the Debtors' relationship with their customers. Continuing the Customer Programs uninterrupted is necessary to attract new customers and maintain existing customer satisfaction, and is thus essential to the Debtors' ability to reorganize.

DB02:8768128.3

068746.1001

### C. Employee Obligations Motion

88. The Debtors seek, in their discretion and in the exercise of their business judgment, interim and final orders (I) authorizing, but not directing, the Debtors to (a) pay or otherwise honor various employee-related prepetition obligations of the Debtors to, or for the benefit of, employees, (b) continue postpetition certain of the Debtors' employee benefit plans and programs in effect immediately prior to the filing of these bankruptcy cases, and (c) honor Debtors' workers' compensation obligations (the foregoing collectively referred to as the "**Employee Obligations**"); (II) confirming that the Debtors are permitted, but not required, to pay any and all local, state and federal withholding and payroll-related or similar taxes relating to prepetition periods; and (III) directing all banks to honor prepetition checks for payment of the Debtors' prepetition employee obligations. Pursuant to the Employee Obligations Motion, the Debtors seek an interim order authorizing the payment of Employee Obligations to the extent such Employee Obligations do not exceed $10,950. The Debtors also moved for the authority to pay all Employee Obligations (which term excludes certain payments to insiders), irrespective of whether they exceed $10,950, upon the entry of a final order with respect to the Employee Obligations Motion.

89. The Debtors employ approximately 511 active salaried employees and 1,365 hourly employees in the United States (collectively the "**Employees**").[11] I believe that the continued and uninterrupted service of the Employees is essential to the Debtors' continuing operations and to their ability to reorganize.

90. As set forth in Part I above, as part of the Company's cost-cutting strategy, Accuride has taken many steps to reduce its labor costs. To minimize the personal hardship to

---

[11] The Debtors also have approximately 425 hourly Employees who are on layoff status.

remaining Employees and to maintain the Employees' morale during this critical time, I believe it is imperative that the Debtors be granted the authority, in their sole discretion, to pay the Employee Obligations outlined below and more fully described in the Employee Obligations Motion.

91.     Salaries and Wages.   The average monthly payroll for the Debtors' salaried and hourly U.S. Employees is approximately $8.0 million.  Salaried Employees are paid on a semi-monthly basis and current as of their pay dates, except for salaried Employees at the Debtors' Brillion facility, which are paid bi-weekly and current as of their pay dates.  Direct deposits and payroll checks for all accrued payroll for salaried Employees through October 4, 2009 were issued on October 5, 2009.  Hourly Employees for the Debtors are paid on a weekly basis five days in arrears, except for hourly Employees at the Debtors' Erie and Brillion facilities, which are paid eleven days in arrears, and hourly Employees at the Debtors' Bostrom, Rockford, and Elkhart facilities, which are paid four days in arrears.  Hourly Employees at the Debtors' facilities were paid on October 7, 2009.  Further, certain Employees at the Brillion facilities earn commissions in addition to their wages.  As of the Petition Date, the Debtors anticipate that there will be approximately $14,400 in earned but unpaid commissions.  The Debtors are seeking authorization, but not direction, to pay the prepetition and postpetition amounts owed to Employees on account of salaries, wages, and commissions.

92.     Independent Contractors.  In addition to the Employees described above, the Debtors employ approximately 61 independent contractors (the "**Independent Contractors**") to provide various services including, but not limited to, facility maintenance, construction, and technical consulting services.  Ensuring that the Independent Contractors are paid in the ordinary course just like the Employees is essential to the Debtors' continuing

operations and, therefore, to their ability to reorganize. As of the Petition Date, the total accrued but unpaid wages for the Independent Contractors are approximately $301,000 in the aggregate. The Debtors are seeking authorization, but not direction, to pay the prepetition amounts owed to the Independent Contractors and their agencies to ensure the uninterrupted employment of the Independent Contractors with the Debtors.

93.    Temporary Employees.    The Debtors also employ 29 temporary Employees (the "**Temporary Employees**"). Ensuring that the Temporary Employees are paid in the ordinary course is essential to the Debtors' continuing operations and, therefore, to their ability to reorganize. As of the Petition Date, the total accrued but unpaid wages for the Temporary Employees is approximately $53,000 in the aggregate. The Debtors are seeking authorization, but not direction, to pay the prepetition amounts owed to the Temporary Employees to ensure their uninterrupted employment with the Debtors.

94.    Vacations, Sick Leave and Holidays.    Paragraphs 16 through 17 of the Employee Obligations Motion provide an accurate and detailed description of the Debtors' vacation, sick leave, and holiday policies. The Debtors seek authority to honor all liabilities to their Employees that arose under their vacation, sick leave, and holiday policies prior to the Petition Date. The Debtors anticipate that their Employees will utilize any accrued vacation or sick leave in the ordinary course of business, without resulting in any material cash flow requirements beyond the Debtors' normal payroll obligations.

95.    Existing Bonus Plan.    The Debtors offer incentive bonuses to certain Employee constituencies at the corporate and local plant levels through a variety of award plans and the Accuride Corporation Annual Incentive Compensation Plan (collectively, the "**Bonus Plans**"). Bonuses may be awarded pursuant to the Bonus Plans for, among other things,

achieving corporate and plant performance goals, achieving local plant improvement goals, achieving individual goals, exceptional contributions to specific tasks, or contributing to the realization of savings through participation in strategic initiatives. In 2008, Debtors made $13,790,546 in payments to their Employees pursuant to the Bonus Plans. As of the Petition Date, 1,434 Employees were eligible to receive bonuses under the Bonus Plans. The Debtors estimate the bonuses earned but unpaid under the Bonus Plans to be $247,475 in the aggregate as of the Petition Date, owed to approximately 869 Employees. The Debtors seek authority, but not direction, to continue to honor and perform under the existing Bonus Plans set forth above.

