## <u>Exhibit B</u>

## <u>PWP Engagement Letter</u>

PERELLA WEINBERG PARTNERS LP
767 FIFTH AVENUE
NEW YORK, NY 10153
PHONE: 212-287-3200
FAX: 212-287-3201

September 31, 2009

PERSONAL AND CONFIDENTIAL

Accuride Corporation
7140 Office Circle
Evansville, Indiana 47715
Attention: Mr. William Lasky

Dear Mr. Lasky:

This letter agreement ("Agreement") amends and restates the terms of our letter agreement dated May 28, 2009, under which Accuride Corporation (together with its subsidiaries and controlled affiliates, the "Company") has engaged Perella Weinberg Partners LP (together with its affiliates, "Perella Weinberg Partners," "we" or "us") as its financial advisor in connection with its review and evaluation of strategic alternatives available to the Company, including, without limitation: (i) any Financing (as defined below), (ii) any Sale Transaction (as defined below) involving the Company and any other third party (each, an "Acquiror"), and (iii) any Restructuring Transaction (as defined below). As you are aware, we have previously advised the Special Committee of the Board of Directors of Accuride (the "Special Committee") with respect to its review and evaluation of strategic alternatives. We will however represent only the Company going forward with respect to such matters. The matters referred to in this letter constitute our "Engagement." This Agreement shall be effective as of May 28, 2009 (the "Engagement Date").

1.    <u>Services to be Rendered</u>.  The financial advisory services provided by Perella Weinberg Partners shall include the following:

*General Financial Advisory and Investment Banking Services.*  To the extent requested by the Company, we shall:

(a)    Familiarize ourselves with the business, operations, properties, financial condition and prospects of the Company;

(b)    Review the Company's financial condition and outlook;

(c)    Assist the Company in identifying, reviewing and evaluating strategic alternatives available to the Company;

(d)    Assist in the development of financial data and presentations to the Company, its Board of Directors and Special Committee, various creditors, and other parties;

(e)     Analyze the Company's financial liquidity and evaluate alternatives to improve such liquidity;

(f)     Evaluate the Company's debt capacity and alternative capital structures;

(g)     Participate in negotiations among the, the Company and its creditors, suppliers, lessors and other interested parties with respect to any of the transactions contemplated by this Agreement;

(h)     Advise the Company and negotiate with lenders with respect to potential waivers or amendments of various credit facilities; and

(i)     Provide such other advisory services as are customarily provided in connection with the analysis and negotiation of any of the transactions contemplated by this Agreement, as requested and mutually agreed.

The transaction team will be actively led by Michael Kramer and Richard Shinder (or other of our personnel acceptable to the Company) and supported by other Perella Weinberg Partners investment bankers.

*Restructuring Services.*  To the extent requested by the Company, we shall:

(a)     Identify and analyze various Restructuring Transaction scenarios and the potential impact of these scenarios on the value of the Company and the recoveries of those stakeholders impacted by the Restructuring Transaction;

(b)     Provide strategic advice with regard to restructuring or refinancing the Company's obligations;

(c)     Provide financial advice and assistance to the Company in developing a Restructuring Transaction;

(d)     In connection therewith, provide financial advice and assistance to the Company in structuring any new securities to be issued under a Restructuring Transaction; and

(e)     Assist the Company and/or participate in negotiations with entities or groups affected by the Restructuring Transaction.

For purposes of this Agreement, the term "Restructuring Transaction" means, whether effected directly or indirectly, or whether in-court or out-of-court, any restructuring of a significant portion of the Company's liabilities (including preferred stock and contingent liabilities), including, without limitation, any exchange, conversion,

repurchase or repayment of any such liabilities, or any modification, amendment, deferral, restructuring, recapitalization, rescheduling, moratorium, or adjustment of the terms and/or conditions of any such liabilities.

