| | |
|---|---|
| In re:<br><br>ACCURIDE CORPORATION,<br>*et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 09-13449 (BLS)<br><br>(Jointly Administered)<br><br>**Hearing Date: November 23, 2009 at 3:00 p.m. (ET)**<br>**Objection Deadline: November 18, 2009 at 4:00 p.m. (ET)** |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO (I) HONOR CERTAIN PREPETITION BENEFIT PROGRAMS, (II) IMPLEMENT A KEY EMPLOYEE INCENTIVE PLAN, (III) MODIFY THE DIRECTORS' DEFERRED COMPENSATION PLAN, AND (IV) ENTER INTO A NON-COMPETE AGREEMENT WITH ITS INTERIM CHIEF EXECUTIVE OFFICER**

The above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**") hereby file this motion (the "**Motion**") for entry of an order (the "**Order**"),[2] pursuant to sections 105(a), 363(b), 363(c), and 503(c)(3) of title 11 of the United States Code (the "**Bankruptcy Code**"), authorizing the Debtors to (a) honor certain Prepetition Benefit Programs (defined below), (b) implement a key employee incentive plan (the "**KEIP**"), (c) modify the Directors' Deferred Compensation Plan (defined below), and (d) enter into a non-compete agreement with the Accuride Corporation's Chief Executive Officer, Mr. William Lasky. In

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Accuride Corporation, a Delaware corporation (9077); Accuride Cuyahoga Falls, Inc., a Delaware corporation (9556); Accuride Distributing, LLC, a Delaware limited liability company (3124); Accuride EMI, LLC, a Delaware limited liability company (N/A); Accuride Erie L.P., a Delaware limited partnership (4862); Accuride Henderson Limited Liability Company, a Delaware limited liability company (8596); AKW General Partner L.L.C., a Delaware limited liability company (4861); AOT Inc., a Delaware corporation (3088); Bostrom Holdings, Inc., a Delaware corporation (9282); Bostrom Seating, Inc., a Delaware corporation (7179); Bostrom Specialty Seating, Inc., a Delaware corporation (4182); Brillion Iron Works, Inc., a Delaware corporation (6942); Erie Land Holding, Inc., a Delaware corporation (8018); Fabco Automotive Corporation, a Delaware corporation (9802); Gunite Corporation, a Delaware corporation (9803); Imperial Group Holding Corp. -1, a Delaware corporation (4007); Imperial Group Holding Corp. -2, a Delaware corporation (4009); Imperial Group, L.P., a Delaware limited partnership (4012); JAII Management Company, a Delaware corporation (N/A); Transportation Technologies Industries, Inc., a Delaware corporation (2791); and Truck Components Inc., a Delaware corporation (5407). The mailing address for Accuride Corporation is 7140 Office Circle, Evansville, Indiana 47715.

[2] A copy of the Order is attached hereto as <u>Exhibit A</u>.

support of this Motion, the Debtors respectfully state as follows:

## Jurisdiction

1.     The Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.     The statutory bases for the relief requested herein are sections 105(a), 363(b), 363(c), and 503(c)(3) of the Bankruptcy Code.

## Background

### I.     Generally

3.     On October 8, 2009 (the "**Petition Date**"), each of the Debtors filed a petition with the Court under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**"). The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

4.     On October 21, 2009, the Office of the United States Trustee appointed an official committee of unsecured creditors for these Chapter 11 Cases (the "**Creditors' Committee**") [Docket No. 103].

5.     A description of the Debtors' businesses and the reasons for commencing these Chapter 11 Cases are set forth in the First Day Declaration of James H. Woodward, Jr., filed on October 8, 2009 [Docket No. 3].

### II.     Description of the Benefit Programs

6.     Prior to the Petition Date, the Debtors maintained, in the ordinary course of business, the Accuride Corporation Annual Incentive Compensation Plan (the "**AICP**"), the Long-Term Incentive Program (the "**LTIP**"), and a financial planning stipend plan (collectively, the "**Prepetition Benefit Programs**"). Although the Court has previously entered an order

authorizing the Debtors to continue certain of the Prepetition Benefit Programs and to make payments thereunder to non-insiders employed by the Debtors, to date, the Debtors have not sought authorization to make payments under the Prepetition Benefit Programs to insiders of the Debtors [Docket Nos. 16, 173].

7.     In addition to honoring certain of the Prepetition Benefit Programs during these Chapter 11 Cases with respect to eleven insiders, the Debtors propose that these insiders of the Debtors, plus six additional non-insider key employees (for a total of seventeen participants) (the "**Participants**") also receive benefits under the KEIP, as more fully described below. The Debtors also seek the authority hereunder to modify the Directors' Deferred Compensation Plan (as defined below). Finally, the Debtors request authority to enter into the Non-Compete Agreement (as defined below).

A.     *Prepetition Benefit Programs*

8.     The Debtors offer incentive bonuses through the AICP which is applicable to 415 employees. The Debtors will not meet their earnings target under the 2009 AICP; therefore, no amounts will be paid under the AICP based on the 2009 calendar year.

9.     The Long-Term Incentive Plan, which is offered by the Debtors to twenty-nine employees, nine of which are insiders, has three components, each vesting on December 1st of the calendar year: (a) cash, (b) restricted stock units, and (c) stock appreciation rights. The cash component was added in 2009 due to limitations in the number of available shares in the Debtors' equity plan and due to the significant decline in the price per share of the Debtors' common stock. The cash award is scheduled to vest as follows: 10% in December 2009, 20% in December 2010, 30% in December 2011, and 40% in December 2012, provided that the award recipient remains employed by the Debtors over that period.