96.    Long-Term Incentive Plan. Approximately 20 Employees participate in a long-term incentive plan, designed to align the incentives and compensation of such Employees with the success of the Debtors and their shareholders (the "**Long-Term Incentive Plan**"). The Long-Term Incentive Plan has three components, each vesting on December 1st of the calendar year: (a) cash, (b) restricted stock units, and (c) stock appreciation rights. The cash component was added in 2009 due to limitations in the number of available shares in the Debtors' equity plan and due to the significant decline in the price per share of the Debtors' common stock. The cash award is scheduled to vest as follows: 10% in December 2009, 20% in December 2010, 30% in December 2011, and 40% in December 2012, provided that the award recipient remains employed by the Debtors over that period. The amount associated with the cash component amount to be paid in December 2009 to eligible Employees is approximately $41,000 in the aggregate. The Debtors estimate that the amounts to be paid in restricted stock units and stock appreciation rights in December of 2009 are de minimis. The Debtors seek authority to honor their obligations to Employees under the Long-Term Incentive Plan, including making the cash payment to eligible Employees on December 1, 2009.

97. <u>Bonus Payments to Insiders</u>. Certain of the Debtors' officers and directors participate in the Bonus Plans and the Long-Term Incentive Plan. Additionally, certain of the Debtors' officers and directors participate in a financial planning stipend plan, and are party to retention bonus agreements and change-in-control agreements[12] (collectively, the "**Executive Bonus Programs**"). The Debtors do not seek authority by the Employee Obligations Motion to make payments to insiders (as such term is defined in the Bankruptcy Code) under the Bonus Plans, the Long-Term Incentive Plan, or under the Executive Bonus Programs, and will not make any such payments without further order of the Court.

98. <u>Miscellaneous Payroll Deductions</u>. In addition to the deductions discussed herein, the Debtors deduct certain amounts from their Employees' paychecks to make payments on behalf of Employees for, among other things, union dues, court orders, garnishments, child support, and similar deductions, charitable donations, U.S. savings bonds, safety equipment, voluntary health and welfare plans, and other pre-tax and after-tax deductions payable pursuant to certain miscellaneous employee benefit plans (collectively, the "**Miscellaneous Payroll Deductions**"). The Debtors subsequently forward these deductions to appropriate third party recipients. On average, the Debtors have historically deducted approximately $955,162 in Miscellaneous Payroll Deductions from Employees' paychecks per month. As of Petition Date, approximately $65,000 that was previously deducted from Employees' paychecks has not yet been remitted to the appropriate third party recipients.

99. <u>Reimbursable Business Expenses</u>. In the ordinary course of the Debtors' businesses, many Employees incur a variety of business expenses that are typically reimbursed by the Debtors, pursuant to their normal business practices. The reimbursable business expenses

---

[12] Certain non-insiders also have change-in-control agreements with the Debtors. The Debtors do not seek authority by the Employee Obligations Motion to continue honoring their obligations under the change-in-control agreements with any Employees, regardless of whether they are an insider.

incurred by the Employees include business travel expenses, relocation expenses, housing expenses, education expenses, professional memberships and certifications, and other similar items reimbursable under the Debtors' existing policies (collectively, the "**Reimbursable Business Expenses**"). Certain Employees have not yet been reimbursed for Reimbursable Business Expenses previously incurred on behalf of the Debtors primarily because the Debtors filed their chapter 11 petitions in the midst of their regular reimbursement cycle for Reimbursable Business Expenses. All Reimbursable Business Expenses were incurred with the understanding that they would be reimbursed by the Debtors. As of the Petition Date, the Debtors estimate that approximately $841,000 in Reimbursable Business Expenses have been incurred by certain Employees and have not yet been reimbursed to Employees. The Debtors seek authority to pay prepetition amounts owed on account of the Reimbursable Business Expenses, and to continue to pay such expenses postpetition as they arise in the ordinary course of business.

100.  <u>Health Care Programs</u>. In the ordinary course of their business, the Debtors provide medical, vision, dental and prescription drug coverage, and employee assistance plans, whether through third party insurers or otherwise (the "**Health Care Programs**"). The Debtors' Health Care Programs are provided through both insured and self-insured programs administered through third parties. For example, the medical coverage for certain of the Debtors' non-union Employees is provided through self-insured medical plans administered by BlueCross BlueShield of Illinois ("**BCBSIL**") and BlueCross BlueShield of Alabama ("**BCBSAL**"), as well as through insured plans administered by United Healthcare, Kaiser, and Highmark Insurance Company. The Debtors also utilize Delta Dental, Metlife, Deaconess Concern, and VSP, among others, to provide vision, dental, and employee assistance plans under

the Health Care Programs. The Health Care Programs are funded through contributions by the Debtors and participating Employees. The percentage contributed by an Employee varies depending on, among other things, applicable collective bargaining agreements and whether Employees' family members, partners, or dependents are covered under the Health Care Programs. The Debtors also offer certain executives a "Mayo Clinic Executive Health Program," which covers a variety of screenings and tests. On average, the Debtors pay approximately $1.9 million per month in the aggregate for both insured and self-insured Health Care Programs, including claim payments, premiums, and administrations fees. As of the Petition Date, the estimated outstanding due but unpaid amount for the Health Care Programs is approximately $2.5 million.

101. <u>Employee Welfare Programs</u>. In the ordinary course of business, the Debtors also provide long and short-term disability insurance, life insurance, accidental death and dismemberment insurance, and other related insurance to their Employees (the "**Employee Welfare Programs**"). The Debtors provide self-insured short-term disability benefits ("**Short-Term Disability Benefits**") for the majority of their Employees.[13] On average, the Debtors monthly cost of providing Short-Term Disability Benefits is $34,590, including claim payments, premiums, and administration fees. The Debtors currently provide approximately 877 Employees with long-term disability benefits ("**Long-Term Disability Benefits**"). The Long-Term Disability Benefits are insured and administered through Unum. The approximate monthly cost for Long-Term Disability Benefits is $15,142 per month, including premium payments and administration fees.

---

[13]  Short-term Disability Benefits are self-insured and administered in house except for hourly non-bargain Employees at the Debtors AOT facility (which uses The Principal as its insurance provider) and Bargain Employees at Fabco (at which short-term disability is offered through the multi-employer Automotive Industries Welfare Plan).

102.     The Debtors provide basic and supplemental life insurance and accidental death and dismemberment insurance coverage ("**Life/AD&D Insurance**") to 1,481 of its eligible Employees through Harford, Kaiser, and The Principal.[14] The Debtors' approximate monthly cost for providing Life/AD&D Insurance to its Employees is $32,672, including claim payments, premiums, and administration fees. Additionally, the Debtors offer certain executives the option to participate in an executive life insurance plan (the "**Executive Life Insurance Plan**"). Under the Executive Life Insurance Plan, in lieu of company-paid group term life insurance, the Debtors provide eligible executives with funds to pay for a flexible premium variable universal life insurance policy or variable annuity, to be wholly owned by the executive. The annual cost of the Executive Life Insurance Plan is $185,000, plus a tax-gross up.