*Financing Services.* To the extent requested by the Company, we shall:

      (a)    Provide financial advice to the Company in analyzing, structuring and effecting a Financing (as defined below), identify potential lenders or investors in connection with a Financing and, at the Company's request, contact and solicit such lenders or investors; and

      (b)    Assist in the arranging of a Financing, including identifying potential sources of capital, developing and preparing a memorandum (*i.e.*, an offering memorandum) to be used in connection with the Financing, assisting in the due diligence process, and negotiating the terms of any proposed Financing, as requested.

For purposes of this Agreement, the term "Financing" shall mean a private issuance, sale or placement of the equity, equity-linked or debt securities, instruments or obligations of the Company with one or more lenders and/or investors, or any loan or other financing, or a rights offering (each such lender or investor, an "Investor").

It is understood that nothing contained herein shall constitute an express or implied commitment by us to act in any capacity or to underwrite, place or purchase any financing or securities, which commitment shall only be set forth in a separate underwriting, placement agency or other appropriate agreement relating to the Financing; provided that there shall be no separate fees paid to Perella Weinberg Partners if Perella Weinberg Partners agrees to act in any such capacity in connection with the Financing.

*Sale Services.* To the extent requested by the Company, we shall:

      (a)    Provide financial advice to the Company in structuring, evaluating and effecting a Sale Transaction (as defined below), identify potential acquirers and, at the Company's request, contact and solicit potential acquirers; and

      (b)    Assist in the arranging and executing a Sale Transaction, including identifying potential buyers or parties in interest, assisting in the due diligence process, and negotiating the terms of any proposed Sale Transaction, as requested.

For purposes of this Agreement, the term "Sale Transaction" means, whether effected directly or indirectly or in one transaction or a series of transactions: (a) any merger, consolidation, reorganization or other business combination pursuant to which the Company and an Acquiror and/or all or more than 50% of their respective businesses, product lines or divisions are combined or (b) the sale, transfer or other

disposition of all or more than 50% of the capital stock or assets of the Company by way of tender or exchange offer, option, negotiated purchase, leveraged buyout, minority investment or partnership, joint or collaborative venture or otherwise. The term "Transaction" means, any Financing, Sale Transaction or Restructuring Transaction. Notwithstanding anything to the contrary in this Agreement, the sale of Brillion Farms, Bostrom Seating and/or Fabco Automotive Corporation will not qualify as a Transaction for purposes of this Agreement.

    *Generally.* Notwithstanding anything contained in this Agreement to the contrary, we shall have no responsibility for designing or implementing any initiatives to improve the Company's operations, profitability, cash management or liquidity or to provide any fairness, valuation or solvency opinions or to make any independent evaluation or appraisal of any assets or liabilities of the Company or any other party. We make no representations or warranties about the Company's ability to (i) successfully improve its operations, (ii) maintain or secure sufficient liquidity to operate its business, or (iii) successfully complete a Transaction. We are retained under this Agreement solely to provide advice and services regarding the transactions contemplated by this Agreement. Our Engagement does not encompass providing "crises management."

    The advisory services and compensation arrangements set forth in this Agreement do not encompass other investment banking services or transactions that may be undertaken by us at the request of the Company, or any other specific services not set forth in this Agreement. The terms and conditions of such investment banking services, including compensation and arrangements, would be set forth in a separate written agreement between us and the Company.

    2. <u>Compensation</u>. As compensation for our services, the Company agrees to pay us in cash, by wire transfer of immediately available funds when due, the following fees (individually or collectively, "<u>Fees</u>"):

    (a) A monthly cash advisory fee of $100,000 (each, a "<u>Monthly Advisory Fee</u>"), earned in advance and payable beginning on the effective date of this Agreement and thereafter on each monthly anniversary of the date of this Agreement; provided that the Monthly Advisory Fee will increase to $175,000 in the event the Company is or becomes a debtor under Chapter 11 of the Bankruptcy Code. 100% of the aggregate Monthly Advisory Fees received by us from you during the twelve months from May 28, 2009, to May 28, 2010, and only 50% of the aggregate Monthly Advisory Fees thereafter, shall be creditable once against any Restructuring Transaction Fee (as defined below) and/or any Sale Transaction Fee (as defined below), whichever occurs first.