10.     The amount associated with the cash component of the LTIP to be paid in

December 2009 to eligible employees is approximately $121,000 in the aggregate.[3] The Debtors estimate that the amounts to be paid in restricted stock units and stock appreciation rights to eligible employees in December of 2009 are de minimis.

11.  The Debtors also offer a financial planning stipend to certain officers of the company to defray the cost of retaining a personal financial advisor. The Debtors offer the financial planning stipend to ten employees, all of which are insiders. The annual cost of the program is approximately $130,000 in the aggregate, payable in the first quarter of 2010.[4]

### B.  *Post-Petition AICP*

12.  While no payouts will be made under the AICP for the 2009 calendar year, the Debtors intend to establish earnings targets under the AICP for the 2010 calendar year in the ordinary course of business. In connection with the 2010 AICP, the Debtors intend to make prorated AICP payouts to all eligible employees upon emergence. Prorated payouts under the 2010 AICP will depend on the annual earnings target under the 2010 AICP (which has not yet been set by the board of directors), prorated by the number of complete 2010 calendar months that have elapsed at emergence. Prorated AICP payments will only be made if approved by order of the Court or pursuant to a confirmed plan of reorganization; as such, all parties in interest will have sufficient notice and opportunity to object to the prorated AICP payouts. After emerging from bankruptcy, the reorganized Debtors may choose to continue the 2010 AICP, or

---

[3]  The court has already authorized $41,000 of this amount to be paid to the twenty non-insider employees eligible under the LTIP pursuant to the Court's *Order (Final) Authorizing, But Not Directing, the Debtors to (A) Pay Prepetition Employee Obligations, (B) Continue Employee Benefit Plans and Programs Postpetition, and (C) Honor Workers' Compensation Obligations; (II) Confirming that Debtors are Able to Pay Withholding and Payroll-Related Taxes and; (III) Directing All Banks to Honor Prepetition Checks for Payment of Employee Obligations* [Docket No 173]. Thus, the cost of the relief requested herein would be approximately $80,000.

[4]  Certain officers of the company are also party to prepetition retention agreements. The terms of the retention agreements provide for the payment of a lump sum equal to one year's base salary if the employee remains employed with the company upon the one-year anniversary of the date of the retention agreement (which will occur in May 2010). The Debtors do not seek authority by this Motion to make such retention payments; however, the Debtors reserve the right to so move in the future, as well as the right to assume such agreements in connection with a plan of reorganization.

may choose to modify the terms of the AICP in the ordinary course of business. For the avoidance or doubt, the Debtors do not seek Court approval to make specific AICP payouts at this time, but expressly reserve the right to seek to make prorated payouts under the 2010 AICP upon emergence if the targets set and approved by the board are met.

### C.    *Post-Petition Key Employee Incentive Plan (KEIP)*

#### (a)    *Formulation of the KEIP*

13.    In the face of new and greater challenges, the Debtors' senior management and the compensation committee, which is comprised of certain of the directors on the board (the "**Composition Committee**"), in consultation with Hewitt Associates LLC ("**Hewitt**")[5] – the Debtors' compensation and benefits consultant – and the Debtors' financial and legal advisors, embarked on a process of constructing a suitable incentive program that was tailored to the Debtors' current situation. One goal was to supplement prior long-term incentive compensation tied to the value of Accuride common stock, which no longer has significant value, and the AICP, under which no bonuses will be paid for the 2009 year. In addition to the Debtors' current situation, the Compensation Committee considered the Debtors' industry, which is highly cyclical, and in which it is a common practice to adjust compensation models to account for shortfalls in more traditional methods of compensation.

14.    At the outset, the Debtors' senior management identified a group of employees whose continued service is particularly important to the Debtors' successful reorganization. Each Participant was selected for inclusion in the KEIP on the basis of (a) the importance of the Participant's job functions to the Debtors' overall restructuring efforts, and (b)

---

[5]    Hewitt is one of the leading human resources and compensation consulting firms in the United States. Among other things, Hewitt assists companies in analyzing and determining reasonable and equitable compensation packages to appropriately compensation and motivate executives, managers, and other employees. See www.hewittassociates.com.

the importance of the Participant's individual performance within these functions. The resulting Participants all have significant knowledge of the Debtors' businesses and will play an important role in achieving the Debtors' goals during the reorganization.

15.     Once the Debtors identified the universe of Participants for inclusion in the KEIP, the Debtors' senior management and the Compensation Committee worked closely with Hewitt to design and structure the KEIP. In doing so, the Debtors considered specific key employee incentive programs implemented by similar-sized companies in chapter 11, which proved helpful to the Debtors in developing the basic framework of their KEIP. The primary determinant of the KEIP's structure was the Debtors' requirement that the KEIP align the Debtors' reorganization goals with those of the Debtors' various creditor stakeholders to encourage maximum benefit to these estates.

16.     Once the basic framework was agreed upon, the Debtors, with input from Hewitt, assessed on an individual-by-individual basis the amount of incentive pay that would be required to motivate each individual during these Chapter 11 Cases. Throughout this process, the Debtors were mindful of the overall cost of the KEIP and it was an express consideration of the Compensation Committee that the cost of the KEIP approximate the conservative market median of similar incentive programs among the Debtors' competitors. To measure the cost of the KEIP, the Compensation Committee was provided with, and reviewed, market data prepared by Hewitt.