103.     The Debtors also offer certain executives supplemental insurance for personal liability ("**Personal Excess Insurance**"). Under the Personal Excess Insurance program, the Debtors subsidize certain insurance, such as personal liability coverage and uninsured motorist coverage. The annual cost of offering Personal Excess Insurance is approximately $16,000.

104.     Furthermore, the Debtors provide Employees with flexible spending account plans, pursuant to which, 275 Employees currently maintain flexible spending accounts for healthcare and dependent care expenses. Flexible spending accounts are composed entirely of Employee contributions with average monthly Employee payroll deductions of $31,957. I believe that such amounts are being held in trust for the benefit of those contributing Employees and, therefore, are not property of the Debtors' bankruptcy estates. Nonetheless, out of an

---

[14]     Life/AD&D insurance coverage for hourly bargained for employees at the Fabco facility is provided through the multiple-employer Automotive Industries Welfare Plan.

abundance of caution, the Debtors seek the approval of this Court to continue this program and reimburse Employees in the ordinary course.

105. On average, approximately 4% is withheld from Employee payroll as the required contributions to the above-mentioned Health Care and Employee Welfare Programs. The percentage withheld varies depending on, among other things, the benefit program elected and the employee group of the benefit recipient.

106. The Debtors seek authority, but not direction, to continue postpetition and to pay all amounts due and owing as of the Petition Date for the Health Care Programs and the Employee Welfare Programs.

107. <u>Workers' Compensation Obligations</u>. Under the laws of the various jurisdictions in which they operate, the Debtors are required to maintain workers' compensation policies and programs and to provide Employees with workers' compensation coverage for claims arising from or related to their employment with the Debtors. Accordingly, the Debtors maintain workers' compensation programs in all states in which they operate pursuant to the applicable requirements of local law. Paragraphs 32 through 36 of the Employee Obligations Motion provide an accurate and detailed description of the Debtors' workers' compensation programs and obligations.

108. <u>Retirement Savings Plan</u>. The Debtors maintain the various retirement savings plans (the "**Retirement Savings Plans**") for their Employees. The Retirement Savings Plans are defined contribution retirement plans qualified under Section 401(k) of the Internal Revenue Code. Under the Retirement Savings Plans, the Debtors make deductions from each participating salaried and hourly Employee's payroll check and transfer the withheld funds to the plan trustee.

DB02:8768128.3

068746.1001

109.    The Debtors have historically provided partial matching contributions of up to varying percentages of each salaried and hourly Employee's annual compensation. As of March 23, 2009, the Debtors suspended the employee match program with respect to their non-union Employees. As of the Petition Date, the Debtors' estimated outstanding matching liability for the Retirement Savings Plans to Union Employees is $42,000. In addition to matching, the Debtors make an annual "retirement contribution" to the Retirement Savings Plan.[15] The Debtors seek authority, but not direction, to pay amounts owed as of the Petition Date and continue performing under the Retirement Savings Plans.

110.    **Executive Retirement Allowance.** In order to replace the benefits lost due to the elimination of the company contribution features in certain retirement plans for executives, the Debtors adopted an Executive Retirement Allowance Policy (the "**Executive Retirement Allowance Policy**"). Under the Executive Retirement Allowance Policy, the Debtors pay certain executives a "retirement allowance" based on a percentage of the executive's base salary. The retirement allowance is partially paid in December, with the balance paid within 90 days after the end of the calendar year. The Debtors estimate that the annual cost of the Executive Retirement Allowance Policy is $66,137, plus a tax gross-up. The Debtors seek authority, but not direction, to pay amounts owed as of the Petition Date and continue performing under the Executive Retirement Allowance Policy, subject to the entry of a final order with respect to the Employee Obligations Motion.

---

[15]    The Debtors also have a profit sharing plan for Union Employees at the Brillion Facility. The outstanding obligations under this profit sharing plan as of the Petition Date are de minimis.

111. _Pension Plans_. The Debtors maintain six defined benefit pension plans (the "**Pension Plans**"),[16] pursuant to which a benefit is payable to the Employee or other designated beneficiary upon the Employee's retirement from the company, total and permanent disability, or death. The Accuride Retirement Plan was frozen as of December 31, 2008 and therefore Employees are not currently accruing any additional credited service or increased benefit amount (but are still accruing interest credits). Similarly, the Transportation Technologies Industries, Inc. Pension Plan was frozen as of December 31, 2000 and the Transportation Technologies Industries, Inc. Bargaining Unit Pension Plan was frozen as of June 4, 1999.

112. As of the most recent actuarial analysis on January 1, 2008, (1) the Accuride Retirement Plan was approximately 85.81% funded; (2) the Accuride Erie Hourly Employee Pension Plan was 80.0% funded; (3) the Gunite Corporation Hourly-Rate Employees Pension Plan (Elkhart) was 101.64% funded; (4) the Gunite Corporation Rockford (UAW) Hourly-Rated Employees Pension Plan was 85.02% funded; (5) the Transportation Technologies Industries, Inc. Pension Plan was 80.16% funded; and (6) the Transportation Technologies Industries, Inc. Bargaining Unit Pension Plan was 80.36% funded. Furthermore, as of the last actuarial analysis on January 1, 2008, (1) the Accuride Retirement Plan had assets and liabilities with market values of approximately $26,962,113 and $29,539,633, respectively; (2) the Accuride Erie Hourly Employee Pension Plan had assets and liabilities with market values of approximately $3,382,166 and $3,302,672, respectively; (3) the Gunite Elkhart Pension Plan had assets and liabilities with market values of $8,677,127 and $8,938,615, respectively; (4) the

---

[16]     The Debtors have the following six defined benefit pension plans: (1) Accuride Retirement Plan; (2) Accuride Erie Hourly Employee Pension Plan; (3) Gunite Corporation Hourly-Rate Employee Pension Plan (Elkhart) (4) Gunite Corporation Rockford (UAW) Hourly-Rated Employees Pension Plan; (5) Transportation Technologies Industries, Inc. Pension Plan; and (6) Transportation Technologies Industries, Inc. Bargaining Unit Pension Plan.