    (b) A fee equal to $1,500,000, payable promptly at the closing of a Sale Transaction (the "<u>Sale Transaction Fee</u>").

    (c) If the Company is or becomes a debtor under Chapter 11 of the Bankruptcy Code, Perella Weinberg Partners shall be entitled to receive a fee equal to

4

$4,500,000, payable promptly at the effective date of a plan of reorganization with respect to a Restructuring Transaction or the closing of a Sale Transaction pursuant to Section 363 of the Bankruptcy Code (the "Restructuring Transaction Fee").

We will not be entitled to a Sale Fee in the event a Restructuring Transaction Fee is due and payable to us.

3.      Expenses. In addition to our fees for professional services, the Company agrees that it will promptly reimburse us for all of our reasonable expenses ("Expenses"), (including, but not limited to, reasonable professional and legal fees, reasonable charges and disbursements of our legal counsel, any sales, use or similar taxes (including additions to such taxes, if any) (but not including charges for in-house legal or back-office personnel) incurred in connection with the Engagement, travel and hotel expenses, printing costs, data processing and communication charges, research expenses and courier and postage services); provided, that we will not incur Expenses, including fees, disbursements and other charges of outside legal counsel, in excess of $50,000 in the aggregate, without the Company's prior written approval (not to be unreasonably withheld, conditioned or delayed). The Company's obligation to reimburse expenses incurred by us in connection with the Engagement will survive the completion or termination of the Engagement.

4.      Indemnification. The Company acknowledges that we have been retained hereunder solely as an independent contractor and that nothing in this Agreement or the nature of our services shall be deemed to create a fiduciary or agency relationship between us and the Company or its equity holder(s), employees or creditors. In order to induce us to accept the Engagement, the Company agrees to the indemnity, exculpation provisions and other matters set forth in Annex A, which forms a part of and is incorporated by reference into the Agreement. Prior to entering into any agreement or arrangement with respect to, or effecting, any proposed sale, exchange, dividend or other distribution or liquidation of all or a significant portion of its assets in one or a series of transactions or any significant recapitalization or reclassification of its outstanding securities that does not directly or indirectly provide for the assumption of the obligations of the Company set forth in Annex A, the Company will notify us in writing thereof (if not previously so notified) and, if requested by us, shall arrange in connection therewith alternative means of providing for the obligations of the Company set forth in Annex A, including the assumption of such obligations by another party, insurance, surety bonds or the creation of an escrow, in each case, in an amount and upon terms and conditions reasonably satisfactory to us and the Company. The terms and provisions of this Section 4 and of Annex A shall survive the completion or termination of the Engagement.

5.      Bankruptcy Court Approval. In the event that the Company is or becomes a debtor under Chapter 11 of the Bankruptcy Code, whether voluntarily or involuntarily, the Company shall use its reasonable efforts to seek an order authorizing our employment pursuant to the terms of this Agreement, as a professional person pursuant to, and subject to the standard of review of, Sections 327(a) and 328(a) of title 11 of the United States Code (the "Bankruptcy Code"), the applicable Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") and applicable local rules and orders and not subject to any other standard of review under Section 330 of the Bankruptcy Code. In so agreeing to seek our retention under Sections 327(a) and 328(a) of the Bankruptcy Code, the Company acknowledges that it believes that our general restructuring experience and expertise, its knowledge of the capital markets and its merger and acquisition capabilities will inure to the benefit of the Company in pursuing any Transaction, that the value to the Company of our services derives in substantial part from that expertise and experience and that, accordingly, the structure and amount of the contingent Fees are reasonable regardless of the number of hours to be expended by our professionals in the performance of the services to be provided hereunder. The Company shall submit our employment application as soon as practicable following the Company's filing of a voluntary Chapter 11 case, or the entry of an order for relief in any involuntary case filed against the Company, and use its reasonable efforts to cause such application to be considered promptly. The employment application and the proposed order authorizing our employment shall be provided to us as much in advance of any Chapter 11 filing as is practicable, to enable us and our counsel to review and comment thereon. Following entry of the order authorizing our employment, the Company shall pay all Fees and Expenses due pursuant to this Agreement, as approved by the court having jurisdiction of the bankruptcy case involving the Company (the "Bankruptcy Court"), as promptly as possible in accordance with the terms of this Agreement and the order of such Bankruptcy Court, the Bankruptcy Code, the Bankruptcy Rules and applicable local rules and orders, and will work with us to promptly file any and all necessary applications regarding such fees and expenses with the Bankruptcy Court. We shall have no obligation to provide services under this Agreement in the event that the Company becomes a debtor under the Bankruptcy Code unless our retention under this Agreement is approved under Sections 327(a) and 328(a) of the Bankruptcy Code by final order of the Bankruptcy Court which is acceptable to us and which approves this Agreement in all material respects. If the order authorizing our employment is not obtained, or is later reversed, modified or set aside for any reason, we may terminate this Agreement, and the Company shall promptly reimburse us for all Fees and Expenses due hereunder, including any Fees due or to become due under the Tail Period (as defined below). Prior to commencing a Chapter 11 case, the Company shall pay all amounts then due and payable to us in cash. The terms of this Section are solely for our benefit, and may be waived, in whole or in part, only by us.