(b)     *The Terms of the KEIP*

17.     The proposed KEIP covers seventeen of the Debtors' employees and is designed to incentivize those employees to optimize the value of the Debtors' estates by increasing liquidity and promptly exiting bankruptcy. Under the KEIP, the Participants would, upon emergence from bankruptcy, receive a payout based on liquidity (measured by cash on

hand at emergence) and business preservation (measured by the timing of emergence).

18.     The KEIP strives to ensure that the pre-negotiated terms of the restructuring are met, and to provide management with an incentive to create the most liquidity possible over the duration of these cases. The payouts under the KEIP are determined according to a market-based "payout curve," which is a function of both liquidity and timing of emergence. Liquidity is measured by cash and cash equivalents (excluding any cash used to collateralize any letter of credit), held by the Debtors and their consolidated subsidiaries at emergence, adjusted as provided by Section 7(b)(iii) of the Accuride Corporation Convertible Notes Commitment Agreement dated October 7, 2009. The threshold liquidity (net of cash payouts under the KEIP and AICP prorated payout) is $50 million; the liquidity required to achieve the target payout under the KEIP (net of cash payouts under the KEIP and AICP prorated payout) is $56 million. The timing of emergence factor under the KEIP works as a "value creation accelerator," which increases the KEIP payout by specified percentages. The target KEIP bonus pool is $3.2 million. The "payout curve" is continuous, but several scenarios are shown in the below chart:

| Level | Net Estimated Liquidity (net of cash payouts under the KEIP and AICP payout) | Payout (percent of Target) | Value Creation Accelerator |
|-------|-------|-------|-------|
| Threshold | $50,000,000 | 50% | February/March 2010 emergence: 1.75x; |
| Target | $56,000,000 | 100% | April 2010 emergence: 1.5x; |
| High Performance 1 | $62,000,000 | 150% | May 2010 or later emergence: 1.0x |
| High Performance 2 | $67,200,000 | 200% | |
| High Performance 3 | $72,800,000 | 300% | |

19.     The Chief Executive Officer and the Chief Financial Officer have each

agreed to receive their respective payments under the KEIP in the form of common stock in the reorganized Debtors, rather than cash, provided that they continue in their respective positions with the reorganized Debtors. Otherwise, all KEIP payments will be paid in cash.

20.     The KEIP has integrated features that work together to create a conservative overall compensation design, and the achievement of the target performance goals will be difficult. The KEIP is also self-funded, in that the increased liquidity of the Debtors' estates will be used (in part) to make the KEIP payout. In other words, if the Debtors do not achieve their liquidity goals, then higher payouts cannot and will not be made to the Participants.

21.     Hewitt has assisted the Debtors in designing and refining the KEIP and has confirmed, among other things, that the target levels and other features of the proposed KEIP are reasonable, consistent with the Debtors' long-standing compensation philosophy, and at approximately the market median for total direct compensation within the Debtors' peer group. Hewitt has further confirmed that incentive compensation, as under the proposed KEIP, is both common and necessary when companies are in chapter 11 proceedings. At the hearing on this Motion, Hewitt will be available to testify to the foregoing.

22.     The names of the KEIP Participants, their positions at the Debtors, and their respective potential KEIP payments are set forth on Exhibit B hereto, which is being filed contemporaneously under seal.[6] The Debtors will provide Exhibit B to the United States Trustee, the Creditors' Committee, their pre and post-petition lenders and the ad hoc committee for the holders of 8.5% senior subordinated notes due February 1, 2015 (the "**Ad Hoc Noteholder Committee**").

23.     On or about October 28, 2009, the Debtors shared a draft of the KEIP with

---

[6]     With respect to any party-in-interest who demonstrates a legitimate need to obtain some or all of the personal and confidential information contained in the KEIP, the Debtors will meet and confer with such party or parties in an effort to reach an agreement to provide the information subject to a confidentiality agreement.

the Creditors' Committee, the Ad Hoc Noteholder Committee, and the debtor in possession lenders. Since that time, the Debtors have had multiple conversation with these constituencies and their respective advisors about the KEIP. The Debtors are committed to continuing to work with the Creditors' Committee, the Ad Hoc Noteholder Committee, and the debtor in possession lenders to address any remaining concerns that they have prior to the hearing on this Motion. While it is the Debtors' hope and expectation that the relief requested in this Motion will be supported by their key constituents, each of those constituents reserves all of its rights with respect to the substantive relief requested in this Motion.

### D. *Modification to Directors' Deferred Compensation Plan*

24. The Debtors offer their directors the ability to defer portions of their fees (both payable in cash and Accuride Corporation common stock) pursuant to a deferred compensation plan (the "**Directors' Deferred Compensation Plan**"). There are two types of accounts in which directors may place their deferred compensation. The first option is a "stock account," in which the directors' fees are invested in phantom common stock of Accuride Corporation. The second option is "cash account," which is credited with a set rate of interest each month. Directors fees normally paid in stock are deferred into the "stock account" and the directors may elect to defer the fees normally paid in cash into either the "cash account" or the "stock account." There are two directors who are currently deferring under the Directors' Deferred Compensation Plan and both have compensation being deferred into the "stock account." By the terms of the Directors' Deferred Compensation Plan a director may not stop deferring compensation during a calendar year.

25. Because it is anticipated that the value of Accuride Corporation's common stock upon exit from bankruptcy will be negligible, by deferring into the "stock accounts" directors are automatically losing the value of their fees. Accordingly, placing any further funds

into these accounts would unduly deny the directors their standard compensation.