Gunite Rockford (UAW) Hourly-Rated Employees Pension Plan had assets and liabilities with market values of approximately $14,036,653 and $13,411,827, respectively; (5) the Transportation Technologies Industries, Inc. Pension Plan had assets and liabilities with market values of approximately $13,892,103 and $16,737,325, respectively; and (6) the Transportation Technologies Industries, Inc. Bargaining Unit Pension Plan had assets and liabilities with market values of approximately $25,498,388 and $31,013,398, respectively. The Debtors have a pension contribution of $236,000 and a PBGC premium of $168,127, each due on October 15, 2009. The Debtors seek authority, but not the direction, to continue funding the Pension Plans and to any make payments with respect thereto, including premium payments to the Pension Benefit Guaranty Corporation, as they become due.

113. <u>Retiree Medical Benefits</u>. The Debtors provide retiree medical benefits (the "**Retiree Medical Benefits**") to approximately 697 former employees or surviving dependents. The Debtors provide different levels of medical, dental, life insurance and prescription drug programs to retired employees and to retired union workers pursuant to various collective bargaining agreements. A portion of the Retiree Medical Benefits for Medicare-eligible retirees and their covered dependents is insured or covered by a multi-employer plan. Plan types for the insured benefits include health maintenance organizations, among others, a majority of which are provided by Highmark. The remaining Retiree Medical Benefits liability is self-insured with claims administered by several third-party administrators, predominately BCBSIL, BCBSAL and Preferred Health and paid by the Debtors. The estimated cost of providing Retiree Medical Benefits in 2009 is $3,150,000. Based on the most current actuarial analyses, the Debtors estimate that the Debtors' cumulative long-term liability for fully performing all of their existing Retiree Medical Benefits on behalf of all eligible retired

employees and dependents and current Employees and dependents who have accrued rights to the Retiree Medical Benefits as of the Petition Date would total approximately $76.5 million.

114. <u>Severance Plan</u>. Prior to the Petition Date and in the ordinary course of business, the Debtors maintained the Accuride Corporation Separation Pay Plan (as amended, the "**Severance Plan**") for certain of their salaried Employees. The Severance Plan provides for the payment of severance pay and benefits to terminated salaried employees who elect to participate in the Severance Plan and execute a "Waiver and Release Agreement" pursuant to the Severance Plan. Benefits under the Severance Plan are based on an Employee's years of service. As of the Petition Date, approximately 77 former employees are receiving benefits pursuant to the Severance Plan (the "**Terminated Employees**"). The Debtors' aggregate liability for severance pay and benefits owed to the 77 Terminated Employees is approximately $1.7 million. The Debtors seek authority to honor their obligations under the Severance Plan to Terminated Employees who have executed a Waiver and Release Agreement.[17] Further, the Debtors request authority, but not direction, to continue the Severance Plan on a go-forward basis for non-insider Employees terminated postpetition in the ordinary course of business. Finally, the Debtors' insiders are excluded from the relief requested herein. To the extent the Debtors propose to provide severance payments during the Chapter 11 Cases to any insiders, the Debtors will seek approval from this Court prior to making such payments.

115. <u>COBRA Obligations</u>. As of the Petition Date, there were 130 former Employees ("**Severed Employees**") receiving COBRA benefits ("**Continued Healthcare Benefits**"). Further, as of the Petition Date, there were 79 Severed Employees that are eligible but have not yet elected Continued Healthcare Benefits. Therefore, in the event that a Severed

---

[17] There are approximately 58 Terminate Employees owed more than $10,950 under the Severance Plan. Any funds owed in excess of $10,950 to a Terminated Employee will not be paid until entry of a final order.

Employee makes such an election after the Petition Date, the Debtors request authority to pay prepetition and postpetition Continued Healthcare Benefits to such Severed Employees. The Debtors' Continued Healthcare Benefits are self-insured and I believe that there is no outstanding liability related to Continued Healthcare Benefits as of the Petition Date.

116. Additionally, the American Recovery and Reinvestment Act of 2009 (the "**ARRA**") provides for an employer subsidy of COBRA premiums for involuntarily terminated employees. Under the ARRA, an employee who becomes eligible for COBRA between September 1, 2008 and December 31, 2009 due to a covered employee's involuntary termination of employment will only be required to pay thirty-five percent (35%) of his or her COBRA premium. The remaining sixty-five percent (65%) of the COBRA premium will be paid for by the employer and then reimbursed by means of a payroll tax credit to the employer. As of the Petition Date, approximately 130 of the Debtors' Severed Employees elected COBRA and may be eligible for employer subsidized COBRA under the ARRA. As the Petition Date, the Debtors estimate that there are approximately 79 Severed Employees who may elect COBRA (and the ARRA subsidy) after receiving notice. The Debtors seek authority to honor all obligations related to COBRA premiums subsidies for eligible individuals under the ARRA.

117. <u>SUB Plan</u>. Prior to the Petition Date, the Debtors maintained the AKW L.P. Supplemental Unemployment Plan for the Bargain Employees of the Erie Plant (the "**Erie SUB Plan**") and the Gunite Corporation Rockford Supplemental Unemployment Plan for the Bargain Employees of the Gunite location (the "**Gunite Corporation SUB Plan**, and together with the Erie SUB Plan, the "**SUB Plans**"). The SUB Plans hold assets in a trust and pays supplemental benefits to eligible Employees during a period of layoff. There are approximately 112 and 125 eligible Employees at the Erie and Gunite facilities, respectively. As of the Petition

Date, the Debtors do not believe they have an outstanding liability for the SUB Plans. The Debtors seek authority, but not direction, to pay amounts owed under the SUB Plans as of the Petition Date and continue performing under such plans postpetition. The Debtors also seek to continue the continuation of certain benefits to employees on layoff status at certain facilities. The Debtors estimate the amount outstanding under these programs is approximately $17,500.

118. <u>Other Programs</u>. The Debtors sponsor certain other programs, including a scholarship program, a tuition reimbursement program and a leased car program. Paragraphs 51 through 53 of the Employee Obligations Motion provide an accurate and detailed description of such programs.

119. <u>Administration of Employee Benefits</u>. As is customary in the case of most large companies, the Debtors utilize the services of ADP to administer their payroll taxes. The administration services cost the Debtors approximately $1300 per month. The Debtors request that they be authorized, but not directed, to pay the various costs incident to maintaining or paying third parties to maintain and provide record keeping relating to the various Employee benefit programs that may be outstanding as of the Petition Date. I believe that these unpaid processing costs will be <u>de minimis</u>.