      6.     Expertise. The Company acknowledges and agrees that Perella Weinberg Partners' restructuring expertise as well as its capital markets knowledge, financing skills and mergers and acquisitions capabilities, some or all of which may be required by the Company during the term of our Engagement hereunder, were important factors in determining the amount of the various fees set forth herein, and that the ultimate benefit to the Company of our services hereunder could not be measured merely by reference to the number of hours to be expended by our professionals in the performance of such services. The Company also acknowledges and agrees that the various fees set forth herein have been agreed upon by the parties in anticipation that a substantial commitment of professional time and effort will be required of us and our

professionals hereunder over the life of the Engagement, and in light of the fact that such commitment may foreclose other opportunities for us and that the actual time and commitment required of us and our professionals to perform their services hereunder may vary substantially from week to week or month to month, creating "peak load" issues for the firm. In addition, given the numerous issues which we may be required to address in the performance of our services hereunder, our commitment to the variable level of time and effort necessary to address all such issues as they arise, and the market prices for our services for engagements of this nature in an out-of-court context, the Company agrees that all of the fee arrangements specified herein are commercially reasonable.

       7.      <u>Information: Cooperation.</u> In connection with the Engagement, the Company will provide us with access to the Company's officers, directors, employees, accountants, legal advisors, and other representatives (collectively, "<u>Representatives</u>"), and will furnish us and cause its Representatives to furnish us with such information as we believe appropriate for the Engagement (all such information so furnished being the "<u>Information</u>"). The Company recognize and confirm that we (i) will use and rely primarily on the Information and on information available from generally recognized public sources in performing its services without having independently verified the same and (ii) do not assume responsibility for the accuracy or completeness of the Information and such other information. To the best of the Company's knowledge, the information to be furnished by the Company and its Representatives, when delivered, will be true and correct in all material respects and will not contain any material misstatement of fact or omit to state any material fact necessary to make the statements contained therein not misleading. The Company will promptly notify us if it learns of any material inaccuracy or misstatement in, or material omission from, any Information theretofore delivered to us.

       Except with your consent or as otherwise required in carrying out our services, we will treat as confidential all Information, whether oral or written, except for Information (a) already in our possession on a non-confidential basis prior to its receipt from the Company or its Representatives, (b) which we obtain from a person (other than the Company or any of the Company's Representatives) who, insofar as is known to us, is not prohibited from transmitting the information to us by a contractual, legal or fiduciary obligation to the Company, (c) that is already or becomes public, (d) that the Company agrees may be disclosed or (e) that we are required to disclose by applicable law, regulation or legal process. If we are required by applicable law, regulation or legal process to disclose any Information, the Company agrees we may do so without liability hereunder, but we will first provide the Company with prompt written notice of such requirement and will cooperate with the Company to seek an appropriate protective order, minimize the required disclosure and/or obtain reasonable assurance that the Information will be accorded confidential treatment.