26. The Debtors seek authority to modify their Directors' Deferred Compensation Plan, such that all deferred compensation installments (including those normally payable in stock) made after the October 28, 2009 (the date the board of directors approved the modification) would be placed into cash accounts, which will put the two affected directors in roughly the same economic position as their colleagues who did not defer their compensation into the Directors' Deferred Compensation Plan.[7]

27. For the year 2010, the Debtors do not anticipate that any directors will elect to defer compensation under the Directors' Deferred Compensation Plan. Therefore, the relief requested by this Motion will only apply to the deferred compensation installments (including those normally payable in stock) made after the October 28, 2009.[8]

E. *Non-Compete Agreement with Chief Executive Officer*

28. Mr. Lasky joined the board of directors of Accuride Corporation in October 2007 as an independent director. In September 2008, the board of directors appointed Mr. Lasky as interim President and CEO upon the resignation of his predecessor, John R. Murphy. In January 2009, Mr. Lasky was appointed Chairman of the Board by the board of directors after the resignation of Terrence J. Keating.

29. Because Mr. Lasky was engaged by Accuride Corporation as its interim CEO, a traditional CEO compensation package was not put into place by the board of directors for Mr. Lasky. Currently, Mr. Lasky is an at will employee. Although Mr. Lasky is eligible to participate in certain of the Prepetition Benefit Plans, Mr. Lasky does not have a severance plan

---

[7] Indeed, the two directors may still be worse off than their colleagues, as claims for any deferred compensation will likely be unsecured claims.

[8] Some compensation, although earned for services in 2009, may be payable in January 2010.

or a non-compete agreement. Mr. Lasky is extremely valuable to the Debtors, not only for his tireless day-to-day efforts, but also on account of his formidable experience in the industry.

30. Mr. Lasky has gained extensive experience at a number of commercial vehicle suppliers in addition to Accuride. From 1999 through late 2006, Mr. Lasky served as the Chairman, President and Chief Executive Officer of JLG Industries, Inc. ("**JLG**"), a manufacturer of aerial work platforms, telescopic material handlers and related accessories. Prior to joining JLG, Mr. Lasky served in various senior capacities at Dana Corporation from 1977 to 1999.

31. Due to his extensive experience at Accuride and other commercial vehicle suppliers, if Mr. Lasky were to join a competitor of Accuride, the Debtors have determined it would have a detrimental effect on the business and prospects of Accuride.

32. For the foregoing reasons, under the totality of the circumstances, the Compensation Committee and the board of directors in consultation with Hewitt have determined, in their business judgment, to enter into a non-compete agreement with Mr. Lasky (the "**Non-Compete Agreement**"). Based on their experience and expertise with CEO compensation packages, including non-competition agreements, Hewitt assisted the Debtors in designing and refining the Non-Compete Agreement. Pursuant to the terms of the Non-Compete Agreement, a final form of which will be filed separately under seal as Exhibit C to the Motion,[9] Mr. Lasky will receive $800,000, which is equal to one-year's base salary, to refrain from competing with the Debtors for a period of one year after the date on which his employment with the Debtors ends. The non-compete payment will be payable upon the date Mr. Lasky's employment with the Debtors' ends for any reason, voluntarily or otherwise, other than by

---

[9]    Upon completion of the final form of the Non-Compete Agreement, the Debtors will provide the Non-Compete Agreement to the United States Trustee, the Creditors' Committee, their pre and post-petition lenders and ad hoc committee for the holders of 8.5% senior subordinated notes due February 1, 2015.

reason of death or permanent disability, and will be paid over a period of twelve months according to the Company's normal payroll schedule.[10]

**Relief Requested**

33.     By this Motion, the Debtors seek entry of an order authorizing the Debtors to (i) honor certain of the Prepetition Benefit Programs to all eligible employees, including insiders; (ii) implement the KEIP; (iii) modify the Directors' Deferred Compensation Plan, such that all postpetition deferred compensation will be placed in cash accounts not tied to the price of the common stock of Accuride Corporation; and (iv) enter into the Non-Compete Agreement with Mr. Lasky.

**Basis for Relief**

I.      **Implementing the KEIP is a Sound Exercise of the Debtors' Business Judgment and Should be Approved under Section 363(b) of the Bankruptcy Code.**

34.     Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." To approve the use of estate property under section 363(b)(1) of the Bankruptcy Code, a debtor must show that the decision to use the property outside of the ordinary course of business was based on the debtor's business judgment. See In re Chateaugay Corp., 973 F.2d 141, 143 (2d Cir. 1992) (holding that a judge determining a 363(b) application must find a good business reason to grant such application); see also In re Lionel Corp., 722 F.2d 1063, 1070 (2d Cir. 1983) (requiring "some articulated business justification" to approve the use, sale or lease of property outside the ordinary course of business); In re Ionosphere Clubs, Inc.,

---

[10]     If any stock of Accuride is traded on an established securities market at the time of his termination, payments will be delayed for six months, with ½ the amount paid on the six month anniversary of his termination and the remainder payable in installments over the remaining six months. This delay in payment is required in order for the payment to comply with the deferred compensation rules of Section 409A of the Internal Revenue Code. Otherwise, the payments will be paid in installments over 12 months.

100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989) (noting that the standard for determining a section 363(b) motion is "a good business reason"); In re Global Crossing Ltd., 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003).