120. <u>Employment and Withholding Taxes</u>. The Debtors accrue, in the ordinary course of business, state, local and federal employment and withholding taxes as wages are earned by the Debtors' Employees. These taxes are calculated based on statutorily mandated percentages of earned wages. Historically the Debtors have timely paid all federal, state and local Employment and Withholding Taxes to the relevant Taxing Authority, usually on a per pay period basis.

121.    As stated above, the relief requested in the Employee Obligations Motion is necessary and appropriate and is in the best interest of the Debtors' estates, creditors and other parties-in-interest. In short, all parties in interest will suffer if the Employee Obligations are not paid when due and as expected during this critical time.

### D.    Tax Motion

122.    The Debtors seek authorization, but not direction, to charge and/or pay certain prepetition taxes and fees, including (1) sales, use, and gross receipts taxes, (2) property taxes against the Debtors' real property and personal property, (3) franchise taxes and de minimis registration fees and (4) business license fees and annual report or bi-annual report taxes and certain other taxes (collectively, the "**Taxes**") to the respective federal, state and local taxing authorities (the "**Taxing Authorities**") in the ordinary course of the Debtors' business. Prior to the Petition Date, the Debtors generally paid their tax obligations as they became due.

123.    An accurate and detailed description of the Taxes is set forth in paragraphs 5 through 8 of the Tax Motion. The Debtors' failure to pay the Taxes could cause some states to challenge the Debtors' right to operate within their jurisdiction. Addressing any subsequent action taken by those states would be costly, place an administrative burden on management, and divert management's attention from the reorganization process.

### E.    Utilities Motion

124.    In connection with the operation of their business and management of their properties, the Debtors obtain services ( the "**Utility Services**") from various providers of Utility Services (each a "**Utility Company**" and, collectively, the "**Utility Companies**").

125.    Uninterrupted Utility Services to the Debtors are vital to the continued operation of the Debtors' business enterprise and, consequently, to the success of their Chapter

11 Cases. The Debtors depend on the reliable delivery of power and other Utility Services to operate their facilities and manufacture their products. Thus, I submit that termination of the Utility Services would result in substantial (and potentially) irreparable disruption to the Debtors' businesses that could decimate their revenue and profits and, therefore, substantially diminish or eliminate the Debtors' chances for a successful reorganization. Accordingly, the relief requested in the Utilities Motion is necessary and in the best interests of the Debtors' estates and their creditors.

126. I believe that the Debtors have provided sufficient assurances of their future performance with respect to the Utility Companies. Furthermore, the adequate assurance method proposed is a reasonable accommodation of the interests of the Utility Companies and the Debtors. The total amount of cash proposed as the Adequate Assurance Deposit is $1,213,841.00. The Debtors have availability under their proposed DIP financing to reserve such funds.

**F.    Insurance Financing Motion**

127. The Debtors seek authorization, but not direction, to (a) maintain, and to pay all policy premiums and brokers' fees related to, their various insurance policies (collectively, the "**Insurance Policies**"), which the Debtors have obtained through several third-party insurance carriers (collectively, the "**Insurance Carriers**"); (b) continue honoring their obligations related to the Debtors' letter of credit obligations in favor of the Insurance Carriers (collectively, the "**Letter of Credit Obligations**"); (c) continue honoring their obligations pursuant to prepetition insurance premium financing agreements (collectively, the "**Finance Agreements**") entered into for the purpose of financing the purchase of several forms of insurance coverage; and (d) continue to grant a security interest to the Insurance Premium

Finance Company (as defined in the Insurance Financing Motion). I estimate that for the remainder of 2009, insurance brokers' fees to be paid will total approximately $22,500; insurance premiums to be paid will total $127,941; and the obligations on account of the Finance Agreements will total approximately $446,502. As more fully set forth below, I believe it is essential to the Debtors ongoing business to honor all the obligations described in the Insurance Financing Motion.

128. In connection with the operation of their businesses and management of their properties, the Debtors maintain various Insurance Policies. The Insurance Policies include, but are not limited to, coverage for workers' compensation claims, automobile claims, fiduciary liability claims, claims for losses due to crime, directors' and officers' liability, certain general and excess liability claims and various casualty and property-related liabilities. I believe that the third-party claims that are covered by the Insurance Policies are neither unusual in amount, nor in number, in relation to the extent of the business operations conducted by the Debtors.

129. _Payment of the Insurance Premiums and Brokers' Fees_. Maintenance of insurance coverage under the various Insurance Policies is essential to the continued operation of the Debtors' businesses and is required under the United States Trustee's Operating Guidelines (the "**Operating Guidelines**") for chapter 11 cases, the laws of the various states in which the Debtors operate and the Debtors' various debt agreements. Thus, I believe the court should authorize the Debtors to continue to pay Insurance Policy premiums as such premiums come due in the ordinary course of the Debtors' businesses.

130. The Debtors have been represented in their negotiations with their various insurance underwriters by Marsh USA, Inc. The employment of Marsh USA, Inc. as the

068746.1001

Debtors' insurance broker has allowed the Debtors to obtain the insurance coverage necessary to operate their businesses in a reasonable and prudent manner and to realize considerable savings in the procurement of such policies. Marsh USA, Inc. charges the Debtors an annual fee of $200,000, of which $110,000 is paid in advance and the remainder is spread over four quarterly payments of $22,500. The Debtors believe that it is in the best interests of their creditors and estates to continue their business relationship with Marsh USA, Inc.

131. <u>Letter of Credit Obligations</u>. To secure certain of the Debtors' obligations under their workers compensation program, certain Insurance Carriers have required the Debtors to post collateral in the form of unconditional and irrevocable letters of credit. As of the Petition Date, the aggregate amount of outstanding letters of credit posted by the Debtors in support of their workers compensation program is approximately $14.5 million. Such letters of credit are required to maintain workers compensation insurance, which is essential to the Debtors' businesses.

132. <u>Prepetition Insurance Premium Finance and Security Agreement</u>. As described more fully in the Insurance Financing Motion, the Finance Agreements were executed for the purpose of financing the purchase of several forms of insurance coverage. I believe that the terms of the Finance Agreements represent the best possible terms for financing the premiums of the Insurance Programs. The Debtors' estates will benefit by maintaining this low-cost financing from the Insurance Premium Finance Company. Moreover, any interruption of payments might adversely affect the Debtors' ability to obtain financing for future policies on favorable terms.