       The Company agrees to cooperate with us in the performance of our services under this Agreement and shall direct the Company to provide us with timely access to and use of personnel, facilities, equipment, data and information to the extent

necessary to permit us to perform services under this Agreement. In order to coordinate effectively the Company's and our activities to effect a Transaction, the Company will endeavor to promptly inform us of any pending or future material discussions, negotiations or inquiries regarding a possible Transaction (including any such discussions, negotiations or inquiries that have occurred since February 1, 2009).

8. <u>Work Product</u>. All documents, materials or information of any kind created by us in connection with this engagement, including, without limitation, any written reports, memoranda, analyses, work papers or status summaries, whether or not delivered to the Company, are work product (collectively, "<u>Work Product</u>"). All Work Product shall be owned by and maintained by us. You agree not to use any Work Product except in connection with any transaction contemplated by this Agreement or otherwise within the scope of the Engagement, and not for any other purpose. Our Work Product may not be relied upon by any other person including, but not limited to, any security holder, or employee or creditor of the Company, and may not be used or relied upon for any other purpose; provided, that the Company may disclose the foregoing on a confidential basis to the Company's directors, officers and employees and its legal counsel. The Company may not publicly disclose, summarize, excerpt from or otherwise refer to any Work Product rendered by us, whether formal or informal, without our prior written consent.

9. <u>Confidentiality</u>. Except to the extent required by applicable law, the Company may not publicly disclose, summarize, excerpt from or otherwise refer to any advice rendered by us, whether formal or informal, without our prior written consent. In addition, except to the extent required by applicable law or the rules and regulations of the Securities and Exchange Commission, the Company may not refer to our name or the terms of our Engagement without our prior written consent. Notwithstanding the foregoing, the Company may disclose the foregoing on a confidential basis to the Company's directors, officers and employees and its legal counsel. The Company's obligations under this section will survive the completion or termination of the Engagement.

We will not be providing the Company with, and the Company will not look to us for, tax, legal, accounting or other similar advice and we agree that nothing in this Agreement is intended to impose any conditions of confidentiality within the meaning of Section 6111 of the Internal Revenue Code of 1986, as amended, or US Treasury Regulation Section 1.6011-4. The Company may disclose to any and all persons, without limitation of any kind, the United States tax treatment (federal, state and local) and tax structure of any transaction and all materials of any kind relating to such tax treatment and tax structure.

10. <u>Termination</u>. Our services hereunder may be terminated upon 10 days written notice with or without cause by the Company or by us at any time and without liability or continuing obligation to the Company or to us. No termination of our Engagement or this Agreement shall modify or affect (i) the Company's obligation to pay our Fees and to pay or reimburse Expenses through the effective date of termination

under Sections 2 and 3 of this Agreement, respectively, and (ii) the Company's obligations under Sections 4, 5, 8, 9, 10, 14, 15 and 16, all of which shall survive the termination of our Engagement; provided, however, that in the case of termination by the Company, we shall be entitled to be paid the full amount of our Fees if, within 18 months of such termination (the "Tail Period"), any Transaction is consummated; further provided, that we shall only be entitled to Fees with respect to any Tail Period if this Agreement was terminated by the Company for a reason other than Perella Weinberg Partners' gross negligence or willful misconduct.

11.    Other Perella Weinberg Partners Activities.  Perella Weinberg Partners is a financial services firm engaged directly and through its affiliates in investment banking, financial advisory services, investment management, asset management and other advisory services and sponsors special purpose acquisition vehicles.  The Company understands and acknowledges that in performing the Engagement we will not be under any duty to disclose to the Company, or use for the benefit of the Company, any confidential or non-public information obtained by us or our affiliates in the course of providing services to any other person or engaging in any other transaction (including as principal) or business activities.