35.     The business judgment rule shields a debtor's management's decisions from judicial second guessing.  In re Johns-Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) (a "presumption of reasonableness attaches to a Debtor's management decisions" and courts will generally not entertain objections to the debtor's conduct after a reasonable basis is set forth).  Once a debtor articulates a valid business justification, the law vests the debtor's decision to use property outside of the ordinary course of business with a strong presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company."  In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (citations and internal quotations omitted), appeal dismissed, 3 F.3d 49 (2d Cir. 1993).  Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

36.     The implementation of the KEIP is a proper exercise of the Debtors' business judgment and is in the best interests of their estates and the interests of all stakeholders in these Chapter 11 Cases.  In addition to their ordinary course activities overseeing the Debtors' businesses and maintaining key relationships with employees, long-standing customers and suppliers, the Participants must take on the additional responsibilities attendant to managing the chapter 11 process.  The skills, knowledge, and motivation of the Participants are essential to meeting the Debtors' budgets and preserving the value of the Debtors' businesses.

37.     The KEIP aligns the interests of the Participants and all stakeholders in

these Chapter 11 Cases. Payments under the KEIP are only made if the Participants attain certain liquidity targets. The liquidity targets can only be met if the Participants preserve the going concern value of the Debtors' business and maximize the value of that business. The KEIP is calibrated to meet its stated goal, which is to motivate the Participants through the remainder of these Chapter 11 Cases by rewarding them for maximizing value for all parties in interest. Thus, the KEIP is designed to "achieve the desired performance." In re Dana Corp., 358 B.R. 567, 576 (Bankr. S.D.N.Y. 2006) (emphasis omitted).

38. Not only is the KEIP calculated to achieve the desired performance, but any payouts under the KEIP are reasonable. Hewitt analyzed the potential payouts under the KEIP using benchmarks for senior management compensation in comparable chapter 11 cases in which the Debtors received court authorization to implement a postpetition incentive program. Hewitt found the potential payouts to be reasonable and within market practice. If necessary, at the hearing on this Motion, Hewitt will be available to testify to the foregoing.

39. This Court and other courts have recognized that programs such as the KEIP can provide a highly efficient means of maximizing value for a debtor's estate and, accordingly, have approved similar incentive programs. See In re Leiner Health Prods. Inc., Case No. 08-10446 (KJC) (Bankr. D. Del. Apr. 14, 2008) (approving incentive payments to senior management); In re Dura Automotive Systems, Inc., Case No. 06-11202 (KJC) (Bankr. D. Del. June 1, 2007) (approving incentive payments to senior management); In re Dura, (Bankr. D. Del. May 8, 2007) (approving cash payments under the debtors' key management incentive plan for progress made in the debtors' operational restructuring initiatives); In re Riverstone Networks, Inc., Case No. 06-10110 (CSS) (Bankr. D. Del. Mar. 28, 2006) (approving an employee bonus program providing for cash payments for successful completion of certain

individual and company performance goals); In re Pliant Corp., Case No. 06-10001 (MFW) (Bankr. D. Del. Mar. 14, 2006) (approving management incentive compensation plan providing for cash awards for achievement of organizational performance goals); In re Nobex Corp., Case No. 05-20050 (MFW) (Bankr. D. Del. Jan. 19, 2006) (approving incentive payments to certain employees, with amount of payments tied to sale price achieved); In re Dana, 358 B.R. at 584 (approving management incentive plan); In re PlusFunds Group, Inc., Case No. 06-10402 (JMP) (Bankr. S.D.N.Y. Apr. 19, 2006) (granting debtor's request to implement an incentive plan for six senior managers); In re Musicland Holding Corp., Case No. 06-10064 (SMB) (Bankr. S.D.N.Y. Feb. 1, 2006) (approving continuation of management incentive plan); and In re Kimball Hill, Inc., Case No. 08-10095 (SPS) (Bankr. N.D. Ill. Dec. 17, 2008 (approving management incentive plan in connection with the wind-down of the debtors' operations).

40.     Accordingly, the Debtors submit that implementing the KEIP is a valid exercise of the Debtors' business judgment and is in the best interests of the Debtors' stakeholders in these Chapter 11 Cases.

## II.     The KEIP Satisfies the Requirements of Section 503(c) of the Bankruptcy Code and Should be Approved.

41.     Certain of the Participants are "insiders" within the meaning of section 101(31) of the Bankruptcy Code, and therefore, the KEIP implicates section 503(c) of the Bankruptcy Code.    Section 503(c) of the Bankruptcy Code, which is applicable in all bankruptcy cases filed after October 2005, provides criteria for courts to use in approving certain types of payments to insiders and "other transfers or obligations that are outside the ordinary course of business."    Section 503(c) comprises three subsections: (1) restrictions on retention plans for insiders; (2) limitations on severance payments; and (3) standards governing other transfers to certain employees and consultants, among others, that are

outside of the ordinary course. See 11 U.S.C. § 503(c). The Debtors respectfully submit that neither 503(c)(1) nor 503(c)(2) are applicable to evaluating the KEIP. In addition, while section 503(c)(3) of the Bankruptcy Code may be applicable to the KEIP, as described below, that section of the Bankruptcy Code mirrors section 363(b) of the Bankruptcy Code. Thus, the Debtors submit that the standard for evaluating the KEIP pursuant to section 503(c)(3) of the Bankruptcy Code is the same as the standard pursuant to section 363(b) of the Bankruptcy Code, discussed supra.