## III. CONTINUING VENDOR MOTIONS

### A. U.S. Essential Supplier Motion

133. The Debtors seek entry of an order authorizing but not directing (a) the Debtors to pay, in the ordinary course of business, the prepetition claims of certain suppliers, vendors, regulatory agencies, and other prepetition creditors located in the United States (collectively, the "**Essential U.S. Suppliers**," whose claims shall be identified as "**Essential U.S. Supplier Claims**") that provide goods or services to the Debtors that the Debtors deem in the exercise of their business judgment to be essential to the uninterrupted functioning of the Debtors' business operations (the "**Essential Goods and Services**") in an aggregate amount not to exceed $4.25 million on an interim basis and an additional $4.25 million on a final basis for a total of $8.5 million (the "**Essential U.S. Supplier Cap**"), and (b) financial institutions to honor and process related checks and transfers.

134. The Debtors are highly mindful of their fiduciary obligations to seek to preserve and maximize the value of their estates. Accordingly, the preservation and maximization of the going concern value of the Debtors' businesses, including the preservation of key business relationships, are among management's primary goals as the Debtors transition into chapter 11. Providing seamless service to customers, including the Debtors' original equipment manufacturing customers (collectively, the "**OEM Customers**"), which account for a substantial portion of the Debtors' global sales, is key to meeting those goals. For these reasons, the Debtors seek to minimize the adverse business effects – as well as the cash flow impact – of their chapter 11 filing to the fullest extent possible by obtaining authority to pay certain vendors that are of paramount importance to their business operations.

135. I believe payment of the Essential U.S. Supplier Claims is necessary because the Debtors' manufacturing facilities use the "just-in-time" supply method for

DB02:8768128.3

068746.1001

processing their products. The just-in-time supply method is standard in the automotive industry and is used not only by other automotive equipment suppliers, but, more importantly, by the Debtors' OEM Customers. Under the just-in-time model, even small disruptions in the supply chain have significant and costly ripple effects.

136. In connection with the commencement of these cases, the Debtors are making every effort to avoid interruptions in the supply chain and the adverse effects that even a temporary break in the supply chain could have on their businesses. Because the OEM Customers are aware of the potential deleterious effects of supply chain interruptions, they often take steps to divert business from financially troubled companies who are at risk for business interruptions. The OEM Customers generally have multiple alternatives in the marketplace; if there were disruptions in the supply chain it is likely that the OEM Customers will take note of any instability in the Debtors' businesses when considering their future sourcing needs, and will be mindful of the efforts made by the Debtors to prevent such instability.

137. Because of the nature of the Debtors' businesses, I believe that many vendors will make credible threats that, unless paid on account of their prepetition debt, they will cease to supply the Debtors with the specialized goods and services necessary to maintain the smooth operation of the Debtors' businesses. Certain aspects of the Debtors' business operations, which are described in detail in the U.S. Essential Supplier Motion, demonstrate the Debtors' need for authority to make payments on account of the prepetition claims of essential vendors as required in the exercise of their business judgment, and subject to appropriate terms and conditions, to preserve the value of their businesses.

138. The Debtors seek authority to pay Essential U.S. Suppliers of key direct materials, raw materials, components, equipment, supplies and other goods utilized in the

Debtors' manufacturing processes. The Debtors' relationships with their OEM Customers and others require that the Debtors acquire most of their direct material suppliers from pre-approved suppliers. The pre-approval process can be time consuming and last as long as six months. Thus, it is difficult for the Debtors to change suppliers. The Essential U.S. Suppliers are well aware of their market power and their importance to the Debtors' business operations as a result of the uniqueness of the materials or components that they supply. I believe that these vendors, feeling confident that they possess the "upper hand" in their dealings with the Debtors, likely would demand prepetition payments as a condition of continuing to do business with the Debtors. Although it is possible that some of these demands might amount to empty threats (and presumably would violate the Bankruptcy Code), I believe that many Essential U.S. Suppliers, at minimum, would stop shipping to the Debtors for a period of time, quickly causing production delays that would adversely impact the Debtors' ability to meet the needs of their customers. As noted above, even a short interruption in the production of a small part could have devastating consequences to the Debtors' businesses.

139. Similarly, even if the Essential U.S. Supplier ultimately agreed to supply the Debtors with the goods essential to their businesses, the harm to relations with the Essential U.S. Supplier could have a long-term adverse impact on the Debtors' businesses. The Debtors rely on the Essential U.S. Suppliers to provide high levels of service to the Debtors, including regular accommodations to address pressing and unscheduled production demands. Absent the payment of the Essential U.S. Suppliers' claims, the Debtors may be unable to obtain such accommodation for the occasional requirement for materials, components and finished goods on short notice a need that is driven by the nature of the Debtors' business and cannot be predicted

DB02:8768128.3

068746.1001

or mitigated. The inability to rely on such assistance would create an ongoing risk that could adversely impact the Debtors' ability to service their customers.

140. I believe that the Debtors' management and employees have exercised high levels of care in reviewing the facts and circumstances of their Essential U.S. Suppliers and have identified a reasonable list of such vendors that they believe could cause material business disruptions of the kinds described above if the Debtors do not obtain the relief sought herein. The Debtors intend to pay only certain of these vendors and to require postpetition commitments from these vendors as a quid pro quo for, and as a condition to, the payment of the Essential U.S. Supplier Claims, as discussed in detail in the U.S. Essential Supplier Motion. I therefore believe it is in the best interest of the Debtors for the court to grant them the authority, in their sole discretion, to pay the prepetition claims of the Essential U.S. Suppliers, up to the Essential U.S. Supplier Cap. Given the size of their businesses, the magnitude of the costs of any disruption in their operations and the demonstrated benefits to be obtained in exchange for any payments to the Essential U.S. Suppliers, I submit that this is a reasonable and appropriate cap on the expenditure of estate funds.