12.    Governing Law.  All aspects of the relationship created by this Agreement (including Annex A) shall be governed by and construed in accordance with the laws of the State of New York, applicable to agreements made and to be performed entirely in such State.  All actions and proceedings arising out of or relating to this Agreement shall be heard and determined exclusively in any New York state or federal court sitting in the Borough of Manhattan of the City of New York, to whose jurisdiction the Company hereby irrevocably submits.  The Company hereby irrevocably waives any defense or objection to the New York forum designated above.  Perella Weinberg Partners and the Company waives all right to trial by jury in any action, suit, proceeding or counterclaim (whether based upon contract, tort or otherwise) related to or arising out of the Engagement or the performance by us of the services contemplated by this Agreement.

13.    Assignment; Severability.  No party hereto may assign, transfer or delegate any of its rights or obligations without the prior written consent of the other parties, such consent not to be unreasonably withheld.  In the event that any term or provision of this Agreement shall be held to be invalid, void or unenforceable by a court of competent jurisdiction (not subject to further appeal), then the remainder of this Agreement shall not be affected, and each such term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

14.    Public Announcements.  The Company acknowledges that we may, at our option and expense and after public announcement of a Transaction, place announcements and advertisements or otherwise publicize such Transaction and our role in it (which may include the reproduction of the Company's logo and a hyperlink to the Company's website) on our internet website and in such financial and other newspapers

and journals as we may choose, stating that we acted as financial advisor to the Company in connection with the Transaction.

15. <u>Regulation Relating to Client Identification</u>. Federal law and regulations require financial institutions to obtain, verify and record information that identifies each person with whom they do business prior to doing such business and to provide reasonable notice to such persons that the financial institution is verifying such person's identity. Accordingly, the Company will provide us, as necessary and upon request, certain identifying information, including, but not limited to, a government-issued identification number (e.g., a U.S. taxpayer identification number) and certain other information or documents necessary to verify the Company's identity, such as certified corporate documentation, partnership agreement or trust instrument.

16. <u>Limitation on Actions</u>. No action, regardless of form, arising out of or relating to the Engagement, may be brought by you more than one year after you or the Company knew, or should reasonably have known, of the facts and/or circumstances that gave raise to a cause of action has occurred.

17. <u>Other Advisors</u>. It is understood that no Indemnified Person, as defined herein in Annex A, shall have any responsibility or liability to the Company or its affiliates or any other party in connection with the advice, opinions or actions of any other advisor, or any other party that is or may be engaged by the Company, and further, no Indemnified Person or such other advisor shall have any responsibility or liability to each other in connection with the advice or opinions rendered by such party in connection with the Transaction.

18. <u>Entire Agreement; Amendments</u>. This Agreement, including Annex A, and the Confidentiality Agreement constitute the entire agreement between us and the Company with respect to the Engagement and supersedes all other oral and written representations, understandings or agreements relating to this Engagement. No alteration, waiver, amendment, change or supplement hereto shall be binding or effective unless the same is set forth in writing signed by a duly authorized representative of Perella Weinberg Partners, and the Company.

You acknowledge your agreement with the terms stated herein, and acknowledge that you have reviewed and agreed to be bound by the terms of this Agreement, and that you have all requisite power and authority to enter into this Agreement on behalf of the Company, and have been duly and validly authorized to do so, as evidenced by your signature below. Facsimile signatures shall be deemed original, binding signatures.

We are delighted to accept the Engagement and look forward to working with you on this assignment. Please confirm your agreement to the foregoing by signing and returning to us the enclosed duplicate of this letter.

Very truly yours,

PERELLA WEINBERG PARTNERS LP

By: _____

Name: Peter Weinberg

Title: Partner

Agreed and accepted as of
the date set forth above:

ACCURIDE CORPORATION

By: _____

William Lasky

ACKNOWLEDGED AND AGREED TO
THIS ___ DAY OF _____, 2009

The Special Committee of the Board of Directors
Of Accuride Corporation, a Delaware corporation

By: _____

Name: Don Johnson

Title: Chairman of the Special Committee

You acknowledge your agreement with the terms stated herein, and acknowledge that you have reviewed and agreed to be bound by the terms of this Agreement, and that you have all requisite power and authority to enter into this Agreement on behalf of the Company, and have been duly and validly authorized to do so, as evidenced by your signature below. Facsimile signatures shall be deemed original, binding signatures.