**A.**    ***The KEIP is Neither a Severance Plan Nor a Retention Plan.***

42.    By the statute's plain language, section 503(c)(1) pertains solely to retention plans of insiders and section 503(c)(2) addresses only the requirements for severance plans. Neither provision applies to performance-based incentive plans, such as the instant KEIP. See, e.g., In re Nobex Corp., No. 05-20050, January 12, 2006, Hearing Tr. at 67 (Bankr. D. Del. 2006) (Walrath, C.J.); In re Calpine Corp., No. 05-60200, April 26, 2006 Hearing Tr. at 87 (Bankr. S.D.N.Y. 2006) (Lifland, J.). Indeed, one court has held that:

> If sections 503(c)(1) and (c)(2) are not operative, a court may consider whether the payments are permissible under section 503(c)(3), which limits payments made to management and employees, among others, outside of the ordinary course, unless such payments are shown to be justified under the facts and circumstances of the chapter 11 case. As one treatise points out, the test in section 503(c)(3) appears to be no more stringent a test than the one courts must apply in approving any administrative expense under section 503(b)(1)(A).

In re Dana, 358 B.R. at 576; In re Werner Holding Co., Inc., Case No. 06-10578 (KJC) (Bankr. D. Del. July 28, 2006, Aug. 22, 2006 and Dec. 27, 2006) (ordering various relief requested in connection with debtors' incentive bonus plans pursuant to sections 363(b) and 503(c) of the Bankruptcy Code); In re Musicland, (Bankr. S.D.N.Y. Feb. 1, 2006) (debtor continuing to provide incentive bonuses under management incentive plan did not violate section 503(c) of the

Bankruptcy Code); In re Dana, 358 B.R. at 576 (applying section 503(c)(3) of the Bankruptcy Code to evaluate management incentive plan in absence of applicability of sections 503(c)(1) or 501(c)(2) of the Bankruptcy Code); In re Calpine Corp., Case No. 05-60200, Hr'g Tr. at 84-85 (Bankr. S.D.N.Y. Apr. 26, 2006), (sections 503(c)(1) and 503(c)(2) of the Bankruptcy Code do not apply to incentive programs).

43.     The KEIP contains neither retention nor severance components. Rather, the KEIP provides only for targeted, metric based incentive payments. These incentive payments are based upon achievement of specific liquidity and timing goals, which may only be achieved if the Participants do an outstanding job of maintaining the going concern value of the business during these Chapter 11 Cases and working diligently with creditor constituencies to emerge from bankruptcy promptly. These performance-based goals have been calculated such that they will be difficult to achieve. Furthermore, the Participants will not receive any payment pursuant to the KEIP if these goals are not reached. Therefore, the Debtors respectfully submit that neither section 503(c)(1) nor section 503(c)(2) applies to the Motion.

**B.**     *The KEIP Meets the Requirements of Section 503(c)(3) of the Bankruptcy Code.*

44.     Section 503(c)(3) of the Bankruptcy Code also does not preclude the KEIP. Section 503(c)(3) prohibits transfers made to officers, managers, consultants and others that are both "outside the ordinary course of business and not justified by the facts and circumstances of the case." 4-503 Collier on Bankruptcy ¶ 503.17 (15th ed. rev. 2009). Courts that have analyzed the prohibition on "other transfers" to certain categories of employees set forth in section 503(c)(3) of the Bankruptcy Code have applied the same standard under that section as they do under section 363(b) of the Bankruptcy Code: namely, whether the decision to use estate property outside of the ordinary course of business is based on a sound exercise of the

debtor's business judgment. See Dana, 358 B.R. at 576 (the test for evaluating a compensation proposal under section 503(c)(3) of the Bankruptcy Code is the "sound business judgment" test) (citing Nobex, 2006 Bankr. LEXIS 417 (Bankr. D. Del. Jan. 19, 2006); see also Nobex, Case No. 05-20050 (MFW) (Bankr. D. Del. Jan. 12, 2006), Hearing Tr. at 86- 87 (concluding that the standard under section 503(c)(3) of the Bankruptcy Code was "quite frankly nothing more than a reiteration of the standard under [Section] 363 [of the Bankruptcy Code] . . . the business judgment of the debtor").

45.     As set forth above, implementing the KEIP has a sound business purpose: (a) to maximize value for all parties in interest in these Chapter 11 Cases, and (b) to motive the Participants throughout the duration of these Chapter 11 Cases by rewarding them for outstanding performance.  Thus, the KEIP satisfies section 503(c)(3) of the Bankruptcy Code because, as discussed above, implementation of the KEIP is a proper exercise of the Debtors' business judgment and is justified by the facts and circumstances of these Chapter 11 Cases.

**III.    The Debtors Should be Authorized to Enter Into The Non-Compete Agreement Under 503(c)(3) and 363(b).**

46.     Neither section 503(c)(1), which applies to "retention" payments, nor section 503(c)(2), which applies to "severance" payments, are applicable to the Non-Compete Agreement.   However, the non-compete payment to Mr. Lasky may be subject to the requirements of section 503(c)(3) of the Bankruptcy Code, which governs transfers to insiders outside the ordinary course of business.  Nevertheless, the non-compete payment, if made to Mr. Lasky during the pendency of these Chapter 11 Cases, would easily satisfy the requirement of 503(c)(3), as a transfer outside the ordinary course of business that is "justified by the facts and circumstances of the case."