**B.     Foreign Creditor Motion**

141. The Debtors seek entry of an order (a) authorizing but not directing the Debtors to pay, in their sole discretion and in the ordinary course of business, as and when due, prepetition claims (the "**Foreign Claims**") owing to vendors, service providers, regulatory agencies, and governments located in foreign jurisdictions (collectively, the "**Foreign Creditors**"), including, without limitation, claims for payment for goods (the "**Goods**") and services provided to the Debtors, as well as import or tax obligations, and (b) authorizing their banks to receive, process, honor, and pay checks or electronic transfers used by the Debtors to

068746.1001

pay prepetition obligations to the Foreign Creditors. The Foreign Creditors include, among others, foreign vendors and foreign governmental authorities. The Debtors have reviewed 2009 forecasted annual purchase volumes as well as actual disbursements made by the Debtors for, or related to, Foreign Creditors during the period from January through July 2009. The average monthly payments for or related to Foreign Creditors during this period were, in the aggregate, approximately $2.6 million per month. Although it is difficult to estimate with precision, the Debtors estimate that the outstanding prepetition obligations owing to all Foreign Creditors as of the Petition Date is approximately $1.8 million.

142. I believe that if the Foreign Claims are not paid, the Foreign Creditors may take precipitous action against the Debtors based upon their belief that they are not subject to the jurisdiction of this Court and, thus, not subject to the automatic stay provisions of 11 U.S.C. § 362(a). The Foreign Creditors could, among other things, sue in a foreign court and obtain a judgment against the Debtors to collect prepetition amounts owed to them. They could immediately seek to attach or seize the Debtors' foreign assets even prior to obtaining a judgment. In addition, foreign governmental authorities might seize the Debtors' assets in such countries, including, without limitation, parts and other goods destined for the Debtors' manufacturing plants in the U.S. The foreign governmental entities could also seek civil penalties against the Debtors. More importantly, I believe the Debtors' foreign suppliers could refuse to do business with the Debtors. The impact of such events on the Debtors' operations would be catastrophic.

143. Payment of the Foreign Claims is also necessary because the Debtors' manufacturing facilities use the "just-in-time" and "sole source" supply methods for processing their products, as set forth in greater detail above and in the Foreign Creditor Motion. Indeed, if

DB02:8768128.3

068746.1001

the foreign suppliers fail to ship goods or refuse to do business with the Debtors because of a failure to pay the Foreign Claims, or if foreign governmental entities seize goods from sole-source suppliers because of a failure to pay the Foreign Claims owing to such entities, the Debtors' manufacturing facilities utilizing those parts would likely be forced to shut down, impairing the Debtor's ability to ship goods to their OEM Customers. I believe a line shutdown could cause the Debtors to suffer a loss of customer relations and goodwill. In addition, if the Debtors' line shutdown forces the OEM Customers to halt production of their products, the OEM Customers could assert damages against the Debtors. The Debtors would also be harmed by continuing to incur the considerable fixed costs connected to the facilities idled by the failure to receive parts without generating any revenue to offset such fixed costs. I believe the long term damage caused by such shutdowns to the Debtors' business would be both immeasurable and irreparable.

144.    Furthermore, the failure to pay Foreign Claims could result in the Debtors' inability to continue their businesses in certain foreign jurisdictions. Therefore, payment of the Foreign Claims is essential for the Debtors to maintain their trade relationships with foreign jurisdictions. I believe the relief requested in the Foreign Creditor Motion is necessary and appropriate and is in the best interest of the Debtors' estates, creditors and other parties-in-interest.

C.    **Administrative Expense and 503(b)(9) Motion**

145.    The Debtors seek entry an order (a) confirming that their subcontractors, suppliers, and vendors (collectively, the "**Vendors**") will have administrative expense priority claims for those undisputed obligations arising from prepetition purchase orders outstanding on the Petition Date (the "**Outstanding Orders**") relating to the Goods that are or will be received

and accepted by the Debtors on or subsequent to the Petition Date and authorizing, but not directing, the Debtors to pay such obligations in the ordinary course of business and (b) confirming the grant of administrative expense status to obligations arising from prepetition delivery of goods received within 20 days of the commencement date of these Chapter 11 Cases (the "**20-day Goods**") and authorizing, but not directing, the Debtors to pay such obligations in their discretion in the ordinary course of business.

146.    In the ordinary operation of the Debtors' businesses, numerous Vendors provide the Debtors with hundreds of thousands of dollars of Goods on a daily basis. Indeed, because of the Debtors' use of "just-in-time" inventory systems, the Debtors receive Goods from Vendors on a continuous basis. As of the Petition Date, and in the ordinary course of their businesses, the Debtors had a substantial number of Outstanding Orders with the Vendors. I believe that as a result of the filing of the Debtors' Chapter 11 Cases, many of the Vendors may be concerned that delivery or shipment of Goods after the Petition Date pursuant to a prepetition purchase order will render that Vendor a general unsecured creditor of the Debtors' estates. Accordingly, without confirmation that claims for Goods shipped pursuant to Outstanding Orders will be entitled to administrative expense priority status, Vendors may decline to ship, or may instruct their shippers not to deliver, Goods destined for the Debtors unless the Debtors issue substitute, postpetition purchase orders, which could impose a significant administrative burden as it could require the Debtors to issue thousands of new purchase orders. If this were to occur, I believe the Debtors supply chain would be disrupted.

147.    The Debtors also request that the court confirm the grant of administrative expense status to obligations arising from prepetition delivery of the 20-day Goods. I have been told that, as of the Petition Date, certain of the Vendors have not been paid for the 20-day Goods.

The Vendors' claims relating to the 20-day Goods are administrative expenses. The Debtors ordered the Goods prepetition, and the Vendors delivered the Goods to the Debtors within 20 days of the commencement date of these cases. I believe that, although they are not required to, the Debtors must pay the claims of the Vendors with respect to the 20-day Goods, or the Vendors may refuse to continue to do business with the Debtors. The Debtors estimate that approximately $10.3 million with respect to such 20-day Goods will become due and payable during the next sixty (60) days. Payments of claims with respect to the 20 Day Goods – even if made to critical vendors – shall not count against the Essential U.S. Supplier Cap.

148. I believe that payment of claims for the Goods delivered as a result of the Outstanding Orders and the 20-day Goods are essential to enabling the Debtors to continue their business and for the Debtors to successfully reorganize.