We are delighted to accept the Engagement and look forward to working with you on this assignment. Please confirm your agreement to the foregoing by signing and returning to us the enclosed duplicate of this letter.

Very truly yours,

PERELLA WEINBERG PARTNERS LP

By: _____
    Name:
    Title:

Agreed and accepted as of
the date set forth above:

ACCURIDE CORPORATION
By: _____
    Name: James H Woodward Jr
    Title: SVP + CFO

ACKNOWLEDGED AND AGREED TO
THIS __ DAY OF _____, 2009

The Special Committee of the Board of Directors
Of Accuride Corporation, a Delaware corporation

By: _____
    Name: Don Johnson
    Title: Chairman of the Special Committee

11

## Annex A

The Company agrees to indemnify and hold harmless Perella Weinberg Partners and its affiliates and its and their respective officers, directors, partners, members, employees, consultants and agents and each other person, if any, controlling Perella Weinberg Partners or any of its affiliates (Perella Weinberg Partners and each such other person being an "*Indemnified Person*") from and against any losses, claims, damages or liabilities related to, arising out of or in connection with our engagement or any matter referred to in the Agreement to which this indemnity is annexed (the "*Engagement*"), and will reimburse each Indemnified Person for all reasonable expenses (including reasonable fees, charges and disbursements of counsel) as they are incurred in connection with investigating, preparing, pursuing or defending any action, claim, suit, investigation or proceeding related to, arising out of or in connection with the Engagement, whether or not pending or threatened and whether or not any Indemnified Person is a party; provided, however, that the Company will not be responsible for any losses, claims, damages or liabilities (or expenses relating thereto, including expenses previously reimbursed by the Company) to the extent that they are finally judicially determined to have resulted from the gross negligence or willful misconduct of any Indemnified Person. The Company also agrees that no Indemnified Person shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company for or in connection with the Engagement, except for any such liability for losses, claims, damages or, liabilities incurred by the Company that are finally judicially determined to have resulted from the gross negligence, bad faith or willful misconduct of such Indemnified Person.

The Company (nor any of its controlled affiliates) will not, without Perella Weinberg Partners' prior written consent (not to be unreasonably withheld), settle, compromise, consent to the entry of any judgment in or otherwise seek to terminate any action, claim, suit, investigation or proceeding in respect of which indemnification, reimbursement or contribution may be sought hereunder (whether or not any Indemnified Person is a party thereto) unless such settlement, compromise, consent or termination includes a full release of each Indemnified Person from any and all liabilities arising out of such action, claim, suit, investigation or proceeding. No Indemnified Person seeking indemnification, reimbursement or contribution under this *Annex A* will, without the Company's prior written consent, settle, compromise, consent to the entry of any judgment in or otherwise seek to terminate any action, claim, suit, investigation or proceeding referred to in the preceding paragraph.

If the indemnification provided for in the first paragraph of this *Annex A* is judicially determined to be unavailable (other than in accordance with the terms hereof) to an Indemnified Person in respect of any losses, claims, damages or liabilities referred to herein, then, in lieu of indemnifying such Indemnified Person hereunder, the Company shall contribute to the amount paid or payable by such Indemnified Person as a result of such losses, claims, damages or liabilities (and expenses relating thereto) (a) in such proportion as is appropriate to reflect the relative benefits to Perella Weinberg Partners, on the one hand, and the Company, on the other hand, of the Engagement or (b) if the allocation provided by clause (a) above is not available, in such proportion as is appropriate to reflect not only the relative benefits referred to in such clause (a) but also the relative fault of each of Perella Weinberg Partners and the Company, as well as any other relevant equitable considerations; provided, however, in no event