**A.** **_The Non-Compete Agreement is Neither A Retention Plan Nor A Severance Plan._**

47. By the statute's plain language, section 503(c)(1) only applies to "retention" plans of insiders. The Non-Compete Agreement is not a retention plan in any sense of the word. In fact, Mr. Lasky is only paid under the Non-Compete Agreement upon ceasing to be employed by the Debtors, not continuing to be employed.

48. Section 503(c)(2) addresses the requirements for "severance payments." Section 503(c)(2) does not apply to the Non-Compete Agreement because the agreement does not contemplate making any severance payments to Mr. Lasky. The Second Circuit, in <u>Straus-Duparquet, Inc. v. International Brotherhood of Electrical Workers</u>, 386 F.2d 649, 651 (2d Cir. 1967), defined "severance," in the bankruptcy context, as "a form of compensation . . . primarily to alleviate the consequent need for economic readjustment but also to recompense [] for certain losses attributable to the dismissal." The payment Mr. Lasky would receive under the Non-Compete Agreement is <u>not</u> to "recompense" him for losses, but rather to pay him for his agreement not to compete with the Debtors. Moreover, unlike almost all modern severance payments, Mr. Lasky receives the non-compete payment even if he voluntarily resigns. Furthermore, Mr. Lasky will not receive the non-compete payment if his employment is terminated by reason of death or disability, as following such event, Mr. Lasky would not be in a position to compete with the Company. This demonstrates that the payment Mr. Lasky may receive under the Non-Compete Agreement is purely to compensate Mr. Lasky for not competing with the Debtors and not to compensate him for the loss of his employment. The Debtors considered making the non-compete payment to Mr. Lasky now (to induce Mr. Lasky to enter into the Non-Compete Agreement); however, in light of the Debtors current financial situation, Mr. Lasky has agreed to delay receiving the non-compete payment until such time as

his employment with the Debtors ends (voluntarily or otherwise).

49.     The Debtors are aware of the decision by the Bankruptcy Court for the Southern District of New York in In re Dana Corp., 351 B.R. 96 (Bankr. S.D.N.Y. 2006) ("**Dana I**"). In Dana I, the court held that a proposed severance payment to induce an insider of the company to enter into a non-compete agreement was still a "severance payment" that was subject to the requirements of section 503(c)(2).   However, the non-compete payment the Debtors propose in this case differs significantly from the severance payment to be made in Dana I. Specifically, the payment in Dana I was only payable upon "involuntary dismissal or resigning for good reason."   Id. at 102.   On the other hand, in this case, the Debtors seek to make a payment to Mr. Lasky regardless of the reason for his departure from the Debtors, solely for the purpose of inducing him not to compete.   Indeed, the proposed payment under the Non-Compete Agreement is much more like the non-compete payments in In re Pilgrim's Pride Corp., 401 B.R. 229 (Bankr. N.D. Tex. 2009), in which the court approved the debtors' motion to "purchase" the non-compete agreements of former officers for the purpose of preventing them from competing with the debtors.

50.     Thus, the requirement of sections 503(c)(1) and 503(c)(2) of the Bankruptcy Code do not apply to the Non-Compete Agreement.

**B.      *The Non-Compete Agreement Meets the Requirements of Section 503(c)(3) of the Bankruptcy Code.***

51.     Section 503(c)(3) of the Bankruptcy Code prohibits transfers or other obligations to insiders that are "outside the ordinary course of business and not justified by the facts and circumstances of the case."   As set forth above, this standard is the same as the standard employed by section 363(b) of the Bankruptcy Code, that is, the business judgment standard. See Nobex, Case No. 05-20050 (MFW) (Bankr. D. Del. Jan. 12, 2006), Hearing Tr. at 86- 87.

52. The Debtors decision to enter into the Non-Compete Agreement easily satisfies the business judgment standard. As described herein, Mr. Lasky is intimately familiar with the Debtors' businesses and is well-aware of the markets in which the Debtors operate. He is known among all major companies in the Debtors' industry and would be highly desirable for many of the Debtors' competitors.

53. Mr. Lasky does not currently have a non-compete agreement with the Debtors and his employment is at will. As such, Mr. Lasky could theoretically resign today and begin working at a major competitor tomorrow. Losing Mr. Lasky at this critical time would undoubtedly lead to a loss in customers and a loss in people's faith in the Debtors' ability to reorganize successfully. Of even greater importance, losing Mr. Lasky to a competitor would likely lead to accelerated losses in revenue and market share.

54. If the Debtors enter into the Non-Compete Agreement, and Mr. Lasky's employment with the Debtors ends, the Non-Compete Agreement would provide the Debtors with a full year to allow them to solidify their positions in the market under new management, before Mr. Lasky would be able to bring his considerable talents to a competitor.

55. Thus, the Non-Compete Agreement satisfies section 503(c)(3) of the Bankruptcy Code because it will increase the value of the Debtors businesses. As discussed above, entering into the Non-Compete Agreement is a proper exercise of the Debtors' business judgment that is justified by the facts and circumstances of these Chapter 11 Cases and will maximize the value of the Debtors' respective estates.

## IV. Honoring Certain of the Prepetition Benefit Programs and Modifying the Directors' Deferred Compensation Plan Should be Approved under Section 363(b) and 363(c) of the Bankruptcy Code.