## D. Shipping Motion

149. The Debtors seek entry of an order authorizing them to pay prepetition shipping and import expenses, including customs duties, general order penalties, ocean freight, air freight, trucking charges, brokerage fees, detention and demurrage fees, surety bond premiums, amounts owed to Paying Agents (as defined below), consolidation and deconsolidation charges, and the like (collectively, the "**Shipping Claims**"), as the Debtors determine, in the exercise of their business judgment, may be necessary or appropriate to obtain goods in transit and to satisfy the liens, if any, in respect thereof. Paragraphs 8 through 21 of the Shipping Motion provide an accurate and detailed description of these obligations. On a weekly basis, the Debtors' total accrued, outstanding claims owed to any shippers or other transportation providers is approximately $500,000. The Debtors estimate that their payments for prepetition

Shipping Claims, Import Obligations (as defined in the Shipping Motion) will not exceed approximately $2.5 million.

150. The Debtors seek to pay the prepetition Shipping Claims for several reasons. First, if they are not paid, many independent shippers and distributors may refuse to perform additional services for the Debtors. In such event, the Debtors will incur additional expenses (such as premium shipping costs) to replace these shippers and distributors, which amounts will likely exceed the amount of unpaid prepetition Shipping Claims that the Debtors request permission to pay hereunder.

151. I believe that any delays in delivery with respect to goods that may be in the possession of shippers, customs brokers, and/or distributors as of the commencement of these cases will likely result in the assertion, under applicable law, of possessory liens upon the Debtors' property in the possession of such shippers, customs brokers or distributors, and could disrupt the Debtors' inventory distribution network to the detriment of their operations.

152. The failure of the Debtors to receive some of the goods at issue can cause temporary shutdowns of the Debtors' manufacturing facilities, which could have global ramifications for the automotive industry. Because of the highly integrated nature of the automotive supply chain and the Debtors' central role within that chain, any disruptions to the Debtors' manufacturing facilities from not obtaining the necessary goods may cause similar shutdowns for their large customers. Such shutdowns will not only frustrate the expectations of their customers and erode customer goodwill, but also ruin the Debtors' reorganization efforts.

153. I believe that payment of the Debtors' Import Obligations will benefit the Debtors' estates because (a) the Debtors' manufacturing operations might otherwise be interrupted, (b) the eventual sale of the products so imported will generate substantial gross

income, (c) forfeiture of goods for which the Debtors have already become indirectly obligated will be avoided and (d) important customer goodwill, based upon the availability of advertised products, will be protected.

154.     Paying Agent Fees. In the ordinary course of business, the Debtors utilize third party paying agents (the "**Paying Agents**"), to pay the majority of the Debtors' shipping charges. The Paying Agents collect invoices in connection with various Shipping Claims, reconcile such invoices against the Debtors' records and then periodically bill the Debtors for amounts owed to the Shippers. Once payment from the Debtors is received, the Paying Agents pay the Debtors' shipping charges on the Debtors' behalf.

155.     The Debtors do not have an alternative system in place to pay most of their Shipping Claims absent the use of the Paying Agents. Therefore, I believe that the continued utilization of the Paying Agents to process invoices in connection with the Shipping Claims is critical to the Debtors' reorganization and believe it would be in the Debtors' best interest for the court to grant them authority to continue paying the Paying Agents all amounts owed for outstanding Shipping Claims, as well as the Paying Agents' standard fees for processing and paying such Shipping Claims, including payment in the ordinary course of any prepetition amounts outstanding.

156.     I believe that the relief requested in the Shipping Motion will ensure the continuous supply of goods that are vital to the Debtors' continuous operations and integral to their successful reorganization. Absent the relief requested in the Shipping Motion, the Debtors would be required to expend substantial time and resources convincing shippers, distributors, and parties holding goods that they should not assert a lien on or hold goods in transit. The attendant disruption to the continuous flow of goods (including imported goods held by shippers, customs

brokers and/or distributors) to the Debtors would likely result in a shortage of goods used by the Debtors in their operations. Without the goods, the Debtors' business would rapidly deteriorate and their opportunity to achieve a successful reorganization would be seriously jeopardized. Accordingly, I believe the relief requested is necessary and appropriate and is in the best interest of the Debtors' estates, creditors and other parties-in-interest.

### E.  Lien Claimants Motion

157.  The Debtors seek entry of an order authorizing them to pay certain Contractors (as defined in the Lien Claimants Motion) for certain prepetition services in satisfaction of any liens according to the conditions outlined in the Lien Claimants Motion. The Debtors estimate that the aggregate amount to be paid by the Debtors for such Contractor claims pursuant to the Lien Claimant Motion would be less than $1.2 million.

158.  Paragraphs 7 through 12 of the Lien Claimants Motion provide an accurate and detailed description of the potential Contractor lien claims. Although the Debtors have generally made timely payments to the Contractors, as of the Petition Date, a substantial number of the Contractors may not have been paid for certain prepetition goods and services provided. As a result, I believe certain Contractors may refuse to perform their ongoing obligations. Absent the Contractors' services, the physical condition of certain of the Debtors' facilities would deteriorate. Additionally, the crafting and assembly of certain products would be delayed, if finished at all. Ultimately, I believe the Contractors' failure to provide ongoing services would adversely impact the Debtors' operations, and thus, hamper the Debtors' reorganization efforts.

159.  Moreover, the Debtors' failure to pay the Contractors for prepetition goods and services may result in many of the Contractors having a right to assert mechanics' or

artisans' liens ("**Mechanics' Liens**") against the relevant plant locations of the Debtors or the Debtors' goods, which Mechanics' Liens may be perfected notwithstanding the automatic stay established by section 362 of the Bankruptcy Code. I believe that the existence and perfection of these Mechanics' Liens, particularly with respect to the Debtors' products, could adversely affect the Debtors' reorganization efforts.

## IV.   CONCLUSION

160.   The Debtors' ultimate goal is to reorganize their financial affairs pursuant to the terms of a confirmed chapter 11 plan. In the near term, however, to minimize any loss of value of their businesses during their restructuring, the Debtors' immediate objective is to maintain a business as usual atmosphere during the early stages of these Chapter 11 Cases, with as little interruption or disruption to the Debtors' operations as possible. I believe that if the Court grants the relief requested in each of the First Day Motions, the prospect for achieving these objectives and completing a successful reorganization of the Debtors' businesses will be substantially enhanced.

161.   I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request that all of the relief requested in the First Day Motions be granted, together with such other and further relief as is just.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8ᵗʰ day of october , 2009.

**Accuride Corporation. et al.**
Debtors and Debtors in Possession

James Woodward
Vice President and Chief Financial Officer