56. The Court should approve the Debtors' request to honor certain of the Prepetition Benefit Programs under section 363(c) of the Bankruptcy Code, which allows the

Debtors to "use property of the estate in the ordinary course of business." 11 U.S.C. § 363(c)(1). Moreover, even assuming that honoring certain of the Prepetition Benefit Programs fall outside the ordinary course of business, honoring such programs is a sound exercise of the Debtors' business judgment under section 363(b). The relatively modest amounts sought to be paid under the LTIP and financial planning stipend are a small price to pay for the invaluable service eligible employees under such programs provide to the Debtors. Thus, while the debtors believe that such payments are in the ordinary course under 363(c), out of an abundance of caution, the Debtors request that the Court grant the authority to honor such programs to all eligible employees postpetition.

57.     The modification of the Directors' Deferred Compensation Plan is also a proper exercise of the Debtors' business judgment and is in the best interests of their estates and the interests of all stakeholders in these Chapter 11 Cases. It would be inequitable to punish the directors who have chosen to defer compensation into a "stock account." Such deferred compensation is earned by the directors in the ordinary course of business, and placing this compensation in accounts that are tied to the value of Accuride stock unfairly denies the directors of fair compensation. The cost of placing all deferred compensation into cash accounts is very modest and is a proper exercise of the Debtors' business judgment. Fairly compensating directors is a sound business practice and is clearly within the Debtors' business judgment.

58.     Thus, the Debtors submit that honoring certain of the Prepetition Benefit Programs and modifying the Directors Deferred Compensation Plan should be authorized by the Court.

**V.      The Relief Requested Herein Is Also Warranted Under Section 105(a) to Protect the Value of the Debtors' Estates.**

59.     The relief requested herein is also warranted under section 105(a) of the

Bankruptcy Code, which allows the Court to enter any order "that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Any order designed to preserve the value of the debtor's estate is an order authorized under section 105(a) of the Bankruptcy Code. See, e.g., In re Adelphia Communications Corp., 2003 WL 21297258, at *4 (S.D.N.Y. June 4, 2003) ("Section 105 of Title 11 provides the bankruptcy courts with a broad range of equitable powers over cases within its jurisdiction."). As explained above, the proposed programs and payments are intended to preserve the value of the Debtors' estates by creating appropriate financial incentives for the eligible employees to increase the value of the Debtors' estates.

60.     Indeed, section 105(a) is sufficiently robust that it even grants authority in appropriate cases to provide for payment of pre-petition incentive payments. See, e.g., In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (noting that a bankruptcy court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept"); In re Just for Feet, 242 B.R. 821, 824 (D. Del. 1999) ("Certain pre-petition claims by employees and trade creditors, however, may need to be paid to facilitate a successful reorganization. Section 105(a) of the Code provides a statutory basis for the payment of prepetition claims.") (citing In re Lehigh & New England Railway Co., 657 F.2d 570, 581 (3rd Cir. 1981)).

61.     Accordingly, for all of the foregoing reasons, the Debtors submit that cause exists for authorizing the Debtors to implement the KEIP, honor certain of the Prepetition Benefit Programs, modify the Directors' Deferred Compensation Plan, and enter into the Non-Compete Agreement with Mr. Lasky.

## Notice

62.     No trustee or examiner has been appointed in the Chapter 11 Cases.  The Debtors have provided notice of this Motion to: (a) the United States Trustee for the District of Delaware; (b) counsel to administrative agent under the prepetition secured loan facility; (c) counsel to the ad hoc committee for the holders of 8.5% senior subordinated notes due February 1, 2015; (d) counsel to the debtor in possession lenders; (e) counsel to the Creditors' Committee; (f) the Internal Revenue Service; (g) the Securities and Exchange Commission; (h) the Creditors' Committee; and (i) all parties requesting notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, the Debtors submit that no further notice is required or needed under the circumstances.

63.     A  copy  of  the  Motion  is  available  on  the  Court's  website: www.deb.uscourts.gov.  Additional copies of the Motion are available on the website of the Debtors' proposed claims, noticing, soliciting and balloting agent, Garden City Group, at www.accurideinfo.com or can be requested by calling 888-478-2068.

WHEREFORE, the Debtors respectfully request the entry of an order, substantially in the form attached hereto as Exhibit A, authorizing the Debtors (a) honor certain of the Prepetition Benefit Programs, (b) implement the KEIP, (c) modify the Directors' Deferred Compensation Plan, (d) enter into the Non-Compete Agreement, and (e) granting such other and further relief as the Court deems appropriate.

Dated: November 10, 2009　　　　Respectfully Submitted,
Wilmington, Delaware


　　　　　　　　　　　　/s/ Kara Hammond Coyle
　　　　　　　　　　　　Michael R. Nestor (No. 3526)
　　　　　　　　　　　　Kara Hammond Coyle (No. 4410)
　　　　　　　　　　　　YOUNG CONAWAY STARGATT & TAYLOR, LLP
　　　　　　　　　　　　1000 West Street, 17th Floor
　　　　　　　　　　　　Wilmington, Delaware 19801
　　　　　　　　　　　　Telephone: (302) 571-6600
　　　　　　　　　　　　Facsimile: (302) 571-1253

　　　　　　　　　　　　　　-and-

　　　　　　　　　　　　David S. Heller
　　　　　　　　　　　　Caroline A. Reckler
　　　　　　　　　　　　LATHAM & WATKINS LLP
　　　　　　　　　　　　Willis Tower, Suite 5800
　　　　　　　　　　　　233 South Wacker Drive
　　　　　　　　　　　　Chicago, IL 60606
　　　　　　　　　　　　Telephone: (312) 876-7700
　　　　　　　　　　　　Facsimile: (312) 993-9767

　　　　　　　　　　　　Counsel for Debtors and Debtors in Possession