# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| ACCURIDE CORPORATION, *et al.*,[1] | ) |
| | ) Case No. 09-13449 (BLS) |
| Debtors. | ) |
| | ) |

---

## DISCLOSURE STATEMENT FOR
## THE JOINT PLAN OF REORGANIZATION FOR
## ACCURIDE CORPORATION, *et al.*

**LATHAM & WATKINS LLP**
David S. Heller
Josef S. Athanas
Caroline A. Reckler
233 South Wacker Drive, Suite 5800
Chicago, Illinois 160606
Telephone: (312) 876-7608
Facsimile: (312) 993-9767

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Michael R. Nestor
Kara H. Coyle
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Co-Counsel for the Debtors and Debtors in Possession

Dated: November 17, 2009

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Accuride Corporation, a Delaware corporation (9077); Accuride Cuyahoga Falls, Inc., a Delaware corporation (9556); Accuride Distributing, LLC, a Delaware limited liability company (3124); Accuride EMI, LLC, a Delaware limited liability company (N/A); Accuride Erie L.P., a Delaware limited partnership (4862); Accuride Henderson Limited Liability Company, a Delaware limited liability company (8596); AKW General Partner L.L.C., a Delaware limited liability company (4861); AOT Inc., a Delaware corporation (3088); Bostrom Holdings, Inc., a Delaware corporation (9282); Bostrom Seating, Inc., a Delaware corporation (7179); Bostrom Specialty Seating, Inc., a Delaware corporation (4182); Brillion Iron Works, Inc., a Delaware corporation (6942); Erie Land Holding, Inc., a Delaware corporation (8018); Fabco Automotive Corporation, a Delaware corporation (9802); Gunite Corporation, a Delaware corporation (9803); Imperial Group Holding Corp. -1, a Delaware corporation (4007); Imperial Group Holding Corp. -2, a Delaware corporation (4009); Imperial Group, L.P., a Delaware limited partnership (4012); JAII Management Company, a Delaware corporation (N/A); Transportation Technologies Industries, Inc., a Delaware corporation (2791); and Truck Components Inc., a Delaware corporation (5407). The mailing address for Accuride Corporation is 7140 Office Circle, Evansville, Indiana 47715.

**THE VOTING DEADLINE IS [4:00] P.M. PREVAILING EASTERN TIME ON [JANUARY 29], 2010** (UNLESS THE DEBTORS EXTEND THE VOTING DEADLINE).

TO BE COUNTED AS A VOTE TO ACCEPT OR REJECT THE PLAN, THE VOTING AND CLAIMS AGENT MUST <u>ACTUALLY</u> <u>RECEIVE</u> YOUR BALLOT, PRE-VALIDATED BENEFICIAL HOLDER BALLOT OR MASTER BALLOT, AS APPLICABLE, ON OR BEFORE THE VOTING DEADLINE.

BENEFICIAL HOLDERS RECEIVING BENEFICIAL HOLDER BALLOTS THAT ARE <u>NOT</u> PRE-VALIDATED MUST RETURN SUCH BENEFICIAL HOLDER BALLOTS TO THEIR RESPECTIVE INTERMEDIARY RECORD OWNERS AS SOON AS POSSIBLE TO ALLOW SUFFICIENT TIME FOR INTERMEDIARY RECORD OWNERS TO VALIDATE AND INCLUDE THEIR VOTES ON A MASTER BALLOT AND RETURN SUCH MASTER BALLOTS TO THE VOTING AND CLAIMS AGENT ON OR BEFORE THE VOTING DEADLINE.

CH\1125862.14

| IMPORTANT INFORMATION FOR YOU TO READ |
| --- |

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR THE PURPOSE OF SOLICITING VOTES TO ACCEPT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAVE PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. THE READER IS CAUTIONED THAT ALL FORWARD LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD LOOKING STATEMENTS. THE LIQUIDATION ANALYSIS, DISTRIBUTION PROJECTIONS AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS OR EQUITY INTERESTS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. THEREFORE, ANY ANALYSES, ESTIMATES OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016 AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THE SECURITIES DESCRIBED HEREIN WILL BE ISSUED TO CREDITORS AND EQUITY INTEREST HOLDERS WITHOUT REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY SIMILAR FEDERAL, STATE OR LOCAL LAW, AND WILL INSTEAD RELY UPON THE EXEMPTIONS SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE AND SECTION 4(2) OF THE SECURITIES ACT OR OTHER APPLICABLE EXEMPTIONS. THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF ANY SECURITIES PURSUANT TO THE PLAN CONSULT THEIR OWN LEGAL COUNSEL CONCERNING THE SECURITIES LAWS GOVERNING THE TRANSFERABILITY OF ANY SUCH SECURITIES.

NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT. THE DEBTORS URGE EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF DISCLOSURE CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE PLAN.

IT IS THE DEBTORS' POSITION THAT THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER. RATHER, THIS DISCLOSURE STATEMENT SHALL CONSTITUTE A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR LITIGATION CLAIM OR PROJECTED OBJECTION TO A PARTICULAR CLAIM OR EQUITY INTEREST IS, OR IS NOT, IDENTIFIED IN THE DISCLOSURE STATEMENT. THE DEBTORS OR THE REORGANIZED DEBTORS MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE CLAIMS OR EQUITY INTERESTS AND MAY OBJECT TO CLAIMS OR EQUITY INTERESTS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THE DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR EQUITY INTERESTS OR OBJECTIONS TO CLAIMS OR EQUITY INTERESTS.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY CONFLICT, INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN AND CONTROL FOR ALL PURPOSES. EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED, FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE DEBTORS' MANAGEMENT HAS REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THE DEBTORS HAVE USED THEIR REASONABLE BUSINESS JUDGMENT TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED (UNLESS EXPRESSLY PROVIDED HEREIN).

THE DEBTORS ARE GENERALLY MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF WHERE FEASIBLE, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO. HOLDERS OF CLAIMS AND EQUITY INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DISCLOSURE STATEMENT WAS FILED. THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

HOLDERS OF CLAIMS AND EQUITY INTERESTS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN MUST RELY ON THEIR OWN EVALUATION OF THE DEBTORS AND THEIR OWN ANALYSES OF THE TERMS OF THE PLAN IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.  IMPORTANTLY, PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST IN A VOTING CLASS SHOULD REVIEW THE PLAN IN ITS ENTIRETY AND CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT AND ANY EXHIBITS HERETO, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL IN SECTION VI HEREIN, "PLAN-RELATED RISK FACTORS."

# TABLE OF CONTENTS

Page

I. EXECUTIVE SUMMARY ........................................................................................... i

    A.    Purpose and Effect of the Plan .............................................................................. i

    B.    Administrative, DIP Facility and Priority Tax Claims ........................................ iv

    C.    Classification and Treatment of Claims and Interests Under the Plan .................. v

    D.    Solicitation Procedures ....................................................................................... vii

    E.    Voting Procedures ................................................................................................ xi

    F.    Confirmation of the Plan .................................................................................... xiv

    G.    Consummation of the Plan ................................................................................... xv

    H.    Risk Factors ......................................................................................................... xv

II. BACKGROUND TO THE CHAPTER 11 CASES ................................................... 1

    A.    The Debtors' Corporate History ........................................................................... 1

    B.    Overview of the Debtors' Business ........................................................................ 1

    C.    Overview Of The Prepetition Capital Structure .................................................... 3

    D.    Litigation Claims .................................................................................................. 5

    E.    Events Leading to the Chapter 11 Filing .............................................................. 5

    F.    Restructuring Support Agreements ....................................................................... 8

III. EVENTS DURING THE CHAPTER 11 CASES ................................................... 10

    A.    First Day Motions and Certain Related Relief .................................................... 10

    B.    The Official Committee of Unsecured Creditors ................................................ 12

    C.    Filing of the Schedules and Establishment of the Claims Bar Date .................... 13

    D.    Reorganization Strategy ..................................................................................... 13

    E.    Exclusive Period for Filing a Plan and Soliciting Votes ..................................... 13

    F.    Deadline to Assume or Reject Leases of Nonresidential Real Property ............... 14

G.    Summary Of The Rights Offering ............................................................................ 14

H.    Summary Of The New Notes ................................................................................. 15

I.    Summary Of The Restructured Credit Facility ...................................................... 16

J.    Summary Of The KEIP And Related Compensation Issues .................................. 17

K.    Substantive Consolidation Of The Debtors ........................................................... 18

L.    Summary Of The Equity Capitalization Of Reorganized Accuride ..................... 19

IV.    **SUMMARY OF THE PLAN** ....................................................................................... **22**

A.    Administrative, DIP Facility and Priority Tax Claims ......................................... 22

B.    Classification and Treatment of Classified Claims and Equity Interests .............. 24

C.    Acceptance or Rejection of the Plan ..................................................................... 30

D.    Means for Implementation of the Plan .................................................................. 31

E.    Treatment of Executory Contracts and Unexpired Leases .................................... 37

F.    Provisions Governing Distributions ...................................................................... 40

G.    Procedures for Resolving Contingent, Unliquidated and Disputed Claims ........... 44

H.    Conditions Precedent to Confirmation and Consummation of the Plan ................ 45

I.    Release, Injunction And Related Provisions ......................................................... 47

J.    Binding Nature Of Plan ......................................................................................... 50

V.    **CONFIRMATION AND CONSUMMATION PROCEDURES** ..................................... **51**

A.    Solicitation of Votes ............................................................................................. 51

B.    Confirmation Procedures ...................................................................................... 51

C.    Statutory Requirements for Confirmation of the Plan ........................................... 51

D.    Consummation of the Plan .................................................................................... 56

VI.    **PLAN-RELATED RISK FACTORS** ........................................................................... **57**

A.    Certain Bankruptcy Law Considerations .............................................................. 57

B.    Risk Factors That May Affect the Value of Securities to be Issued Under the Plan and/or Recoveries Under the Plan ................................................................. 59

C.      Risk Factors that Could Negatively Impact the Debtors' Business ......................................... 60

D.      Risks Associated with Forward Looking Statements........................................................... 70

E.      Disclosure Statement Disclaimer ...................................................................................... 70

VII.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN........................... 73

A.      Liquidation Under Chapter 7 of the Bankruptcy Code ...................................................... 73

B.      Filing of an Alternative Plan of Reorganization ............................................................... 73

VIII.   EXEMPTIONS FROM SECURITIES ACT REGISTRATION.................................................... 74

Section 1145 of the Bankruptcy Code and Section 4(2) of the Securities Act.................................. 74

IX.     CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ................................. 77

A.      Introduction...................................................................................................................... 77

B.      Federal Income Tax Consequences to the Debtors ............................................................ 78

C.      Federal Income Tax Consequences to Holders of Certain Claims....................................... 81

RECOMMENDATION ..................................................................................................................... 88

## SCHEDULES

SCHEDULE 1    The Debtors

## EXHIBITS

EXHIBIT A    Plan of Reorganization

EXHIBIT B    Organizational Chart of the Debtors

EXHIBIT C    Disclosure Statement Order

EXHIBIT D    The Reorganized Debtors' Financial Projections

EXHIBIT E    The Reorganized Debtors' Valuation Analysis

EXHIBIT F    Liquidation Analysis

EXHIBIT G    Historical Financial Statements

> THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH EXHIBIT ATTACHED TO THIS DISCLOSURE STATEMENT BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN.

# I.
# EXECUTIVE SUMMARY

Accuride Corporation, a Delaware corporation ("**Accuride**"), and each of the other debtors listed on Schedule 1 hereto (collectively, the "**Debtors**" or the "**Company**"), submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code in connection with the solicitation of votes on the Joint Plan of Reorganization for Accuride Corporation, *et al.*, dated November 17, 2009 (the "**Plan**"),[2] which was filed by the Debtors with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"). The Confirmation Hearing on the Plan is scheduled to commence at 10:00 a.m. prevailing Eastern Time on February 10, 2010 before the Bankruptcy Court. The lead number for the jointly administered Chapter 11 Cases is 09-13449 (BLS). A copy of the Plan is attached hereto as Exhibit A.

Prior to soliciting votes on a proposed plan of reorganization, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance or rejection of the plan of reorganization. As such, this Disclosure Statement is being submitted in accordance with the requirements of section 1125 of the Bankruptcy Code.

This Executive Summary is being provided as an overview of the material items addressed in the Disclosure Statement and the Plan, which is qualified by reference to the entire Disclosure Statement and by the actual terms of the Plan (and including all exhibits attached hereto and to the Plan), and should not be relied upon for a comprehensive discussion of the Disclosure Statement and/or the Plan. This Disclosure Statement includes, without limitation, information about:

- the Debtors' prepetition operating and financial history;

- the events leading up to the commencement of the Chapter 11 Cases;

- the significant events that have occurred during the Chapter 11 Cases;

- the solicitation procedures for voting on the Plan;

- the Confirmation process and the voting procedures that Holders of Claims and Equity Interests who are entitled to vote on the Plan must follow for their votes to be counted;

- the terms and provisions of the Plan, including certain effects of confirmation of the Plan, certain risk factors relating to the Debtors or the Reorganized Debtors, the Plan and the securities to be issued under the Plan and the manner in which distributions will be made under the Plan; and

- the proposed organization, operations and financing of the Reorganized Debtors if the Plan is confirmed and becomes effective.

## A.    PURPOSE AND EFFECT OF THE PLAN

### 1.    Plan of Reorganization Under Chapter 11 of the Bankruptcy Code

---

[2] All capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan. To the extent that a definition of a term in the text of this Disclosure Statement and the definition of such term in the Plan are inconsistent, the definition included in the Plan shall control and govern.

i

The Debtors are reorganizing pursuant to chapter 11 of the Bankruptcy Code, which is the principal business reorganization chapter of the Bankruptcy Code. As a result, the confirmation of the Plan means that the Reorganized Debtors will continue to operate their businesses going forward and does not mean that the Debtors will be liquidated or forced to go out of business. Additionally, as discussed in greater detail in Section IV.J herein, titled "Binding Nature of the Plan," a bankruptcy court's confirmation of a plan binds the debtor, any entity acquiring property under the plan, any holder of a claim or an equity interest in a debtor and all other entities as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code to the terms and conditions of the confirmed plan, whether or not such Entity voted on the Plan or affirmatively voted to reject the plan.

2.      **Financial Restructurings Under the Plan**

The Plan contemplates certain transactions, including, without limitation, the following transactions (described in greater detail in Section IV herein):

- Accuride's $291 million of Subordinated Notes Claims will be converted into 98,000,000 shares of the New Common Stock of Reorganized Accuride and the holders will receive their Pro Rata share of such shares of New Common Stock. The percentage ownership represented by such shares of New Common Stock of Reorganized Accuride is subject to dilution, including dilution for (i) the Backstop Fee, (ii) exercise of the New Warrants, (ii) conversion of the New Notes issued in payment of PIK interest (as defined in Section III.H) ("**PIK Notes**") and (iii) the Equity Incentive Program;

- Accuride's common stock will be cancelled and, if the Class of Accuride Other Equity Interests votes to accept the Plan, the holders will receive their Pro Rata share of 2,000,000 shares of the New Common Stock of Reorganized Accuride and their Pro Rata share of the New Warrants exercisable for an aggregate of 22,058,824 shares of the New Common Stock of Reorganized Accuride. The percentage ownership represented by the shares of New Common Stock of Reorganized Accuride issued directly to the Holders of Accuride Other Equity Interests is subject to dilution, including dilution for (i) the Backstop Fee, (ii) exercise of the New Warrants, (ii) conversion of the New Notes and PIK Notes and (iii) the Equity Incentive Program. The percentage ownership represented by the shares of New Common Stock issued to Holders of Accuride Other Equity Interests upon conversion of the New Warrants is subject to dilution, including dilution for (i) conversion of the New Notes and PIK Notes and (ii) the Equity Incentive Program;

- the Debtors will commence a Rights Offering of $140 million principal amount of New Notes to be issued by Accuride, and the Rights Offering Participants will receive Subscription Rights in the Rights Offering;

- the Reorganized Debtors and Accuride Canada Inc., a wholly-owned subsidiary of Accuride ("**Accuride Canada**"), will enter into a Restructured Credit Facility in an amount equal to $308.2 million including (i) letters of credit and (ii) the amount of interest accrued on the Last Out Credit Agreement Claims through the date of the exit;

- the obligations under the DIP Facility will be satisfied in full in Cash on the Effective Date;

- each Holder of a Prepetition First Out Credit Agreement Other Claim will be satisfied in full by becoming a lender under the Restructured Credit Facility on a Pro Rata basis;

- each Holder of a Prepetition First Out Credit Agreement LC Claim will be satisfied in full by receiving the right to receive the letter of credit fees, the reimbursement rights and the other rights set forth in the Restructured Credit Facility Agreement;

- the Prepetition Last Out Credit Agreement Claims will be satisfied in full in Cash on the Effective Date;

- the Accuride Preferred Equity Interests will be redeemed and the Holder of the Accuride Preferred Equity Interests will receive $100 liquidation preference in Cash;

- Unsecured trade creditors will be unimpaired and their claims will be paid in full in accordance with the terms of the Plan; and

- the Holders of other Claims or Equity Interests will receive the treatment summarized in Section IV.B.2 below.

The Debtors believe that consummation of the financial restructurings proposed under the Plan will simplify and de-lever their capital structure, provide sufficient liquidity to fund their emergence from chapter 11, appropriately capitalize the Reorganized Debtors and facilitate the implementation of the Debtors' business plan.

(a)     Substantive Consolidation.

The Plan is premised on the substantive consolidation of all of the Debtors with respect to the voting and treatment of all Claims and Equity Interests except for the Other Secured Claims in Class 2 and Secured Tax Claims in Class 3, as provided in the Plan. As a result, the Plan will serve as a request by the Debtors to the Bankruptcy Court that it grant substantive consolidation with respect to the treatment of all Claims and Equity Interests other than Class 2 Claims and Class 3 Claims as summarized in Section III.K herein and as further described in Section IV.D.2 herein and the Plan.

(b)     Satisfaction of the Prepetition Credit Facility Claims and Entry into the Restructured Credit Facility

On the Effective Date, the Prepetition Credit Agreement and all "Loan Documents" as defined therein will, subject to satisfaction or waiver of the conditions precedent set forth in the Restructured Credit Facility Agreement, be amended, restated and superseded in their entirety by the Restructured Credit Facility Agreement and all "Loan Documents" as defined therein; *provided*, that certain "Collateral Documents" (as defined in the Prepetition Credit Agreement) will be amended, supplemented or otherwise modified and will constitute and become "Collateral Documents" (as defined in the Restructured Credit Facility Agreement), and shall secure all the obligations under the Restructured Credit Facility Agreement and the other "Loan Documents" (as defined in the Restructured Credit Facility Agreement). The Restructured Credit Facility will be secured by a first-priority lien on and security interest in substantially all of the properties and assets of the Reorganized Debtors and Accuride Canada. The terms of the Restructured Credit Facility are summarized in Section III.I herein. On the Effective Date, each Holder of a Prepetition First Out Credit Agreement Other Claim will become a "Lender" under the Restructured Credit Facility, with all of the rights set forth therein and on a Pro Rata basis, and each Holder of a Prepetition First Out Credit Agreement LC Claim will receive, as prepetition letter of credit issuer, the right to receive the letter of credit fees, the reimbursement rights and the other rights set forth in the Restructured Credit Facility Agreement. The Prepetition Last Out Credit Agreement Claims will be satisfied in full in Cash by payment of the Prepetition Last Out Credit Payment Amount.

(c)     New Common Stock To be Issued Under the Plan

On the Effective Date, all Equity Interests in Accuride outstanding immediately prior to the Effective Date will be cancelled and Reorganized Accuride will issue the New Common Stock to Holders of Allowed Subordinated Notes Claims and, in the event that the Holders of Other Equity Interests in Accuride vote to accept the Plan, Holders of Allowed Accuride Other Equity Interests, pursuant to the terms set forth in the Plan. The percentage ownership represented by the New Common Stock of Reorganized Accuride issued to Holders of Allowed Subordinated Notes Claims and, if applicable, Holders of Allowed Accuride Other Equity Interests under the Plan is subject to dilution, including dilution for (i) the Backstop Fee, (ii) exercise of the New Warrants, (ii) conversion of the New Notes and PIK Notes and (iii) the Equity Incentive Program. Accuride will use its best efforts to list the New Common Stock on The New York Stock Exchange, the NASDAQ Market or another national securities exchange. The New Common Stock will be issued in accordance with applicable bankruptcy law and without

registration under the Securities Act or any similar federal, state or local law as set forth in greater detail in Section VIII herein, titled "Exemptions From Securities Act Registration."

<div align="center">(d)    <u>New Warrants To be Issued Under the Plan</u></div>

In the event that the Holders of Other Equity Interests in Accuride vote to accept the Plan, on the Effective Date, Reorganized Accuride will issue the New Warrants to Holders of Allowed Accuride Other Equity Interests pursuant to the terms set forth in the Plan. The New Warrants will be exercisable for an aggregate of 22,058,824 shares of the New Common Stock at the price per share set forth in Exhibit E to the Plan. The percentage ownership represented by the shares of New Common Stock issued to Holders of Allowed Accuride Other Equity Interests upon conversion of the New Warrants is subject to dilution, including dilution for (i) conversion of the New Notes and PIK Notes and (ii) the Equity Incentive Program. The New Warrants will expire two years from the Effective Date.

<div align="center">(e)    <u>The Rights Offering and the New Notes</u></div>

On the Subscription Commencement Date (which will occur as soon as possible after entry of the Disclosure Statement Order), the Debtors will commence a Rights Offering of $140 million principal amount of New Notes issued by Accuride, which will be offered to each Rights Offering Participant as of the Rights Offering Record Date. Pursuant to the Rights Offering, each Rights Offering Participant may subscribe for its Pro Rata Share of the Rights Offering Notes. Pursuant to the Backstop Commitment Agreement, the Backstop Investors have committed to purchase all Rights Offering Notes offered, but not otherwise purchased, in the Rights Offering. As compensation for their commitment, the Debtors will pay the Backstop Investors the Backstop Fee. The terms of the Rights Offering are summarized in Section III.G herein.

On the Effective Date, the New Notes will be convertible into an aggregate of (i) [187,500,000] shares of New Common Stock of Reorganized Accuride, if the Holders of Other Equity Interests in Accuride vote to accept the Plan, and (ii) [183,750,000] shares of New Common Stock of Reorganized Accuride, if the Holders of Other Equity Interests in Accuride do not vote to accept the Plan. If the Holders of Other Equity Interests in Accuride vote to accept the Plan and the New Warrants issued under the Plan are subsequently exercised in full in cash, the New Notes will be adjusted to be convertible into an aggregate of [220,588,235] shares of New Common Stock of Reorganized Accuride. The percentage ownership represented by the shares of New Common Stock issued upon conversion of the New Notes is subject to dilution, including dilution for the Equity Incentive Program. The proceeds of the Rights Offering will fund Cash payments required to be made under this Plan, including, without limitation, Transaction Expenses, the Prepetition Last Out Payment Amount and repayment of the DIP Facility Claims, and be used for general corporate purposes by the Reorganized Debtors after the Effective Date.

The New Notes will be senior unsecured obligations of Reorganized Accuride and will rank *pari passu* in right of payment to any existing senior unsecured debt of Accuride or any guarantor, and senior in right of payment to any current or future subordinated debt of Accuride or of any guarantor. The obligations of Reorganized Accuride will be guaranteed by each of Reorganized Accuride's domestic subsidiaries. The New Notes will be issued in a private placement that is exempt from registration under the Securities Act or any similar federal, state or local law as set forth in greater detail in Section VIII herein, titled "Exemptions From Securities Act Registration." The terms of the New Notes are summarized in Section III.H herein and in the term sheet attached as Exhibit D to the Plan.

<div align="center">(f)    <u>Equity Incentive Program for Directors and Management</u></div>

Following the Effective Date, Reorganized Accuride will adopt and implement a post-Effective Date director and employee equity incentive program providing for the issuance from time to time of shares of the New Common Stock of Accuride, including the grant of incentive stock options within the meaning of Section 422 of the Internal Revenue Code of 1986, as amended.

**B.    ADMINISTRATIVE, DIP FACILITY AND PRIORITY TAX CLAIMS**

The following is a summary of the treatment of Administrative, DIP Facility and Priority Tax Claims under the Plan. For a more detailed description of the treatment of such Claims under the Plan, please see Article II of the Plan.

### 1.     Administrative Claims

Except as otherwise provided in Article II of the Plan, on the later of the Effective Date or the date on which an Administrative Claim becomes an Allowed Administrative Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Claim will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim either (i) payment in full in Cash for the unpaid portion of such Allowed Administrative Claim; or (ii) such other less favorable treatment as agreed to in writing by the Debtors or Reorganized Debtors, as applicable, and such Holder; provided, however, that Administrative Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in accordance with such applicable terms and conditions relating thereto in the discretion of the Debtors or Reorganized Debtors without further notice to or order of the Bankruptcy Court.

### 2.     DIP Facility Claims

Unless otherwise agreed to by the DIP Lenders, the Allowed DIP Facility Claims will be paid and satisfied in full in Cash on the Effective Date in full satisfaction, settlement, discharge and release of, and in exchange for, such DIP Facility Claims.

### 3.     Priority Tax Claims

Except as otherwise provided in Article II of the Plan and as more fully described in Section IV.A.3 hereof, each Holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtors or Reorganized Debtors: (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; (b) such other less favorable treatment as agreed to in writing by the Debtors or Reorganized Debtors, as applicable, and such Holder; provided, however, that such parties may further agree for the payment of such Allowed Priority Tax Claim at a later date; or (c) installment Cash payments pursuant to and in accordance with sections 1129(a)(9)(C) and (D) of the Bankruptcy Code.

## C.     CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

The following table provides a summary of the classification and treatment of Claims and Equity Interests and the potential distributions to Holders of Allowed Claims or Equity Interests under the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS OR EQUITY INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN AND THE RISK FACTORS DESCRIBED IN ARTICLE VI BELOW. THE TABLE IS INTENDED FOR ILLUSTRATIVE PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR A REVIEW OF THE PLAN AND DISCLOSURE STATEMENT IN THEIR ENTIRETY. FOR CERTAIN CLASSES OF CLAIMS, THE ACTUAL AMOUNT OF ALLOWED CLAIMS OR EQUITY INTERESTS COULD BE MATERIALLY DIFFERENT THAN THE ESTIMATED AMOUNTS SHOWN IN THE TABLE BELOW.**

| | | SUMMARY OF EXPECTED RECOVERIES | |
|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
| 1 | Other Priority Claims | Each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim: | 100% |

v

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| | Expected Amount: $0 | • Cash in an amount equal to the amount of such Allowed Other Priority Claim; | |
| | | • Such other less favorable treatment as to which the Debtors or Reorganized Debtors and the Holder of such Allowed Other Priority Claim shall have agreed upon in writing; or | |
| | | • Such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code. | |
| 2 | Other Secured Claims | Each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim: | 100% |
| | Expected Amount: $3,100,000 | • Cash in an amount equal to the amount of such Other Secured Claim; | |
| | | • Such other less favorable treatment as to which the Debtors or Reorganized Debtors and the Holder of such Allowed Other Secured Claim shall have agreed upon in writing; or | |
| | | • Such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code. | |
| 3 | Secured Tax Claims | Each Holder of an Allowed Class 3 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 3 Claim: | 100%[3] |
| | Expected Amount: $2,300,000 | • Cash in an amount equal to the amount of such Allowed Secured Tax Claim; | |
| | | • Cash in an amount agreed to by the Debtors or the Reorganized Debtors, as applicable, and such Holder; provided, however, that such parties may further agree for the payment of such Allowed Secured Tax Claim at a later date; or | |
| | | • at the option of the Debtors or the Reorganized Debtors, as applicable, and in accordance with section 1129(a)(9)(C) and (D) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Secured Tax Claim payable in regular installment payments over a period ending not more than five years after the Petition Date. | |
| 4A | Prepetition First Out Credit Agreement LC Claims | Each Holder of an Allowed Class 4A Claim will receive, as prepetition letter of credit issuer, the right to receive the letter of credit fees, the reimbursement rights and the other rights set forth in the Restructured Credit Facility Agreement, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 4A Claim. | 100% |
| | Expected Amount: Approximately $2,000,000 | | |
| 4B | Prepetition First Out Credit Agreement Other Claims | Each Holder of an Allowed Class 4B Claim will become a "Lender" under the Restructured Credit Facility Agreement on a Pro Rata basis with all of the rights set forth therein, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 4B Claim. | 100% |
| | Expected Amount: Approximately $306,200,000 | | |
| 5 | Prepetition Last Out Credit Agreement Claims | Each Holder of an Allowed Class 5 Claim will receive its Pro Rata share of the Prepetition Last Out Payment Amount in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 5 Claim. | 100% |
| | Expected amount: Approximately $70,100,000 | | |

---

[3] Projected recoveries are illustrated based on the midpoint valuation.

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| 6 | General Unsecured Claims | Each Holder of an Allowed Class 6 Claim will, at the Debtors' option and in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 6 Claim, be <br><br> • Reinstated and paid, subject to the terms and conditions of the legal, equitable and contractual rights in respect of any Class 6 Claim under applicable non-bankruptcy law, in Cash when due in the ordinary course of the Reorganized Debtors' business operations and not on the Effective Date; or <br><br> • otherwise rendered not impaired pursuant to section 1124 of the Bankruptcy Code, except to the extent that the Reorganized Debtors and such Holder agree to other less favorable treatment in writing. | 100% |
| 7 | Subordinated Notes Claims <br><br> Expected Amount: Approximately $291,000,000 | Each Holder of an Allowed Class 7 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 5 Claim, its Pro Rata share of 98,000,000 shares of the New Common Stock. | 42.9%[4] |
| 8 | Intercompany Claims | Each Holder of an Allowed Class 8 Intercompany Claims shall be Reinstated in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 8 Intercompany Claims. | 100% |
| 9 | Accuride Preferred Equity Interests | Accuride Preferred Equity Interests will be redeemed in accordance with Section 3 of the Certificate of Designation and the Holder of the Accuride Preferred Equity Interests will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 10 Equity Interest, $100 liquidation preference in Cash. In accordance with the Certificate of Designation, from and after notice of redemption, the Accuride Preferred Equity Interests will no longer be, or be deemed to be, outstanding for any purpose, and all rights, preferences and powers (including voting rights and powers) of the Accuride Preferred Equity Interests shall automatically cease and terminate. | 100% |
| 10 | Accuride Other Equity Interests | In the event the Holders of Allowed Class 10 Claims vote to reject the Plan, Accuride Other Equity Interests will be deemed canceled and will be of no further force and effect, whether surrendered for cancellation or otherwise, and the Holders of such Equity Interests will not receive any distribution or retain any property on account of such Equity Interests. <br><br> In the event Holders of Allowed Class 10 Equity Interests vote to accept the Plan, on the Initial Distribution Date, each Holder of Accuride Other Equity Interests as of the Distribution Record Date shall receive its Pro Rata share of 2,000,000 shares of the New Common Stock and its Pro Rata share of the New Warrants in satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 10 Equity Interests. | N/A |
| 11 | Equity Interests in Subsidiaries | The Reorganized Debtors will retain the Equity Interests they hold in the Subsidiaries. | 100% |

## D. SOLICITATION PROCEDURES

### 1. The Solicitation and Voting Procedures

On December [__], 2009 the Bankruptcy Court entered the Disclosure Statement Order, which, among other things, (a) approved the dates, procedures and forms applicable to the process of soliciting votes on and

---

[4] Projected recovery assumes the New Notes are debt obligations of Reorganized Accuride as of the Effective Date and have not been converted into shares of New Common Stock. If the New Notes were converted into shares of New Common Stock as of the Effective Date, the projected recovery under the Plan for Holders of Subordinated Notes Claims would be 32.3%.

providing notice of the Plan, as well as certain vote tabulation procedures and (b) established the deadline for filing objections to the Plan and scheduling the hearing to consider confirmation of the Plan.

The discussion of the procedures below is a summary of the solicitation and voting process. Detailed voting instructions will be provided with each Ballot, Beneficial Holder Ballot and Master Ballot, as applicable, and are also set forth in greater detail in Disclosure Statement Order.

> PLEASE REFER TO THE INSTRUCTIONS ACCOMPANYING THE BALLOTS, BENEFICIAL HOLDER BALLOTS AND MASTER BALLOTS, AS APPLICABLE, AND THE DISCLOSURE STATEMENT ORDER FOR MORE INFORMATION REGARDING VOTING REQUIREMENTS TO ENSURE THAT YOUR BALLOT, BENEFICIAL HOLDER BALLOT OR MASTER BALLOT, AS APPLICABLE, IS PROPERLY AND TIMELY SUBMITTED SUCH THAT YOUR VOTE MAY BE COUNTED.

### 2. The Voting and Claims Agent

With the approval of the Bankruptcy Court, the Debtors retained The Garden City Group, Inc. to, among other things, act as Voting and Claims Agent.

Specifically, the Voting and Claims Agent will assist the Debtors with: (a) mailing Confirmation Hearing Notices (as defined in the Disclosure Statement Order), (b) mailing Solicitation Packages (as defined in the Disclosure Statement Order and as described below), (c) soliciting votes on the Plan, (d) receiving, tabulating, and reporting on ballots cast for or against the Plan by holders of claims against or equity interests in the Debtors, (e) responding to inquiries from creditors and stakeholders relating to the Plan, the Disclosure Statement, the ballots and matters related thereto, including, without limitation, the procedures and requirements for voting to accept or reject the Plan and objecting to the Plan, and (f) if necessary, contacting creditors regarding the Plan and their Ballots.

### 3. Holders of Claims and Equity Interests Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all holders of claims against and equity interests in a debtor are entitled to vote on a chapter 11 plan. The following table provides a summary of the status and voting rights of each Class (and, therefore, of each Holder of a Claim or an Equity Interest within such Class) under the Plan:

| | SUMMARY OF STATUS AND VOTING RIGHTS | | |
|---|---|---|---|
| Class | Claim/Equity Interest | Status | Voting Rights |
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Secured Tax Claims | Unimpaired | Deemed to Accept |
| 4A | Prepetition First Out Credit Agreement LC Claims | **Impaired** | **Entitled to Vote** |
| 4B | Prepetition First Out Credit Agreement Other Claims | **Impaired** | **Entitled to Vote** |
| 5 | Prepetition Last Out Credit Agreement Claims | Unimpaired | Deemed to Accept |
| 6 | General Unsecured Claims | Unimpaired | Deemed to Accept |
| 7 | Subordinated Notes Claims | **Impaired** | **Entitled to Vote** |

CH\1125862.14

## SUMMARY OF STATUS AND VOTING RIGHTS

| Class | Claim/Equity Interest | Status | Voting Rights |
|-------|----------------------|--------|---------------|
| 8 | Intercompany Claims | Unimpaired | Deemed to Accept |
| 9 | Accuride Preferred Equity Interests | Unimpaired | Deemed to Accept |
| 10 | Accuride Other Equity Interests | **Impaired** | **Entitled to Vote** |
| 11 | Equity Interests in Subsidiaries | Unimpaired | Deemed to Accept |

Based on the foregoing, the Debtors **are** soliciting votes to accept the Plan only from Holders of Claims in Classes 4A, 4B and 7 and Holders of Equity Interests in Class 10 (collectively, the "**Voting Classes**") because Holders of Claims and Equity Interests in the Voting Classes are Impaired under the Plan and, therefore, have the right to vote to accept or reject the Plan. The Debtors are **not** soliciting votes from Holders of Unimpaired Claims in Classes 1, 2, 3, 5, 6 and 8 and Holders of Equity Interests in Classes 9 and 11 because such parties are conclusively presumed to have accepted the Plan (the "**Non-Voting Class**").

### 4. The Voting Record Date

**The Bankruptcy Court has approved [December 11], 2009 as the Securities Voting Record Date with respect to Claims in Class 7 and Equity Interests in Class 10 and has approved [December 18], 2009 as the Non-securities Voting Record Date with respect to Claims in Classes 4A and 4B.** The applicable Voting Record Date is the date on which it will be determined: (a) which Holders of Claims and Equity Interests in the Voting Classes are entitled to vote to accept or reject the Plan and receive Solicitation Packages in accordance with the Disclosure Statement Order; and (b) which Holders of Claims and Equity Interests in the Non-Voting Classes are entitled to receive the Confirmation Hearing Notice, including notice of such Holder's non-voting status, in accordance with the Disclosure Statement Order.

### 5. Contents of the Solicitation Package

The following documents and materials will collectively constitute the Solicitation Package:

- (a) a cover letter from the Debtors (i) describing the contents of the Solicitation Package and instructions on how paper copies of any materials that may be provided in CD-ROM format can be obtained at no charge; (ii) explaining that the Plan Supplement will be filed on or before fourteen (14) days before the Voting Deadline; and (iii) urging the members of the voting class to vote to accept the Plan;

- the Confirmation Hearing Notice, attached as Exhibit 8 to the Disclosure Statement Order;

- this Disclosure Statement (and exhibits annexed thereto, including the Plan);

- the Disclosure Statement Order;

- to the extent applicable, a Ballot and/or notice, appropriate for the specific creditor or interest holder, in substantially the forms attached to the Disclosure Statement Order (as may be modified for particular classes and with instruction attached thereto); and

- such other materials as the Bankruptcy Court may direct.

### 6. Distribution of the Solicitation Package to Holders of Claims and Equity Interests Entitled to Vote on the Plan

With the assistance of the Voting and Claims Agent, the Debtors intend to distribute Solicitation Packages on or before **[December 29]**, 2009 (the "**Solicitation Mailing Date**"). The Debtors submit that the timing of such distribution will provide such Holders of Claims or Equity Interests with adequate time within which to review the materials required to allow such parties to make informed decisions with respect to voting on the Plan in accordance with Bankruptcy Rules 3017(d) and 2002(b). The Debtors will make every reasonable effort to ensure that Holders who have more than one Allowed Claim in a single voting Class receive no more than one Solicitation Package. If a Holder holds both Claims and Equity Interests or Claims in more than one Class and is entitled to vote in more than one Class, such Holder will receive separate Ballots which must be used for each separate Class of Claims and Equity Interests.

7.  **Distribution of Notices to Holders of Claims and Equity Interests in Non-Voting Classes and Holders of Disputed Claims and Equity Interests**

As set forth above, certain Holders of Claims and Equity Interests are <u>not</u> entitled to vote on the Plan. As a result, such parties will <u>not</u> receive Solicitation Packages and, instead, will receive the appropriate form of notice as follows:

- <u>Unimpaired Claims and Equity Interests – Deemed to Accept</u>. Administrative Claims, DIP Facility Claims and Priority Tax Claims are unclassified, non-voting Claims, Claims in Classes 1, 2, 3, 5, 6 and 8 and Equity Interests in Classes 9 and 11 are Unimpaired under the Plan and, therefore, are presumed to have accepted the Plan. As such, Holders of such Claims or Equity Interests will receive, in lieu of a Solicitation Package, a "Non-Voting Status Notice With Respect to Unimpaired Classes Deemed to Accept the Plan" attached as <u>Exhibit 4</u> to the Disclosure Statement Order.

- <u>Disputed Claims or Equity Interests</u>.
  (a) Any Holder of a Claim or an Equity Interest for which the Debtors have filed an objection, whether such objection related to the entire Claim or Equity Interest or a portion thereof, will not be entitled to vote on the Plan and will not be counted in determining whether the requirements of section 1126(c) of the Bankruptcy Code have been met with respect to the Plan. Such Holders will receive a "Non-Voting Status Notice to Holders of Claims or Equity Interests for Which an Objection has been Filed by the Debtors," attached as <u>Exhibit 2</u> to the Disclosure Statement Order.

  (b) Any Holder of a Claim against or an Equity Interest in the Debtors for which such Holder has timely filed a Proof of Claim (or an untimely Proof of Claim which has been allowed as timely by the Court under applicable law on or before the applicable Voting Record Date), which, in whole or in, part reflects a disputed, unliquidated, or contingent claim or equity interest, and which is not subject to an objection filed by the Debtors, shall have its entire claim temporarily allowed for voting purposes only, and not for purposes of allowance or distribution, at $1.00. Such Holders will receive (a) a Solicitation Package which contains the applicable ballot, (b) a "Confirmation Hearing Notice," which notice informs such person or entity that its entire Claim or Equity Interest has been allowed temporarily for voting purposes only and not for purposes of allowance or distribution, at $1.00 and (c) a "Notice of Limited Voting Status to Holders of Contingent, Unliquidated or Disputed Claims or Equity Interests for Which No Objection Has Been Filed by the Debtors," attached as <u>Exhibit 9</u> to the Disclosure Statement Order.

  If any Holder described in the preceding two subparagraphs disagrees with the Debtors' classification or status of its Claim or Equity Interest, then such Holder <u>MUST</u> file and serve a motion requesting temporary allowance of its Claim or Equity Interest solely for voting purposes in accordance with the procedures set forth in the Disclosure Statement Order.

- <u>Contract and Lease Counterparties</u>. Parties to certain of the Debtors' executory contracts and unexpired leases may not have scheduled Claims or Claims based upon filed Proofs of Claim pending the disposition of their contracts or leases by assumption or rejection. To ensure that such parties nevertheless receive notice of the Plan, counterparties to the Debtors' executory contracts and

unexpired leases will receive, in lieu of a Solicitation Package, a "Contract/Lease Notice" attached as Exhibit 6 to the Disclosure Statement Order.

**8.     Additional Distribution of Solicitation Documents**

In addition to the distribution of Solicitation Packages to Holders of Claims and Equity Interests in Voting Classes, the Debtors will also provide parties who have filed requests for notices under Bankruptcy Rule 2002 as of the applicable Voting Record Date with the Disclosure Statement, Disclosure Statement Order and Plan. Additionally, parties may request (and obtain at the Debtors' expense) a copy of the Disclosure Statement (and any exhibits thereto, including the Plan) by: (a) calling the Voting and Claims Agent at (888) 478-2068; (b) writing to Accuride Corporation c/o The Garden City Group, Inc., PO Box 9521, Dublin, Ohio 43017-4821; and/or (c) visiting the Debtors' restructuring website at: http://www.accurideinfo.com. Parties may also obtain any documents filed in the Chapter 11 Cases for a fee via PACER at http://www.deb.uscourts.gov.

**9.     Filing of the Plan Supplement**

The Debtors will file the Plan Supplement no later than January 15, 2010, which date is fourteen (14) days before the Voting Deadline. The Debtors will transmit a copy of the Plan Supplement to the Distribution List, as defined in this Section D.9. Additionally, parties may request (and obtain at the Debtors' expense) a copy of the Plan Supplement by: (a) calling the Voting and Claims Agent at (888) 478-2068; (b) writing to Accuride Corporation c/o The Garden City Group, Inc., PO Box 9521, Dublin, Ohio 43017-4821; and/or (c) visiting the Debtors' restructuring website at: http://www.accurideinfo.com. Parties may also obtain any documents filed in the Chapter 11 Case for a fee via PACER at http://www.deb.uscourts.gov.

The Plan Supplement will include, without limitation, the following documents, to the extent not already filed as exhibits to the Plan or this Disclosure Statement:

- the Amended Organizational Documents;

- the list of Executory Contracts and Unexpired Leases designated by the Debtors to be rejected on the Effective Date;

- a non-exclusive list of Litigation Claims held by the Debtors as of the Effective Date;

- a list of Non-Released Parties; and

- the New Indenture.

As used herein, the term "**Distribution List**" means (a) the Office of the United States Trustee, (b) counsel for the Committee, (c) counsel to the DIP Agent, (d) counsel to the Prepetition Lenders, (e) counsel to the Ad Hoc Noteholders Group, (f) the Securities and Exchange Commission, (g) the Internal Revenue Service and (h) all parties that, as of the applicable date of determination, have filed requests for notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002.

**E.     VOTING PROCEDURES**

Holders of Claims or Equity Interests entitled to vote on the Plan are advised to read the Disclosure Statement Order, which set forth in greater detail the voting instructions summarized herein.

**1.     The Voting Deadline**

**The Bankruptcy Court has approved 4:00 p.m. prevailing Eastern Time on January 29, 2010 as the Voting Deadline.** The Voting Deadline is the date by which all Ballots, Beneficial Holder Ballots and Master

Ballots, as applicable, must be properly executed, completed and delivered to the Voting and Claims Agent in order to be counted as votes to accept or reject the Plan.

2.     **Types of Ballots**

The Debtors will provide the following ballots to Holders of Claims and Equity Interests in the Voting Classes (i.e. Classes 4A, 4B, 7 and 10):

- *"**Ballots**"*, the form of which is attached to the Disclosure Statement Order as <u>Exhibit 3-A and 3-B</u>, will be sent to all Holders of Class 4A Prepetition First Out Credit Agreement LC Claims and Holders of Class 4B Prepetition First Out Credit Agreement Other Claims, respectively;

- *"**Beneficial Holder Ballots**"*, the forms of which are attached to the Disclosure Statement Order as <u>Exhibits 3-C and 3-E</u> will be sent to Beneficial Holders of Class 7 Subordinated Notes Claims and Class 10 Accuride Other Equity Interests, respectively; and

- *"**Master Ballots**"*, the forms of which are attached to the Disclosure Statement Order as <u>Exhibits 3-D and 3-F</u>, will be sent to Registered Record Owners and Intermediary Record Owners holding Subordinated Notes and Accuride Other Equity Interests, respectively, for, and voting on behalf of, Beneficial Holders of Class 7 Subordinated Notes Claims and Class 10 Accuride Other Equity Interests.

3.     **Voting Instructions**

Under the Plan, Holders of Claims and Equity Interests in the Voting Classes are entitled to vote to accept or reject the Plan. Those Holders may so vote by completing a Ballot, Beneficial Holder Ballot and/or Master Ballot, as applicable, and returning it to the Voting and Claims Agent prior to the Voting Deadline. There are special voting rules/procedures, however, for Beneficial Holders of Class 7 Subordinated Notes Claims and Class 10 Accuride Other Equity Interests, which are discussed in Section I.E.4 herein (and set forth in greater detail in the Disclosure Statement Order).

> **PLEASE REFER TO THE INSTRUCTIONS ATTACHED TO THE BALLOTS, BENEFICIAL HOLDER BALLOTS OR MASTER BALLOTS THAT YOU HAVE RECEIVED FOR MORE DETAILED INFORMATION REGARDING THE VOTING REQUIREMENTS, RULES AND PROCEDURES APPLICABLE TO VOTING YOUR CLAIM OR EQUITY INTEREST.**

To be counted as votes to accept or reject the Plan, <u>all</u> Ballots, pre-validated Beneficial Holder Ballots and Master Ballots, as applicable, (all of which will clearly indicate the appropriate return address) must be properly executed, completed, dated and delivered by using the return envelope provided by (a) first class mail, (b) overnight courier or (c) personal delivery, so that they are **actually received** on or before the Voting Deadline by the Voting and Claims Agent at the following address:

> The Garden City Group, Inc.
> Attn: Accuride Ballot Processing Center
> P.O. Box 9521
> Dublin, Ohio 43017-4821
>
> If you have any questions on the procedures for voting on the Plan, please call the Voting and Claims Agent at:
> (888) 478-2068

***BENEFICIAL HOLDERS OF CLASS 7 SUBORDINATED NOTES CLAIMS AND CLASS 10 ACCURIDE OTHER EQUITY INTERESTS MUST EXECUTE, COMPLETE AND RETURN THEIR BENEFICIAL HOLDER BALLOTS IN ACCORDANCE WITH THE DISTINCT RULES FOR VOTING THEIR CLASS 7 CLAIMS AND CLASS 10 EQUITY INTERESTS SET FORTH IN SECTION I.E.4 BELOW.***

4. **Voting Instructions Specific to Beneficial Holders of Class 7 Subordinated Notes Claims and Class 10 Accuride Other Equity Interests Entitled to Vote on the Plan**

Prior to the Solicitation Mailing Date, the Voting and Claims Agent will determine the identity of those Registered Record Owners and Intermediary Record Owners (collectively, "**Record Owners**") holding Subordinated Notes or Accuride Other Equity Interests on behalf of Beneficial Holders as of the applicable Voting Record Date and will distribute an appropriate number of Solicitation Packages to such Record Owners to allow them to forward one to each applicable Beneficial Holder. Intermediate Record Holders will distribute Solicitation Packages to the respective Beneficial Holders within seven (7) days of receiving Solicitation Packages.

Record Owners who elect to pre-validate Beneficial Holder Ballots must deliver Solicitation Packages, including pre-validated Beneficial Holder Ballots, to Beneficial Holders along with a pre-addressed return envelope addressed to the Voting and Claims Agent. Beneficial Holders who receive pre-validated Beneficial Holder Ballots must complete, date, execute and deliver such Beneficial Holder Ballots directly to the Voting and Claims Agent so they are actually received on or before the Voting Deadline.

Record Owners who do not elect to pre-validate Beneficial Holder Ballots must deliver to the Beneficial Holders the Solicitation Packages, including Beneficial Holder Ballots and pre-addressed return envelops addressed to the Record Owners. Upon the return of completed Beneficial Holder Ballots, such Record Owners will summarize and compile the votes cast and/or other relevant information onto the Master Ballots and date and return the Master Ballot(s) so that they are actually received on or before the Voting Deadline by the Voting and Claims Agent.

5. **Tabulation of Votes**

> **THE FOLLOWING IS IMPORTANT INFORMATION REGARDING VOTING THAT SHOULD BE READ CAREFULLY BY ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS IN VOTING CLASSES.**

- FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT, BENEFICIAL HOLDER BALLOT OR MASTER BALLOT, AS APPLICABLE, MUST BE PROPERLY EXECUTED, COMPLETED, DATED AND DELIVERED SUCH THAT IT IS **ACTUALLY RECEIVED** ON OR BEFORE THE VOTING DEADLINE BY THE VOTING AND CLAIMS AGENT.

- A HOLDER OF A CLAIM OR AN EQUITY INTEREST MAY CAST ONLY ONE VOTE PER EACH CLAIM OR EQUITY INTEREST SO HELD. BY SIGNING AND RETURNING A BALLOT, BENEFICIAL HOLDER BALLOT OR MASTER BALLOT, EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS, BENEFICIAL HOLDER BALLOTS OR MASTER BALLOTS WITH RESPECT TO SUCH CLAIM OR EQUITY INTEREST HAS BEEN CAST OR, IF ANY OTHER BALLOTS, BENEFICIAL HOLDER BALLOTS OR MASTER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLAIM OR EQUITY INTEREST, SUCH EARLIER BALLOTS, BENEFICIAL HOLDER BALLOTS OR MASTER BALLOTS ARE THEREBY SUPERSEDED AND REVOKED.

- ANY BALLOT, BENEFICIAL HOLDER BALLOT OR MASTER BALLOT THAT IS RECEIVED **AFTER** THE VOTING DEADLINE WILL **NOT** BE COUNTED TOWARD CONFIRMATION OF THE PLAN UNLESS THE DEBTORS HAVE GRANTED AN

EXTENSION OF THE VOTING DEADLINE IN WRITING WITH RESPECT TO SUCH BALLOT, BENEFICIAL HOLDER BALLOT OR MASTER BALLOT.

- **ADDITIONALLY, THE FOLLOWING BALLOTS, BENEFICIAL HOLDER BALLOTS AND MASTER BALLOTS WILL <u>NOT</u> BE COUNTED:**

  o  any Ballot, Beneficial Holder Ballot or Master Ballot that the Debtors determine, after consultation with the Committee and the Ad Hoc Noteholders Group, is illegible or contains insufficient information to permit the identification of the Holder of the Claim or Equity Interest;

  o  any Ballot, Beneficial Holder Ballot or Master Ballot cast by an entity that does not hold a Claim or Equity Interest in a Class that is entitled to vote on the Plan;

  o  any Ballot, Beneficial Holder Ballot or Master Ballot cast for a Claim or Equity Interest not listed on the Schedules or Scheduled at zero, in unknown amount, or listed in the Schedules in whole or in part, as contingent, unliquidated or disputed for which the applicable bar date has passed and no Proof of Claim was timely filed;

  o  any Ballot, Beneficial Holder Ballot or Master Ballot that (a) is properly completed, executed and timely filed, but does not indicate an acceptance or rejection of the Plan, or (b) indicates both an acceptance and rejection of the Plan, or (c) partially accepts and partially rejects the Plan

  o  any Ballot, Beneficial Holder Ballot or Master Ballot cast for a Claim or Equity Interest that is subject to an objection pending as of the applicable Voting Record Date (except as otherwise provided in the Disclosure Statement Order);

  o  any Ballot, Beneficial Holder Ballot or Master Ballot sent to the Court, the Debtors, the Debtors' agents/representatives (other than the Voting and Claims Agent), the Indenture Trustees or the Debtors' financial or legal advisors;

  o  any Ballot, Beneficial Holder Ballot or Master Ballot transmitted by facsimile, telecopy or electronic mail;

  o  any unsigned Ballot, Beneficial Holder Ballot or Master Ballot; or

  o  any Ballot, Beneficial Holder Ballot or Master Ballot not cast in accordance with the procedures approved in the Disclosure Statement Order.

## F.  CONFIRMATION OF THE PLAN

### 1.  The Confirmation Hearing

<u>The Confirmation Hearing will commence at 10:00 a.m prevailing Eastern Time on February 10, 2010</u> before the Honorable Brendan Linehan Shannon, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, located at 824 Market Street, 6th Floor, Courtroom 1, Wilmington, Delaware 19801-3024. The Confirmation Hearing may be continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order. Moreover, the Plan may be modified or amended, if necessary, pursuant to section 1127 of the Bankruptcy Code, prior to, during or as a result of the Confirmation Hearing, without further notice to parties-in-interest.

### 2.  The Deadline for Objecting to Confirmation of the Plan

**The Confirmation Objection Deadline is 4:00 p.m. prevailing Eastern Time on [January 29], 2010.** Any objection to confirmation of the Plan must: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; (iii) state the name of the objecting party and the amount and nature of the Claim of such Entity or the amount of Equity Interests held by such Entity; (iv) state with particularity the legal and factual bases and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (v) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is **actually received** no later than the Confirmation Objection Deadline by the parties set forth below (the "**Notice Parties**"). CONFIRMATION OBJECTIONS NOT TIMELY FILED AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE.

*Notice Parties*

(a) Counsel to the Debtors, Latham & Watkins LLP, Suite 5800 Willis Tower, 233 South Wacker Drive, Chicago, Illinois 60611 (Attn: David S. Heller, Josef S. Athanas and Caroline A. Reckler) and Young Conway, Stargatt & Taylor LLP, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, Delaware 19801 (Attn: Michael R. Nestor and Kara H. Coyle);

(b) Counsel to the Committee, Irell & Manella LLP, 840 Newport Center Drive, Suite 400, Newport Beach, CA 92660 (attn: Jeffrey Reisner);

(c) Counsel to the Ad Hoc Noteholders Group, Milbank, Tweed, Hadley & McCloy LLP, 601 South Figueroa Street, Los Angeles, California 90017 (Attn: Paul Aronzon, Paul Denaro and Robert C. Shenfeld);

(d) Counsel to the DIP Agent and the Prepetition Lenders, White & Case LLP, 1155 Avenue of the Americas, New York, NY 10036-2787 (Attn: Scott Greissman and Elizabeth Feld);

(e) The Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, Delaware 19801 (Attn: Jane Leamy).

3. **Effect of Confirmation of the Plan**

Article X of the Plan contains certain provisions relating to (a) the compromise and settlement of Claims and Equity Interests, (b) the release of the Released Parties by the Debtors and the Holders of Claims or Equity Interests, and each of their respective Related Persons, and (c) exculpation of certain parties. **It is important to read such provisions carefully so that you understand the implications of these provisions with respect to your Claim or Equity Interest such that you may cast your vote accordingly.**

THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (A) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (B) HAS FILED A PROOF OF CLAIM IN THE CHAPTER 11 CASES OR (C) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.

G. **CONSUMMATION OF THE PLAN**

It will be a condition to confirmation of the Plan that all provisions, terms and conditions of the Plan are approved in the Confirmation Order unless otherwise satisfied or waived pursuant to the provisions of Article IX of the Plan. Following confirmation, the Plan will be consummated on the Effective Date.

H. **RISK FACTORS**

**PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST IN A VOTING CLASS SHOULD CONSIDER CAREFULLY ALL**

OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS
DESCRIBED IN SECTION VI HEREIN TITLED, "PLAN-RELATED RISK FACTORS."

CH\1125862.14

## II.
## BACKGROUND TO THE CHAPTER 11 CASES

### A.    THE DEBTORS' CORPORATE HISTORY

Accuride and Accuride Canada were incorporated in November 1986 for the purpose of acquiring substantially all of the assets of a division of The Firestone Tire & Rubber Company. In 1988, Accuride was purchased by Phelps Dodge Corporation. In November 1997, Accuride entered into a stock subscription agreement with an affiliate of Kohlberg Kravis Roberts & Co. L.P. ("**KKR**") through which KKR acquired a controlling interest in Accuride. In January 2005, a wholly owned subsidiary of Accuride was merged with and into Transportation Technologies Industries, Inc. ("**TTI**"), resulting in TTI becoming a wholly owned subsidiary of Accuride. On April 26, 2005, Accuride completed the initial public offering of 11 million shares of common stock, which was traded on the New York Stock Exchange under the symbol "ACW." On November 12, 2008, Accuride's common stock was removed from the NYSE and began trading under the symbol "AURD" on the Over The Counter Bulletin Board. On January 1, 2009, Accuride offset the principal (approximately $64 million ) owed by Accuride Canada under three promissory notes against amounts owed by Accuride to Accuride Canada on account of Accuride's purchase of steel wheels (approximately $86.8 million). Immediately after the offset of the principal balance of the Notes, Accuride owed Accuride Canada approximately $22 million. There are currently approximately 47,506,895 shares of common stock outstanding and one share of Series A preferred stock outstanding.

### B.    OVERVIEW OF THE DEBTORS' BUSINESS

The Debtors are among the largest and most diversified manufacturers and suppliers of commercial vehicle components in North America. The Company's products include wheels, wheel-end components and assemblies, truck body and chassis parts, seating assemblies and other commercial vehicle components. These products are marketed under several well-recognized brands in the industry, including Accuride, Gunite, Imperial, Bostrom, Fabco, Brillion and Highway Original.

#### 1.    Business Operations and Sales

While Accuride is headquartered in Evansville, Indiana, the Company has approximately 2,268 active employees and 19 technologically-advanced facilities across the United States, Mexico, and Canada. Among the active employees, 1,892 are located in the United States, 146 are located in Canada, and 230 are located in Mexico. The Company's U.S. manufacturing operations are located in Alabama, California, Illinois, Indiana, Kentucky, Ohio, Pennsylvania, Tennessee, Texas, Virginia, Washington, and Wisconsin. In addition, the Company has manufacturing facilities located in Canada and Mexico. A corporate organization chart is attached as hereto as Exhibit B.

The Company's consolidated net sales were approximately $1.4 billion in 2006, $1.0 billion in 2007, $931.4 million in 2008, and $424.0 for the 9 months ending September 30, 2009. The Company's consolidated net income was approximately $65.1 million in 2006, a net loss of $8.6 million in 2007, a net loss of $328.3 million in 2008, and a net loss of $100.5 million for the 9 months ending September 30, 2009. The Company's consolidated EBITDA was approximately $211.7 million in 2006, $99.3 million in 2007, $41.7 million in 2008, and $13.1 million for the 9 months ending September 30, 2009.

The Debtors offer the broadest product line in the North American heavy- and medium-duty wheel industry. The Company is the only North American manufacturer and supplier of both steel and forged aluminum heavy- and medium-duty wheels. The Company produces wheels for buses, commercial light trucks, heavy-duty pick-up trucks, and military vehicles. The Company's line of heavy- and medium-duty wheels accounted for approximately 41.2% of the Company's first 9 months of 2009 net sales, 42% of the Company's 2008 net sales, and 47% of the Company's 2007 net sales.

The Debtors are a leading North American supplier of wheel-end components and assemblies to the heavy- and medium-duty truck markets and related aftermarket. The Company markets wheel-end components and assemblies under the Gunite brand. The Company produces basic wheel-end systems including: disc wheels, hubs, brake drums, spoke wheel/brake drum assemblies, spoke wheel/brake rotor assemblies, and disc wheel hub/brake rotor assemblies. The Company also manufactures a full line of wheel-end components for the heavy- and medium-duty truck markets, such as brake drums, disc wheel hubs, spoke wheels, rotors and automatic slack adjusters. The Company's line of wheel-end components and assemblies accounted for approximately 26.8% of the Company's first 9 months of 2009 net sales, 23% of the Company's 2008 net sales, and 20% of the Company's 2007 net sales.

The Company is a leading supplier of truck body and chassis parts to heavy- and medium-duty truck manufacturers, including bus manufacturers. The Company fabricates a broad line of truck body and chassis parts under the Imperial brand name, including bumpers, battery and toolboxes, crown assemblies, bus component and chassis assemblies, fuel tanks, roofs, fenders, and crossmembers. The Company also provides a variety of value-added services, such as chrome plating and polishing, hood assembly, and the kitting and assembly of exhaust systems. The Company specializes in the fabrication of components requiring a significant amount of tooling or customization. The Company's truck body and chassis parts manufacturing operations are characterized by low-volume production runs. The Company's line of truck body and chassis parts accounted for approximately 12.7% of the Company's first 9 months of 2009 net sales, 12% of the Company's 2008 net sales, and 14% of the Company's 2007 net sales.

Under the Bostrom brand name, the Debtors design, engineer and manufacture air suspension and static seating assemblies for heavy- and medium-duty trucks, related aftermarkets, and school and transit buses. The majority of North American heavy-duty truck manufacturers offer the Company's seats as standard equipment or as an option. Seating assemblies are primarily differentiated on comfort, price, and quality, with driver comfort being especially important given the substantial amount of time that truck drivers spend on the road. The Company's line of air suspension and static seating assemblies accounted for approximately 4.1% of the Company's first 9 months of 2009 net sales, 4% of the Company's 2008 net sales, and 5% of the Company's 2007 net sales.

The Debtors also produce other commercial vehicle components, including steerable drive axles and gearboxes as well as engine and transmission components. These other product lines accounted for approximately 15.2% of the Company's first 9 months of 2009 net sales, 19% of the Company's 2008 net sales, and 15% of the Company's 2007 net sales.

## 2.    Customers

The vast majority of the Debtors' sales are to the heavy- and medium-duty truck and commercial trailer original equipment manufacturers ("**OEMs**") and their related aftermarkets. The remainder of sales are made to customers in the light truck, specialty and military vehicle and other industrial markets. The Company markets components to more than 1,000 customers and its customer base includes substantially all of the leading North American commercial vehicle OEMs, such as Daimler Truck North America, LLC, with its Freightliner, Western Star and Thomas Built brand trucks; PACCAR, Inc., with its Peterbilt and Kenworth brand trucks; Navistar Corporation, with its International brand trucks; and Volvo Truck Corporation, or Volvo/Mack, with its Volvo and Mack brand trucks. In addition, the Company markets to the major aftermarket suppliers, including OEM dealer networks, wholesale distributors, and aftermarket buying groups. The Company's primary commercial trailer customers include leading commercial trailer OEMs, such as Great Dane Limited Partnership and Wabash National, Inc. The Company's largest customers are Daimler Truck North America, PACCAR, Navistar Corporation, and Volvo/Mack, which, combined, accounted for approximately 54.5% of the Company's first 9 months of net sales in 2009. Accuride's largest light truck customer is General Motors Corporation. Accuride Canada manufactures parts, which are then sold to Accuride to on-sell to General Motors.

## 3.    Competition, Cyclicality, and Seasonality

The Company operates in highly competitive markets. However, no single manufacturer competes with all of the products manufactured and sold by the Company in the heavy- and medium-duty truck market, and the degree of competition varies among the different products that the Company sells. In each of the Company's markets, the

2

Company competes on the basis of price, manufacturing and distribution capabilities, product quality, product design, product line breadth, delivery, and service.

The commercial vehicle components industry is highly cyclical, and in large part, depends on the overall strength of the demand for heavy- and medium-duty trucks. These industries have historically experienced significant fluctuations in demand based on factors such as general economic conditions, gas prices, interest rates, government regulations, and consumer confidence. In addition, the Company's operations are typically seasonal as a result of regular customer maintenance and model changeover shutdowns, which typically occur in the third and fourth quarter of each calendar year. This seasonality can result in decreased net sales and profitability during the third and fourth quarters of each calendar year.

## C.  OVERVIEW OF THE PREPETITION CAPITAL STRUCTURE

### 1.  Senior Credit Facility

Accuride and Accuride Canada are borrowers (the "**Borrowers**") under the Fourth Amended and Restated Credit Agreement, dated as of January 31, 2005 (the "**Prepetition Credit Agreement**"), and amended pursuant to that certain First Amendment, dated as of November 28, 2007 (the "**First Amendment**"), that certain Second Amendment, dated as of January 28, 2009 (the "**Second Amendment**"), that certain Third Amendment and Consent to the Fourth Amended and Restated Credit Agreement; and First Amendment to the Amended and Restated Guarantee and Collateral Agreement, dated as of August 14, 2009 (the "**Third Amendment**") and that certain Fourth Amendment and Canadian Forbearance Agreement, dated as of October 8, 2009 (the "**Fourth Amendment**"). As set forth in the Prepetition Credit Agreement, Accuride is the "**U.S. Borrower**" and Accuride Canada is the "**Canadian Borrower**."

The senior secured credit facilities provided for under the Prepetition Credit Agreement (the "**Prepetition Credit Facilities**") consist of (a) a U.S. term credit facility in an aggregate principal amount of $550 million, which requires annual amortization payments of 1% per year, with the balance payable on January 31, 2011 (the "**Prepetition Term Facility**"); (b) a U.S. revolving credit facility in an aggregate principal amount of up to $76 million (the "**Prepetition US Revolver**") and (c) a Canadian revolving credit facility in an aggregate principal amount of up to $24 million (the "**Prepetition Canadian Revolver**", and together with the Prepetition US Revolver, the "**Prepetition Revolving Facility**"). In April 2009, Accuride made a draw of $30.6 million under the Prepetition Revolving Facility, which reduced availability under the Prepetition Revolving Facility to approximately $1.5 million, excluding $24.2 million of unfunded commitments held by Lehman Commercial Paper, Inc. The commitments under the Prepetition Revolving Facility were terminated on the Petition Date. As of the Petition Date, the outstanding balance under the Prepetition Credit Facilities, including undrawn letters of credit, was approximately $304.6 million.

Accuride's obligations under the Prepetition Credit Agreement are guaranteed by all of Accuride's domestic subsidiaries. Accuride Canada's obligations under the Prepetition Credit Agreement are guaranteed by Accuride and all of Accuride's domestic subsidiaries. The obligations of Accuride and its domestic subsidiaries under the Prepetition Credit Agreement and the related guarantees are secured by, among other things, a first-priority lien on and security interest in substantially all of the U.S. properties and assets of Accuride and its domestic subsidiaries. Additionally, the Debtors are obligated in the amount of approximately $2.2 million to Deutsche Bank AG, as counterparty on account of a Bank Hedge Agreement (as defined in the Prepetition Credit Agreement) which terminated shortly after the Petition Date. Payment of such amount comprises part of the First Out Loan Obligations (as defined in the Prepetition Credit Agreement) for all purposes and is secured by the Debtors' assets and property on a *pari passu* basis with the other obligations under the Prepetition Credit Agreement.

The obligations of Accuride Canada under the Prepetition Credit Agreement are secured by substantially all of the properties and assets of Accuride Canada and, by virtue of the guarantees, all of the properties and assets of Accuride and Accuride's domestic subsidiaries.

### 2.  Senior Subordinated Notes

3

Effective January 31, 2005, Accuride issued $275 million aggregate principal amount of the Subordinated Notes pursuant to the Indenture. Interest on the Subordinated Notes is payable on February 1 and August 1 of each year. The aggregate Subordinated Notes Claims, including interest accrued through the Petition Date, are $291 million. The Subordinated Notes are general unsecured obligations ranking senior in right of payment to all of Accuride's existing and future subordinated indebtedness. The Subordinated Notes are subordinated to all existing and future senior indebtedness including indebtedness incurred under the Prepetition Credit Agreement. Although initially issued in a private placement, through an exchange offer in May 2005, the Subordinated Notes were registered under the Securities Act.

3.    **February 2009 Transactions**

In late 2008, Accuride realized that it would soon be in violation of certain financial covenants under the Prepetition Credit Agreement in light of continuing deterioration in the Company's business due to, among other things, the recession discussed below. In order to avoid breaching these covenants, in February 2009, Accuride completed a series of transactions to provide the Company with financial covenant relief and enhanced liquidity for fiscal 2009 (the "**February Transactions**").

The February Transactions included the Second Amendment and a transaction with Sun Accuride Debt Investments, LLC ("**Sun Capital**"), an affiliate of Sun Capital Securities Group, LLC, in which Sun Capital became the holder of approximately $70 million principal amount of Accuride's indebtedness outstanding under the Prepetition Term Facility (the "**Sun Loans**"). In connection with such transaction with Sun Capital, Sun Capital executed a certain Last Out Debt Agreement (the "**Prepetition Last Out Debt Agreement**").

The Second Amendment, among other things, adjusted certain financial covenants under the Prepetition Credit Agreement applicable to the fourth quarter of 2008 through the fourth quarter of 2010, including senior secured leverage, leverage, interest coverage and fixed charge coverage ratios, and extended the maturity date of the Prepetition Revolving Facility until January 31, 2011. Accuride was able to negotiate these adjusted financial covenants with the Prepetition Lenders as a result of Sun Capital's willingness to subordinate its right to payment of the Sun Loans (the "**Prepetition Last Out Loans**") to the payment in full of the other loans outstanding under the Prepetition Term Facility (the "**Prepetition First Out Loans**"). Sun Capital also agreed to modify certain voting provisions and other rights of the holder of the Prepetition Last Out Loans under the Prepetition Credit Agreement.

Under the Second Amendment, Accuride re-priced the indebtedness outstanding under the Prepetition Credit Agreement as follows:

(a)    Interest on the Prepetition First Out Loans and on debt outstanding under the Prepetition Revolving Facility will accrue at an annual rate of LIBOR plus 500 basis points, with a LIBOR floor of 300 basis points;

(b)    Interest on the Prepetition Last Out Loans will accrue at an annual rate of (i) LIBOR plus 1000 basis points per annum, with a LIBOR floor of 300 basis points (the "**PIK Rate**"), if interest is payable in kind ("**PIK**") on any relevant interest payment date, or (ii) LIBOR plus 800 basis points per annum, with a LIBOR floor of 300 basis points (the "**Cash Pay Rate**"), if interest is payable in cash on any relevant interest payment date;

(c)    Until December 31, 2009, interest on the Prepetition Last Out Loans will accrue at the PIK Rate. After December 31, 2009, interest on the Prepetition Last Out Loans will accrue at the PIK Rate unless certain conditions shall have been satisfied as of the relevant interest payment date (including (i) average liquidity of the Company, as of the last day of the immediately preceding fiscal quarter, shall have exceeded a certain amount and (ii) Accuride shall have been in compliance with the financial covenants set forth in the Prepetition Credit Agreement at the end of the most recently ended financial quarter for which financial statements were delivered to the Prepetition Agent). If these conditions are satisfied, interest on the Prepetition Last Out Loans will accrue at the Cash Pay Rate and be payable in cash. Because Accuride was not in compliance with the financial covenants set forth in the Prepetition Credit Agreement on September 30, 2009,

4

Accuride does not contemplate that interest on the Prepetition Last Out Loans will accrue at the Cash Pay Rate or be payable in cash after December 31, 2009. Interest on the Prepetition Last Out Loans accruing at the PIK Rate is payable on a first-out basis as a Prepetition First Out Loan.

In connection with the Prepetition Last Out Loans and pursuant to the Prepetition Last Out Debt Agreement, Accuride issued a warrant (the "**Prepetition Warrant**") to Sun Capital exercisable for up to twenty-five percent (25%) of Accuride's fully-diluted common stock. Sun Capital partially exercised the Prepetition Warrant on September 28, 2009, obtaining 24.5% of Accuride's then outstanding common stock.

In connection with the Prepetition Last Out Loans, Accuride also issued a new class of preferred stock (the "**Class A Preferred Share**") to Sun Capital. The Class A Preferred Share grants the holder the right to nominate five directors (the "**Sun Capital Directors**") and nominate one independent director to Accuride's board of directors. As part of the February Transactions, Accuride also amended its Bylaws to require the approval of two-thirds of Acccuride's board of directors for certain corporate actions. Accordingly, approval from the Sun Capital Directors is needed in order for the Company to undertake those corporate actions that require approval of two-thirds of Acccuride's board of directors.

## D. LITIGATION CLAIMS

A non-exhaustive list of Accuride's litigation claims is set forth on Plan Schedule 2. Among other litigation, Accuride has filed a claim against Forgitron Technologies, LLC and Automated Wheels, LLC, for the alleged misappropriation of Accuride's trade secrets relating to the manufacture of aluminum wheels. The portion of the suit against Forgitron Technologies, LLC was settled on October 1, 2009. The portion of the suit against Automated Wheels, LLC continues. Additionally, Accuride has tendered a request for indemnification from Shanghai Baolong Industries, Co., Ltd. regarding an open product liability issue.

## E. EVENTS LEADING TO THE CHAPTER 11 FILING

### 1. Global Economic Crisis and Automotive Industry

In late 2008, the current global economic crisis began, significantly affecting the automotive industry. The purchase of new commercial vehicles is highly dependent upon macroeconomic factors, such as Gross Domestic Product and interest rates. In addition, the commercial vehicle components industry is highly cyclical and, in large part, depends on the overall strength of the demand for heavy- and medium-duty trucks. These industries have historically experienced significant fluctuations in demand based on factors such as general economic conditions, gas prices, interest rates, government regulations, and consumer confidence. Following the economic recession in 2001 and through 2006, the commercial vehicle industry experienced increasing demand for new vehicles as trucking fleets replaced aging vehicles ahead of new EPA standards effective in January 2007 requiring lower emissions for diesel engines. As forecasted by the industry analysts, including America's Commercial Transportation Publications, industry demand declined in the first half of 2007 by approximately 23% from the previous year as trucking fleets reduced purchases of new vehicles. Beginning in late 2007, trucking fleets began to delay purchases as the freight environment weakened as growth in the U.S. economy began to slow. Following the economic meltdown in late 2008, the already weak freight environment continued to erode which created excess capacity in the trucking industry allowing fleets to further delay new truck purchases. Exacerbated by the current, unprecedented downturn in the U.S. economy and tightened credit terms, demand for commercial vehicles in 2009 is forecasted by industry analysts to decline, for the third consecutive year, to levels not seen since the recession of 1982.

The impact of the prolonged and severely depressed demand for trucks and trailers in the commercial vehicle industry has substantially and negatively impacted the Debtors. The Company's enterprise value has substantially declined and the Company's stock price has decreased from a high of $16.91 per share in 2007, to a high of $8.93 per share in 2008, to a current price of less than $0.20 per share. The Subordinated Notes are also selling at a discount to face value.

In addition, Accuride's production and consolidated net sales volumes are down in all product lines. The Company's consolidated net sales in the second quarter of 2009 were down approximately forty-five percent (45%) as compared to second quarter of 2008. The Company's consolidated gross profit also fell to $55.6 million in 2008, down $30.9 million from the 2007 gross profit of $86.5 million. These decreases are primarily due to reduced sales and operating inefficiencies related to low production volume.

In response to the global economic crisis, in September 2008 the Company engaged in a strategic restructuring to reduce expenses, increase competitiveness, strengthen customer relationships and enhance shareholder value. The two key components of the strategic restructuring were a significant reduction in staffing levels and a focus on cost savings primarily related to inventory reductions, headcount and freight costs. The financial benefits associated with this strategic restructuring are expected to begin in fiscal year 2010.

## 2. Credit Agreement Waivers; Indenture Forbearance Agreements

*Credit Agreement Waivers*

During the second quarter of 2009, the Company determined that, as of June 30, 2009, it would likely be in violation of certain financial covenants under the Prepetition Credit Facilities. As a result, effective on July 8, 2009, Accuride, Accuride Canada, Accuride's domestic subsidiaries, the Prepetition Lenders, Citicorp USA, Inc., as existing administrative agent, and the Prepetition Agent, as successor administrative agent, entered into a temporary waiver agreement with respect to the Prepetition Credit Agreement ("**First Temporary Waiver**"). Pursuant to the First Temporary Waiver, the Prepetition Lenders agreed to waive Accuride's compliance with certain financial covenants (specifically, the Senior Secured Leverage Ratio, the Interest Coverage Ratio, and the Fixed Charge Coverage Ratio (each as defined in the Prepetition Credit Agreement)) (the "**Specified Defaults**") under the Prepetition Credit Agreement for the fiscal quarter ended June 30, 2009, for the duration of the Temporary Waiver Period (as defined in the First Temporary Waiver). In addition, the First Temporary Waiver required that Accuride (a) pay interest on advances and all outstanding obligations under the Prepetition Credit Agreement at an annual rate of 2.0% plus the otherwise applicable rate during the Temporary Waiver Period, (b) comply with certain restrictions on incurring additional debt, making investments and selling assets, and (c) comply with minimum liquidity requirements specified in the First Temporary Waiver. The First Temporary Waiver Period terminated on August 15, 2009.

On August 15, 2009, Accuride, Accuride Canada, Accuride's domestic subsidiaries and the Prepetition Lenders entered into a Second Temporary Waiver Agreement (the "**Second Temporary Waiver**"). Under the terms of the Second Temporary Waiver, the Prepetition Lenders agreed to continue to waive the Company's non-compliance with the Specified Defaults through the Second Temporary Waiver Period (as defined in the Second Temporary Waiver). In addition, the Prepetition Lenders agreed to waive any default under Section 7.01(e) of the Prepetition Credit Agreement (a "**7.01(e) Default**") if the Company failed to make the interest payment due and owing on August 1, 2009, to the holders of the Subordinated Notes. The Second Temporary Waiver required Accuride to (a) pay interest on advances and all outstanding obligations under the Prepetition Credit Agreement at an annual rate of 2.0% plus the otherwise applicable rate during the Second Temporary Waiver Period, (b) comply with certain reporting requirements and restrictions on incurring additional debt, making investments and selling assets, (c) comply with minimum liquidity requirements specified in the Second Temporary Waiver and (d) deliver updated schedules in accordance with milestones specified in the Second Temporary Waiver. The Second Temporary Waiver Period terminated on September 15, 2009.

On September 15, 2009, Accuride, Accuride Canada, Accuride's domestic subsidiaries and the Prepetition Lenders entered into a Third Temporary Waiver Agreement (the "**Third Temporary Waiver**"). Under the terms of the Third Temporary Waiver, the Prepetition Lenders agreed to continue to waive the Company's non-compliance with the Specified Defaults, the 7.01(e) Default, and the technical default due to the failure of the Company to pay an interest payment that was due on August 26, 2009 (the "**Interest Payment Default**"), each through the Third Temporary Waiver Period (as defined in the Third Temporary Waiver). Under the Third Temporary Waiver, Accuride agreed to further conditions and restrictions and agreed to comply with specified minimum liquidity requirements. The Third Temporary Waiver Period would have ended on September 25, 2009, but the Steering Committee (as defined in the Third Temporary Waiver), pursuant to a letter dated September 25, 2009, and in accordance with the terms of the Third Temporary Waiver, consented to the extension of the deadline (and thus the

Third Temporary Waiver Period) to September 30, 2009. The Third Temporary Waiver Period terminated on September 30, 2009.

On September 30, 2009, Accuride, Accuride Canada, Accuride's domestic subsidiaries and the Prepetition Lenders entered into a Fourth Temporary Waiver Agreement (the "**Fourth Temporary Waiver**"). Under the Fourth Temporary Waiver, the Company agreed to comply with conditions and restrictions specified in the Fourth Temporary Waiver and substantially similar to those under the Third Temporary Waiver. Under the Fourth Temporary Waiver, the Prepetition Lenders agreed to continue to waive the Company's non-compliance with the Specified Defaults, the 7.01(e) Default, and the Interest Payment Default during the Fourth Temporary Waiver Period (as defined in the Fourth Temporary Waiver). The Fourth Temporary Waiver Period terminated on October 5, 2009.

On October 5, 2009, Accuride, Accuride Canada, Accuride's domestic subsidiaries and the Prepetition Lenders entered into a Fifth Temporary Waiver Agreement (the "**Fifth Temporary Waiver**," and together with the First Temporary Waiver, the Second Temporary Waiver, the Third Temporary Waiver, and the Fourth Temporary Waiver, the "**Temporary Waivers**"). Under the Fifth Temporary Waiver, the Company agreed to comply with the conditions and restrictions specified in the Fifth Temporary Waiver and substantially similar to those under the Third Temporary Waiver and the Fourth Temporary Waiver. Under the Fifth Temporary Waiver, the Prepetition Lenders agreed to continue to waive the Company's non-compliance with the Specified Defaults, the 7.01(e) Default, and the Interest Payment Default during the Fifth Temporary Waiver Period (as defined in the Fifth Temporary Waiver). The Fifth Temporary Waiver Period terminated on October 8, 2009.

*Indenture Forbearance Agreements*

The Company did not make the interest payment to the holders of the Subordinated Notes (the "**Prepetition Noteholders**") that was due August 3, 2009 (the "**Specified Default**"). Under the terms of the Indenture, the Company had a 30-day grace period to make the interest payment before the failure to make such payment would constitute an Event of Default (as defined in the Indenture). On August 31, 2009, the Company entered into a forbearance agreement (the "**First Forbearance Agreement**") with the Ad Hoc Noteholders Group. Under the First Forbearance Agreement, the Ad Hoc Noteholders Group agreed to forbear from exercising their rights and remedies under the Indenture with respect to the Specified Default until the earliest to occur of (a) September 30, 2009, and (b) the occurrence of any Termination Event (as defined in the First Forbearance Agreement). As one of the conditions to such forbearance, Accuride agreed to deliver a final restructuring term sheet (the "**Final Term Sheet**"), in form and substance acceptable to the Ad Hoc Noteholders Group and the Prepetition Lenders, on or before September 15, 2009 (the "**Final Term Sheet Deadline**"). As it became clear that Accuride would not be able to comply with the Final Term Sheet Deadline, Accuride and the Ad Hoc Noteholders Group entered into a letter agreement, dated September 15, 2009, pursuant to which the Final Term Sheet Deadline was extended to September 25, 2009. On September 25, 2009, the Ad Hoc Noteholders Group agreed pursuant to a second letter agreement to extend the Final Term Sheet Deadline to September 30, 2009.

On September 30, 2009, the Company entered into a second forbearance agreement with the Ad Hoc Noteolders Group (the "**Second Forbearance Agreement**"). Under the Second Forbearance Agreement, the Ad Hoc Noteholders Group agreed to continue to forbear from exercising their rights and remedies under the Indenture with respect to the Specified Default. The Second Forbearance Agreement terminated on October 5, 2009.

On October 6, 2009, the Company entered into a third forbearance agreement with the Ad Hoc Noteholders Group (the "**Third Forbearance Agreement**," and together with the First Forbearance Agreement and the Second Forbearance Agreement, the "**Forbearance Agreements**"). Under the Third Forbearance Agreement, the Ad Hoc Noteholders Group agreed to continue to forbear from exercising their rights and remedies under the Indenture with respect to the Specified Default. The Third Forbearance Agreement terminated on October 8, 2009.

3.     **Evaluation of Strategic Alternatives; Restructuring Preparations**

Since the first quarter of 2009, the Company has been proactively evaluating strategic alternatives to address ongoing liquidity and financing concerns, including the sale of non-core assets and/or alternative debt structures, such as debt-for-debt or debt-for-equity agreements. In addition, mindful of Sun Capital's role on

Acccuride's board of directors, its status as a Prepetition Lender, Prepetition Noteholder, holder of the Class A Preferred Share and holder of common stock, the Board of Directors appointed a special committee of independent directors who are not directly or indirectly affiliated with Sun Capital and who are not members of the Company's management (the "**Special Committee**"). Accuride's board of directors asked the Special Committee to identify and evaluate strategic alternatives, with the input of management, counsel and financial advisors, and to recommend an appropriate course of action to the full board of directors. Perella Weinberg Partners LP and UBS Securities LLC were engaged as financial advisors in connection with this review. Continuing through the summer of 2009, the Company's representatives held numerous meetings with the Prepetition Lenders and the Ad Hoc Noteholders Group, attempting to negotiate alternatives to a chapter 11 filing.

After several weeks of active and arm's-length negotiations, the Company, in consultation with its advisors, reached prepetition agreements in principal with certain Prepetition Lenders and the Ad Hoc Noteholders Group, representing a substantial majority of Prepetition Lenders and the Prepetition Noteholders respectively, on a pre-arranged restructuring plan. The Plan represents a significant achievement for the Company and should greatly enhance the Company's ability to reorganize successfully and expeditiously. Through confirmation of the Plan implementing the terms of the pre-arranged restructuring, the Company will restructure and substantially deleverage its balance sheet; reduce its cash interest expense to a level that is aligned with its expected future cash flows; retain additional flexibility to invest in growth initiatives to maximize enterprise value; and maintain very favorable pricing to the Company under the Prepetition Credit Agreement. Additionally, the Company expects that it will continue to generate significant liquidity from its operations, including during these Chapter 11 Cases. For all of these reasons, the Company believes that during the course of, and following, these Chapter 11 Cases it will be exceptionally well-positioned going forward.

Notwithstanding the global economic circumstances that contributed to the Company's current liquidity challenges, the Company is a global market leader in the manufacture and sale of automotive wheels. The Company is among the largest wheel producers in the world, ranking first or second in most markets and product segments, with a broad customer base, low production costs and diversified product offerings and revenue streams in major regions of the world. The Company is also generally recognized as a global wheel technology innovator with technologically advanced manufacturing facilities. Similarly, the Company has an experienced senior management team with significant automotive and best practices experience, as well as a proven track record of restructuring the Company's business.

The commencement of the Chapter 11 Cases affords the Company the opportunity to adjust its debt levels and capital structure in a manner that is commensurate with its projected cash flows. The Debtors expect to accomplish this goal through a process that will be consensual and that has the support of its key constituents.

The Debtors' restructuring efforts are designed to result in greater profitability for the Company and to solidify their position as the market leader in their product categories. The Debtors expect to expeditiously emerge from chapter 11 having rationalized their capital structure by reducing debt to levels commensurate with their cash flow generating capacity and industry norms. Reducing leverage should create financial flexibility for future operating requirements and capital expenditures and improve liquidity. The Debtors believe that the efforts they have taken, and expect to take, will return the most value to the Company's stakeholders.

The Board of Directors of each Debtor approved the chapter 11 filings on October 5, 2009 and the Debtors filed the Chapter 11 Cases on October 8, 2009.

## F.      RESTRUCTURING SUPPORT AGREEMENTS

### 1.      Noteholder Restructuring Support Agreement

On October 7, 2009, the Company entered into the Noteholder Restructuring Support Agreement with the holders of approximately 70% of the principal amount of the Subordinated Notes then outstanding (each, a "**Supporting Noteholder**" and collectively, the "**Supporting Noteholders**"). Pursuant to the Noteholder Restructuring Support Agreement, each Supporting Noteholder agreed to exercise all votes to which it is entitled with respect to the principal amount of Subordinated Notes subject to the Noteholder Restructuring Support

Agreement to accept the Plan. These votes represent approximately 70% of the dollar amount of the Class 7 Subordinated Notes Claims.

While the Noteholder Restructuring Support Agreement is in effect, each Supporting Noteholder agreed not to transfer any Subordinated Notes held by it that are subject to the Noteholder Restructuring Support Agreement except to a transferee who agrees to be bound by the Noteholder Restructuring Support Agreement.

The Noteholder Restructuring Support Agreement may be terminated by any Supporting Noteholder or group of Supporting Noteholders holding more than 50% of the aggregate face amount of the Subordinated Notes that are subject to the terms of the Noteholder Restructuring Support Agreement (the "**Requisite Supporting Noteholders**") if, *inter alia*, Prepetition Lenders representing at least 67% of the aggregate principal amount of the Prepetition First Out Credit Facility Claims have not executed the Lender Restructuring Support Agreement within seven Business Days of the entry of the Disclosure Statement Order. As of the Petition Date, Prepetition Lenders representing 57% of the aggregate principal amount of the Prepetition First Out Credit Agreement Claims executed the Lender Restructuring Support Agreement. The Debtors and the Supporting Lenders (as defined below) expect to solicit additional signatures to the Lender Restructuring Support Agreement after the Bankruptcy Court enters the Disclosure Statement Order. Any counterpart purported to be executed by a Prepetition Lender after the Petition Date but before the entry of the Disclosure Statement Order is null and void for all purposes.

The Requisite Supporting Noteholders may also terminate the Noteholder Restructuring Support Agreement for several other reasons, including but not limited to, if (i) the Effective Date has not occurred within one hundred ninety days after the Petition Date, (ii) the Plan ultimately confirmed by the Bankruptcy Court does not conform in all economic and other material respects to the term sheets attached to the Noteholder Restructuring Support Agreement, (iii) Accuride has materially breached its obligations under the Noteholder Restructuring Support Agreement or (iv) the Lender Restructuring Support Agreement (as defined below) shall have been terminated.

### 2. Lender Restructuring Support Agreement

Also on October 7, 2009, the Company entered into the Lender Restructuring Support Agreement with the holders of approximately 57% of the principal amount of the loans outstanding under the Prepetition Credit Agreement. Pursuant to the Lender Restructuring Support Agreement, each Prepetition Lender party thereto (each, a "**Supporting Lender**" and collectively, the "**Supporting Lenders**") agreed to exercise all votes to which it is entitled to accept the Plan. These votes represent approximately 57% of the dollar amount of the Prepetition First Out Credit Agreement Claims. Accuride and the Supporting Lenders expect to solicit additional signatures to the Lender Restructuring Support Agreement after the Bankruptcy Court enters the Disclosure Statement Order. Any counterpart purported to be executed by a Prepetition Lender after the Petition Date but before the entry of the Disclosure Statement Order is deemed null and void for all purposes.

While the Lender Restructuring Support Agreement is in effect, the Supporting Lenders agreed to not transfer any Claims except to a transferee who agrees to be bound by the Lender Restructuring Support Agreement.

The Requisite Independent Supporting Lenders may terminate the Lender Restructuring Support Agreement for several reasons, including but not limited to, if (i) the Effective Date has not occurred within one hundred ninety days after the Petition Date (ii) the Plan ultimately confirmed by the Bankruptcy Court does not conform in all economic and other material respects to the term sheets attached to the Lender Restructuring Support Agreement, (iii) Accuride has materially breached its obligations under the Lender Restructuring Support Agreement, (iv) a "Termination Date" occurs under the DIP Orders, the DIP Facility Credit Agreement or the other DIP Facility documentation, and the DIP Agent enforces of any of its rights and remedies thereunder, or (v) the Noteholder Restructuring Support Agreement shall have been terminated.

<div align="center">

**III.**
**EVENTS DURING THE CHAPTER 11 CASES**

</div>

A.     **FIRST DAY MOTIONS AND CERTAIN RELATED RELIEF**

Immediately following the Petition Date, the Debtors devoted substantial efforts to stabilizing their operations and preserving and restoring their relationships with, among others, vendors, customers, employees and utility providers that the Debtors believed could be impacted by the commencement of the Chapter 11 Cases. As a result of these initial efforts, the Debtors were able to minimize, as much as practicable, the negative impacts of the commencement of the Chapter 11 Cases.

On or around the Petition Date, in addition to filing their voluntary petition for relief, the Debtors also filed a number of motions (collectively referred to herein as "**First Day Motions**") with the Bankruptcy Court. At a hearing conducted on October 9, 2009, the Bankruptcy Court entered several orders to, among other things: (i) authorize joint administration of the Debtors' Chapter 11 Cases; (ii) prevent interruptions to the Debtors' business; (iii) ease the strain on the Debtors' relationships with certain essential constituents, including employees, vendors, customers and utility providers; (iv) provide access to critical working capital; and (v) allow the Debtors to retain certain advisors to assist them with the administration of the Chapter 11 Cases (each, a "**First Day Order**").

1.     **Procedural Motions**

To facilitate a smooth and efficient administration of the Chapter 11 Cases, the Bankruptcy Court entered certain "procedural" First Day Orders, by which the Bankruptcy Court (a) authorized the joint administration of the Chapter 11 Cases; (b) enforced the automatic stay as it relates to foreign creditors and contract parties and the prohibition against termination of the Debtors' contracts as a result of *ipso facto* provisions that purport to terminate such contracts upon a chapter 11 filing and (c) established notice and hearing procedures with respect to trading in equity securities of Accuride.

2.     **Employment of Advisors**

To assist the Debtors in carrying out their duties as debtors in possession and to represent their interests in the Chapter 11 Cases, the Bankruptcy Court entered a First Day Order authorizing the Debtors to retain and employ The Garden City Group, Inc. as the Voting and Claims Agent in the Chapter 11 Cases. Also, on October 9, 2009, the Debtors filed a number of applications seeking to retain the following advisors: (a) Latham & Watkins LLP and Young Conaway Stargatt & Taylor, LLP, as co-counsel; (b) Goodmans LLP, as Canadian counsel; (c) Zolfo Cooper, LLC, as restructuring consultants; (d) Perella Weinberg Partners LP, as financial advisors and investment banker; (e) Edward Howard & Co. as communications consultant; and (f) Hewitt Associates LLC as compensation consultant. The Debtors also sought an order approving and establishing procedures for the retention of professionals utilized in the ordinary course of the Debtors' business. The Bankruptcy Court approved the retention applications on November 2, 2009.

3.     **Stabilizing Operations**

Recognizing that any interruption of the Debtors' business, even for a brief period of time, would negatively impact their operations, customer relationships, revenue and profits, the Debtors filed a number of First Day Motions to help facilitate a stabilization of its manufacturing operations and effectuate, as much as possible, a smooth transition into operations as debtors in possession. Specifically, in addition to certain orders discussed in greater detail below, the Debtors sought and obtained First Day Orders authorizing the Debtors to:

- maintain and administer customer programs and honor its prepetition obligations arising under or relating to those customer programs;

<div align="center">10</div>

- pay prepetition wages, salaries and other compensation, reimbursable employee expenses and employee medical and similar benefits and continue to pay these amounts postpetition;

- pay prepetition shipping and import obligations to common carriers and distributors;

- pay prepetition obligations to common carriers and contractors able to perfect mechanics' or artists', or other liens in respect of prepetition obligations;

- determine adequate assurance for future utility service and establish procedures for utility providers to object to such assurance;

- pay prepetition insurance obligations and to continue insurance coverage;

- maintain existing bank accounts, continue operation of its existing cash management system, continue entering into certain intercompany transactions among the Debtors and their non-debtor foreign entities and continue entering into currency exchange contracts and forward purchase contracts for certain raw materials; and

- remit and pay certain prepetition taxes and fees.

In addition to the foregoing relief, to prevent the imposition of the automatic stay from disrupting its business and to ensure continued deliveries on favorable credit terms, the Debtors sought and obtained Bankruptcy Court approval to pay the prepetition claims of certain vendors who the Debtors believed were essential to the ongoing operation of their businesses. Indeed, the Debtors' ability to pay the claims of these vendors was critical to maintaining ongoing business operations due to the Debtors' inability to acquire essential replacement goods and services of the same quality, reliability, cost or availability from other sources and, ultimately, to the success of the Debtors' Chapter 11 Cases.

Similarly, to reduce the potentially negative effects of its bankruptcy on operations, the Debtors sought and obtained Bankruptcy Court approval to pay prepetition claims of vendors entitled to administrative expense status under Section 503(b)(9) of the Bankruptcy Code. Satisfying these obligations early in its Chapter 11 Cases, rather than upon the Effective Date, will enable the Debtors to effectuate a smoother transition into chapter 11, and help alleviated some of the strain that a chapter 11 filing can place on a debtor's relationships with its vendors.

4.    **DIP Financing and Use of Cash Collateral**

A critical goal of the Debtors' business stabilization efforts was to ensure the Debtors maintained sufficient liquidity to operate their businesses during the pendency of the Chapter 11 Cases. Therefore, on October 7, 2009, the Debtors reached an agreement with the DIP Lenders as to the terms of debtor-in-possession financing facilities. The Debtors were not able to obtain postposition financing or other financing accommodations from any prospective lender or group of lenders on more favorable terms and conditions than those contained in the DIP Facility and described below. Specifically, the Debtors were unable to obtain debtor-in-possession financing without providing senior priming liens. The DIP Facility was negotiated in good faith and at arm's length, extensively and diligently considered by the Debtors' management and submitted to the Accuride board of directors for approval. The management of the Debtors' believes that the terms of the DIP Facility are fair and reasonable in light of current market conditions (particularly the lack of a ready market for any financing, including debtor-in-possession financing) and are in the best interests of the Debtors' estates.

On the Petition Date, the Debtors filed their Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364: (I) Authorizing Debtors To (A) Obtain Post-Petition Financing, And (B) Grant Senior Liens, Junior Liens And Superpriority Administrative Expense Status; (II) Approving Use Of Cash Collateral; (III) Granting Adequate Protection To Certain Prepetition Secured Parties; (IV) Scheduling A Final Hearing; And (V) Granting Related Relief [Docket No. 20] (the "**DIP Motion**"). In the DIP Motion, the Debtors sought permission from the Court to enter into the DIP Facility among Accuride, the DIP Agent and the other DIP Lenders, pursuant to which the Debtors obtained a revolving credit facility of $25 million and a term loan first-in,

last-out facility of $25 million. The $25 million of loans under the DIP Facility bears interest, at the election of Accuride, at a rate of LIBOR + 6.50% (with a LIBOR floor of 2.50%) or Base Rate + 5.50% (with a Base Rate floor of 3.50%), and the $25 million of first-in, last-out term loans under the DIP Facility bears interest, at the election of Accuride, at a rate of LIBOR + 7.50% (with a LIBOR floor of 2.50%) or Base Rate + 6.50% (with a Base Rate floor of 3.50%). The Debtors' obligations under the DIP Facility were granted super-priority administrative claim status, and are secured by a first priority priming lien on substantially all of the U.S. properties and assets of Accuride and its domestic subsidiaries.

At the hearing held on October 9, 2009, the Bankruptcy Court entered the Interim DIP Order, which, among other things: (a) authorized the Debtors to borrow up to $25 million under the DIP Facility; and (b) approved the Debtors' request to use Cash Collateral, in each case, on an interim basis pending final approval of the DIP Facility and use of Cash Collateral after notice and a hearing.

At the hearing held on November 2, 2009, the Bankruptcy Court entered the Final DIP Order, which, among other things: (a) authorized the Debtors to borrow up to $50 million in the aggregate under the DIP Facility; and (b) approved the Debtors' request to use Cash Collateral, in each case, on a final basis.

The financing provided under the DIP Facility and the use of Cash Collateral has allowed the Debtors to, among other things: (a) continue their businesses in an orderly manner; (b) maintain their valuable relationships with vendors, shippers, suppliers, customers and employees; (c) pay various interest, fees and expenses under the DIP Facility; and (d) support their working capital, general corporate and overall operational needs - all of which were necessary to preserve and maintain the going-concern value of the Debtors' businesses and, ultimately, help ensure a successful reorganization.

## B.     THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

### 1.     Appointment of the Committee

On October 21, 2009, the U.S. Trustee appointed the Committee pursuant to section 1102 of the Bankruptcy Code. The members of the Committee included the following: The Bank of New York Mellon Trust Company, N.A., Ryerson, Dawlen Corporation, B&D Thread Rolling, Inc. and Church Electric.

The Committee retained (a) Irell & Manella, LLP as lead counsel; (b) Reed Smith LLP as Delaware counsel; and (c) Morris Anderson & Associates Ltd., as financial advisor.

### 2.     Meeting of Creditors

The meeting of creditors pursuant to section 341 of the Bankruptcy Code was held on November 9, 2009 at J. Caleb Boggs Federal Building in Wilmington, Delaware. In accordance with Bankruptcy Rule 9001(5), one representative of the Debtors, as well as counsel to the Debtors, attended the meeting and answered questions posed by the U.S. Trustee and other parties in interest present at the meeting.

### 3.     Request for Equity Committee

On or about October 13, 2009, Sonnenschein Nath & Rosenthal LLP, on behalf of Trimaran Investments II, L.L.C. ("**Trimaran**"), sent a letter to the Office of the United States Trustee requesting the appointment of an official committee of equity security holders in these chapter 11 cases. The Debtors responded to such letter and urged the United States Trustee to deny the request for the appointment of an official equity committee because, among other reasons (a) Trimaran has not met its burden of proving a substantial likelihood of a meaningful distribution to equity in these cases, (b) the interests of equity interest holders have been more than adequately represented in the months preceding the petition date and will be more than adequately represented during the chapter 11 cases, (c) Trimaran is more than capable of representing itself in the chapter 11 cases, and (d) the appointment of an official equity committee would be an unnecessary and unwarranted use of estate resources. As of November 15, 2009, the United States Trustee had not determined whether or not to appoint an official equity committee.

## C. FILING OF THE SCHEDULES AND ESTABLISHMENT OF THE CLAIMS BAR DATE

### 1. Filing of the Schedules

On October 30, 2009, the Debtors filed their Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases and Statements of Financial Affairs with the Bankruptcy Court pursuant to section 521 of the Bankruptcy Code.

### 2. Establishment of the Claims Bar Date

On November 2, 2009, the Bankruptcy Court entered that certain Order Pursuant to Bankruptcy Rule 3003(c)(3) and Local Rule 2002-1(e) Establishing Bar Dates and Related Procedures for Filing Proofs of Claim (Including for Administrative Expense Claims Under Section 503(b)(9) of the Bankruptcy Code) and Approving the Form and Manner of Notice Thereof, (Docket No. 349, the "**Bar Date Order**"), establishing November 30, 2009 as the Claims Bar Date and establishing April 6, 2010 as the Governmental Bar Date.

## D. REORGANIZATION STRATEGY

### 1. Enhancing the Debtors' Business Operations

With the assistance of its advisors, the Debtors have been focused on developing and executing a reorganization strategy to (a) maximize the value of their Estates, (b) address the factors that led to the bankruptcy filing and (c) enable the Debtors to emerge from chapter 11 a stronger, more viable company. Specifically, this reorganization strategy is primarily (though not exclusively) focused on:

- restructuring the Debtors' balance sheet and emerging from chapter 11 with a long-term capital structure conducive to future profitability;

- managing the Debtors' business to enhance its financial and operating performance, including utilizing the unique powers and opportunities afforded to a chapter 11 debtor in possession; and

- reviewing the Debtors' Unexpired Leases to determine whether there are benefits to the Debtors in assuming or rejecting any Unexpired Leases.

Accuride Canada has not commenced insolvency proceedings in Canada, and continues to operate in the ordinary course.

### 2. Appropriate Capital Structure, Conversion of Debt and Rights Offering

As set forth above, as of September 30, 2009, the Debtors had outstanding debt of approximately $635 million. Upon emergence from chapter 11, the Reorganized Debtors will have an improved balance sheet and more appropriate capital structure resulting from (i) the conversion of $291 million of Subordinated Notes into New Common Stock and (ii) the $140.0 million Rights Offering, which will be used, in part, to retire the Prepetition Last Out Credit Facility Claims of approximately $70 million. Accuride and Accuride Canada will be party to the Restructured Credit Facility. This will result in a reduction of leverage associated with the aforementioned $70 million debt reduction and a decrease in cash interest obligations associated with the conversion to equity of the Subordinated Notes of $23 million. The interest rates to be paid on the Restructured Credit Facility will be, at the option of the Debtors, either LIBOR plus 6.75% or base rate plus 5.75%.

## E. EXCLUSIVE PERIOD FOR FILING A PLAN AND SOLICITING VOTES

Under the Bankruptcy Code, a debtor has the exclusive right to file and solicit acceptance of a plan or plans of reorganization for an initial period of 120 days from the date on which the debtor filed for voluntary relief. If a debtor files a plan within this exclusive period, then the debtor has the exclusive right for 180 days from the Petition Date to solicit acceptances to the plan. During these exclusive periods, no other party in interest may file a

CH\1125862.14

competing plan of reorganization; however, a court may extend these periods upon request of a party in interest and "for cause."

The Debtors' initial exclusive periods to file a plan and solicit acceptances of a plan are set to expire on February 5, 2010, 2009 and April 6, 2010, respectively.

## F.    DEADLINE TO ASSUME OR REJECT LEASES OF NONRESIDENTIAL REAL PROPERTY

Pursuant to section 365(d)(4) of the Bankruptcy Code, the time within which the Debtor have to assume or reject unexpired leases of nonresidential real property is also scheduled to expire on February 5, 2010, unless extended by order of the Bankruptcy Court.

## G.    SUMMARY OF THE RIGHTS OFFERING

Accuride Corporation and the Backstop Investors executed the Convertible Notes Commitment Agreement on October 8, 2009 (the "**Backstop Commitment Agreement,**" attached to the Plan as Exhibit B). Although the Debtors will offer holders of the Subordinated Notes who are accredited investors the opportunity to participate in the Rights Offering, it is possible that the Debtors will be unable to obtain sufficient commitments from the holders of the Subordinated Notes who are accredited investors to purchase $140 million of New Notes. To guard against this possibility, the Backstop Investors have agreed to "backstop" the Rights Offering and purchase any of the Debtors' New Notes that are not subscribed upon the subscription expiration date. The Backstop Investors are Blackrock Financial Management, Inc., Brigade Capital Management, LLC, Sankaty Advisors, LLC and Tinicum Lantern L.L.C, or their respective affiliates. Certain Backstop Investors owned Subordinated Notes as of the Petition Date.

In consideration for entry into the Backstop Commitment Agreement, the Backstop Investors are entitled to, and the Debtors are obligated to pay the Backstop Fee (as defined in the Backstop Commitment Agreement) and the Debtors have agreed to reimburse or pay, as the case may be, the reasonable expenses of the Backstop Investors, including the fees and expenses of Rothschild Inc., financial advisor to the Backstop Investors, and Milbank, Tweed, Hadley & McCloy LLP and local Wilmington, Delaware counsel, as legal advisors to the Backstop Investors. On the Effective Date, the Backstop Fee will be paid in an aggregate of [25,000,000] shares of New Common Stock if the Holders of Accuride Other Equity Interests vote to accept the Plan or [24,500,000] shares of New Common Stock if the Holders of Accuride Other Equity Interests vote to reject the Plan. In addition, an additional fee may be paid upon termination of the Backstop Commitment Agreement in certain circumstances. On November 2, 2009, this Court entered an order (the "**Backstop Order**") authorizing the Debtors to (i) assume the Backstop Commitment Agreement and (ii) pay certain fees and expenses incurred in connection therewith, including the cash backstop fee, stock backstop fee, transaction expenses and termination fee [Docket No. 167].

(i)    Rights Offering Participants:  Means each Holder of a Subordinated Notes Claim as of the Rights Offering Record Date is an "accredited investor," as defined in Rule 501(a) of Regulation D under the Securities Act as of the Rights Offering Record Date.

(ii)    Rights Offering Record Date:  Means the date for determining which Holders of Subordinated Notes Claims who are accredited investors may be eligible to participate in the Rights Offering and shall be the proposed Voting Record Date applicable to Subordinated Notes Claims (i.e., December 11, 2009).

(iii)    Issuance of Rights:  Each Rights Offering Participant will receive Subscription Rights to subscribe for its Pro Rata Share of the Rights Offering Notes for an aggregate purchase price equal to the applicable Subscription Payment Amount. The Rights Offering Notes shall be subject to the terms of the New Indenture.

(iv)    New Indenture:  On the Effective Date, Accuride shall be authorized to enter into the transactions contemplated by the New Indenture, and the New Indenture and all such agreements and documents shall become effective in accordance with their respective terms and conditions upon the parties thereto.

CH\1125862.14

(iv)　Subscription Payment Amount: Means, with respect to a particular Rights Offering Purchaser, an amount of Cash equal to the Rights Offering Amount multiplied by such Rights Offering Purchaser's subscribed-for portion of its Pro Rata Share of the Rights Offering Notes.

(v)　Subscription Period: Means the time period during which Rights Offering Participants may subscribe to purchase the Rights Offering Notes, which period shall commence on the Subscription Commencement Date and expire on the Subscription Deadline, as set forth in the Subscription Form.

(vi)　Exercise of Subscription Rights: To exercise the Subscription Rights, each Rights Offering Participant must review and return a duly completed Subscription Form (making a binding and irrevocable commitment to participate in the Rights Offering) to the Debtors or other Entity specified in the Subscription Form so that such form is actually received by the Debtors or such other Entity on or before the Subscription Deadline. If the Debtors or such other Entity for any reason do not receive from a given holder of Subscription Rights a duly completed Subscription Form on or prior to the Subscription Deadline, then such holder shall be deemed to have forever and irrevocably relinquished and waived its right to participate in the Rights Offering.

(vii)　No Transfer; Detachment Restrictions; No Revocation: The Subscription Rights are not Transferable or detachable. Any such Transfer or detachment, or attempted Transfer or detachment, will be null and void and the Debtors will not treat any purported transferee of the Subscription Rights separate from the Subordinated Notes Claims as the holder of any Subscription Rights. Once a Rights Offering Participant has exercised any of its Subscription Rights by properly executing and delivering a Subscription Form to the Debtors or other Entity specified in the Subscription Form, such exercise may only be revoked, rescinded or annulled in the sole discretion of the Debtors or Reorganized Debtors.

(viii)　Validity of Exercise of Subscription Rights: All questions concerning the timeliness, validity, form, and eligibility of any exercise, or purported exercise, of Subscription Rights shall be determined by the Debtors or Reorganized Debtors. The Debtors or Reorganized Debtors, in their discretion reasonably exercised in good faith, may waive any defect or irregularity, or permit a defect or irregularity to be corrected within such times as they may determine, or reject the purported exercise of any Subscription Rights. A Subscription Form shall be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Debtors or Reorganized Debtors determine in their discretion reasonably exercised in good faith. The Debtors or Reorganized Debtors will use commercially reasonable efforts to give written notice to any Rights Offering Participant regarding any defect or irregularity in connection with any purported exercise of Subscription Rights by such Person and may permit such defect or irregularity to be cured within such time as they may determine in good faith to be appropriate; provided, however, that neither the Debtors and Reorganized Debtors nor any of their Related Persons shall incur any liability for giving, or failing to give, such notification and opportunity to cure.

## H.　SUMMARY OF THE NEW NOTES

The New Notes are 7.5% Senior Convertible Notes due 2020 that will be issued by Reorganized Accuride to the Rights Offering Participants and/or the Backstop Investors pursuant to the Rights Offering, the Backstop Commitment Agreement and the Plan. Interest on the New Notes will be payable semi-annually, with the first six interest payments being payable as paid-in-kind interest (“**PIK interest**”) and the remaining being payable in cash, at a rate of 7.5% per annum. The New Notes will mature ten (10) years from the date of issue. In addition, New Indenture will not contain any financial covenants and the holders of the New Notes will be entitled to exercise all the voting rights associated with the New Common Stock on an as-converted basis.

The New Notes will be convertible at any time at the option of the holder thereof, in part or in whole, into New Common Stock at a conversion price (the “**Conversion Price**”) that results in the New Notes, if converted in whole immediately upon the Effective Date, without giving effect to the accrual of any PIK interest, being convertible into an aggregate of (i) [187,500,000] shares of New Common Stock of Reorganized Accuride, if the Holders of Other Equity Interests in Accuride vote to accept the Plan, and (ii) [183,750,000] shares of New Common Stock of Reorganized Accuride, if the Holders of Other Equity Interests in Accuride do not vote to accept the Plan. If the Holders of Other Equity Interests in Accuride vote to accept the Plan and the New Warrants issued under the Plan are subsequently exercised in full in cash, the New Notes will be adjusted to be convertible into an aggregate of [220,588,235] shares of New Common Stock of Reorganized Accuride. The percentage ownership

15

represented by the shares of New Common Stock issued upon conversion of the New Notes is subject to dilution, including dilution for the Equity Incentive Program. The Conversion Price will be subject to adjustment from time to time as described in the section entitled "Adjustment to the Conversion Rate/Anti-Dilution Protection" in the term sheet attached as Exhibit D to the Plan. To the extent interest on the New Notes is paid in PIK, the additional notes so paid will be convertible into New Common Stock at the same Conversion Price as the New Notes. Additional terms of the New Notes are summarized in the term sheet attached as Exhibit D to the Plan.

The New Notes will be senior unsecured debt obligations of Reorganized Accuride and will rank *pari passu* in right of payment to any existing or future senior unsecured debt of Accuride or any guarantor, and senior in right of payment to any current or future subordinated debt of Reorganized Accuride or of any guarantor. All of the domestic subsidiaries of Reorganized Accuride will guarantee Reorganized Accuride's payment obligations with respect to the New Notes.

The New Notes will be issued in a private placement that is exempt from registration under the Securities Act or any similar federal, state or local law as set forth in greater detail in Section VIII herein, titled "Exemptions From Securities Act Registration."

## I.   SUMMARY OF THE RESTRUCTURED CREDIT FACILITY

The Restructured Credit Facility will consist of U.S. Advances (as defined in the Restructured Credit Agreement) in the aggregate principal amount of $264.3 million plus the amount paid on drawings on letters of credit that are drawn prior to the effective date of the Restructured Credit Agreement (such draws, the "**Letter of Credit Draws**"), Canadian Advances (as defined in the Restructured Credit Agreement) in the aggregate principal amount of $22 million and a letter of credit facility equal to $18.3 million minus the amount of the Letter of Credit Draws.

The terms of the Restructured Credit Facility Agreement will amend and restate, and supersede in their entirety, the terms of the Prepetition Credit Agreement to, among other things: (i) extend the maturity of the Prepetition Revolving Facility and the Prepetition Term Facility through June 30, 2013, (ii) amend the interest rate, at the option of Accuride, to LIBOR + 6.75% (with a LIBOR floor of 3.00%) or Base Rate + 5.50% (with a Base Rate floor of 3.50%) and (iii) eliminate all financial covenants except minimum liquidity and minimum EBITDA covenants. For additional terms of the Restructured Credit Facility, refer to the Restructured Credit Facility Agreement attached to the Plan as Exhibit G. Advances may not be reborrowed once repaid.

The borrowers under the Restructured Credit Facility will be Reorganized Accuride and Accuride Canada. The obligations of Reorganized Accuride under the Restructured Credit Facility Agreement will be guaranteed by all of Reorganized Accuride's domestic subsidiaries and the obligations of Accuride Canada will be guaranteed by Reorganized Accuride and all of Reorganized Accuride's domestic subsidiaries. The obligations of Reorganized Accuride and its domestic subsidiaries under the Restructured Credit Agreement and the related guarantees will be secured by, among other things, a first-priority lien on and security interest in substantially all of the U.S. properties and assets of the Reorganized Debtors. The obligations of Accuride Canada under the Restructured Credit Agreement will be secured by a first priority lien on and security interest in substantially all of the properties and assets of Accuride Canada and, by virtue of the guarantees, all of the properties and assets of Reorganized Accuride and Reorganized Accuride's domestic subsidiaries

It is possible the terms of the Restructured Credit Facility Agreement may be modified on or prior to the Effective Date and that the terms of the Restructured Credit Facility Agreement may ultimately be materially different than those described herein.

As consideration for Deutsche Bank Trust Company Americas (in such capacity, the "**Postpetition Administrative Agent**") efforts in connection with the Restructured Credit Facility Agreement, the Postpetition Administrative Agent has requested, and the Debtors have agreed to pay, certain fees to the Postpetition Administrative Agent for services performed in connection with the Restructured Credit Facility Agreement (the "**Fees**"), the amounts of which are disclosed in that certain Restructuring Arrangement Fee Letter, dated as of October 7, 2009, between the Postpetition Administrative Agent and Accuride Corporation (the "**Fee Letter**"). The

Fees are payable upon the effective date of Plan and the Debtors will seek authorization to pay the Fees in the Confirmation Order.

The Debtors believe that the Fee Letter contains commercially sensitive information. The Postpetition Administrative Agent has represented to the Debtors that the disclosure of the terms of the Fee Letter would prejudice the economic interests of the Postpetition Administrative Agent. Copies of the Fee Letter will be provided to the Creditors' Committee, counsel to the Postpetition Administrative Agent, counsel to the Ad Hoc Noteholders Group, the U.S. Trustee and their legal and financial advisors, all on a confidential basis. The Debtors believe that providing copies of the Fee Letter to those parties will provide sufficient representation with respect to all interested parties regarding the narrow issues that might be raised in connection with the Debtors' entry into the Fee Letter.

## J.    SUMMARY OF THE KEIP AND RELATED COMPENSATION ISSUES

### 1.    KEIP

On November 10, 2009, the Debtors filed a motion (the "**KEIP Motion**") to (a) honor certain prepetition benefit programs, (b) implement a key employee incentive plan (the "**KEIP**"), (c) modify the Directors' Deferred Compensation Plan (as defined in the KEIP Motion), and (d) enter into a non-compete agreement with Accuride Corporation's Chief Executive Officer, Mr. William Lasky. The KEIP Motion also contemplates making prorated payments under the Debtors Annual Incentive Compensation Plan ("**AICP**"), upon further court approval. The Court will hear the KEIP Motion on November 23, 2009.

The proposed KEIP covers seventeen of the Debtors' employees and is designed to incentivize those employees to optimize the value of the Debtors' estates by increasing liquidity and promptly exiting bankruptcy. Under the KEIP, the participants would, upon emergence from bankruptcy, receive a payout based on liquidity (measured by cash on hand at emergence) and business preservation (measured by the timing of emergence). The threshold liquidity (net of cash payouts under the KEIP and AICP prorated payout) is $50 million; the liquidity required to achieve the target payout under the KEIP (net of cash payouts under the KEIP and AICP prorated payout) is $56 million. The target KEIP bonus pool is $3.2 million, a portion of which (attributable to the Chief Executive Officer and the Chief Financial Officer) may be paid in stock under certain circumstances.

William Lasky, the chairman and Chief Executive Officer of Accuride, is an at-will employee. Mr. Lasky does not currently have a severance plan or a non-compete agreement. Mr. Lasky is extremely valuable to the Debtors, not only for his day-to-day efforts, but also on account of his formidable experience in the industry. As such, the Debtors have decided in their business judgment to enter into a non-compete agreement with Mr. Lasky. Pursuant to the terms of the non-compete agreement, Mr. Lasky will receive $800,000, which is equal to one-year's base salary, to refrain from competing with the Debtors for a period of one year after the date on which his employment with the Debtors ends. The non-compete payment will be payable upon the date Mr. Lasky's employment with the Debtors' ends for any reason, voluntarily or otherwise, other than by reason of death or permanent disability, and will be paid over a period of twelve months according to the Company's normal payroll schedule. If any stock of Accuride is traded on an established securities market at the time of his termination, payments will be delayed for six months, with ½ the amount paid on the six month anniversary of his termination and the remainder payable in installments over the remaining six months. This delay in payment is required in order for the payment to comply with the deferred compensation rules of Section 409A of the Internal Revenue Code. Otherwise, the payments will be paid in installments over twelve months.

The KEIP Motion also seeks to continue certain prepetition benefit programs, including the Long Term Incentive Plan (as defined in the KEIP Motion) and the financial planning stipend. Finally, the KEIP Motion requests authority to modify the Directors' Deferred Compensation Plan (as defined in the KEIP Motion), such that all deferred compensation installments, including those normally payable in stock, made after the October 28, 2009 (the date the board of directors approved the modification) would be placed into cash accounts.

2. **Other Compensation Issues**

The Debtors have prepetition severance agreements with nine management-level employees. Under these severance agreements, a severance payment becomes payable when the employee party to the agreement is terminated without cause or terminates his or her employment for good reason. Five of the employees with severance agreements also have prepetition retention agreements in place. Each employee party to a retention agreement is scheduled to receive a retention bonus in May of 2010, provided he or she continues to be employed by the Debtors at such time. The Debtors will assume the severance agreements and retention agreements pursuant to the Plan.

# K.    SUBSTANTIVE CONSOLIDATION OF THE DEBTORS

As set forth in more detail in Section IV, the Plan provides for the substantive consolidation of the Debtors with respect to the voting and treatment of all Claims and Equity Interests except General Other Secured Claims and Secured Tax Claims. Section 105(a) of the Bankruptcy Code empowers a bankruptcy court to authorize substantive consolidation. The United States Court of Appeals for the Third Circuit has adopted a standard for granting a request for substantive consolidation similar to the standards adopted by other Circuits authorizing substantive consolidation. See In re Owens Corning, 419 F.3d 195, 211 (3d Cir. 2005); Reider v. F.D.I.C. (In re Reider), 31 F.3d 1102, 1107-1108 (11th Cir. 1994); Woburn Assoc. v. Kahn (In re Hemingway Transport Inc.), 954 F.2d 1, 11-12 (1st Cir. 1992); First Nat'l Bank of El Dorado v. Giller (In re Giller), 962 F.2d 796, 798-99 (8th Cir. 1992); Union Sav. Bank. v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.) 860 F.2d 515, 518 (2d Cir. 1988); Drabkin v. Midland-Ross Corp. (In re Auto-Train Corp.), 810 F.2d 270, 276 (D.C. Cir. 1987).

In the Third Circuit, Debtors seeking substantive consolidation must show either "(i) prepetition they disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors." Owens Corning, 419 F.3d at 211 (emphasis supplied). The facts of these Chapter 11 Cases necessitate substantive consolidation, and substantive consolidation is warranted under the aforementioned test.

There is ample evidence that prior to the Petition Date creditors of the Debtors treated them as one legal entity. The Debtors prepared and disseminated consolidated financial reports to the public, including customers, suppliers, landlords, lenders, credit rating agencies and stockholders. Moreover, suppliers rely on Accuride's "Dun and Bradstreet" report for extending credit, which is only available on a consolidated basis. In fact, the terms of many significant purchase orders were negotiated by Accuride Corporation, not by the individual Debtors. Furthermore, all SEC reporting that is available to the public is consolidated, and broken down by "operating units." The operating units are wheels, components, and other. All three operating units are composed of multiple Debtors. Because the Debtors disseminated financial information to the public on a consolidated basis, it is highly unlikely that creditors relied on the separate identity of any Debtor in extending credit to such Debtor.

Because financial information disseminated to customers, suppliers, landlords, lenders, credit rating agencies and stockholders, has been prepared and presented on a consolidated basis, it is clear that creditors treated the Debtors as one legal entity when deciding whether to extend credit. Substantive consolidation would ensure that all of the Debtors' creditors, having relied on the creditworthiness of the Debtors as a unit, receive the benefit of a distribution in satisfaction of their claims from the single pool of assets. Thus, substantive consolidation is warranted in this case under the test set forth by the Third Circuit.[5]

Several courts within the Third Circuit have acknowledged the existence and application of substantive consolidation of separate bankruptcy estates in appropriate circumstances. See In re Molnar Bros., 200 B.R. 555 (Bankr. D.N.J. 1996) (recognizing the application of substantive consolidation of two or more bankruptcy estates); In re PWS Holding Corp., Bruno's, Inc., et al., Case No. 98-212-223 (SLR) (D. Del. 1998) (approving substantive consolidation of debtors pursuant to a plan of reorganization); In re Smith Corona Corp. et al., Case No. 95-788

---

[5] Although Accuride Canada's business is also closely linked to Accuride's business and operations, Accuride Canada is not affected by the substantive consolidation of the Debtors, and is not a party to the Chapter 11 Cases. Further, Accuride Canada has not commenced insolvency proceedings in Canada.

18

(HSB) (Bankr. D. Del., Oct. 18, 1996) (adopting substantive consolidation test articulated by the Eighth Circuit); Bracaglia v. Manzo (In re United Stairs Corp.) 176 B.R. 359, 368 (Bankr. D.N.J. 1995) (stating that it is "well established that in the appropriate circumstances the court may substantively consolidate corporate entities"); In re Buckhead American Corp., 1992 Bankr. LEXIS 2506 (Bankr. D. Del. August 13, 1992) (substantively consolidating debtors); In re Cooper, 147 B.R. 678, 682 (Bankr. D.N.J. 1992) (stating that substantive consolidation constitutes the "merger of the assets and liabilities of two or more estates, creating a common fund of assets and a single body of creditors.") (citation omitted).

For the reasons set forth above, the Debtors believe that the requirements for substantive consolidation of the Debtors with respect to voting and treatment of all Claims and Equity Interests except for Class 2 Claims and Class 3 Claims are satisfied.

The Plan and Disclosure Statement do not contemplate or seek the substantive consolidation of any of the Debtors with their non-Debtor subsidiaries. Thus, any pledge by any of the Debtors of any of its respective assets, including, without limitation any stock in any of its subsidiaries, is unaffected by the limited substantive consolidation proposed in the Plan.

## L.    SUMMARY OF THE EQUITY CAPITALIZATION OF REORGANIZED ACCURIDE

The following tables set forth the equity capitalization of Reorganized Accuride on a *pro forma* basis, giving effect to the transactions contemplated by the Plan, including the initial distributions of New Common Stock to the Holders of Subordinated Notes Claims and, if applicable, Holders of Accuride Other Equity Interests, the payment of the Backstop Fee, the conversion of the New Notes and the exercise of the New Warrants. The following tables have been prepared for illustrative purposes only and assume that the New Notes are converted into shares of New Common Stock, and that the New Warrants are exercised in full in cash to acquire shares of New Common Stock, in each case on the Effective Date of the Plan. There can be no assurance as to the timing of the conversion of the New Notes or the exercise of the New Warrants, or whether the New Notes or the New Warrants will ever be converted or exercised. In addition, the calculations in the following tables do not give effect to additional dilution that is expected to occur after the Effective Date of the Plan, including dilution anticipated upon the conversion of New Notes issued in payment of PIK interest or the issuance of New Common Stock under the Equity Incentive Plan. All percents set forth in the following tables represent the applicable percent of the total number of shares of New Common Stock deemed to be outstanding, on a fully diluted basis, for purposes of the calculations set forth in the applicable column in the table.

The distribution under the Plan to the Holders of Accuride Other Equity Interests depends upon whether such Holders vote to accept or reject the Plan. The following table sets forth the anticipated equity capitalization of Reorganized Accuride, assuming that the Holders of Accuride Other Equity Interests vote to accept the Plan:

### Pro Forma Equity Capitalization of Reorganized Accuride
### (Assuming Accuride Other Equity Interests Vote to Accept the Plan)

|  | Initial Distribution(1) | | After Payment of Backstop Fee (2) | | After Conversion of New Notes (3) | | After Conversion of New Notes and Exercise of Warrants (4) | |
|---|---|---|---|---|---|---|---|---|
|  | Number | Percent | Number | Percent | Number | Percent | Number | Percent |
| Issued to Holders of Subordinated Notes Claims | 98,000,000 | 98.0% | 98,000,000 | 78.4% | 98,000,000 | 31.4% | 98,000,000 | 26.7% |
| Issued to Holders of Accuride Other Equity Interests | 2,000,000 | 2.0% | 2,000,000 | 1.6% | 2,000,000 | 0.6% | 24,058,824 | 6.5% |
| Issued as | - | - | 25,000,000 | 20.0% | 25,000,000 | 8.0% | 25,000,000 | 6.8% |

CH\1125862.14

| | Number | Percent | Number | Percent | Number | Percent | Number | Percent |
|---|---|---|---|---|---|---|---|---|
| Backstop Fee to Backstop Investors | | | | | | | | |
| Issued to Noteholders on Conversion of New Notes | - | - | - | - | 187,500,000 | 60.0% | 220,588,235 | 60.0% |
| **Total** | 100,000,000 | 100% | 125,000,000 | 100% | 312,500,000 | 100% | 367,647,059 | 100% |

(1) Calculated based on distribution of New Common Stock to Holders of Subordinated Notes Claims and Accuride Other Equity Interests, and prior to payment of the Backstop Fee, the conversion of the New Notes or the exercise of the New Warrants.

(2) Calculated based on distribution of New Common Stock to Holders of Subordinated Notes Claims and Accuride Other Equity Interests and the payment of the Backstop Fee, and prior to the conversion of the New Notes and the exercise of the New Warrants.

(3) Calculated based on distribution of New Common Stock to Holders of Subordinated Notes Claims and Accuride Other Equity Interests, the payment of the Backstop Fee and the conversion of the New Notes, and prior to the exercise of the Warrant.

(4) Calculated based on distribution of New Common Stock to Holders of Subordinated Notes Claims and Accuride Other Equity Interests, the payment of the Backstop Fee, the conversion of the New Notes and the exercise of the New Warrants. Additional shares of New Common Stock will be issued upon conversion of the New Notes to ensure that Holders of New Notes receive 60% of the fully diluted capitalization of Reorganized Accuride after the exercise of the New Warrants. For purposes of calculating the number of shares issued to Holders of Accuride Other Equity Interests, this analysis assumes the New Warrants are exercised prior to the conversion of the New Notes and, therefore, the percentage represented by the shares issuable upon the exercise of the New Warrants is diluted upon the conversion of the New Notes.

The following table sets forth the anticipated equity capitalization of Reorganized Accuride, assuming that the Holders of Accuride Other Equity Interests vote to reject the Plan:

### Pro Forma Equity Capitalization of Reorganized Accuride
### (Assumes Accuride Other Equity Interests Vote to Reject the Plan)

| | Initial Distribution(1) | | After Payment of Backstop Fee (2) | | After Conversion of New Notes (3) | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Issued to Holders of Subordinated Notes Claims | 98,000,000 | 100.0% | 98,000,000 | 80.0% | 98,000,000 | 32.0% |
| Issued to Holders of Accuride Other Equity Interests | - | - | - | - | - | - |
| Issued as Backstop Fee to Backstop Investors | - | - | 24,500,000 | 20.0% | 24,500,000 | 8.0% |
| Issued to Noteholders on Conversion of New Notes | - | - | - | - | 183,750,000 | 60.0% |
| **Total** | 98,000,000 | 100.0% | 122,500,000 | 100.0% | 306,250,000 | 100.0% |

(1) Calculated based on distribution of New Common Stock to Holders of Subordinated Notes Claims, and prior to payment of the Backstop Fee and the conversion of the New Notes.

(2) Calculated based on distribution of New Common Stock to Holders of Subordinated Notes Claims and the payment of the Backstop Fee, and prior to the conversion of the New Notes.

(3) Calculated based on distribution of New Common Stock to Holders of Subordinated Notes Claims, the payment of the Backstop Fee and the conversion of the New Notes.

20

> THIS SECTION IV IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE <u>MATERIAL TERMS</u> OF THE PLAN AND IS QUALIFIED BY REFERENCE TO THE ENTIRE DISCLOSURE STATEMENT AND THE PLAN AND SHOULD <u>NOT</u> BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN. TO THE EXTENT THERE ARE ANY INCONSISTENCIES OR CONFLICTS BETWEEN THIS SECTION IV AND THE PLAN, THE TERMS AND CONDITIONS SET FORTH IN THE PLAN SHALL CONTROL AND GOVERN.

A. **ADMINISTRATIVE, DIP FACILITY AND PRIORITY TAX CLAIMS**

1. **Administrative Claims**

Subject to sub-paragraph (a) below, on the later of the Effective Date or the date on which an Administrative Claim becomes an Allowed Administrative Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Claim will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim either (i) payment in full in Cash for the unpaid portion of such Allowed Administrative Claim; or (ii) such other less favorable treatment as agreed to in writing by the Debtors or Reorganized Debtors, as applicable, and such Holder; provided, however, that Administrative Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in accordance with such applicable terms and conditions relating thereto in the discretion of the Debtors or Reorganized Debtors without further notice to or order of the Bankruptcy Court.

(a) <u>Bar Date for Administrative Claims</u>

Except as otherwise provided in Article II.A of the Plan, unless previously Filed or paid, requests for payment of Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date will be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors or the Reorganized Debtors or their Estates and property and such Administrative Claims will be deemed discharged as of the Effective Date. All such Claims will, as of the Effective Date, be subject to the permanent injunction set forth in Article X.F of the Plan. Objections to such requests must be Filed and served on the Reorganized Debtors and the requesting party by the later of (i) 60 days after the Effective Date and (ii) 60 days after the Filing of the applicable request for payment of Administrative Claims, if applicable, as the same may be modified or extended from time to time by order of the Bankruptcy Court.

(b) <u>Professional Compensation and Reimbursement Claims</u>

(i) *Professional Fee Claims.* Professionals or other Entities asserting a Professional Fee Claim for services rendered before the Effective Date must File and serve on the Reorganized Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Professional Fee Claim no later than the Professional Fees Bar Date; provided that the Reorganized Debtors will pay Professionals in the ordinary course of business for any work performed after the Effective Date, including those fees and expenses incurred by Professionals in connection with the implementation and consummation of this Plan, in each case without further application or notice to or order of the Bankruptcy Court; provided, further, that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date, without further Bankruptcy Court order, pursuant to the Ordinary Course Professionals Order. Objections to any Professional Fee Claim must be Filed and served on the Reorganized Debtors and the requesting party by the later of (a) 90 days after the Effective Date and

(b) 30 days after the Filing of the applicable request for payment of the Professional Fee Claim. Each Holder of an Allowed Professional Fee Claim will be paid by the Reorganized Debtors in Cash within five Business Days of entry of the order approving such Allowed Professional Fee Claim.

(ii)    *Ad Hoc Noteholders Group Fees and Expenses and Secured Lenders' Fees and Expenses*. The Ad Hoc Noteholders Group Professionals, the DIP Agent's and the DIP Lenders' professionals, the Prepetition Agent's professional and the professionals of the members of the steering committee of Prepetition Lenders will not be required to comply with the U.S. Trustee fee guidelines, but will provide reasonably detailed statements (redacted if necessary for privileged, confidential or otherwise sensitive information) to the Office of the U.S. Trustee, counsel for any Committee and the Debtors. Notwithstanding anything herein to the contrary, the Debtors will, within ten (10) days of presentment of such statements, if no written objections to the reasonableness of the fees and expenses charged in any such invoice (or portion thereof) is made, pay in Cash the Ad Hoc Noteholders Group Fees and Expenses, and all unpaid reasonable fees and expenses (whether accrued prepetition or postpetition) of the Prepetition Agent, the DIP Agent, the DIP Lenders, each of the Prepetition Lenders that are members of the steering committee of Prepetition Lenders, and each of the members of the Ad Hoc Noteholders Group related to and arising from membership in such group, as Administrative Claims. Any objection to the payment of such fees or expenses will be made only on the basis of "reasonableness," and will specify in writing the amount of the contested fees and expenses and the detailed basis for such objection. To the extent an objection only contests a portion of an invoice, the undisputed portion thereof will be promptly paid. If any such objection to payment of an invoice (or any portion thereof) is not otherwise resolved between the Debtors, any Committee or the U.S. Trustee and the issuer of the invoice, either party may submit such dispute to the Court for a determination as to the reasonableness of the relevant disputed fees and expenses set forth in the invoice. The Bankruptcy Court will resolve any dispute as to the reasonableness of any fees and expenses if the Debtors or Reorganized Debtors and any such Entity cannot agree on the amount of fees and expenses to be paid to such party.

## 2.    DIP Facility Claims

Unless otherwise agreed to by the DIP Lenders, the Allowed DIP Facility Claims will be indefeasibly paid and satisfied in full in Cash on the Effective Date in full satisfaction, settlement, discharge and release of, and in exchange for, such DIP Facility Claims. Upon indefeasible payment and satisfaction in full of all DIP Facility Claims, the DIP Facility Credit Agreement and all "Loan Documents" as defined therein, and all Liens and security interests granted to secure the DIP Facility Claims, will be immediately terminated, extinguished and released, and the DIP Agent will promptly execute and deliver to the Reorganized Debtors, at the Reorganized Debtors' sole cost and expense, such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors. Notwithstanding the above, any indemnity provisions contained in the DIP Facility Credit Agreement will survive such termination, release and satisfaction in the manner and to the extent set forth therein.

## 3.    Priority Tax Claims

The legal, equitable and contractual rights of the Holders of Priority Tax Claims are unaltered by the Plan. Subject to Article VIII of the Plan, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtors or Reorganized Debtors:  (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; (b) such other less favorable treatment as agreed to in writing by the Debtors or Reorganized Debtors, as applicable, and such Holder; provided, however, that such parties may further agree for the payment of such Allowed Priority Tax Claim at a later date; or (c) pursuant to and in accordance with sections 1129(a)(9)(C) and (D) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Priority Tax Claim payable in regular installment payments over a period ending not more than five years after the Petition Date, plus simple interest at the rate required by applicable law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to in writing by a particular taxing authority and the Debtors or Reorganized Debtors, as applicable, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; provided, further, that Priority Tax Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in accordance with such applicable terms and conditions

relating thereto in the discretion of the Debtors or Reorganized Debtors without further notice to or order of the Bankruptcy Court. Any installment payments to be made under clause (c) above will be made in equal quarterly Cash payments beginning on the Subsequent Distribution Date, and continuing on each Subsequent Distribution Date thereafter until payment in full of the applicable Allowed Priority Tax Claim.

## B.     CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

### 1.      Summary

All Claims and Equity Interests, except Administrative Claims, DIP Facility Claims and Priority Tax Claims, are placed in the Classes set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Facility Claims and Priority Tax Claims have not been classified as described in Article II of the Plan.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including, without limitation, voting, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled prior to the Effective Date.

### 2.      Classification and Treatment of Claims and Equity Interests

(a)      <u>Class 1 – Other Priority Claims</u>

- *Classification*: Class 1 consists of the Other Priority Claims.

- *Treatment*: The legal, equitable and contractual rights of the Holders of Class 1 Claims are unaltered by the Plan. Subject to Article VIII of the Plan, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 1 Claim is an Allowed Class 1 Claim on the Effective Date or (ii) the date on which such Class 1 Claim becomes an Allowed Class 1 Claim, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtors or Reorganized Debtors: (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code; provided, however, that Class 1 Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto in the discretion of the Debtors or Reorganized Debtors without further notice to or order of the Bankruptcy Court.

- *Voting*: Class 1 is an Unimpaired Class, and the Holders of Class 1 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 1 Claims will not be entitled to vote to accept or reject the Plan.

(b)      <u>Class 2 et seq. – Other Secured Claims</u>

- *Classification*: Each Class 2 Claim is an Other Secured Claim against the applicable Debtors. With respect to each Debtors, this Class will be further divided into subclasses designated by letters of the alphabet (Class 2A, Class 2B and so on), so that each holder

of any Other Secured Claim against such Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class, and except for a precautionary class of otherwise unclassified Other Secured Claims.

- *Treatment*: The legal, equitable and contractual rights of the Holders of Class 2 Claims are unaltered by the Plan. Subject to Article VIII of the Plan, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 2 Claim is an Allowed Class 2 Claim on the Effective Date or (ii) the date on which such Class 2 Claim becomes an Allowed Class 2 Claim, each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim, at the election of the Debtors or Reorganized Debtors: (A) Cash equal to the amount of such Allowed Class 2 Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors and the Holder of such Allowed Class 2 Claim will have agreed upon in writing; or (C) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code; provided, however, that Class 2 Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto in the discretion of the Debtors or Reorganized Debtors without further notice to or order of the Bankruptcy Court. Each Holder of an Allowed Other Secured Claim will retain the Liens securing its Allowed Other Secured Claim as of the Effective Date until full and final payment of such Allowed Other Secured Claim is made as provided herein. On the full payment or other satisfaction of such obligations, the Liens securing such Allowed Other Secured Claim will be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

- *Voting*: Class 2 is an Unimpaired Class, and the Holders of Class 2 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 2 Claims will not be entitled to vote to accept or reject the Plan.

(c)     Class 3 et seq. – Secured Tax Claims

- *Classification*: Each Class 3 Claim is an Secured Tax Claim against the applicable Debtors. With respect to each Debtor, this Class will be further divided into subclasses designated by letters of the alphabet (Class 3A, Class 3B and so on), so that each holder of any Secured Tax Claim against such Debtor is in a Class by itself, except to the extent that there are Secured Tax Claims that are substantially similar to each other and may be included within a single Class, and except for a precautionary class of otherwise unclassified Secured Tax Claims.

- *Treatment*: The legal, equitable and contractual rights of the Holders of Class 3 Claims are unaltered by the Plan. Subject to Article VIII of the Plan, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 3 Claim is an Allowed Class 3 Claim as of the Effective Date or (ii) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim due and payable on or prior to the Effective Date will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 3 Claim, at the election of the Debtors or Reorganized Debtors: (a) Cash in an amount equal to the amount of such Allowed Class 3 Claim; (b) such other less favorable treatment as agreed to in writing by the Debtors or Reorganized Debtors, as applicable, and such Holder; provided, however, that such parties may further agree for the payment of such Allowed Class 3 Claim at a later date; or (c) pursuant to and in accordance with sections

CH\1125862.14

1129(a)(9)(C) and (D) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Class 3 Claim payable in regular installment payments over a period ending not more than five years after the Petition Date, plus simple interest at the rate required by applicable law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to in writing by a particular taxing authority and the Debtors or Reorganized Debtors, as applicable, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; provided, further, that Class 3 Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in accordance with such applicable terms and conditions relating thereto in the discretion of the Debtors or Reorganized Debtors without further notice to or order of the Bankruptcy Court. Each Holder of an Allowed Class 3 Claim will retain the Liens securing its Allowed Class 3 Claim as of the Effective Date until full and final payment of such Allowed Class 3 Claim is made as provided herein. On the full payment or other satisfaction of such obligations, the Liens securing such Allowed Class 3 Claim will be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. Any installment payments to be made under clause (c) above will be made in equal quarterly Cash payments beginning on the first Subsequent Distribution Date following the Effective Date, and continuing on each Subsequent Distribution Date thereafter until payment in full of the applicable Allowed Secured Tax Claim.

- *Voting*: Class 3 is an Unimpaired Class, and the Holders of Class 3 Claims will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 3 Claims will not be entitled to vote to accept or reject the Plan.

(d)    Class 4A – Prepetition First Out Credit Agreement LC Claims

- *Classification*: Class 4A consists of the Prepetition First Out Credit Agreement LC Claims.

- *Allowance*: On the Effective Date, the Prepetition First Out Credit Agreement LC Claims will be deemed Allowed contingent claims in an aggregate amount equal to $2 million.

- *Treatment*:   On the Effective Date, the Prepetition Credit Agreement and all "Loan Documents" as defined therein will, subject to satisfaction or waiver of the conditions precedent set forth in the Restructured Credit Facility Agreement, be amended, restated and replaced in their entirety by the Restructured Credit Facility Agreement and all "Loan Documents" as defined therein; provided, that certain "Collateral Documents" (as defined in the Prepetition Credit Agreement) will be amended, supplemented or otherwise modified and will constitute and become "Collateral Documents" (as defined in the Restructured Credit Facility Agreement), and will secure all the obligations under the Restructured Credit Facility Agreement and the other "Loan Documents" (as defined in the Restructured Credit Facility Agreement). On the Effective Date, the Holder of the Allowed Prepetition First Out Credit Agreement LC Claim will receive, as prepetition letter of credit issuer, the right to receive the letter of credit fees, the reimbursement rights and the other rights set forth in the Restructured Credit Facility Agreement, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim. Upon the effectiveness of the Restructured Credit Facility Agreement and receipt by the Distribution Agent of the Prepetition Last Out Payment Amount described below, the Prepetition Credit Agreement and all Liens securing such Allowed Prepetition First Out Credit Agreement LC Claims, will be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of

CH\1125862.14

any Entity; provided, however, that certain "Collateral Documents" and Liens granted thereunder will, notwithstanding the release, termination and extinguishment of the Liens securing the obligations under the Prepetition Credit Agreement, continue in existence for the purpose of securing the obligations under the Restructured Credit Facility Agreement and the other "Loan Documents" (as defined in the Restructured Credit Facility Agreement). The Prepetition Agent and the Prepetition Lenders will promptly execute and deliver to the Reorganized Debtors such instruments of termination, release, satisfaction and/or assignment (in recordable form) of any and all "Loan Documents" (as defined in the Prepetition Credit Agreement) that do not constitute and become "Collateral Documents" (as defined in the Restructured Credit Facility Agreement) as may be reasonably requested by the Reorganized Debtors.

- *Voting*: Class 4A is Impaired, and Holders of Class 4A Claims are entitled to vote to accept or reject the Plan.

(e)    Class 4B – Prepetition First Out Credit Agreement Other Claims

- *Classification*: Class 4B consists of the Prepetition First Out Credit Agreement Other Claims.

- *Allowance*: On the Effective Date, the Prepetition First Out Credit Agreement Other Claims will be deemed Allowed in an aggregate amount equal to $306.2 million.

- *Treatment*: On the Effective Date, the Prepetition Credit Agreement and all "Loan Documents" as defined therein will, subject to satisfaction of the conditions precedent set forth in the Restructured Credit Facility Agreement, be amended, restated and replaced in their entirety by the Restructured Credit Facility Agreement and all "Loan Documents" as defined therein; provided, that certain "Collateral Documents" (as defined in the Prepetition Credit Agreement) will be amended, supplemented or otherwise modified and will constitute and become "Collateral Documents" (as defined in the Restructured Credit Facility Agreement), and will secure all the obligations under the Restructured Credit Facility Agreement and the other "Loan Documents" (as defined in the Restructured Credit Facility Agreement). On the Effective Date, each and every Holder of an Allowed Prepetition First Out Credit Agreement Other Claim will become a "Lender" under the Restructured Credit Facility Agreement on a Pro Rata basis with all of the rights set forth therein, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim. Upon the effectiveness of the Restructured Credit Facility Agreement and receipt by the Distribution Agent of the Prepetition Last Out Payment Amount described below, the Prepetition Credit Agreement and all Liens securing such Allowed Prepetition First Out Credit Agreement LC Claims, will be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity; provided, however, that certain "Collateral Documents" and Liens granted thereunder will, notwithstanding the release, termination and extinguishment of the Liens securing the obligations under the Prepetition Credit Agreement, continue in existence for the purpose of securing the obligations under the Restructured Credit Facility Agreement and the other "Loan Documents" (as defined in the Restructured Credit Facility Agreement). The Prepetition Agent and the Prepetition Lenders will promptly execute and deliver to the Reorganized Debtors such instruments of termination, release, satisfaction and/or assignment (in recordable form) of any and all "Loan Documents" (as defined in the Prepetition Credit Agreement) that do not constitute and become "Collateral Documents" (as defined in the Restructured Credit Facility Agreement) as may be reasonably requested by the Reorganized Debtors.

- *Voting*: Class 4B is Impaired, and Holders of Class 4B Claims are entitled to vote to accept or reject the Plan.

(f)   Class 5 – Prepetition Last Out Credit Agreement Claims

- *Classification*: Class 5 consists of the Prepetition Last Out Credit Agreement Claims.

- *Allowance*: On the Effective Date, the Prepetition Last Out Credit Agreement Claims will be deemed Allowed in an aggregate amount equal to $70.1 million.

- *Treatment*: On the Effective Date, the Distribution Agent will receive for and on behalf of each and every Holder of an Allowed Prepetition Last Out Credit Agreement Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim, the Prepetition Last Out Payment Amount, which the Distribution Agent will promptly distribute Pro Rata to or for the benefit of Holders of Allowed Prepetition Last Out Credit Agreement Claims. Upon the Distribution Agent's receipt of the foregoing and upon the effectiveness of the Restructured Credit Facility described above, the Prepetition Credit Agreement, and all Liens securing such Allowed Prepetition Last Out Credit Agreement Claims, will be deemed released, terminated and extinguished as and to the extent described in Sections III.B.4.c. and III.B.5.c. of the Plan and, in any event, such Liens will no longer secure the Allowed Prepetition Last Out Credit Agreement Claims, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

- *Voting*: Class 5 is an Unimpaired Class, and the Holders of Class 5 Claims will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 5 Claims are not entitled to vote to accept or reject the Plan.

(g)   Class 6 – General Unsecured Claims

- *Classification*: Class 6 consists of the General Unsecured Claims.

- *Treatment*: Subject to Article VIII of the Plan solely to the extent, if any, of the legal, equitable and contractual rights in respect of any Class 6 Claim under applicable non-bankruptcy law, each Allowed Class 6 Claim will be, at the Debtors' option: (i) Reinstated and paid, subject to the terms and conditions thereof, in Cash when due in the ordinary course of the Reorganized Debtors' business operations and not on the Effective Date or (iii) otherwise rendered not impaired pursuant to section 1124 of the Bankruptcy Code, except to the extent that the Reorganized Debtors and such Holder agree to other less favorable treatment in writing. .

- *Voting*: Class 6 is an Unimpaired Class, and the Holders of Class 6 Claims will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 6 Claims are not entitled to vote to accept or reject the Plan.

(h)   Class 7 – Subordinated Notes Claims

- *Classification*: Class 7 consists of the Subordinated Notes Claims.

- *Allowance*: On the Effective Date, the Subordinated Notes Claims will be deemed Allowed in an aggregate amount equal to $291 million.

- *Treatment*: On the Effective Date, the Distribution Agent will receive for and on behalf of each and every Holder of an Allowed Subordinated Notes Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim, 98,000,000 shares of the New Common Stock. The Distribution Agent will promptly distribute the New Common Stock on a Pro Rata basis to the Holders of Allowed Subordinated Notes Claims.

- *Voting*: Class 7 is Impaired, and Holders of Class 7 Claims are entitled to vote to accept or reject the Plan.

(i)     Class 8 – Intercompany Claims

- *Classification*: Class 8 consists of the Intercompany Claims.

- *Treatment*: Notwithstanding the substantive consolidation of the Debtors for voting and distribution purposes under the Plan, on the Effective Date, all Class 8 Intercompany Claims will be Reinstated.

- *Voting*: Class 8 is an Unimpaired Class, and the Holders of Class 8 Claims will be conclusively deemed to have accepted the Plan. Therefore, Holders of Class 8 Claims will not be entitled to vote to accept or reject the Plan.

(j)     Class 9 – Accuride Preferred Equity Interests

- *Classification*: Class 9 consists of the Equity Interests in Accuride. Class 9 consists of all of the Accuride Preferred Equity Interests

- *Treatment*: On the Effective Date, immediately after the Accuride Other Equity Interests are canceled, the Accuride Preferred Equity Interests will be redeemed in accordance with Section 3 of the Certificate of Designation of Series A Preferred Stock of Accuride Corporation (the "**Certificate of Designation**") and the Holder of the Accuride Preferred Equity Interests will, upon surrender of the Accuride Preferred Equity Interests, receive the $100 liquidation preference in Cash. In accordance with the Certificate of Designation, from and after notice of redemption, the Accuride Preferred Equity Interests will no longer be, or be deemed to be, outstanding for any purpose, and all rights, preferences and powers (including voting rights and powers) of the Accuride Preferred Equity Interests will automatically cease and terminate.

- *Voting*: Class 9 is an Unimpaired Class, and the Holders of Class 9 Equity Interests will be conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 9 Equity Interests are not entitled to vote to accept or reject this Plan.

(k)     Class 10 – Accuride Other Equity Interests

- *Classification*: Class 10 consists of the Accuride Other Equity Interests.

- *Treatment*: On the Effective Date, all Class 10 Equity Interests will be deemed canceled and will be of no further force and effect, whether surrendered for cancellation or otherwise. In the event Class 10 votes to reject the Plan, the Holders of Class 10 Equity Interests will not receive any distribution or retain any property on account of such Class 10 Equity Interests. In the event Class 10 votes to accept the Plan, on the Initial Distribution Date, each holder of Accuride Other Equity Interests as of the Distribution Record Date will receive a Pro Rata share of 2,000,000 shares of the New Common

Stock and its Pro Rata share of the New Warrants in satisfaction of its Class 10 Equity Interests.

- *Voting*: Class 10 is Impaired, and the Holders of Class 10 Equity Interests are entitled to vote to accept or reject the Plan.

(l)    <u>Class 11 -- Equity Interests in Subsidiaries</u>

- *Classification*: Class 11 consists of the Equity Interests in the Subsidiaries.

- *Treatment*:  On the Effective Date, the Reorganized Debtors will retain the Equity Interests they hold in the Subsidiaries.

- *Voting*:  Class 11 is an Unimpaired Class, and the Holders of Class 11 Equity Interests will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 10 Equity Interests are not entitled to vote to accept or reject the Plan.

### 3.    Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtors' rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

### 4.    Discharge of Claims

Except as otherwise provided in the Plan and effective as of the Effective Date: (i) the rights afforded herein and the treatment of all Claims and Equity Interests will be in exchange for and in complete satisfaction, settlement, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including (except in the case of postpetition interest comprising part of the Prepetition First Out Credit Agreement Claim or the DIP Facility Claim) any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their assets, property, or Estates; (ii) the Plan will bind all Holders of Claims and Equity Interests, notwithstanding whether any such Holders abstained from voting to accept or reject the Plan or voted to reject the Plan; (iii) all Claims and Equity Interests will be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto will be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (iv) all Entities will be precluded from asserting against the Debtors, the Debtors' Estates, the Reorganized Debtors, each of their successors and assigns, and each of their assets and properties, any other Claims or Equity Interests based upon any documents, instruments or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date..

## C.    ACCEPTANCE OR REJECTION OF THE PLAN

### 1.    Presumed Acceptance of Plan

Classes 1, 2, 3, 5, 6, 8, 9 and 11 are Unimpaired under the Plan, and are, therefore, presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

### 2.    Voting Classes

Each Holder of an Allowed Claim or Allowed Equity Interest as of the applicable Voting Record Date in each of the Voting Classes (Classes 4A, 4B, 7 and 10) will be entitled to vote to accept or reject the Plan.

### 3.    Acceptance by Impaired Classes of Claims and Equity Interests

CH\1125862.14

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class actually voting have voted to accept the Plan. Pursuant to section 1126(d) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, a Class of Equity Interests has accepted the Plan if at least two-thirds in amount of the Allowed Equity Interests in such Class actually voting have voted to accept the Plan.

### 4. Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code

The Debtors request confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code. The Debtors reserve the right to modify the Plan or any Exhibit thereto or Plan Schedule in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

## D. MEANS FOR IMPLEMENTATION OF THE PLAN

### 1. General Settlement of Claims

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan will constitute a good faith compromise and settlement of all Claims and Equity Interests and controversies resolved pursuant to the Plan.

### 2. Substantive Consolidation of Claims and Equity Interests against Debtors for Plan Purposes Only

The Plan is premised on the substantive consolidation of all of the Debtors with respect to the voting and treatment of all Claims and Equity Interests except for the Other Secured Claims in Class 2 and Secured Tax Claims in Class 3, as provided below. The Plan does not contemplate substantive consolidation of the Debtors with respect to the Class 2 Claims or Class 3 Claims, which will be deemed to apply separately with respect to the Plan proposed by each Debtor. This Plan will serve as a request by the Debtors, in lieu of a separate motion, to the Bankruptcy Court, that it grant substantive consolidation with respect to the voting and treatment of all Claims and Equity Interests other than Class 2 Claims and Class 3 Claims as follows: on the Effective Date, (a) Class 8 Intercompany Claims will not be taken into account for voting or treatment purposes under this Plan (although such Claims will be Reinstated); (b) all assets and liabilities of the Debtors will be merged or treated as though they were merged (except to the extent they secure any Allowed Other Secured Claim or Allowed Secured Tax Claim); (c) all guarantees of the Debtors of the obligations of any other Debtor and any joint or several liability of any of the Debtors will be eliminated; and (d) each and every Claim or Interest (except for Other Secured Claims and Secured Tax Claims) against any Debtor will be deemed Filed against the consolidated Debtors and all Claims (except for Other Secured Claims and Secured Tax Claims) Filed against more than one Debtor for the same liability will be deemed one Claim against any obligation of the consolidated Debtors. For the avoidance of doubt, the Debtors will not be substantively consolidated for any purpose other than as set forth in the Plan or Confirmation Order.

### 3. Corporate Existence

The Debtors will continue to exist after the Effective Date as a separate legal entities, with all the powers of corporations, memberships and partnerships pursuant to the applicable law in their states of incorporation or organization and pursuant to the Amended Organizational Documents.

4. **Vesting of Assets in the Reorganized Debtors**

Except as otherwise provided in the Plan or the Confirmation Order, on or after the Effective Date, all property and assets of the Estates (including, without limitation, Causes of Action and, unless otherwise waived or released pursuant to an order of the Bankruptcy Court or the Plan, Avoidance Actions) and any property and assets acquired by the Debtors pursuant to the Plan will vest in the Reorganized Debtors, free and clear of all Liens, Claims, charges or other encumbrances. Except as may be provided in the Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order. Without limiting the foregoing, the Reorganized Debtors will pay the charges that they incur after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.

5. **Restructured Credit Facility and Sources of Cash for Plan Distributions**

On the Effective Date, the Reorganized Debtors will be authorized to execute and deliver the Restructured Credit Facility Agreement, as well as execute, deliver, file, record and issue any notes, guarantees, documents (including UCC financing statements), or agreements in connection therewith, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than expressly required by the Restructured Credit Facility Agreement). Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Reorganized Debtors to make payments required pursuant to the Plan will be obtained from the Reorganized Debtors' Cash balances, including Cash from operations and the proceeds of the Rights Offering. Cash payments to be made pursuant to the Plan will be made by the Reorganized Debtors.

6. **New Common Stock; New Warrants**

On the Effective Date, Reorganized Accuride will issue New Common Stock to Holders of Allowed Subordinated Notes Claims and Allowed Accuride Other Equity Interests pursuant to the terms set forth herein. The aggregate number of shares of New Common Stock to be authorized on the Effective Date will be 800,000,000 shares. The aggregate number of shares of New Common Stock to be issued on the Effective Date will be 122,500,000 shares if Class 10 votes to reject the Plan or 125,000,000 shares if the Class 10 votes to accept the Plan. From and after the Effective Date, Reorganized Accuride will use its best efforts to list the New Common Stock on a national securities exchange.

In the event Class 10 votes to accept the Plan, on the Effective Date, Reorganized Accuride will issue New Warrants to Holders of Allowed Accuride Other Equity Interests pursuant to the terms set forth herein.

7. **Registration Agreement**

On the Effective Date, Accuride will be authorized to enter into and consummate the transactions contemplated by the Registration Agreement and such documents, and any agreement or document entered into in connection therewith, will become effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by the Registration Agreement).

8. **Rights Offering**

(a)     Issuance of Rights; New Indenture.

Each Rights Offering Participant will receive Subscription Rights to subscribe for its Pro Rata Share of the Rights Offering Notes for an aggregate purchase price equal to the applicable Subscription Payment Amount. In

accordance with the Backstop Commitment Agreement, the Backstop Investors have committed to purchase all Remaining Rights Offering Notes. The Rights Offering Notes, including the Remaining Rights Offering Notes, will be issued to the Rights Offering Participants and/or the Backstop Investors, as applicable, for an aggregate purchase price equal to the Rights Offering Amount. The Rights Offering Notes will be subject to the terms of the New Indenture. On the Effective Date, Accuride will be authorized to enter into and consummate the transactions contemplated by the New Indenture and any agreement or document entered into in connection therewith, and the New Indenture and all such agreements and documents will become effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by the New Indenture).

(b)     Subscription Period.

The Rights Offering will commence on the Subscription Commencement Date and will expire on the Subscription Deadline. Each Rights Offering Participant that intends or desires to participate in the Rights Offering must affirmatively elect to exercise its Subscription Rights, and provide written notice thereof to the Entities specified in the Subscription Form, on or prior to the Subscription Deadline in accordance with the terms of the Plan and the Subscription Form. All Remaining Rights Offering Notes will be allocated to the Backstop Investors on the Subscription Deadline, and will be purchased by the Backstop Investors on the Effective Date, all in accordance with the terms and conditions of the Backstop Commitment Agreement.

(c)     Exercise of Subscription Rights and Payment of Subscription Payment Amount.

On the Subscription Commencement Date, Accuride or another applicable Distribution Agent will mail the Subscription Form to each Rights Offering Participant known as of the Rights Offering Record Date, together with appropriate instructions for the proper completion, due execution, and timely delivery of the Subscription Form, as well as instructions for the payment of the eventual Subscription Payment Amount for that portion of the Subscription Rights sought to be exercised by such Person. The Debtors may adopt, with the prior written consent of the Ad Hoc Noteholders Group, such additional detailed procedures consistent with the provisions of the Plan to more efficiently administer the exercise of the Subscription Rights.

In order to exercise the Subscription Rights, each Rights Offering Participant must return a duly completed Subscription Form (making a binding and irrevocable commitment to participate in the Rights Offering) to the Debtors or other Entity specified in the Subscription Form so that such form is actually received by the Debtors or such other Entity on or before the Subscription Deadline. If the Debtors or such other Entity for any reason does not receive from a given holder of Subscription Rights a duly completed Subscription Form on or prior to the Subscription Deadline, then such holder will be deemed to have forever and irrevocably relinquished and waived its right to participate in the Rights Offering. On the Subscription Notification Date, the Debtors will notify each Rights Offering Purchaser of its respective allocated portion of Rights Offering Notes, and in the case of the Backstop Investors, the Debtors will notify each Backstop Investor as soon as practicable after the Subscription Deadline and, in any event, at least four (4) Business Days prior to the Effective Date, of its portion of the Remaining Rights Offering Notes that such Backstop Investor is obligated to purchase pursuant to the Backstop Commitment Agreement and the purchase price therefor. Each Rights Offering Purchaser (other than the Backstop Investors, whose payments will be received by the Debtors on the Effective Date in accordance with the Backstop Commitment Agreement) must tender its Subscription Payment Amount to the Debtors so that it is actually received on or prior to the Subscription Payment Date. In the event the Debtors receive any payments for the exercise of Subscription Rights prior to the Effective Date, such payments will be held in a separate account until the Effective Date. In the event the conditions to the Effective Date are not met or waived, such payments will be returned, without accrual or payment of any interest thereon, to the applicable Rights Offering Purchaser, without reduction, offset or counter-claim.

(d)     No Transfer; Detachment Restrictions; No Revocation.

The Subscription Rights are not Transferable or detachable. Any such Transfer or detachment, or attempted Transfer or detachment, will be null and void and the Debtors will not treat any purported transferee of the Subscription Rights separate from the Subordinated Notes Claims as the holder of any Subscription Rights.

Once a Rights Offering Participant has exercised any of its Subscription Rights by properly executing and delivering the Subscription Form to the Debtors or other Entity specified in the Subscription Form, such exercise may only be revoked, rescinded or annulled in the sole discretion of the Debtors or Reorganized Debtors.

     (e)     <u>Distribution of Rights Offering Notes.</u>

On, or as soon as reasonably practicable after, the Effective Date, Reorganized Accuride or another applicable Distribution Agent will distribute the Rights Offering Notes purchased by each Rights Offering Purchaser or Backstop Investor to such Rights Offering Purchaser or Backstop Investor.

     (f)     <u>Validity of Exercise of Subscription Rights.</u>

All questions concerning the timeliness, validity, form, and eligibility of any exercise, or purported exercise, of Subscription Rights will be determined by the Debtors or Reorganized Debtors. The Debtors or Reorganized Debtors, in their discretion reasonably exercised in good faith, may waive any defect or irregularity, or permit a defect or irregularity to be corrected within such times as they may determine, or reject the purported exercise of any Subscription Rights. A Subscription Form will be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Debtors or Reorganized Debtors determine in their discretion reasonably exercised in good faith. The Debtors or Reorganized Debtors will use commercially reasonable efforts to give written notice to any Rights Offering Participant regarding any defect or irregularity in connection with any purported exercise of Subscription Rights by such Person and may permit such defect or irregularity to be cured within such time as they may determine in good faith to be appropriate; provided, however, that neither the Debtors and Reorganized Debtors nor any of their Related Persons will incur any liability for giving, or failing to give, such notification and opportunity to cure.

     (g)     <u>Rights Offering Proceeds.</u>

The proceeds of the Rights Offering will fund Cash payments required to be made under this Plan, including, without limitation, Transaction Expenses, the Prepetition Last Out Payment Amount and repayment of the DIP Facility Claims, and be used for general corporate purposes by the Reorganized Debtors after the Effective Date.

**9.     Equity Incentive Program**

As of the Effective Date, the Equity Incentive Program will be deemed adopted and implemented by Reorganized Accuride without further notice to or order of the Bankruptcy Court, or the vote, consent, authorization or approval of any Entity, board of directors or shareholder. The approval of this Plan constitutes approval of the Equity Incentive Program pursuant to Section 303 of the Delaware General Corporate Law.

**10.     Issuance of New Securities and Related Documentation**

On the Effective Date, Reorganized Accuride is authorized to and will issue, the New Securities and Documents, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. The issuance of the New Securities and Documents and the distribution thereof under this Plan, the distribution and exercise of the Subscription Rights, the issuance and distribution of New Common Stock upon exercise of the New Warrants and the issuance and distribution of New Common Stock upon conversion of the New Notes will be exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code, Section 4(2) of the Securities Act and/or other applicable exemptions. Without limiting the effect of section 1145 of the Bankruptcy Code, all financing documents, agreements, and instruments entered into and delivered on or as of the Effective Date contemplated by or in furtherance of this Plan, including, without limitation, the Restructured Credit Facility Agreement, the New Indenture, the Registration Agreement, the New Notes and any other agreement or document related to or entered into in connection with any of the foregoing, will become, and the Backstop Commitment Agreement will remain, effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable

law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by such applicable agreement).

Upon the Effective Date, after giving effect to the transactions contemplated hereby, the authorized capital stock or other equity securities of the Reorganized Debtors will be that number of shares of New Common Stock as may be designated in the Amended Organizational Documents. Without limiting the effect of section 1145 of the Bankruptcy Code, on the Effective Date, Accuride will enter into the Registration Agreement with each Person (a) who by virtue of the issuance by Accuride to such Person on the Effective Date of the New Common Stock and/or New Notes, as the case may be, and/or its relationship with Accuride (i) holds New Notes or New Common Stock that are "restricted" (as such term is used within the meaning of the applicable securities laws) because acquired in a private placement under Section 4(2) of the Securities Act, or (ii) could otherwise reasonably be deemed to be an "underwriter" or "affiliate" (as such terms are used within the meaning of applicable securities laws) of Accuride, and (b) who requests in writing that Accuride execute such agreement. In connection with the distribution of New Common Stock to current or former employees of the Debtors, Accuride may take whatever actions are necessary to comply with applicable federal, state, local and international tax withholding obligations, including withholding from distributions a portion of the New Common Stock and selling such securities to satisfy tax withholding obligations including, without limitation, income, social security and Medicare taxes.

11.    **Release of Liens, Claims and Equity Interests**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to Article VII of the Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estates will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. Any Entity holding such Liens or interests will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Reorganized Debtors such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors.

12.    **Certificate of Incorporation and Bylaws**

The Amended Organizational Documents shall amend or succeed the certificates or articles of incorporation, by-laws, membership agreements, partnership agreements and other organizational documents of the Debtors to satisfy the provisions of this Plan and the Bankruptcy Code, and will (i) include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code; (ii) authorize the issuance of New Common Stock in an amount not less than the amount necessary to permit the distributions thereof required or contemplated by this Plan; (iii) to the extent necessary or appropriate, include restrictions on the Transfer of New Common Stock; and (iv) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate this Plan and the transactions contemplated herein. After the Effective Date, the Reorganized Debtors may amend and restate their certificates or articles of incorporation and by-laws, and other applicable organizational documents, as permitted by applicable law.

13.    **Directors and Officers of Reorganized Accuride**

The New Board will initially consist of up to seven (7) directors, who will consist of the Chief Executive Officer of Reorganized Accuride and six (6) directors to be designated by the Ad Hoc Noteholders Group Professionals and consented to by the Debtors or to be otherwise agreed upon between the Ad Hoc Noteholders Group and the Debtors, and, which directors will be identified in the Plan Supplement as Plan Schedule 3. Any directors elected pursuant to Article V.M. of the Plan will be subject to approval of the Bankruptcy Court pursuant to section 1129(a)(5) of the Bankruptcy Code. As of the Effective Date, the initial officers of the Reorganized Debtors will be the officers of the Debtors existing immediately prior to the Effective Date and the existing directors of the Reorganized Debtors other than Reorganized Accuride will be the directors of such Debtors immediately prior to the Effective Date. Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose, at or prior to the Confirmation Hearing, the identity and affiliations of any Person proposed to serve on the initial board of

directors of the Reorganized Debtors, and, to the extent such Person is an insider other than by virtue of being a director, the nature of any compensation for such Person. Each such director and officer will serve from and after the Effective Date pursuant to applicable law and the terms of the Amended Organizational Documents and the other constituent and organizational documents of the Reorganized Debtors. The existing board of directors of Accuride will be deemed to have resigned on and as of the Effective Date, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

14. **Corporate Action**

Each of the Debtors and the Reorganized Debtors, as applicable, may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, including, without limitation, the distribution of the securities to be issued pursuant hereto in the name of and on behalf of the Reorganized Debtors and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers or directors of the Debtors or the Reorganized Debtors and as applicable or by any other Person (except for those expressly required pursuant to the Plan).

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the stockholders, directors or members of any Debtor (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, directors, managers or partners of such Debtors, or the need for any approvals, authorizations, actions or consents of any Person.

All matters provided for in the Plan involving the legal or corporate structure of any Debtor or any Reorganized Debtors, as applicable, and any legal or corporate action required by any Debtor or any Reorganized Debtor as applicable, in connection with the Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers or directors of any Debtor or any Reorganized Debtors, as applicable, or by any other Person. On the Effective Date, the appropriate officers of each Debtor and each Reorganized Debtors, as applicable, are authorized to issue, execute, and deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in the Plan in the name of and on behalf of the Debtor and each Reorganized Debtors, as applicable, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. The secretary and any assistant secretary of each Debtor and each Reorganized Debtor as applicable, will be authorized to certify or attest to any of the foregoing actions.

15. **Cancellation of Notes, Certificates and Instruments**

On the Effective Date, except to the extent otherwise provided in the Plan with respect to "Collateral Documents" under the Prepetition Credit Agreement that will continue in effect and become "Collateral Documents" under the Restated Credit Facility Agreement or otherwise, all notes, stock, instruments, certificates, agreements and other documents evidencing the DIP Facility Claims, Prepetition First Out Credit Agreement Claims, Prepetition Last Out Credit Agreement Claims, Subordinated Notes Claims, the Accuride Preferred Equity interests and the Accuride Other Equity Interests will be canceled, and the obligations of the Debtors thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.

On the Effective Date, except to the extent otherwise provided herein, the Indenture will be deemed to be canceled, as permitted by section 1123(a)(5)(F) of the Bankruptcy Code, and the obligations of the Debtors thereunder will be fully released, terminated, extinguished and discharged. The Indenture will continue in effect

36

solely for the purposes of: (1) allowing Holders of the Subordinated Notes Claims to receive distributions under the Plan; and (2) allowing and preserving the rights of the Indenture Trustee to (a) make distributions in satisfaction of Allowed Subordinated Notes Claims, (b) exercise its charging liens against any such distributions, and (c) seek compensation and reimbursement for any fees and expenses incurred in making such distributions. Upon completion of all such distributions, the Subordinated Notes and the Indenture will terminate completely. From and after the Effective Date, the Indenture Trustee will have no duties or obligations under the Indenture other than to make distributions. As of the Effective Date, the Subordinated Notes will be surrendered to the Indenture Trustee in accordance with the terms of the Indenture. All surrendered and canceled Subordinated Notes held by the Indenture Trustee will be disposed of in accordance with the applicable terms and conditions of the Indenture.

**E. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**1. Assumption and Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, all Executory Contracts and Unexpired Leases of the Debtors will be deemed assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except for those Executory Contracts (including, without limitation, employment agreements) and Unexpired Leases that:

(i)     have been rejected by order of the Bankruptcy Court;

(ii)    are the subject of a motion to reject pending on the Effective Date;

(iii)   are identified on Plan Schedule 4 or in the Plan Supplement (in either case which Exhibit may be amended by the Debtors to add or remove Executory Contracts and Unexpired Leases by filing with the Bankruptcy Court an amended Exhibit and serving it on the affected contract parties at least ten (10) days prior to the Voting Deadline); or

(iv)    are rejected pursuant to the terms of the Plan.

Without amending or altering any prior order of the Bankruptcy Court approving the assumption or rejection of any Executory Contract or Unexpired Lease, entry of the Confirmation Order by the Bankruptcy Court will constitute approval of such assumptions and rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code. To the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan (including, without limitation, any "change of control" provision) restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the Reorganized Debtors' assumption of such Executory Contract or Unexpired Lease, then such provision will be deemed modified such that the transactions contemplated by the Plan will not entitle the non-debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Each Executory Contract and Unexpired Lease assumed pursuant to Article VI of the Plan will revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

**2. Assignment of Executory Contracts or Unexpired Leases**

In the event of an assignment of an Executory Contract or Unexpired Lease, at least twenty (20) days prior to the Confirmation Hearing, the Debtors will serve upon counterparties to such Executory Contracts and Unexpired Leases, a notice of the proposed assumption and assignment, which will: (a) list the applicable cure amount, if any; (b) identify the party to which the Executory Contract or Unexpired Lease will be assigned; (c) describe the procedures for filing objections thereto; and (d) explain the process by which related disputes will be resolved by the Bankruptcy Court; additionally, the Debtors will file with the Bankruptcy Court a list of such Executory Contracts and Unexpired Leases to be assigned and the proposed cure amounts. Any applicable cure amounts will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount in Cash on the Effective Date or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assignment or any related cure amount must be filed, served and actually received by the Debtors at least five (5) days prior to the Confirmation Hearing. Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assignment or cure amount will be deemed to have consented to such assignment of its Executory Contract or Unexpired Lease. The Confirmation Order will constitute an order of the Bankruptcy Court approving any proposed assignments of Executory Contracts or Unexpired Leases pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

In the event of a dispute regarding (a) the amount of any cure payment, (b) the ability of any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assigned or (c) any other matter pertaining to assignment, the applicable cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assignment. If an objection to assignment or cure amount is sustained by the Bankruptcy Court, the Reorganized Debtors in their sole option, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming and assigning it.

### 3. Rejection of Executory Contracts or Unexpired Leases

All Executory Contracts and Unexpired Leases listed on Plan Schedule 4 will be deemed rejected as of the Effective Date. The Confirmation Order will constitute an order of the Bankruptcy Court approving the rejections described in Article VI of the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

### 4. Claims on Account of the Rejection of Executory Contracts or Unexpired Leases

All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be filed with the Bankruptcy Court within thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.

Any Entity that is required to file a Proof of Claim arising from the rejection of an Executory Contract or an Unexpired Lease that fails to timely do so will be forever barred, estopped and enjoined from asserting such Claim, and such Claim will not be enforceable, against the Debtors, the Reorganized Debtors or the Estates, and the Debtors, the Reorganized Debtors and their Estates and property will be forever discharged from any and all indebtedness and liability with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided in the Plan. All such Claims will, as of the Effective Date, be subject to the permanent injunction set forth in Article X.F of the Plan.

### 5. Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash as and when due in the ordinary course or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

CH\1125862.14

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption must be filed, served and actually received by the Debtors at least ten (10) days prior to the Confirmation Hearing. Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assumption will be deemed to have assented and will be deemed to have forever released and waived any objection to the proposed assumption other than with respect to any alleged cure amount, which may be asserted at any time. In the event of a dispute regarding (1) the amount of any payments to cure a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption. If an objection to cure is sustained by the Bankruptcy Court, the Debtors or Reorganized Debtors, as applicable, in their sole option, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it.

### 6. Assumption of Director and Officer Insurance Policies

The Debtors, and upon the Effective Date, the Reorganized Debtors, will assume all of the D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code. Unless previously effectuated by separate order entered by the Bankruptcy Court, entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan will not discharge, impair or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed. Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan will not impair or otherwise modify any rights of the Reorganized Debtors under the D&O Liability Insurance Policies.

### 7. Indemnification Provisions

Except as otherwise provided in the Plan, all indemnification provisions currently in place (whether in the by-laws, certificate of incorporation, board resolutions, contracts, or otherwise) for the directors, officers and employees of the Debtors who served in such capacity as of the Petition Date with respect to or based upon any act or omission taken or omitted in such capacities, for or on behalf of the Debtors, will be Reinstated (or assumed, as the case may be), and will survive effectiveness of the Plan; provided, however, that no indemnification provisions for any Non-Released Party will survive the Effective Date.

### 8. Compensation and Benefit Programs

Except as otherwise provided in the Plan or any order of the Bankruptcy Court, all employment and severance policies, and all compensation and benefit plans, policies, and programs of the Debtors applicable to its employees, retirees, and non-employee directors and the employees and retirees of its subsidiaries, including, without limitation, all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, life, and accidental death and dismemberment insurance plans, are treated as Executory Contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code. Any payment obligations under any assumed employment contracts and benefit plans that have been or purport to have been accelerated as a result of the commencement of the Chapter 11 Cases or the consummation of any transactions contemplated by the Plan will be Reinstated and such acceleration will be rescinded and deemed not to have occurred.

CH\1125862.14

Accuride Corporation, Transportation Technologies Industries, Inc., Accuride Erie, L.P. and Gunite Corporation are the contributing sponsors for the Accuride Retirement Plan, the Transportation Technologies Industries, Inc. Salaried Pension Plan, the Transportation Technologies Industries, Inc. Bargaining Unit Pension Plan, the Accuride Erie Hourly Employee Pension Plan, the Gunite Corporation Hourly-Rate Employee Pension Plan (Elkhart), and the Gunite Corporation Rockford (UAW) Hourly-Rated Employees Pension Plan, respectively ("**Pension Plans**"). The Pension Plans are covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended, ("**ERISA**"), 29 U.S.C. section 1301 et seq. The Pension Benefit Guaranty Corporation ("**PBGC**"), a United States Government corporation, guarantees the payment of certain pension benefits upon termination of a pension plan covered by Title IV of ERISA.

Upon confirmation of the Plan, the Reorganized Debtors will assume and continue to maintain the Pension Plans, and contribute to the Pension Plans the amount necessary to satisfy the minimum funding standards under sections 302 and 303 of ERISA, 29 U.S.C. §§ 1082 and 1083, and sections 412 and 430 of the Internal Revenue Code, 26 U.S.C. §§ 412 and 430. Nothing in the Plan will be construed as discharging, releasing, or relieving Debtors, or their successors, including the Reorganized Debtors, or any party, in any capacity, from any liability imposed under any law or regulatory provision with respect to the Pension Plans or PBGC. PBGC and the Pension Plans will not be enjoined or precluded from enforcing such liability as a result of any provision of the Plan or the Confirmation Order.

### 9. Workers' Compensation Benefits

Except as otherwise provided in the Plan, as of the Effective Date, the Debtors and the Reorganized Debtors will continue to honor their obligations under: (i) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (ii) the Debtors' written contracts, agreements, agreements of indemnity, self-insurer workers' compensation bonds, and any other policies, programs, and plans regarding or relating to workers' compensation and workers' compensation insurance. All such contracts and agreements are treated as Executory Contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code. Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan will not impair or otherwise modify any rights of the Reorganized Debtors under any such contracts, agreements, policies, programs or plans regarding or relating to workers' compensation or workers' compensation insurance..

## F. PROVISIONS GOVERNING DISTRIBUTIONS

### 1. Distributions for Claims Allowed as of the Effective Date

Except as otherwise provided in the "Treatment" sections in Article III of the Plan or as ordered by the Bankruptcy Court, distributions to be made on account of Claims and Equity Interests that are Allowed Claims or Equity Interests as of the Effective Date will be made on the Initial Distribution Date or as soon thereafter as is practicable. Any distribution to be made on the Effective Date pursuant to the Plan will be deemed as having been made on the Effective Date if such distribution is made on the Effective Date or as soon thereafter as is reasonably practicable. Any payment or distribution required to be made under the Plan on a day other than a Business Day will be made on the next succeeding Business Day. Distributions on account of Disputed Claims and Equity Interests that first become Allowed Claims and Equity Interests after the Effective Date will be made pursuant to Article VIII of the Plan.

### 2. No Postpetition Interest on Claims

Unless otherwise specifically provided for in the Plan, the Confirmation Order or the DIP Orders, or required by applicable bankruptcy law, postpetition interest will not accrue or be paid on any Claims, and no Holder of a Claim (other than a Holder of a DIP Facility Claim, a Prepetition First Out Credit Agreement Claim or a Prepetition Last Out Credit Agreement Claim with respect to such applicable Claim) will be entitled to interest accruing on or after the Petition Date on any Claim.

CH\1125862.14

3. **Distributions by Reorganized Accuride or Other Applicable Distribution Agent**

Other than as specifically set forth in the Plan, Reorganized Accuride or another applicable Distribution Agent will make all distributions required to be distributed under the Plan. Distributions on account of the DIP Facility Claims, Prepetition Credit Facility Claims and Subordinated Notes Claims will be made to the DIP Agent, the Prepetition Agent and the Indenture Trustee, respectively. The Reorganized Debtors may employ or contract with other entities to assist in or make the distributions required by the Plan.

4. **Delivery and Distributions and Undeliverable or Unclaimed Distributions**

(a)     <u>Record Date for Distributions</u>

On the Distribution Record Date, the Claims Register will be closed. Accordingly, Reorganized Accuride or other applicable Distribution Agent will have no obligation to recognize the Transfer of, or the sale of any participation in, any Allowed Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute securities, property, notices and other documents only to those Holders of Allowed Claims who are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date. Reorganized Accuride or any other applicable Distribution Agent will be entitled to recognize and deal for all purposes under the Plan with only those record holders stated on the Claims Register, or (if no address appears on the Claims Register) their books and records, as of the close of business on the Distribution Record Date. For purposes of Subordinated Notes Claims, the record Holder thereof as of the Distribution Record Date will be the Indenture Trustee.

(b)     <u>Delivery of Distributions in General</u>

Except as otherwise provided in the Plan, Accuride, Reorganized Accuride or another applicable Distribution Agent, as applicable, will make distributions to Holders of Allowed Claims and Equity Interests, or in care of their authorized agents, as appropriate, at the address for each such Holder or agent as indicated on the Debtors' books and records as of the date of any such distribution; provided, however, that the manner of such distributions will be determined in the sole discretion of the Debtors or the Reorganized Debtors, as applicable; and provided further, that if a Holder of an Allowed Claim or Equity Interest Files a Proof of Claim, the address for such Holder will be deemed to be the address set forth in any Proof of Claim Filed by that Holder.

All distributions to Holders of Subordinated Notes Claims will be governed by the Indenture and will be deemed completed when made to the Indenture Trustee. The Indenture Trustee may effect any distribution to Holders of Subordinated Notes Claims through the book-entry transfer facilities of The Depository Trust Company, who will distribute the same to its participants in accordance with their respective holdings of Subordinated Notes as of the Distribution Record Date.

(c)     <u>Minimum Distributions</u>

Notwithstanding anything in the Plan to the contrary, no Distribution Agent will be required to make distributions or payments of less than $25.00 (whether in Cash or otherwise) or to make partial distributions or payments of fractions of dollars. Whenever any payment or distribution of a fraction of a dollar or share of New Common Stock under the Plan would otherwise be called for, the actual payment or distribution will reflect a rounding of such fraction to the nearest whole dollar or share of New Common Stock (up or down), with half dollars and half shares of New Common Stock or less being rounded down.

No Distribution Agent will have any obligation to make a distribution on account of an Allowed Claim if: (a) the aggregate amount of all distributions authorized to be made on the Subsequent Distribution Date in question is or has an economic value less than $50,000, unless such distribution is a final distribution; or (b) the amount to be distributed to the specific Holder of an Allowed Claim on such Subsequent Distribution Date does not constitute a final distribution to such Holder and is or has an economic value less than $25.00, which will be treated as an undeliverable distribution under Article VII.D.4 of the Plan.

(d)     Undeliverable Distributions

(i)     Holding of Certain Undeliverable Distributions

If the distribution to any Holder of an Allowed Claim or Equity Interest is returned to the Distribution Agent as undeliverable or is otherwise unclaimed, no further distributions will be made to such Holder unless and until the Distribution Agent is notified in writing of such Holder's then current address, at which time all currently due missed distributions will be made to such Holder on the next Subsequent Distribution Date. Undeliverable distributions will remain in the possession of the Reorganized Debtors, subject to Article VII.D.4(b) of the Plan, until such time as any such distributions become deliverable. Undeliverable distributions will not be entitled to any additional interest, dividends or other accruals of any kind on account of their distribution being undeliverable.

(ii)     Failure to Claim Undeliverable Distributions

Any Holder of an Allowed Claim or Equity Interest (or any successor or assignee or other Person or Entity claiming by, through, or on behalf of, such Holder) that does not assert a right pursuant to the Plan for an undeliverable or unclaimed distribution within one (1) year after the later of the Effective Date or the date such distribution is due will be deemed to have forfeited its rights for such undeliverable or unclaimed distribution and will be forever barred and enjoined from asserting any such rights for an undeliverable or unclaimed distribution against the Debtors or their Estates, the Reorganized Debtors or their property. In such cases, any Cash for distribution on account of such rights for undeliverable or unclaimed distributions will become the property of the Estates free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary. Any Cash, New Common Stock, New Notes, New Warrants and/or other New Securities and Documents or other property held for distribution on account of such Claim or Equity Interest will be canceled and of no further force or effect. Nothing contained in the Plan will require the Debtors, Reorganized Debtors, or any Distribution Agent to attempt to locate any Holder of an Allowed Claim or Equity Interest.

(iii)     Failure to Present Checks

Checks issued by the Distribution Agent on account of Allowed Claims will be null and void if not negotiated within 180 days after the issuance of such check. In an effort to ensure that all Holders of Allowed Claims receive their allocated distributions, no later than 180 days after the issuance of such checks, the Reorganized Debtors will File with the Bankruptcy Court a list of the Holders of any un-negotiated checks. This list will be maintained and updated periodically in the sole discretion of the Reorganized Debtors for as long as the Chapter 11 Cases stay open. Requests for reissuance of any check will be made directly to the Distribution Agent by the Holder of the relevant Allowed Claim or Equity Interest with respect to which such check originally was issued. Any Holder of an Allowed Claim or Equity Interest holding an un-negotiated check that does not request reissuance of such un-negotiated check within 365 days after the date of mailing or other delivery of such check will have its Claim or Equity Interest for such un-negotiated check discharged and be discharged and forever barred, estopped and enjoined from asserting any such Claim or Equity Interest against the Reorganized Debtors or their property. In such cases, any Cash held for payment on account of such Claims or Equity Interest will be property of the Reorganized Debtors, free of any Claims or Equity Interests of such Holder with respect thereto. Nothing contained in the Plan will require the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim or Equity Interest.

5.     **Compliance with Tax Requirements/Allocations**

In connection with the Plan and all distributions under the Plan, Reorganized Accuride or another applicable Distribution Agent will comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions under the Plan will be subject to any such withholding and reporting requirements. Reorganized Accuride or other applicable Distribution Agent will be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements. All persons holding Claims will be required to provide any information necessary to effect information reporting and the withholding of such taxes. Notwithstanding any other provision of the Plan to the contrary, each Holder of an Allowed Claim or Equity Interest will have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding,

and other tax obligations, on account of a distribution to such Holder. Any Cash, New Common Stock, New Notes, New Warrants, New Securities and Documents and/or other consideration or property to be distributed pursuant to the Plan will, pending the implementation of such arrangements, be treated as an undeliverable distribution pursuant to Article VII.D.4 of the Plan.

### 6. Allocation of Plan Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution will, to the extent permitted by applicable law, be allocated for income tax purposes to the principal amount of the Claim first and then, to the extent that the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

### 7. Means of Cash Payment

Payments of Cash made pursuant to the Plan will be in U.S. dollars and will be made, at the option and in the sole discretion of the Reorganized Debtors, by (a) checks drawn on, or (b) wire transfer from, a domestic bank selected by the Reorganized Debtors. Cash payments to foreign creditors may be made, at the option of the Reorganized Debtors, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

### 8. Timing and Calculation of Amounts to Be Distributed

On the Initial Distribution Date (or if a Claim or Equity Interest is not an Allowed Claim or Equity Interest on the Effective Date, on the Subsequent Distribution Date occurring after such Claim becomes an Allowed Claim or Equity Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Equity Interest will receive the full amount of the distributions that the Plan provides for Allowed Claims or Equity Interests in the applicable Class. If and to the extent that there are Disputed Claims or Equity Interests, distributions on account of any such Disputed Claims or Equity Interests will be made pursuant to the provisions set forth in the applicable class treatment or in Article VIII of the Plan. Except as otherwise provided in the Plan, Holders of Claims and Equity Interests will not be entitled to interest, dividends or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

### 9. Setoffs

Without altering or limiting any of the rights and remedies of the Debtors and Reorganized Debtors under section 502(d) of the Bankruptcy Code, all of which rights and remedies will be reserved, the Debtors and the Reorganized Debtors may, but will not be required to, withhold (but not setoff except as set forth below) from the distributions called for under the Plan on account of any Allowed Claim an amount equal to any claims, Causes of Action and Litigation Claims of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim. In the event that any such claims, Causes of Action or Litigation Claims are adjudicated by Final Order or otherwise resolved against the applicable Holder, the Debtors and Reorganized Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the amount of such adjudicated or resolved claims, Causes of Action or Litigation Claims. Neither the failure to effect such a setoff nor the allowance of any Claim under the Plan will constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claims, Causes of Action or Litigation Claims.

10. **Surrender of Cancelled Instruments or Securities**

As a condition precedent to receiving any distribution pursuant to the Plan on account of an Allowed Claim or Equity Interest evidenced by the instruments, securities, notes, or other documentation canceled pursuant to Article V.O of the Plan, the Holder of such Claim or Equity Interest will tender the applicable instruments, securities, notes or other documentation evidencing such Claim or Equity Interest to Reorganized Accuride or another applicable Distribution Agent unless waived in writing by the Debtors or the Reorganized Debtors, as applicable.

Any Holder of a Claim or Equity Interest that is required, but that fails, to surrender or is deemed to have failed to surrender the applicable note or security required to be tendered under the Plan within one (1) year after the Effective Date will have its Claim and its distribution pursuant to the Plan on account of such Claim or Equity Interest discharged and will be forever barred from asserting any such Claim or Equity Interest against the Reorganized Debtors or their property. In such cases, any Cash, New Common Stock, New Notes, New Warrants and/or other New Securities and Documents or other property held for distribution on account of such Claim or Equity Interest will be canceled and of no further force or effect.

11. **Lost, Stolen, Mutilated or Destroyed Securities**

In addition to any requirements under any applicable agreement and applicable law, any Holder of a Claim or Equity Interest evidenced by a security or note that has been lost, stolen, mutilated, or destroyed will, in lieu of surrendering such security or note to the extent required by the Plan, deliver to Reorganized Accuride and other applicable Distribution Agents: (x) evidence reasonably satisfactory to Reorganized Accuride and other applicable Distribution Agents of such loss, theft, mutilation, or destruction; and (y) such security or indemnity as may be required by Reorganized Accuride and other applicable Distribution Agents to hold such party harmless from any damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim or Allowed Equity Interest. Upon compliance with Article VII.K of the Plan as determined by the Debtors or Reorganized Debtors by a Holder of a Claim or Equity Interest evidenced by a security or note, such Holder will, for all purposes under the Plan, be deemed to have surrendered such security or note to Reorganized Accuride and other applicable Distribution Agents.

G. **PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS**

1. **Resolution of Disputed Claims**

(a) <u>Allowance of Claims</u>

After the Effective Date and subject to the other provisions of the Plan, the Reorganized Debtors will have and will retain any and all rights and defenses that the Debtors had with respect to any Claim or Equity Interest, except with respect to any Claim or Equity Interest deemed Allowed under the Plan or by orders of the Bankruptcy Court. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including, without limitation, the Confirmation Order and the DIP Orders), no Claim or Equity Interest will become an Allowed Claim unless and until such Claim or Equity Interest is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Cases allowing such Claim or Equity Interest.

(b) <u>Prosecution of Objections to Claims and Equity Interests</u>

After the Confirmation Date but before the Effective Date, the Debtors, and after the Effective Date, the Reorganized Debtors, will have the exclusive authority to File objections to Claims and settle, compromise, withdraw or litigate to judgment objections to any and all Claims, regardless of whether such Claims or Equity Interests are in an Unimpaired Class or otherwise; provided, however, this provision will not apply to Professional Fee Claims, Ad Hoc Noteholders Group Fees and Expenses, the Backstop Fee, the Backstop Transaction Expenses, the Cash Backstop Fee or the DIP Facility Claim. From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim or Equity Interest without any further notice to or action, order or approval

44

of the Bankruptcy Court. The Reorganized Debtors will have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order or approval of the Bankruptcy Court.

(c)     Estimation

After the Confirmation Date but before the Effective Date, the Debtors, and after the Effective Date, the Reorganized Debtors may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim or Equity Interest pursuant to applicable law and (b) any contingent or unliquidated Claim or Equity Interest pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim or Equity Interest, contingent Claim or Equity Interest or unliquidated Claim or Equity Interest, including during the litigation concerning any objection to any Claim or Equity Interest or during the pendency of any appeal relating to any such objection. All of the aforementioned Claim or Equity Interests and objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claim or Equity Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. The rights and objections of all parties are reserved in connection with any such estimation proceeding.

(d)     Deadline to File Objections to Claims and Equity Interests

Any objections to Claims and Equity Interests will be Filed no later than the Claims Objection Bar Date. Moreover, notwithstanding the expiration of the Claims Objection Bar Date, the Debtors or Reorganized Debtors will continue to have the right to amend any claims objections and to file and prosecute supplemental objections and counterclaims to a Disputed Claim or Equity Interest until such Disputed Claim or Equity Interest is Allowed or disallowed.

**2.     No Distributions Pending Allowance**

Notwithstanding any other provision of the Plan to the contrary, no payments or distributions of any kind or nature will be made with respect to the disputed portion of a Disputed Claim or Equity Interest unless and until all objections to such Disputed Claim or Equity Interest have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim or Equity Interest has become an Allowed Claim or Equity Interest; provided, however, that the Debtors will treat the undisputed portion (if any) of a Disputed Claim as an Allowed Claim.

**3.     Distributions on Account of Disputed Claims and Equity Interests Once They Are Allowed and Additional Distributions on Account of Previously Allowed Claims and Equity Interests**

On each Subsequent Distribution Date (or such earlier date as determined by the Reorganized Debtors in their sole discretion), Reorganized Accuride or another applicable Distribution Agent will make distributions (a) on account of any Disputed Claim or Equity Interest that has become an Allowed Claim or Equity Interest during the preceding ninety (90) days, and (b) on account of previously Allowed Claims or Equity Interests of property that would have been distributed to the Holders of such Claim or Equity Interest on the dates distributions previously were made to Holders of Allowed Claims or Equity Interests in such Class had the Disputed Claims or Equity Interests that have become Allowed Claims or Equity Interests or disallowed by Final Order of the Bankruptcy Court been Allowed or disallowed, as applicable, on such dates. Such distributions will be made pursuant to the applicable provisions of Article III of the Plan.

## H.     CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

**1.     Conditions Precedent to Confirmation**

Confirmation of this Plan will be conditioned upon the satisfaction or waiver pursuant to the provisions of Article IX.C hereof of the following:

- The Bankruptcy Court will have entered a Final Order in form and in substance satisfactory to the Debtors, the Requisite Independent Supporting Lenders and the Required Noteholders approving the Disclosure Statement with respect to this Plan as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.

- This Plan and all schedules, documents, supplements and exhibits to this Plan will have been filed in form and substance acceptable to the Debtors, the Requisite Independent Supporting Lenders and the Required Noteholders.

- The proposed Confirmation Order will be in form and substance reasonably acceptable to the Debtors, the Committee, the Requisite Independent Supporting Lenders and the Required Noteholders.

- The board of directors of the Reorganized Debtors will have been selected.

## 2. Conditions Precedent to Consummation

Consummation of this Plan will be conditioned upon the satisfaction or waiver pursuant to the provisions of Article IX.C hereof of the following:

- The Confirmation Order shall have been entered and either (a) become a Final Order or (b) the 10-day stay contemplated by Bankruptcy Rule 3020(e) in respect thereof shall have been terminated, and the Confirmation Order shall otherwise be in a form and in substance reasonably satisfactory to the Debtors, the Committee, the Requisite Independent Supporting Lenders and the Required Noteholders and no stay of the Confirmation Order been entered and be in effect. The Confirmation Order will provide that, among other things, the Debtors or the Reorganized Debtors, as appropriate, are authorized and directed to take all actions necessary or appropriate to consummate this Plan, including, without limitation, entering into, implementing and consummating the contracts, instruments, releases, leases, indentures and other agreements or documents created in connection with or described in this Plan.

- The Bankruptcy Court will have entered one or more Final Orders (which may include the Confirmation Order) authorizing the assumption and rejection of Executory Contracts and Unexpired Leases by the Debtors as contemplated in the Plan and the Plan Supplement.

- All documents and agreements necessary to implement this Plan, including, without limitation, Restructured Credit Facility and the New Indenture, in each case in form and substance acceptable to the Debtors, the Requisite Independent Supporting Lenders, the Required Noteholders and Accuride Canada (to the extent it is a party to such agreements), will have (a) been tendered for delivery, and (b) been effected by, executed by, or otherwise deemed binding upon, all Entities party thereto. All conditions precedent to such documents and agreements will have been satisfied or waived pursuant to the terms of such documents or agreements.

- Without limiting the foregoing, the "Canadian Revolving Credit Lenders" (as defined in the Prepetition Credit Agreement) as of the Effective Date will all have executed and delivered the Restructured Credit Facility Agreement and all related documents and instruments.

- All material consents, actions, documents, certificates and agreements necessary to implement the Plan will have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable governmental units in accordance with applicable laws.

- The Debtors will have received the Rights Offering Amount, in Cash, net of any fees or expenses authorized by Order of the Bankruptcy Court to be paid from the Rights Offering Amount.

- All interest, fees and expenses (including legal and advisory fees and expenses) on account of the Prepetition First Out Credit Facility Claims shall have been paid as required by the DIP Orders.

- The Confirmation Date will have occurred.

### 3. Waiver of Conditions

The conditions to confirmation of this Plan and to Consummation of this Plan set forth in this Article IX may be waived by the Debtors with the consent of the Requisite Independent Supporting Lenders and the Required Noteholders (not to be unreasonably withheld) without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate this Plan; provided, however, notwithstanding the foregoing, the condition set forth in paragraph B(4) of the Plan may not be waived without the consent of all of the "Canadian Revolving Credit Lenders" (as defined in the Prepetition Credit Agreement), the conditions in paragraphs A(3) and B(1) of the Plan may not be waived without the consent of the Committee, which shall not be unreasonably withheld or delayed, and the condition set forth in paragraph B(7) may not be waived without the consent of the Holders of the Prepetition First Out Credit Agreement Claims. The failure to satisfy or waive a condition to Consummation may be asserted by the Debtors or the Reorganized Debtors regardless of the circumstances giving rise to the failure of such condition to be satisfied. The failure of the Debtors or Reorganized Debtors to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time.

### 4. Effect of Non Occurrence of Conditions to Consummation

If the Consummation of the Plan does not occur, the Plan will be null and void in all respects and nothing contained in the Plan or the Disclosure Statement will: (a) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (b) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; (c) constitute an Allowance of any Claim or Equity Interest; or (d) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other Entity in any respect.

## I. RELEASE, INJUNCTION AND RELATED PROVISIONS

### 1. General

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under the Plan, takes into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise. Pursuant to the terms contained in the Plan, among other things, the subordination provisions contained in the Indenture are will be eliminated and each holder of a Subordinated Notes Claim will receive and be entitled to retain the property as set forth in the Plan. As of the Effective Date, any and all contractual, legal and equitable subordination rights, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise, relating to the allowance, classification and treatment of all Allowed Claims and their respective distributions and treatments under the Plan will be settled, compromised, terminated and released pursuant to the Plan; provided, however, that nothing contained in the Plan will preclude any Person or Entity from exercising their rights pursuant to and consistent with the terms of the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with the Plan.

In accordance with the provisions of the Plan, including Article VIII thereof, and pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, without any further notice to or action, order or approval of the

Bankruptcy Court, after the Effective Date (1) the Reorganized Debtors may, in their sole and absolute discretion, compromise and settle Claims against them and (2) the Reorganized Debtors may, in their sole and absolute discretion, compromise and settle Causes of Action against other Entities.

## 2. Release

EFFECTIVE AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE RELEASED PARTIES, THE ADEQUACY OF WHICH WILL BE CONFIRMED BY THE PLAN, THE DEBTORS AND REORGANIZED DEBTORS, IN THEIR INDIVIDUAL CAPACITIES AND AS DEBTORS-IN-POSSESSION, AND THE HOLDERS OF CLAIMS OR EQUITY INTERESTS, AND EACH OF THEIR RESPECTIVE RELATED PERSONS (COLLECTIVELY, THE "RELEASING PARTIES") WILL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER PROVIDED A FULL DISCHARGE, WAIVER AND RELEASE TO THE RELEASED PARTIES (AND EACH SUCH RELEASED PARTY SO RELEASED WILL BE DEEMED FOREVER RELEASED, WAIVED AND DISCHARGED BY THE RELEASING PARTIES) AND THEIR RESPECTIVE PROPERTIES FROM ANY AND ALL CLAIMS, CAUSES OF ACTION, LITIGATION CLAIMS AND ANY OTHER DEBTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, ACTIONS, REMEDIES, AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING AS OF THE EFFECTIVE DATE OR THEREAFTER ARISING, IN LAW, AT EQUITY, WHETHER FOR TORT, CONTRACT, OR OTHERWISE, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, OR OTHER OCCURRENCE OR CIRCUMSTANCES EXISTING OR TAKING PLACE PRIOR TO OR ON THE EFFECTIVE DATE ARISING FROM OR RELATED IN ANY WAY IN WHOLE OR IN PART TO THE DEBTORS, THE CHAPTER 11 CASES, THIS DISCLOSURE STATEMENT, THE PLAN OR THE SOLICITATION OF VOTES ON THE PLAN THAT SUCH RELEASING PARTY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR EQUITY INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT FOR OR ON BEHALF OF THE DEBTORS, THEIR ESTATES OR THE REORGANIZED DEBTORS (WHETHER DIRECTLY OR DERIVATIVELY) AGAINST ANY OF THE RELEASED PARTIES; PROVIDED, HOWEVER, THAT THE FOREGOING PROVISIONS OF THIS RELEASE WILL NOT OPERATE TO WAIVE OR RELEASE (I) ANY CAUSES OF ACTION EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN OR THE PLAN SUPPLEMENT; (II) ANY CAUSES OF ACTION ARISING FROM FRAUD OR WILLFUL MISCONDUCT AS DETERMINED BY FINAL ORDER OF THE BANKRUPTCY COURT OR ANY OTHER COURT OF COMPETENT JURISDICTION; AND/OR (III) THE RIGHTS OF SUCH RELEASING PARTY TO ENFORCE THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES, INDENTURES, AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED UNDER OR IN CONNECTION WITH THE PLAN OR ASSUMED PURSUANT TO THE PLAN OR ASSUMED PURSUANT TO FINAL ORDER OF THE BANKRUPTCY COURT. THE FOREGOING RELEASE WILL BE EFFECTIVE AS OF THE EFFECTIVE DATE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER, OR RULE OR THE VOTE, CONSENT, AUTHORIZATION OR APPROVAL OF ANY PERSON AND THE CONFIRMATION ORDER WILL PERMANENTLY ENJOIN THE COMMENCEMENT OR PROSECUTION BY ANY PERSON OR ENTITY, WHETHER DIRECTLY, DERIVATIVELY OR OTHERWISE, OF ANY CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, OR LIABILITIES RELEASED PURSUANT TO THIS RELEASE. IN ADDITION, THE DEBTORS, ON BEHALF OF THE DEBTORS, THEIR ESTATES, AND THE REORGANIZED DEBTORS, HEREBY RELEASE AND WAIVE ANY AND ALL AVOIDANCE ACTIONS AGAINST ANY AND ALL PERSONS.

## 3. Discharge of Claims

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan or the Confirmation Order, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtors or any of their assets or properties, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests. Except as otherwise expressly provided by the Plan or the Confirmation Order, upon the Effective Date, the Debtors and their Estates will be deemed discharged and released under and to

48

the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

### 4. Exculpation

The Exculpated Parties will neither have nor incur any liability to any Entity for any claims or Causes of Action arising before, on or after the Petition Date and prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Consummation of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or confirmation or Consummation of the Plan; provided, however, that the foregoing provisions will have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order of the Bankruptcy Court or other court of competent jurisdiction to have constituted gross negligence or willful misconduct; provided, further, that each Exculpated Party will be entitled to rely upon the advice of counsel concerning its duties pursuant to, or in connection with, the above referenced documents, actions or inactions; provided, further, however that the foregoing provisions will not apply to any acts, omissions, Claims, Causes of Action or other obligations expressly set forth in and preserved by the Plan or the Plan Supplement.

### 5. Preservation of Rights of Action

#### (a) Maintenance of Causes of Action

Except as otherwise provided in Article X or elsewhere in the Plan or the Confirmation Order, after the Effective Date, the Reorganized Debtors will retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action and Litigation Claims, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Cases. The Reorganized Debtors, as the successors in interest to the Debtors and the Estates, may, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of the Litigation Claims without notice to or approval from the Bankruptcy Court. The Litigation Claims include, without limitation, the claims set forth on Plan Schedule 2.

#### (b) Preservation of All Causes of Action Not Expressly Settled or Released

Unless a Cause of Action or Litigation Claim against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including, without limitation, the Confirmation Order), the Debtors expressly reserve such Cause of Action or Litigation Claim for later adjudication by the Debtors or the Reorganized Debtors (including, without limitation, Causes of Action and Litigation Claims not specifically identified or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action or Litigation Claims upon or after the confirmation of the Plan or Consummation of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order, except where such Causes of Action or Litigation Claims have been expressly released in the Plan (including, without limitation, and for the avoidance of doubt, the Release contained in Article X.B of the Plan) or any other Final Order (including, without limitation, the Confirmation Order). In addition, the Debtors and the Reorganized Debtors expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which any Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

CH\1125862.14

### 6.    Injunction

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY SUIT, ACTION OR OTHER PROCEEDING, OR CREATING, PERFECTING OR ENFORCING ANY LIEN OF ANY KIND, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, EQUITY INTEREST, OR REMEDY RELEASED OR TO BE RELEASED, EXCULPATED OR TO BE EXCULPATED, OR DISCHARGED OR TO BE DISCHARGED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.  BY ACCEPTING DISTRIBUTIONS PURSUANT TO THE PLAN, EACH HOLDER OF AN ALLOWED CLAIM OR EQUITY INTEREST WILL BE DEEMED TO HAVE SPECIFICALLY CONSENTED TO THIS INJUNCTION.  ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CHAPTER 11 CASES UNDER SECTION 105 OR 362 OF THE BANKRUPTCY CODE, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, WILL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.

## J.    BINDING NATURE OF PLAN

ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE PLAN WILL BIND, AND WILL BE DEEMED BINDING UPON, ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, AND SUCH HOLDER'S RESPECTIVE SUCCESSORS AND ASSIGNS, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (I) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR AFFIRMATIVELY VOTED TO REJECT THE PLAN.

CH\1125862.14

<div align="center">

**V.**

**CONFIRMATION AND CONSUMMATION PROCEDURES**

</div>

**A.      SOLICITATION OF VOTES**

The process by which the Debtors will solicit votes to accept or reject the Plan is summarized in Section I herein titled, "Executive Summary" and set forth in detail in the Disclosure Statement Order, which is attached as Exhibit C to this Disclosure Statement.

**PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER FOR MORE INFORMATION REGARDING VOTING REQUIREMENTS TO ENSURE THAT VOTES ARE PROPERLY AND TIMELY SUBMITTED SUCH THAT THEY ARE COUNTED AS VOTES TO ACCEPT OR REJECT THE PLAN.**

**B.      CONFIRMATION PROCEDURES**

**1.      Confirmation Hearing**

The Confirmation Hearing will commence at 10:00 a.m. prevailing Eastern Time on February 10, 2010 before the Honorable Brendan L. Shannon, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, located at 824 Market Street, 6th Floor, Courtroom 1, Wilmington, Delaware 19801-3024. The Confirmation Hearing may be continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order. Moreover, the Plan may be modified or amended, if necessary, pursuant to section 1127 of the Bankruptcy Code, prior to, during or as a result of the Confirmation Hearing, without further notice to parties-in-interest.

The Confirmation Objection Deadline is 4:00 p.m. prevailing Eastern Time on [January 29], 2010.

All Confirmation Objections must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in accordance with the Disclosure Statement Order on or before the Confirmation Objection Deadline.

<div style="border:1px solid black; padding:8px; text-align:center;">

CONFIRMATION OBJECTIONS NOT TIMELY FILED AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE.

</div>

**2.      Filing Objections to the Plan**

Any objection to confirmation of the Plan must: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; (iii) state the name of the objecting party and the amount and nature of the Claim or the amount of Equity Interests held by such Entity; (iv) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (v) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is **actually received** no later than the Confirmation Objection Deadline by the Notice Parties, as defined in Section I.F herein.

**C.      STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (i) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (ii) the Debtors have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in

<div align="center">51</div>

good faith. Specifically, the Debtors believe that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the case, has been or will be disclosed to the Bankruptcy Court, and any such payment: (a) made before the confirmation of the Plan is reasonable; or (b) is subject to the approval of the Bankruptcy Court as reasonable if it is to be fixed after confirmation of the Plan.

- The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Debtors, an affiliate of the Debtors participating in the plan with the Debtors, or a successor to the Debtors under the Plan. The appointment to, or continuance in, such office by such individual, will be consistent with the interests of creditors and equity security holders and with public policy and the Debtors will have disclosed the identity of any insider that the Reorganized Debtors will employ or retain, and the nature of any compensation for such insider;

- Either each Holder of an Impaired Claim or Equity Interest in Accuride will (A) have accepted the Plan or will receive or retain under the Plan on account of such Claim or Equity Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code, or (B) if section 1111(b)(2) applies to such Claim, receive or retain under the Plan on account of such Claim property of a value, as of the Effective Date of the Plan, that is not less than the value of such Holder's interest in the estate's interest in the property that secures such claims;

- Each Class of Claims or Equity Interests that is entitled to vote on the Plan will either have accepted the Plan or will not be Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class pursuant to section 1129(b) of the Bankruptcy Code;

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Claims and Other Priority Claims will be paid in full in Cash on the Effective Date, or as soon thereafter as is reasonably practicable, and that Priority Tax Claims will be paid in accordance with section 1129(a)(9)(C) of the Bankruptcy Code;

- At least one Class of Impaired Claims or Equity Interests will accept the Plan, determined without including any acceptance of the Plan by any insider holding a Claim or Equity Interest in that Class;

- Confirmation of the Plan will not likely be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor thereto under the Plan;

- The Debtors have paid or will pay all fees payable under section 1930 of title 28, and the Plan provides for the payment of all such fees on the Effective Date; and

- The Plan provides for the continuation after the Effective Date of payment of all retiree benefits.

1.    **Best Interests of Creditors Test/Liquidation Analysis**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that the bankruptcy court find, as a condition to confirmation of a chapter 11 plan, that each holder of a claim or equity interest in each impaired class: (i) has accepted the plan; or (ii) among other things, will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such Person would receive if each of the debtors were liquidated under chapter 7 of the Bankruptcy Code. To make these findings, the Bankruptcy Court must: (1) estimate the Cash proceeds (the "**Liquidation Proceeds**") that a chapter 7 trustee would generate if each Debtor's Chapter 11 Case were converted to a chapter 7 case on the Effective Date and the assets of such Debtor's Estate were liquidated; (2) determine the distribution (the "**Liquidation Distribution**") that each non-accepting Holder of a Claim or Equity Interest would receive from the Liquidation Proceeds under the priority scheme dictated in chapter 7; and (3) compare each Holder's Liquidation Distribution to the distribution under the Plan ("**Plan Distribution**") that such Holder would receive if the Plan were confirmed and consummated.

To assist the Bankruptcy Court in making the findings required under section 1129(a)(7) of the Bankruptcy Code, the Debtors' management, together with Zolfo Cooper ("**ZC**"), the Debtors' restructuring and financial advisors, prepared a Liquidation Analysis, a copy of which is attached hereto as Exhibit F.

The Liquidation Analysis presents "High", "Midpoint" and "Low" estimates of Liquidation Proceeds, thus representing a range of management's assumptions relating to the costs incurred during a liquidation and the proceeds realized as a result thereof. The "High", "Midpoint" and "Low" estimates of Liquidation Proceeds for the Chapter 11 Cases are $117,380,000, $95,237,000 and $73,093,000, respectively. For additional detail with respect to such estimates, refer to the Liquidation Analysis attached hereto as Exhibit F. It is assumed that the liquidation would occur over a period of four months. The projected date of conversion to a hypothetical chapter 7 liquidation (the "**Assumed Effective Date**") is September 1, 2009. In each case, it is assumed that the chapter 7 trustee would enter into an agreement with the Debtors' Prepetition Lenders, as applicable, to wind-down operations and sell the remainder of the Debtors' assets on a piecemeal basis.

In a chapter 7 liquidation, certain distinctive factors would limit recovery from the sale of the Debtors' assets. Among the Debtors' most valuable assets are its accounts receivable, finished goods inventory and machinery and equipment. Although a significant portion of the Debtors' trade receivables are current, in a liquidation, the Debtors likely would have a more difficult time collecting such receipts. The Debtors' long customer relationships along with strong brand recognition should allow a substantial amount of finished goods to be sold. However, in order to sell the finished goods within the liquidation timeframe and without warranties or availability of future services for the products, discounts would likely be required. Much of the machinery and equipment are specialized and/or heavy duty machinery that are costly to relocate. As a result, sale of any machinery and equipment would likely generate minimal proceeds when compared to book values for such assets. In aggregate, such reduced realizations would reduce the amounts available for distributions to creditors.

THE STATEMENTS IN THE LIQUIDATION ANALYSIS, INCLUDING ESTIMATES OF ALLOWED CLAIMS, WERE PREPARED SOLELY TO ASSIST THE BANKRUPTCY COURT IN MAKING THE FINDINGS REQUIRED UNDER SECTION 1129(a)(7) AND THEY MAY NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE.

THE DEBTORS BELIEVE THAT ANY ANALYSIS OF A HYPOTHETICAL LIQUIDATION IS NECESSARILY SPECULATIVE. THERE ARE A NUMBER OF ESTIMATES AND ASSUMPTIONS UNDERLYING THE LIQUIDATION ANALYSIS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT ECONOMIC, COMPETITIVE AND OPERATIONAL UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS OR A CHAPTER 7 TRUSTEE. NEITHER THE LIQUIDATION ANALYSIS, NOR THE FINANCIAL INFORMATION ON WHICH IT IS BASED, HAS BEEN EXAMINED OR REVIEWED BY INDEPENDENT ACCOUNTANTS IN ACCORDANCE WITH STANDARDS PROMULGATED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. THERE CAN BE NO ASSURANCE THAT ACTUAL RESULTS WOULD NOT VARY MATERIALLY FROM THE HYPOTHETICAL RESULTS PRESENTED IN THE LIQUIDATION ANALYSIS.

2. **Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find that confirmation is not likely to be followed by the liquidation of the Reorganized Debtors or the need for further financial reorganization, unless the plan contemplates such liquidation. For purposes of demonstrating that the Plan meets this "feasibility" standard, the Debtors have analyzed the ability of the Reorganized Debtors to meet their obligations under the Plan and to retain sufficient liquidity and capital resources to conduct their business.

The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code. In connection with the development of the Plan and for the purposes of determining whether the Plan satisfies this feasibility standard, the Debtors analyzed their ability to satisfy its financial obligations while maintaining sufficient liquidity and capital resources. The Debtors' management, with the assistance of its financial advisors, developed a business plan and prepared financial projections for fiscal years 2009 through 2014 (the "Financial Projections"). The Financial Projections, together with the assumptions on which they are based, are attached hereto as Exhibit D.

In general, as illustrated by the Financial Projections, the Debtors believe that with the significantly de-leveraged capital structure provided under the Plan and the return to trade terms, the Reorganized Debtors should have sufficient Cash flow and availability to make all payments required pursuant to the Plan while conducting ongoing businesses operations. The Debtors believe that confirmation and Consummation is, therefore, not likely to be followed by the liquidation or further reorganization of the Reorganized Debtors. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

THE FINANCIAL PROJECTIONS, INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN. WHILE MANAGEMENT BELIEVES THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, ARE REASONABLE IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE FINANCIAL PROJECTIONS WILL BE REALIZED. THE DEBTORS MAKE NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS.

The Financial Projections have not been examined or compiled by independent accountants. The Debtors make no representation as to the accuracy of the Financial Projections or their ability to achieve the projected results. Many of the assumptions on which the projections are based are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the actual financial results. Therefore, the actual results achieved throughout the 5-year period of the Financial Projections may vary from the projected results and the variations may be material. All Holders of Claims and Equity Interests that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the financial projections are based in connection with their evaluation of the Plan.

### 3.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the interest entitles the holder of such claim or interest or (b) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default, (i) cures any default that occurred before or after the commencement of the chapter 11 case; (ii) reinstates the maturity of such claim or interest as such maturity existed before such default; (iii) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and (iv) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that

class, but for that purpose counts only those who actually vote to accept or to reject the plan and are not insiders. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance. Section 1126(d) of the Bankruptcy Code, except as otherwise provided in section 1126(e) of the Bankruptcy Code, defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of equity interests in that class actually voting to accept or to reject the plan.

Claims in Class 1, 2, 3, 5, 6 and 8 and Equity Interests in Classes 9 and 11 are not Impaired under the Plan, and, as a result, the Holders of such Claims and Equity Interests are deemed to have accepted the Plan.

Claims in Classes 4A, 4B and 7 and Equity Interests in Class 10 are Impaired under the Plan, and as a result, the Holders of Claims or Equity Interests in such Classes are entitled to vote on the Plan. Pursuant to section 1129 of the Bankruptcy Code, the Holders of Claims or Equity Interests in the Voting Classes must accept the Plan for the Plan to be confirmed without application of the "fair and equitable test" to such Classes, and without considering whether the Plan "discriminates unfairly" with respect to such Classes, as both standards are described herein. As stated above, Classes of Claims will have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims of each such Class (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan. Classes of Equity Interests will have accepted the if the Plan is accepted by at least two-thirds in amount of the Equity Interests of each such Class.

4.    **Confirmation Without Acceptance by All Impaired Classes**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if less than all impaired classes entitled to vote on the plan have accepted it, provided that the plan has been accepted by at least one impaired class of claims. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired Class's rejection or deemed rejection of the Plan, the Plan will be confirmed, at the Debtors' request, in a procedure commonly known as "cram down," so long as the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Class of Claims or Equity Interests that is impaired under, and has not accepted, the Plan.

5.    **No Unfair Discrimination**

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

6.    **Fair and Equitable Test**

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to the dissenting class, the test sets different standards depending on the type of claims or equity interests in such class:

- <u>Secured Claims</u>. The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (a) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (b) each holder of a secured claim in the class receives deferred Cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the Debtors' property subject to the liens.

55

- <u>Unsecured Claims</u>. The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the following requirement that either: (a) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property.

- <u>Equity Interests</u>. The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either:

  o the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of: (a) the allowed amount of any fixed liquidation preference to which such holder is entitled; (b) any fixed redemption price to which such holder is entitled; or (c) the value of such interest; <u>or</u>

  o if the class does not receive the amount required in the paragraph directly above, no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

To the extent that any of the Voting Classes vote to reject the Plan, the Debtors reserve the right to seek (a) confirmation of the Plan under section 1129(b) of the Bankruptcy Code and/or (b) modify the Plan in accordance with Article XII of the Plan.

Notwithstanding the rejection of any Class that votes to reject the Plan, the Debtors do not believe that the Plan discriminates unfairly against any Impaired Class of Claims or Equity Interests. The Debtors believe that the Plan and the treatment of all Classes of Claims and Equity Interests under the Plan satisfy the foregoing requirements for non-consensual confirmation of the Plan.

## D.    CONSUMMATION OF THE PLAN

The Plan will be consummated on the Effective Date. For a more detailed discussion of the conditions precedent to the consummation of the Plan and the impact of failure to meet such conditions, see Article IX.B of the Plan.

CH\1125862.14

# VI.
## PLAN-RELATED RISK FACTORS

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS THAT ARE IMPAIRED SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESS OR THE PLAN AND ITS IMPLEMENTATION.

## A.      CERTAIN BANKRUPTCY LAW CONSIDERATIONS

### 1.      Parties in interest may object to the Debtors' classification of Claims and Equity Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2.      The Debtors may fail to satisfy the vote requirement.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to accomplish an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims or Equity Interests as those proposed in the Plan.

### 3.      The Debtors may not be able to secure confirmation of the Plan.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, findings by the bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting Holders of Claims within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim or Equity Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that the Disclosure Statement, the balloting procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes, or the Plan contains other terms disapproved of by the Bankruptcy Court.

Confirmation of the Plan is also subject to certain conditions as described in Article IX of the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims or Equity Interests would receive with respect to their Allowed Claims or Equity Interests.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for confirmation. Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan. Such less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan. Section 1127 of the Bankruptcy permits the Debtors to modify the Plan at any time before confirmation, but not if such modified Plan fails to meet the requirements for confirmation. The Debtors or the Reorganized Debtors may modify the Plan at any time after confirmation of the Plan and before substantial consummation of the Plan if circumstances warrant such modification and this Court, after notice and a hearing, confirms the Plan as modified, but not if such modified Plan fails to meet the requirements for confirmation. The Debtors will comply with the disclosure and solicitation requirements set forth in Section 1125 of the Bankruptcy Code with respect to the modified Plan. Any Holder of a Claim or Equity Interest that has accepted or rejected the Plan is deemed to have accepted or rejected, as the case may be, the Plan as modified, unless, within the time fixed by this Court, such Holder changes their previous acceptance or rejection.

4.    **Non-consensual confirmation of the Plan may be necessary.**

In the event that any impaired class of claims or equity interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Debtors believe that the Plan satisfies these requirements and the Debtors may request such non-consensual confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, in the event that a Voting Class does not accept the Plan, there can be no assurance that the Bankruptcy Court will reach this conclusion.

5.    **The Debtors may object to the amount or classification of a Claim or Equity Interest.**

Except as otherwise provided in the Plan, the Debtors and Reorganized Debtors reserve the right to object to the amount or classification of any Claim or Equity Interest under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim or Equity Interest where such Claim or Equity Interest is or may become subject to an objection, counterclaim or other suit by the Debtors. Any Holder of a Claim or Equity Interest that is or may become subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

6.    **There exists a risk of not obtaining the Rights Offering Amount.**

The Plan is predicated on, among other things, Accuride's receipt of the Rights Offering Amount. Notwithstanding the Backstop Commitment Agreement, because the Rights Offering has not been completed, there can be no assurance that the Debtors will receive any or all of the Rights Offering Amount.

7.    **The Effective Date may not occur.**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.

8.    **Contingencies will not affect validity of votes of Impaired Classes to accept or reject the Plan.**

The distributions available to Holders of Allowed Claims and Equity Interests under the Plan can be affected by a variety of contingencies. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims and Equity Interests under the Plan, will not affect the validity of the vote taken by the Voting Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

9. **The Debtors may default under the DIP Facility.**

The Debtors' DIP Facility contains numerous covenants and events of default. If the Debtors fail to comply with the covenants, or are otherwise in default of the DIP Credit Agreement, the DIP Lenders have the right to accelerate the total amount due under the DIP Facility and require the immediate payment in full in cash of such amounts. Following such a demand, if the Debtors were unable to obtain emergency relief from the Bankruptcy Court, the DIP Lenders and the Prepetition Lenders would have the right, subject to the terms of the DIP Orders, to foreclose upon the assets of the Debtors.

## B. RISK FACTORS THAT MAY AFFECT THE VALUE OF SECURITIES TO BE ISSUED UNDER THE PLAN AND/OR RECOVERIES UNDER THE PLAN

1. **The valuation of the Reorganized Debtors may not be adopted by the Bankruptcy Court.**

The approximate midpoint equity value of the Reorganized Debtors (after taking into account the Rights Offering) set forth in the valuation included as Exhibit E to this Disclosure Statement is $533 million. Parties in interest in the Chapter 11 Cases may oppose confirmation of the Plan by alleging that the midpoint equity value of the Reorganized Debtors is higher than such amount and that the Plan thereby improperly limits or extinguishes their rights to recoveries under the Plan. At the Confirmation Hearing, the Bankruptcy Court will hear evidence regarding the views of the Debtors and opposing parties, if any, with respect to the valuation of the Reorganized Debtors. Based on that evidence, the Bankruptcy Court will determine the appropriate valuation for the Reorganized Debtors for purposes of the Plan.

2. **There may be a lack of a trading market for the New Common Stock or the New Notes.**

The New Common Stock issued to the Holders of Allowed Subordinated Notes Claims and Allowed Accuride Other Equity Interests will be freely transferable upon issuance. Reorganized Accuride has committed to register the New Notes and the New Common Stock issuable upon conversion of the New Notes under the Securities Act to the extent the holders of these securities enter into the Registration Agreement with Reorganized Accuride on the Effective Date. Reorganized Accuride has also committed to use its best efforts to list the New Common Stock on a national securities exchange. There can be no assurance, however, that any market will develop or as to the liquidity of any market that may develop for any such securities.

3. **To service the Reorganized Debtors' indebtedness and to meet their operational needs, the Reorganized Debtors will require a significant amount of cash. Their ability to generate cash depends on many factors beyond their control.**

The Reorganized Debtors' ability to make payments on and to refinance their indebtedness and to fund planned capital expenditures and research and development efforts will depend on their ability to generate cash in the future. This, to a certain extent, is subject to general economic, financial, competitive, legislative, regulatory, and other factors that are beyond their control.

The Reorganized Debtors' businesses may not generate sufficient Cash flow from operations. Although the Financial Projections represent management's view based on current known facts and assumptions about the future operations of the Reorganized Debtors, there is no guarantee that the Financial Projections will be realized. The Reorganized Debtors may not be able to meet their projected financial results or achieve projected revenues and Cash flows assumed in projecting future business prospects. To the extent the Reorganized Debtors do not meet their projected financial results or achieve projected revenues and Cash flows, The Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date, may be unable to service their debt obligations as they come due or may not be able to meet its operational needs. A failure of the Reorganized Debtors to meet their projected financial results or achieve projected revenues and Cash flows could lead to Cash flow and working capital constraints, which constraints may require the Reorganized Debtors to seek additional working capital. The Reorganized Debtors may not be able to obtain such working capital when it is required.

In addition, if the Reorganized Debtors' cash flows and capital resources are insufficient to fund their debt service obligations, they may be forced to reduce or delay capital expenditures, sell material assets or operations, obtain additional equity capital or refinance all or a portion of their indebtedness. In the absence of such operating results and resources, the Reorganized Debtors could face substantial cash flow problems and might be required to sell material assets or operations to meet their debt service and other obligations. The Reorganized Debtors will be unable to predict the timing of such asset sales or the proceeds which they could realize from such sales and that they will be able to refinance any of their indebtedness, including the Restructured Credit Facility and the New Notes, on commercially reasonable terms or at all.

4. **The estimated valuation of the Reorganized Debtors and the New Common Stock and the estimated recoveries to Holders of Allowed Claims and Equity Interests are not intended to represent the private or public sale values of the New Common Stock.**

The Debtors' estimated recoveries to Holders of Allowed Claims and Equity Interests are not intended to represent the private or public sale values of Reorganized Accuride's securities. The estimated recoveries are based on numerous assumptions (the realization of many of which is beyond the control of the Reorganized Debtors), including, without limitation: (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to achieve the operating and financial results included in the Financial Projections; and (d) the Debtors' ability to maintain adequate liquidity to fund operations.

5. **The holders of the Subordinated Notes will control Reorganized Accuride.**

Consummation of the Plan will result in a small number of holders owning a significant percentage of the shares of outstanding New Common Stock, with the holders of the Subordinated Notes holding a controlling percentage of the New Common Stock. These holders will, among other things, exercise a controlling influence over the business and affairs of Reorganized Accuride and the Reorganized Debtors.

6. **The issuance of Equity Interests to Accuride's management may dilute the equity ownership interest of other holders of the New Common Stock.**

It is anticipated that the New Board will adopt an Equity Incentive Program for directors and management, consisting of issuances from time to time of shares of the New Common Stock of Accuride, including the grant of incentive stock options within the meaning of Section 422 of the Internal Revenue Code of 1986, as amended. If the New Board distributes equity interests, or options to acquire such equity interests, to directors, management or employees, it is contemplated that such distributions will dilute the New Common Stock issued on account of Claims and Equity Interests under the Plan and the ownership percentage represented by the New Common Stock distributed under the Plan.

7. **It is unlikely that Accuride will pay dividends in the foreseeable future.**

All of Reorganized Accuride's cash flow will be required to be used in the foreseeable future (a) to make payments under the Restructured Credit Facility, (b) to fund Reorganized Accuride's other obligations under the Plan, and (c) for working capital and capital expenditure purposes. In addition, the New Indenture will contain certain restrictions on Reorganized Accuride's ability to pay dividends. Accordingly, Reorganized Accuride does not anticipate paying cash dividends on the New Common Stock in the foreseeable future.

## C. RISK FACTORS THAT COULD NEGATIVELY IMPACT THE DEBTORS' BUSINESS

1. **Ongoing turmoil in the credit markets and the financial services industry could hinder the Debtors' ability to access capital in the future, even if the Plan is successful.**

The credit markets and the financial services industry continue to experience a period of significant disruption characterized by the bankruptcy, failure, collapse or sale of various financial institutions, increased volatility in securities prices, severely diminished liquidity and credit availability and a significant level of intervention from the United States and other governments. Continued concerns about the systemic impact of

potential long-term or widespread recession, energy costs, geopolitical issues, the availability and cost of credit, the global commercial and residential real estate markets and related mortgage markets and reduced consumer confidence have contributed to increased market volatility and diminished expectations for most developed and emerging economies. As a result of these market conditions, the cost and availability of credit has been and may continue to be adversely affected by illiquid credit markets and wider credit spreads. Even if the Plan is successful, continued turbulence in the United States and international markets and economies could restrict the Reorganized Debtors' ability to refinance their existing indebtedness, increase costs of borrowing, limit access to capital necessary to meet liquidity needs and materially harm the Reorganized Debtors' operations or their ability to implement their business strategy in the future.

The commercial vehicle supply industry in which the Debtors' operate has traditionally been highly competitive and cyclical, and, as a result, has experienced significant downturns in connection with, or in anticipation of, declines in general economic conditions. Additionally, higher energy costs may negatively impact customer demand for the Debtors' products. The current economic conditions have resulted in a severe downturn in the vehicle supply industry resulting in a significant decline in the Debtors' sales volume. Any continued reduction in consumer and commercial spending may drive the Debtors' and the Debtors' competitors to reduce product pricing, which would have a negative impact on gross profit. Moreover, reduced revenues as a result of a softening of the economy may also reduce the Debtors' working capital and interfere with the Debtors' short term and long term strategies.

In addition, the ongoing global financial and economic crisis could impact the Debtors' business in a number of other ways, including:

- uncertainty about current and future economic conditions may cause the Debtors' customers and consumers in general to defer purchases; and

- the inability of customers to obtain sufficient credit to finance purchases of the Debtors' products and meet their payment obligations to the Debtors' could have a material adverse effect on the Debtors' business, financial condition or results of operation.

In light of existing economic conditions, certain of the Debtors' customers may need us to extend additional credit commitments and a continuation of the current credit crisis could require the Debtors to make difficult decisions between increasing the Debtors' level of customer financing or potentially losing sales to these customers.

The Debtors currently maintain trade credit with certain of the Debtors' key suppliers and utilize such credit to purchase significant amounts of raw materials and other supplies with payment terms. As conditions in the commercial vehicle supply industry have become less favorable, key suppliers have been seeking to shorten trade credit terms or to require cash in advance for payment. If a significant number of the Debtors' key suppliers were to shorten or eliminate the Debtors' trade credit, the Debtors' inability to finance large purchases of the Debtors' key supplies and raw materials would increase the Debtors' costs and negatively impact the Debtors' liquidity and cash flow.

Furthermore, although the Debtors do not expect to need additional financing, if circumstances change, the tightening credit markets may make it difficult for the Debtors to obtain additional financing on favorable terms, or at all. In addition, if the current pressures on credit continue or worsen, the Debtors may not be able to refinance, if necessary, on the Debtors' outstanding debt when due, which could have a material adverse effect on the Debtors' business, results of operations or financial condition.

If as a result of the risks outlined above, the Debtors' operating results falter and the Debtors' cash flow or capital resources prove inadequate, or if interest rates increase significantly, the Debtors could face liquidity problems that could have a material adverse effect on the Debtors' business, financial condition or results of operations.

CH\1125862.14

2.    **The Debtors rely on, and make significant operational decisions based in part upon, industry data and forecasts primarily contained in industry forecast publications which may prove to be inaccurate.**

The Debtors continue to operate in a challenging economic environment and the Debtors' ability to maintain liquidity and comply with the Debtors' debt covenants may be affected by economic or other conditions that are beyond the Debtors' control and which are difficult to predict. The October 9, 2009 production forecasts by ACT Publications for the significant commercial vehicle markets that the Debtors serve, are as follows:

| | |
|---|---|
| North American Class 8 | 115,209 |
| North American Classes 5-7 | 93,124 |
| U.S. Trailers | 75,880 |

Based on the these production builds, the Debtors expect to comply with the Debtors' debt covenants and believe that the Debtors' liquidity will be sufficient to fund currently anticipated working capital, capital expenditures, and debt service requirements for at least the next twelve months. However, if the Debtors' net sales are significantly less than expected, given the volatility and the calendarization of the production builds as well as the other markets that the Debtors serve, or due to the challenging credit markets, the Debtors could violate the Debtors' debt covenants or have insufficient liquidity. In the event of noncompliance, the Debtors would pursue an amendment or waiver. However, no assurances can be given that those forecasts will be accurate.

3.    **If deterioration of the economy continues, this could cause additional financial and operational declines, which could lead to unanticipated reductions in the Debtors' earnings and could result in future goodwill impairments.**

During the first 9 months of 2009, the Debtors recorded goodwill and other intangible asset impairment charges of $0.00 and during fiscal 2008, the Debtors recorded goodwill and other intangible asset impairment charges of $277.0 million. Factors the Debtors consider important that could trigger a subsequent impairment review include significant underperformance relative to historical or projected future operating results, significant changes in the manner of the use of the Debtors' assets or the strategy for the Debtors' overall business and significant negative industry or economic trends. If current economic conditions worsen causing decreased revenues and/or increased costs, the Debtors may have further material goodwill impairments.

4.    **The Debtors are dependent on sales to a small number of the Debtors' major customers and on the Debtors' status as standard supplier on certain truck platforms of each of the Debtors' major customers.**

Sales, including aftermarket sales, to Navistar, PACCAR, Daimler Truck North America, and Volvo/Mack constituted approximately 17.7%, 16.2%, 13.8%, and 6.9%, respectively, of the Debtors' first 9 months of 2009 net sales. No other customer accounted for more than 5% of the Debtors' net sales for this period. The loss of any significant portion of sales to any of the Debtors' major customers would likely have a material adverse effect on the Debtors' business, results of operations, or financial condition.

The Debtors are a standard supplier of various components at a majority of the Debtors' major customers, which results in recurring revenue as the Debtors' standard components are installed on most trucks ordered from that platform, unless the end user specifically requests a different product, generally at an additional charge. The selection of one of the Debtors' products as a standard component may also create a steady demand for that product in the aftermarket. The Debtors may not maintain the Debtors' current standard supplier positions in the future, and may not become the standard supplier for additional truck platforms. The loss of a significant standard supplier position or a significant number of standard supplier positions with a major customer could have a material adverse effect on the Debtors' business, results of operations, or financial condition.

CH\1125862.14

The Debtors are continuing to engage in efforts intended to improve and expand the Debtors' relations with each of PACCAR, Daimler Truck North America, Navistar, and Volvo/Mack. Accordingly, on October 9, 2009, the Court approved the Debtors' motion to maintain and administer customer programs and honor their prepetition obligations arising under those customer programs [Docket No. 44]. The Debtors have supported the Debtors' position with these customers through direct and active contact with end users, trucking fleets, and dealers, and have located certain of the Debtors' marketing personnel in offices near these customers and most of the Debtors' other major customers. The Debtors may not be able to successfully maintain or improve the Debtors' customer relationships so that these customers will continue to do business with the Debtors' as they have in the past or be able to supply these customers or any of the Debtors' other customers at current levels. The loss of a significant portion of the Debtors' sales to Daimler Truck North America, PACCAR, Navistar, or Volvo/Mack could have a material adverse effect on the Debtors' business, results of operations or financial condition. In addition, the delay or cancellation of material orders from, or problems at, PACCAR, Daimler Truck North America, Navistar, or Volvo/Mack, or any of the Debtors' other major customers could have a material adverse effect on the Debtors' business, results of operations, or financial condition.

5.    **Increased cost or reduced supply of raw materials and purchased components may adversely affect the Debtors' business, results of operations or financial condition.**

The Debtors' business is subject to the risk of price increases and fluctuations and periodic delays in the delivery of raw materials and purchased components that are beyond the Debtors' control. The Debtors' operations require substantial amounts of raw steel, aluminum, steel scrap, pig iron, electricity, coke, natural gas, sheet and formed steel, bearings, purchased components, fasteners, foam, fabrics, silicon sand, binders, sand additives, coated sand, and tube steel. Fluctuations in the price or delivery of these materials may be driven by the supply/demand relationship for material, factors particular to that material or governmental regulation for raw materials such as electricity and natural gas. In addition, if any of the Debtors' suppliers seeks bankruptcy relief or otherwise cannot continue its business as anticipated or the Debtors cannot renew the Debtors' supply contracts on favorable terms, the availability or price of raw materials could be adversely affected. Fluctuations in prices and/or availability of the raw materials or purchased components used by the Debtors, which at times may be more pronounced during periods of higher truck builds, may affect the Debtors' profitability and, as a result, have a material adverse effect on the Debtors' business, results of operations, or financial condition. In addition, as described above, a shortening or elimination of the Debtors' trade credit by the Debtors' suppliers may affect the Debtors' liquidity and cash flow and, as a result, have a material adverse effect on the Debtors' business, results of operations, or financial condition.

The Debtors use substantial amounts of raw steel and aluminum in the Debtors' production processes. Although raw steel is generally available from a number of sources, the Debtors' have obtained favorable sourcing by negotiating and entering into high-volume contracts with third parties with terms ranging from one to two years. The Debtors' obtain raw steel and aluminum from various third-party suppliers. The Debtors may not be successful in renewing the Debtors supply contracts on favorable terms or at all. A substantial interruption in the supply of raw steel or aluminum or inability to obtain a supply of raw steel or aluminum on commercially desirable terms could have a material adverse effect on the Debtors' business, results of operations or financial condition. The Debtors are not always able, and may not be able in the future, to pass on increases in the price of raw steel or aluminum to o the Debtors' customers. In particular, when raw material prices increase rapidly or to significantly higher than normal levels, the Debtors may not be able to pass price increases through to the Debtors' customers on a timely basis, if at all, which could adversely affect the Debtors' operating margins and cash flow. Any fluctuations in the price or availability of raw steel or aluminum may have a material adverse effect on the Debtors' business, results of operations or financial condition.

Steel scrap and pig iron are also major raw materials used in the Debtors' business to produce the Debtors' wheel-end and industrial components. Steel scrap is derived from, among other sources, junked automobiles, industrial scrap, railroad cars, agricultural and heavy machinery, and demolition steel scrap from obsolete structures, containers and machines. Pig iron is a low-grade cast iron that is a product of smelting iron ore with coke and limestone in a blast furnace. The availability and price of steel scrap and pig iron are subject to market forces largely beyond the Debtors' control, including North American and international demand for steel scrap and pig iron, freight costs, speculation and foreign exchange rates. Steel scrap and pig iron availability and price may also be subject to governmental regulation. Accordingly, the Debtors at times offer their products on a fixed price basis based on forward purchase contracts, which enable the Debtors to control the risk of raw material price fluctuations.

Under a forward purchase contract, the counterparty agrees to supply the Debtors with a fixed quantity of a commodity per month, for a fixed price per month, and for a fixed number of months into the future. Certain major customers of the Debtors require that the Debtors enter into forward purchase contracts for steel so that the customers can enjoy a stable price for the Debtors' products. In the absence of forward purchase contracts, the Debtors are not always able, and may not be able in the future, to pass on increases in the price of steel scrap and pig iron to the Debtors' customers. In particular, when raw material prices increase rapidly or to significantly higher than normal levels, the Debtors may not be able to pass price increases through to the Debtors' customers on a timely basis, if at all, which could have a material adverse effect on the Debtors' operating margins and cash flow. Any fluctuations in the price or availability of steel scrap or pig iron may have a material adverse effect on the Debtors' business, results of operations or financial condition.

6. **The Debtors' business is affected by the seasonality and regulatory nature of the industries and markets that the Debtors serve.**

The Debtors' operations are typically seasonal as a result of regular customer maintenance and model changeover shutdowns, which typically occur in the third and fourth quarter of each calendar year. This seasonality may result in decreased net sales and profitability during the third and fourth fiscal quarters. In addition, federal and state regulations (including engine emissions regulations, tariffs, import regulations and other taxes) may have a material adverse effect on the Debtors' business and are beyond the Debtors' control. For example, The North American truck industry experienced a significant decline in 2007 due to more stringent emissions standards that became effective in 2007.

7. **Cost reduction and quality improvement initiatives by OEMs could have a material adverse effect on the Debtors' business, results of operations or financial condition.**

The Debtors are primarily a components supplier to the heavy- and medium-duty truck industries, which are characterized by a small number of OEMs that are able to exert considerable pressure on components suppliers to reduce costs, improve quality and provide additional design and engineering capabilities. Given the fragmented nature of the industry, OEMs continue to demand and receive price reductions and measurable increases in quality through their use of competitive selection processes, rating programs, and various other arrangements. The Debtors may be unable to generate sufficient production cost savings in the future to offset such price reductions. OEMs may also seek to save costs by relocating production to countries with lower cost structures, which could in turn lead them to purchase components from local suppliers with lower production costs. Additionally, OEMs have generally required component suppliers to provide more design engineering input at earlier stages of the product development process, the costs of which have, in some cases, been absorbed by the suppliers. Future price reductions, increased quality standards and additional engineering capabilities required by OEMs may reduce the Debtors' profitability and have a material adverse effect on the Debtors' business, results of operations, or financial condition.

8. **The Debtors operate in highly competitive markets.**

The markets in which the Debtors operate are highly competitive. The Debtors compete with a number of other manufacturers and distributors that produce and sell similar products. The Debtors' products primarily compete on the basis of price, manufacturing and distribution capability, product design, product quality, product delivery and product service. Some of the Debtors' competitors are companies, or divisions, units or subsidiaries of companies that are larger and have greater financial and other resources than the Debtors do. For these reasons, the Debtors' products may not be able to compete successfully with the products of the Debtors' competitors. In addition, the Debtors' competitors may foresee the course of market development more accurately than the Debtors do, develop products that are superior to the Debtors' products, have the ability to produce similar products at a lower cost than the Debtors can, or adapt more quickly than the Debtors do to new technologies or evolving regulatory, industry, or customer requirements. As a result, the Debtors' products may not be able to compete successfully with their products. In addition, OEMs may expand their internal production of components, shift sourcing to other suppliers, or take other actions that could reduce the market for the Debtors' products and have a negative impact on the Debtors' business. The Debtors may encounter increased competition in the future from existing competitors or new competitors. The Debtors expect these competitive pressures in the Debtors' markets to remain strong.

In addition, potential competition from foreign truck components suppliers, especially in the aftermarket, may lead to an increase in truck components imports into North America, adversely affecting the Debtors' market share and negatively affecting the Debtors' ability to compete. Foreign truck components suppliers may in the future increase their currently modest share of the markets for truck components in which the Debtors compete. Some of these foreign suppliers may be owned, controlled or subsidized by their governments, and their decisions with respect to production, sales and exports may be influenced more by political and economic policy considerations than by prevailing market conditions. In addition, foreign truck components suppliers may be subject to less restrictive regulatory and environmental regimes that could provide them with a cost advantage relative to North American suppliers. Therefore, there is a risk that some foreign suppliers may increase their sales of truck components in North American markets despite decreasing profit margins or losses. If future trade cases do not provide relief from such potential trade practices, U.S. protective trade laws are weakened or international demand for trucks and/or truck components decreases, an increase of truck component imports into the United States may occur, which could have a material adverse effect on the Debtors' business, results of operations, or financial condition.

9.  **The Debtors face exposure to foreign business and operational risks including foreign exchange rate fluctuations and if the Debtors were to experience a substantial fluctuation, the Debtors' profitability may change.**

In the normal course of doing business, the Debtors are exposed to risks associated with changes in foreign exchange rates, particularly with respect to the Canadian dollar. From time to time, the Debtors use forward foreign exchange contracts, and other derivative instruments, to help offset the impact of the variability in exchange rates on the Debtors' operations, cash flows, assets and liabilities. At October 31, 2009, the notional amount of open foreign exchange forward contracts was $4.0 million Canadian. Factors that could further impact the risks associated with changes in foreign exchange rates include the accuracy of the Debtors' sales estimates, volatility of currency markets and the cost and availability of derivative instruments. In addition, changes in the laws or governmental policies in the countries in which the Debtors operate could affect the Debtors' business in such countries and the Debtors' results of operations.

10. **The Debtors may not be able to continue to meet the Debtors' customers' demands for the Debtors' products and services.**

The Debtors must continue to meet the Debtors' customers' demand for the Debtors' products and services. However, the Debtors may not be successful in doing so. If the Debtors' customers' demand for the Debtors' products and/or services exceeds the Debtors' ability to meet that demand, the Debtors may be unable to continue to provide the Debtors' customers with the products and/or services they require to meet their business needs. Factors that could result in the Debtors' inability to meet customer demands include an unforeseen spike in demand for the Debtors' products and/or services, a failure by one or more of the Debtors' suppliers to supply us with the raw materials and other resources that the Debtors need to operate the Debtors' business effectively or poor management of the Debtors' company or one or more divisions or units of the Debtors' company, among other factors. The Debtors' ability to provide the Debtors' customers with products and services in a reliable and timely manner, in the quantity and quality desired and with a high level of customer service, may be severely diminished as a result. If this happens, the Debtors may lose some or all of the Debtors' customers to one or more of the Debtors' competitors, which would have a material adverse effect on the Debtors' business, results of operations, or financial condition.

In addition, it is important that the Debtors continue to meet the Debtors' customers' demands in the truck components industry for product innovation, improvement and enhancement, including the continued development of new-generation products, design improvements and innovations that improve the quality and efficiency of the Debtors' products. Developing product innovations for the truck components industry has been and will continue to be a significant part of the Debtors' strategy. However, such development will require us to continue to invest in research and development and sales and marketing. In the future, the Debtors may not have sufficient resources to make such necessary investments, or the Debtors may be unable to make the technological advances necessary to carry out product innovations sufficient to meet the Debtors' customers' demands. The Debtors are also subject to the risks generally associated with product development, including lack of market acceptance, delays in product development and failure of products to operate properly. The Debtors may, as a result of these factors, be unable to

meaningfully focus on product innovation as a strategy and may therefore be unable to meet the Debtors' customers' demand for product innovation.

**11.    Equipment failures, delays in deliveries or catastrophic loss at any of the Debtors' facilities could lead to production or service curtailments or shutdowns.**

The Debtors manufacture the Debtors' products at 19 facilities and provide logistical services at the Debtors' just-in-time sequencing facilities in the United States. An interruption in production or service capabilities at any of these facilities as a result of equipment failure or other reasons could result in the Debtors' inability to produce the Debtors' products, which would reduce the Debtors' net sales and earnings for the affected period. In the event of a stoppage in production at any of the Debtors' facilities, even if only temporary, or if the Debtors experience delays as a result of events that are beyond the Debtors' control, delivery times to the Debtors' customers could be severely affected. Any significant delay in deliveries to the Debtors' customers could lead to increased returns or cancellations and cause us to lose future sales. The Debtors' facilities are also subject to the risk of catastrophic loss due to unanticipated events such as fires, explosions, violent weather conditions, acts of war, terrorism, or criminal activities. The Debtors may experience plant shutdowns or periods of reduced production as a result of equipment failure, delays in deliveries or catastrophic loss, which could have a material adverse effect on the Debtors' business, results of operations or financial condition.

**12.    The Debtors may incur potential product liability, warranty and product recall costs.**

The Debtors are subject to the risk of exposure to product liability, warranty and product recall claims in the event any of the Debtors' products results in property damage, personal injury or death, or does not conform to specifications. The Debtors may not be able to continue to maintain suitable and adequate insurance in excess of the Debtors' self-insured amounts on acceptable terms that will provide adequate protection against potential liabilities. In addition, if any of the Debtors' products proves to be defective, the Debtors may be required to participate in a recall involving such products. A successful claim brought against the Debtors in excess of available insurance coverage, if any, or a requirement to participate in any product recall, could have a material adverse effect on the Debtors' business, results of operations or financial condition

**13.    Work stoppages or other labor issues at the Debtors' facilities or at the Debtors' customers' facilities could have a material adverse effect on the Debtors' operations.**

As of December 31, 2008, unions represented approximately 49% of the Debtors' workforce. As a result, the Debtors are subject to the risk of work stoppages and other labor relations matters. Any prolonged strike or other work stoppage at any one of the Debtors' principal unionized facilities could have a material adverse effect on the Debtors' business, results of operations or financial condition. The Debtors have collective bargaining agreements with different unions at various facilities. These collective bargaining agreements expire at various times over the next few years, with the exception of the Debtors' union contract at the Debtors' Monterrey, Mexico facility, which expires on an annual basis. The 2009 negotiations in Monterrey were successfully completed prior to the expiration of the Debtors' union contract. In 2010, the Debtors have labor contracts expiring at the Debtors' facilities in Rockford, Illinois and Elkhart, Indiana (two separate bargaining units). Based on the consolidation of the Cuyahoga Falls operations into the Debtors' Erie plant, the Debtors will be ceasing operations performed by the collective bargaining unit at the Cuyahoga Falls facility and do not anticipate negotiating for a new contract at that location. Any failure by the Debtors to reach a new agreement upon expiration of other union contracts may have a material adverse effect on the Debtors' business, results of operations, or financial condition.

In addition, if any of the Debtors' customers experience a material work stoppage, that customer may halt or limit the purchase of the Debtors' products. This could cause us to shut down production facilities relating to these products, which could have a material adverse effect on the Debtors' business, results of operations or financial condition.

**14.    The Debtors are subject to a number of environmental rules and regulations that may require us to make substantial expenditures.**

The Debtors' operations, facilities, and properties are subject to extensive and evolving laws and regulations pertaining to air emissions, wastewater discharges, the handling and disposal of solid and hazardous materials and wastes, the investigation and remediation of contamination, and otherwise relating to health, safety, and the protection of the environment and natural resources. As a result, the Debtors are involved from time to time in administrative or legal proceedings relating to environmental, health and safety matters, and have in the past incurred and will continue to incur capital costs and other expenditures relating to such matters. In addition to environmental laws that regulate the Debtors' subsidiaries' ongoing operations, the Debtors' subsidiaries are also subject to environmental remediation liability. Under the federal Comprehensive Environmental Response, Compensation, and Liability Act ("**CERCLA**"), and analogous state laws, the Debtors' subsidiaries may be liable as a result of the release or threatened release of hazardous materials into the environment. The Debtors' subsidiaries are currently involved in several matters relating to the investigation and/or remediation of locations where they have arranged for the disposal of foundry and other wastes. Such matters include situations in which the Debtors have been named or are believed to be Potentially Responsible Parties as defined under CERCLA or state or local laws in connection with the contamination of these sites. Additionally, environmental remediation may be required to address soil and groundwater contamination identified at certain facilities.

As of December 31, 2008, the Debtors had an environmental reserve of approximately $1.5 million, related primarily to the Debtors' foundry operations. This reserve is based on current cost estimates and does not reduce estimated expenditures to net present value, but does take into account the benefit of a contractual indemnity given to us by a prior owner of the Debtors' wheel-end subsidiary. The failure of the indemnitor to fulfill its obligations could result in future costs that may be material. Any cash expenditures required by us or the Debtors' subsidiaries to comply with applicable environmental laws and/or to pay for any remediation efforts will not be reduced or otherwise affected by the existence of the environmental reserve. The Debtors' environmental reserve may not be adequate to cover the Debtors' future costs related to the sites associated with the environmental reserve, and any additional costs may have a material adverse effect on the Debtors' business, results of operations or financial condition. The discovery of additional sites, the modification of existing or the promulgation of new laws or regulations, more vigorous enforcement by regulators, the imposition of joint and several liability under CERCLA or analogous state laws, or other unanticipated events could result in a material adverse effect.

The final Iron and Steel Foundry NESHAP was developed pursuant to Section 112(d) of the Clean Air Act and requires all major sources of hazardous air pollutants to install controls representative of maximum achievable control technology. The Debtors believe that the Debtors' foundry operations are in compliance with the applicable requirements of the Iron and Steel Foundry NESHAP. However, the imposition of liability under Iron Steel Foundry NESHAP could result in a material adverse effect.

15. **The Debtors might fail to adequately protect the Debtors' intellectual property, or third parties might assert that the Debtors' technologies infringe on their intellectual property.**

The protection of the Debtors' intellectual property is important to the Debtors' business. The Debtors rely on a combination of trademarks, copyrights, patents, and trade secrets to provide protection in this regard, but this protection might be inadequate. For example, the Debtors' pending or future trademark, copyright, and patent applications might not be approved or, if allowed, they might not be of sufficient strength or scope. Conversely, third parties might assert that the Debtors' technologies or other intellectual property infringe on their proprietary rights. Any intellectual property related litigation, which could result in substantial costs and diversion of the Debtors' efforts and, whether or not the Debtors are ultimately successful, the litigation could have a material adverse effect on the Debtors' business, results of operations or financial condition. Litigation against us could be costly and time consuming to defend.

The Debtors are regularly subject to legal proceedings and claims that arise in the ordinary course of business, such as workers' compensation claims, OSHA investigations, employment disputes, unfair labor practice charges, customer and supplier disputes, and product liability claims arising out of the conduct of the Debtors' business. Litigation may result in substantial costs and may divert management's attention and resources from the operation of the Debtors' business, which could have a material adverse effect on the Debtors' business, results of operations or financial condition.

CH\1125862.14

16. **If the Debtors fail to retain the Debtors' executive officers, the Debtors' business could be harmed.**

The Debtors' success largely depends on the efforts and abilities of the Debtors' executive officers. Their skills, experience and industry contacts significantly contribute to the success of the Debtors' business and the Debtors' results of operations. The loss of any one of them could have a material adverse effect on the Debtors' business, results of operations or financial condition. The Debtors' future success and profitability will also depend, in part, upon the Debtors' continuing ability to attract and retain highly qualified personnel throughout the Debtors' company.

In addition, William Lasky, the chairman and Chief Executive Officer of Accuride, is extremely valuable to the Debtors, not only for his day-to-day efforts, but also on account of his formidable experience in the industry. Because Mr. Lasky is an at-will employee, and does not currently have a severance plan or a non-compete agreement, the Debtors have decided in their business judgment to enter into a non-compete agreement with Mr. Lasky. If, however, the Bankruptcy Court, does not approve Mr. Lasky's non-compete agreement, Mr. Lasky would not be subject to any restrictions from competition with the Debtors and, should he choose to compete, could significantly harm the Debtors' business going forward.

17. **The Debtors' products may be rendered obsolete or less attractive by changes in regulatory, legislative or industry requirements.**

Changes in regulatory, legislative or industry requirements may render certain of the Debtors' products obsolete or less attractive. The Debtors' ability to anticipate changes in these requirements, especially changes in regulatory standards, will be a significant factor in the Debtors' ability to remain competitive. The Debtors may not be able to comply in the future with new regulatory, legislative and/or industrial standards that may be necessary for us to remain competitive or that certain of the Debtors' products will not, as a result, become obsolete or less attractive to the Debtors' customers.

18. **The Restructured Credit Facility and the New Indenture may subject Reorganized Accuride to a number of restrictive covenants, which may restrict its business and financing activities.**

The Restructured Credit Facility, the New Indenture and the terms of any future indebtedness may impose, operating and other restrictions on Reorganized Accuride. Such restrictions will affect, and in many respects limit or prohibit, among other things, Reorganized Accuride's ability to:

- incur additional debt;
- pay dividends and make distributions;
- issue stock of subsidiaries;
- make certain investments;
- repurchase stock;
- create liens;
- enter into affiliate transactions;
- enter into sale-leaseback transactions;
- merge or consolidate; and
- transfer and sell assets.

In addition, the Restructured Credit Facility may also require Reorganized Accuride on a consolidated basis to maintain compliance with specified certain minimum liquidity and EBITDA ratios. Reorganized Accuride's ability to comply with these ratios may be affected by events beyond its control.

If commercial vehicle production declines below industry forecasts or Reorganized Accuride is unable to achieve the projected results from its operations for whatever reason, Reorganized Accuride may be unable to comply with the restrictions contained in the Restructured Credit Facility and the New Indenture, and the lenders could:

- declare all borrowings outstanding, together with accrued and unpaid interest, to be immediately due and payable; or
- require Reorganized Accuride to apply all of its available cash to repay the borrowings.

If Reorganized Accuride were unable to repay or otherwise refinance these borrowings when due, the lenders under the Restructured Credit Facility could sell the collateral securing the Restructured Credit Facility, which constitutes substantially all of the Reorganized Debtors' assets.

19. **Reorganized Accuride's leverage and debt service obligations could have a material adverse effect on its financial condition or its ability to fulfill its obligations and make it more difficult for Reorganized Accuride to fund its operations.**

As of the Effective Date, Reorganized Accuride's total indebtedness will be approximately $450 million, after giving effect to the transactions contemplated in the Plan. Reorganized Accuride's substantial level of indebtedness could have important negative consequences to Reorganized Accuride, including that:

- Reorganized Accuride may have difficulty satisfying its obligations with respect to its indebtedness;
- Reorganized Accuride may have difficulty obtaining financing in the future for working capital, capital expenditures, acquisitions or other purposes;
- Reorganized Accuride will need to use a substantial portion of its available cash flow to pay interest and principal on its debt, which will reduce the amount of money available to finance its operations and other business activities;
- Reorganized Accuride's debt level increases its vulnerability to general economic downturns and adverse industry conditions;
- Reorganized Accuride's debt level could limit its flexibility in planning for, or reacting to, changes in their business and in its industry in general;
- Reorganized Accuride's leverage could place it at a competitive disadvantage compared to its competitors that have less debt;
- Reorganized Accuride's failure to comply with the financial and other restrictive covenants in its debt instruments which, among other things, require Reorganized Accuride to maintain certain minimum liquidity and EBITDA ratios and limit its ability to incur debt and sell assets, could result in an event of default that, if not cured or waived, could have a material adverse effect on its business or prospects; and
- Reorganized Accuride's debt level and debt service obligations could limit its flexibility in planning for, or reacting to, changes in its business and industry.

In addition, certain of Reorganized Accuride's borrowings will be at variable rates of interest, which expose Reorganized Accuride to the risk of increasing interest rates. If interest rates increase, Reorganized Accuride's debt service obligations on their variable rate indebtedness would increase even though the amount borrowed remains the same.

20. **Despite Reorganized Accuride's leverage, the Reorganized Debtors will be able to incur more indebtedness. This could further exacerbate the risk immediately described above, including Reorganized Accuride's ability to service its indebtedness.**

The Reorganized Debtors may be able to incur additional indebtedness in the future. Although the Restructured Credit Facility and the New Indenture will contain restrictions on the incurrence of additional indebtedness, such restrictions are subject to a number of qualifications and exceptions, and under certain circumstances indebtedness incurred in compliance with such restrictions could be substantial. For example, Reorganized Accuride may incur additional debt to, among other things, finance future acquisitions, expand through internal growth, fund working capital needs, comply with regulatory requirements, respond to competition or for general financial reasons alone. To the extent new debt is added to the Reorganized Debtors' debt levels, the risks described above would increase.

69

### 21. Tax implications of the Plan.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors currently do not intend to seek any ruling from the IRS on the tax consequences of the Plan. Even if the Debtors decide to request a ruling, there would be no assurance that the IRS would rule favorably or that any ruling would be issued before the Effective Date. In addition, in such case, there would still be issues with significant uncertainties, which would not be the subject of any ruling request. Thus, there can be no assurance that the IRS will not challenge the various positions the Debtors have taken, or intends to take, with respect to the tax treatment in the Plan, or that a court would not sustain such a challenge.

## D. RISKS ASSOCIATED WITH FORWARD LOOKING STATEMENTS

### 1. The financial information contained herein is based on the Debtors' books and records and, unless otherwise stated, no audit was performed.

**The financial information contained in this Disclosure Statement has not been audited.** In preparing this Disclosure Statement, the Debtors relied on financial data derived from its books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

### 2. Financial Projections and other forward looking statements are not assured, are subject to inherent uncertainty due to the numerous assumptions upon which they are based and, as a result, actual results may vary.

This Disclosure Statement contains various projections concerning the financial results of the Reorganized Debtor's operations, including the Financial Projections, that are, by their nature, forward looking, and which projections are necessarily based on certain assumptions and estimates. Should any or all of these assumptions or estimates ultimately prove to be incorrect, the actual future experiences of the Reorganized Debtors may turn out to be different from the financial projections.

Specifically, the projected financial results contained in this Disclosure Statement reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtors, some of which may not materialize, including, without limitation, assumptions concerning: (a) the timing of confirmation and Consummation of the Plan in accordance with its terms; (b) the anticipated future performance of the Reorganized Debtors, including, without limitation, the Debtors' ability to maintain or increase revenue and gross margins, control future operating expenses or make necessary capital expenditures; (c) general business and economic conditions; (d) overall industry performance and trends; (e) the Debtors' ability to maintain market strength and receive vendor support by way of favorable purchasing terms; and (f) consumer preferences continuing to support the Debtors' business plan.

DUE TO THE INHERENT UNCERTAINTIES ASSOCIATED WITH PROJECTING FINANCIAL RESULTS GENERALLY, THE PROJECTIONS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSIDERED ASSURANCES OR GUARANTEES OF THE AMOUNT OF FUNDS OR THE AMOUNT OF CLAIMS THAT MAY BE ALLOWED IN THE VARIOUS CLASSES. WHILE THE DEBTORS BELIEVE THAT THE FINANCIAL PROJECTIONS CONTAINED IN THIS DISCLOSURE STATEMENT ARE REASONABLE, THERE CAN BE NO ASSURANCE THAT THEY WILL BE REALIZED.

## E. DISCLOSURE STATEMENT DISCLAIMER

### 1. The information contained herein is for soliciting votes only.

The information contained in this Disclosure Statement is for purposes of soliciting votes on the Plan and may not be relied upon for any other purposes.

70

2. **This Disclosure Statement was not approved by the Securities and Exchange Commission.**

This Disclosure Statement has not been filed with the Commission or any state regulatory authority. Neither the Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

3. **The Debtors relied on certain exemptions from Registration Under the Securities Act.**

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Rule 3016(b) of the Federal Rules of Bankruptcy Procedure and is not necessarily in accordance with the requirements of federal or state securities laws or other similar laws. The offer of New Common Stock to Holders of Claims in Class 7 and Equity Interests in Class 10 have not been registered under the Securities Act or similar state securities or "blue sky" laws. To the maximum extent permitted by section 1145 of the Bankruptcy Code, the Securities Act and other applicable nonbankruptcy law, the issuance of the New Common Stock, the New Warrants, the New Notes or any shares of New Common Stock reserved for issuance under the Equity Incentive Program, will be exempt from registration under the Securities Act by virtue of section 1145 of the Bankruptcy Code, section 4(2) of the Securities Act or Rule 701 promulgated under the Securities Act.

4. **This Disclosure Statement contains forward looking statements.**

This Disclosure Statement contains "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The liquidation analysis, distribution projections and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims and Equity Interests may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

5. **No legal or tax advice is provided to you by this Disclosure Statement.**

**This Disclosure Statement is not legal advice to you.** The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each Holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Equity Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

6. **No admissions are made by this Disclosure Statement.**

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtor) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims or Equity Interests or any other parties in interest.

7. **No reliance should be placed on any failure to identify litigation Claims or projected objections.**

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure Statement. The Debtors or the Reorganized Debtors may seek to investigate, File and prosecute Claims and Equity Interests and may object to Claims after the confirmation Date or Effective Date of the Plan irrespective of whether the Disclosure Statement identifies such Claims or Equity Interests or objections to Claims or Equity Interests.

8.   **Nothing herein constitutes a waiver of any right to object to Claims or Equity Interests or recover transfers and assets.**

The vote by a Holder of an Allowed Claim or Equity Interest for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors or the Reorganized Debtors (or any party in interest, as the case may be) to object to that Holder's Allowed Claim or Equity Interest regardless of whether any Claims or Causes of Action of the Debtors or their Estate are specifically or generally identified herein.

9.   **The information used herein was provided by the Debtors and was relied upon by the Debtors' advisors.**

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

10.   **The potential exists for inaccuracies, and the Debtors have no duty to update.**

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtors have used its reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

11.   **No representations made outside the Disclosure Statement are authorized.**

No representations concerning or relating to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtors, the counsel to the Committee and the United States Trustee.

CH\1125862.14

# VII.
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### A.    LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE

If no chapter 11 plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which case, a trustee would be elected or appointed to liquidate the Debtors' assets. A discussion of the effect that a chapter 7 liquidation would have on the recovery of Holders of Claims and Equity Interests is set forth in Section V.C herein, titled "Statutory Requirements for Confirmation of the Plan." In performing the liquidation analysis, the Debtors have assumed that all Holders of Claims and Equity Interests will be determined to have "claims" that are entitled to share in the proceeds from any such liquidation. The Debtors believe that liquidation under chapter 7 would result in (i) smaller or equal distributions being made to creditors and equity interests holders than those provided for in the Plan because of the additional administrative expenses involved in the appointment of a trustee and attorneys and other professionals to assist such trustee, (ii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of unexpired leases and executory contracts in connection with the cessation of the Debtors' operations, and (iii) the failure to realize the greater, going-concern value of all of the Debtors' assets.

### B.    FILING OF AN ALTERNATIVE PLAN OF REORGANIZATION

If the Plan is not confirmed, the Debtors or any other party in interest could attempt to formulate a different plan of reorganization. Such a plan might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of the Debtors' assets. During the negotiations prior to the filing of the Plan, the Debtors explored various alternatives to the Plan.

The Debtors believe that the Plan enables the Debtors to emerge from chapter 11 successfully and expeditiously, preserves its business and allows creditors to realize the highest recoveries under the circumstances. In a liquidation under chapter 11 of the Bankruptcy Code, the assets of the Debtors would be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, and a trustee need not be appointed. Accordingly, creditors would receive greater recoveries than in a chapter 7 liquidation. Although a chapter 11 liquidation is preferable to a chapter 7 liquidation, the Debtors believe that a liquidation under chapter 11 is a much less attractive alternative to creditors and interest holders than the Plan because the Plan provides for a greater return to creditors and interest holders.

Moreover, the prolonged continuation of the Chapter 11 Cases is likely to adversely affect the Debtors' business and operations. So long as the Chapter 11 Cases continues, senior management of the Debtors will be required to spend a significant amount of time and effort dealing with the Debtors' reorganization instead of focusing exclusively on business operations. Prolonged continuation of the Chapter 11 Cases will also make it more difficult to attract and retain management and other key personnel necessary to the success and growth of the Debtors' business. In addition, the longer the Chapter 11 Cases continue, the more likely it is that the Debtors' customers, suppliers, distributors, and agents will lose confidence in the Debtors' ability to reorganize their business successfully and will seek to establish alternative commercial relationships. Furthermore, so long as the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the proceedings. The prolonged continuation of the Chapter 11 Cases may also require the Debtors to seek additional financing, either under the DIP Facility or otherwise, in order to service its debt and other obligations. It may not be possible for the Debtors to obtain additional financing during the pendency of the Chapter 11 Cases on commercially favorable terms or at all. If the Debtors were to require additional financing during the Chapter 11 Cases and were unable to obtain the financing on favorable terms or at all, it is unlikely the Debtors could successfully reorganize.

CH\1125862.14

# VIII.
## EXEMPTIONS FROM SECURITIES ACT REGISTRATION

### SECTION 1145 OF THE BANKRUPTCY CODE AND SECTION 4(2) OF THE SECURITIES ACT

1.       **Securities Issued in Reliance on Section 1145 of the Bankruptcy Code**

Under the Plan, the New Common Stock will be issued to Holders of Subordinated Notes Claims and Holders of Accuride Other Equity Interests (other than any equity to be issued pursuant to the Equity Incentive Program) and the New Warrants will be issued to Holders of Accuride Other Equity Interests in reliance upon section 1145 of the Bankruptcy Code. The New Common Stock issuable upon the exercise of the New Warrants will also be securities exempted from registration under the Securities Act in reliance upon section 1145 of the Bankruptcy Code. The New Common Stock and the New Warrants described in the proceeding sentences are collectively referred to herein as the "**1145 Securities**". Section 1145 of the Bankruptcy Code provides that the securities registration requirements of federal and state securities laws do not apply to the offer or sale of stock, warrants or other securities by a debtor if: (a) the offer or sale occurs under a plan of reorganization; (b) the recipients of securities hold a claim against, an interest in or claim for administrative expense against the debtor; and (c) the securities are issued in exchange for a claim against or interest in a debtor or are reissued principally in such exchange and partly for Cash and property.

Such securities may be resold without registration under either (a) state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the several states or (b) the Securities Act pursuant to an exemption provided by section 4(1) of the Securities Act unless the holder is an "underwriter" (as such term is defined in the Bankruptcy Code) with respect to the securities. Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who:

- purchases a claim against, an interest in, or a claim for an administrative expense against the debtor, if that purchase is with a view to distributing any security received in exchange for such a claim or interest;

- offers to sell securities offered under a plan of reorganization for the holders of those securities;

- offers to buy those securities from the holders of the securities, if the offer to buy is (a) with a view to distributing those securities and (b) under an agreement made in connection with the plan of reorganization, the completion of the plan of reorganization or with the offer or sale of securities under the plan of reorganization; or

- is an issuer with respect to the securities, as the term "issuer" is defined in the Securities Act.

The term "issuer" is defined in section 2(4) of the Securities Act; however, the reference contained in section 1145(b)(1)(D) of the Bankruptcy Code to section 2(11) of the Securities Act purports to include as statutory underwriters all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by or are under common control with, an issuer of securities. "Control" (as defined in Rule 405 under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "control person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of the securities of a reorganized debtor may be presumed to be a "control person."

74

2. **The New Common Stock to be Issued to the Backstop Investors, the New Notes and the Underlying New Common Stock Issued Upon Conversion of the New Notes in Reliance on Section 4(2) of the Securities Act**

The Debtors believe that the New Common Stock to issued to the Backstop Investors, the Rights Offering Notes to be issued to Holders of Subordinated Notes Claims and the Backstop Investors, if any, and the New Common Stock issuable upon conversion of such Rights Offering Notes (collectively, the "**Rights Offering Securities**"), as provided under the Plan, will be exempt from the registration requirements of the Securities Act, pursuant to section 4(2) of the Securities Act, as transactions by an issuer not involving any public offering, and equivalent exemptions in state securities laws.

3. **Resales of New Common Stock, New Warrants and New Notes**

Resales of the Rights Offering Securities and, to the extent that persons who receive 1145 Securities are deemed to be "underwriters" (collectively, the "**Restricted Holders**"), resales by Restricted Holders of such 1145 Securities, would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Restricted Holders and holders of the Rights Offering Securities would, however, be permitted to sell New Common Stock, New Warrants, New Notes or other securities without registration if they are able to comply with the provisions of Rule 144 under the Securities Act, as described further below, or if such securities are registered with the Commission pursuant to the Registration Agreement or otherwise. With respect to the 1145 Securities, any person who is an "underwriter" but not an "issuer" with respect to an issue of securities is, in addition, entitled to engage in exempt "ordinary trading transactions" within the meaning of section 1145(b)(1) of the Bankruptcy Code.

4. **Rule 144**

Under certain circumstances, Restricted Holders and holders of the Rights Offering Securities may be entitled to resell their securities pursuant to the limited safe harbor resale provisions under Rule 144 of the Securities Act, to the extent available and in compliance with applicable state and foreign securities laws.

Generally, Rule 144 of the Securities Act provides that persons who are affiliates of an issuer who resell securities will not be deemed to be underwriters if certain conditions are met. These conditions include the requirement that current public information with respect to the issuer be available, a limitation as to the amount of securities that may be sold in any three-month period, the requirement that the securities be sold in a "brokers transaction" or in a transaction directly with a "market maker" and that notice of the resale be filed with the Commission.

Pursuant to the Plan, certificates evidencing 1145 Securities received by Restricted Holders and Rights Offering Securities will bear a legend substantially in the form below:

"THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "<u>ACT</u>"), OR APPLICABLE STATE SECURITIES LAWS ("<u>STATE ACTS</u>") AND MAY NOT BE SOLD, ASSIGNED, PLEDGED OR TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR STATE ACTS COVERING SUCH SECURITIES OR THE SECURITIES ARE SOLD AND TRANSFERRED IN A TRANSACTION THAT IS EXEMPT FROM OR NOT SUBJECT TO THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF SUCH ACT."

**WHETHER OR NOT ANY PARTICULAR PERSON WOULD BE DEEMED TO BE AN "UNDERWRITER" OF SECURITIES TO BE ISSUED PURSUANT TO THE PLAN OR AN "AFFILIATE" OF THE REORGANIZED DEBTOR WOULD DEPEND UPON VARIOUS FACTS AND CIRCUMSTANCES APPLICABLE TO THAT PERSON. ACCORDINGLY, THE DEBTOR EXPRESSES NO VIEW AS TO WHETHER ANY SUCH PERSON WOULD BE SUCH AN "UNDERWRITER" OR AN "AFFILIATE." IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE REORGANIZED DEBTORS, THE DEBTOR MAKES NO REPRESENTATIONS CONCERNING THE**

RIGHT OF ANY PERSON TO TRADE IN SECURITIES OF THE REORGANIZED DEBTORS. ACCORDINGLY, THE DEBTOR RECOMMENDS THAT POTENTIAL RECIPIENTS OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.

# CERTAIN U.S. FEDERAL INCOME
## TAX CONSEQUENCES OF THE PLAN

## A.    INTRODUCTION

The following discussion summarizes certain federal income tax consequences expected to result from the consummation of the Plan. This discussion is only for general information purposes and only describes the expected tax consequences to Holders entitled to vote on the Plan. It is not a complete analysis of all potential federal income tax consequences and does not address any tax consequences arising under any state, local or foreign tax laws or federal estate or gift tax laws. This discussion is based on the Internal Revenue Code of 1986, as amended (the "**IRC**" or "**Tax Code**"), Treasury Regulations promulgated thereunder, judicial decisions, and published rulings and administrative pronouncements of the Internal Revenue Service (the "**IRS**"), all as in effect on the date of this Disclosure Statement. These authorities may change, possibly retroactively, resulting in federal income tax consequences different from those discussed below. No ruling has been or will be sought from the IRS, and no legal opinion of counsel will be rendered, with respect to the matters discussed below. There can be no assurance that the IRS will not take a contrary position regarding the federal income tax consequences resulting from the consummation of the Plan or that any contrary position would not be sustained by a court.

For purposes of this discussion, the terms "**Old Term Obligations**" and "**Old Subordinated Notes**" are used to refer to the Prepetition First Out Credit Agreement Claims and Subordinated Notes Claims, respectively, the term "**Restructured Credit Facility Notes**" is used to refer to the notes issued in connection with the Restructured Credit Facility and the term "**Old Common Stock**" is used to refer to Accuride's common stock. This discussion assumes that Holders of the Old Term Obligations, Old Subordinated Notes (collectively, the "**Old Notes**") and the Accuride Other Equity Interests have held such property as "capital assets" within the meaning of IRC Section 1221 (generally, property held for investment) and will hold the Restructured Credit Facility Notes, Rights Offering Notes (collectively, the "**New Notes**"), New Common Stock and New Warrants (collectively, "**New Equity Interests**") as capital assets. In addition, this discussion assumes that the Debtors' obligations under the Old Notes and New Notes will be treated as debt for federal income tax purposes.

This discussion does not address all federal income tax considerations that may be relevant to a particular Holder in light of that Holder's particular circumstances or to Holders subject to special rules under the federal income tax laws, such as financial institutions, insurance companies, brokers, dealers or traders in securities, commodities or currencies, tax-exempt organizations, tax-qualified retirement plans, partnerships and other pass-through entities, foreign corporations, foreign trusts, foreign estates, Holders who are not citizens or residents of the United States, Holders subject to the alternative minimum tax, Holders holding the Old Notes, New Notes, Accuride Other Equity Interests or New Equity Interests as part of a hedge, straddle or other risk reduction strategy or as part of a conversion transaction or other integrated investment, Holders who have a functional currency other than the U.S. dollar and Holders that acquired the Old Notes or Accuride Other Equity Interests in connection with the performance of services.

HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO THEM OF THE CONSUMMATION OF THE PLAN AND THE OWNERSHIP AND DISPOSITION OF THE NEW NOTES AND NEW EQUITY INTERESTS RECEIVED PURSUANT TO THE PLAN, AS WELL AS ANY TAX CONSEQUENCES ARISING UNDER ANY STATE, LOCAL OR FOREIGN TAX LAWS, OR ANY OTHER FEDERAL TAX LAWS.

**TO COMPLY WITH INTERNAL REVENUE SERVICE CIRCULAR 230, TAXPAYERS ARE HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A TAXPAYER UNDER THE INTERNAL REVENUE CODE, (B) ANY SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED**

## B.     FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS

### 1.     Cancellation of Indebtedness and Reduction of Tax Attributes

The Debtors generally should recognize cancellation of indebtedness ("**COD**") income to the extent the sum of (a) the fair market value of any property (including New Common Stock) and (b) the issue prices of the Restructured Credit Facility Notes received by Holders is less than the sum of (x) the adjusted issue prices of the Old Notes, (y) the adjusted issue price of any other debt exchanged for property pursuant to the Plan and (z) the amount of any unpaid accrued interest on the Old Notes and such other debt (except to the extent the Debtors' payment of such interest would give rise to a tax deduction).

The Debtors currently estimate that the amount of COD income recognized upon consummation of the Plan could range from approximately $75 million to approximately $175 million; however, the ultimate amount of COD income recognized by the Debtors is uncertain because, among other things, it will depend on the fair market value of the New Common Stock and the issue price of the Restructured Credit Facility Notes on the Effective Date. Under IRC Section 108, COD income recognized by a debtor will be excluded from gross income if the discharge of debt occurs in a case brought under the Bankruptcy Code, the debtor is under the court's jurisdiction in such case and the discharge is granted by the court or is pursuant to a plan approved by the court (the "**Bankruptcy Exception**"). Because the Bankruptcy Exception will apply to the transactions consummated pursuant to the Plan, the Debtors will be entitled to exclude from gross income any COD income recognized as a result of the implementation of the Plan.

Under IRC Section 108(b), a debtor that excludes COD income from gross income under the Bankruptcy Exception generally must reduce certain tax attributes by the amount of the excluded COD income. Attributes subject to reduction include net operating losses ("**NOLs**"), NOL carryforwards and certain other losses, credits and carryforwards, and the debtor's tax basis in its assets (including stock of subsidiaries). A debtor's tax basis in its assets generally may not be reduced below the amount of liabilities remaining immediately after the discharge of indebtedness. If the debtor is a member of a consolidated group and is required to reduce its basis in the stock of another group member, a "look-through rule" requires a corresponding reduction in the tax attributes of the lower-tier member. If the amount of a debtor's excluded COD income exceeds the amount of attribute reduction resulting from the application of the foregoing rules, certain other tax attributes of the consolidated group may also be subject to reduction. NOLs for the taxable year of the discharge and NOL carryovers to such year generally are the first attributes subject to reduction. However, a debtor may elect under IRC Section 108(b)(5) (the "**Section 108(b)(5) Election**") to reduce its basis in its depreciable property first. If the debtor is a member a consolidated group, the debtor may treat stock in another group member as depreciable property for purposes of the Section 108(b)(5) Election, provided the lower-tier member consents to a corresponding reduction in its basis in its depreciable property. If a debtor makes a Section 108(b)(5) Election, the limitation on reducing the debtor's basis in its assets below the amount of its remaining liabilities does not apply. The Debtors have not yet determined whether they will make the Section 108(b)(5) Election.

For tax periods through the 2008 tax year, the Debtors have reported on their federal income tax returns approximately $75 million of consolidated NOLs and NOL carryforwards. Approximately $26 million of these NOLs are subject to pre-existing usage limitations under IRC Section 382. The Debtors believe that for federal income tax purposes, the Debtors' consolidated group likely will generate approximately $120 million of additional NOLs in the 2009 tax year. However, the amount of the Debtors' 2009 NOLs will not be determined until the Debtors prepare their consolidated federal income tax returns for the 2009 tax year. Moreover, the Debtors' NOLs are subject to audit and possible challenge by the IRS. Accordingly, the amount of the Debtors' NOLs ultimately may vary from the amounts set forth above.

The Debtors currently anticipate that the application of IRC Section 108(b) (assuming no Section 108(b)(5) Election is made) is likely to result in a reduction of consolidated NOLs and basis in certain assets (including stock) of the Debtors. However, the ultimate effect of the attribute reduction rules is uncertain because, among other things, it will depend on the amount of COD income realized by the Debtors.

78

Under recently enacted Section 108(i) of the Tax Code, the Debtors may generally elect to defer COD income rather than exclude it under the Bankruptcy Exception. Deferred COD income under this rule would be included in the Debtors' income ratably over the five taxable-year period starting in 2014. This election is irrevocable. To the extent COD income is designated to be deferred under this rule, the Debtors would not be required to reduce any of their tax attributes but would have COD income includible in gross income in future years. The Debtors do not expect to make this election.

2.    **Section 382 Limitation on Net Operating Losses**

Under IRC Section 382, if a corporation or a consolidated group of corporations with NOLs (a "**loss corporation**") undergoes an "ownership change," the loss corporation's use of its pre-change NOLs (and certain other tax attributes) generally will be subject to an annual limitation in the post-change period. In general, an "ownership change" occurs if the percentage of the value of the loss corporation's stock owned by one or more direct or indirect "five percent shareholders" increases by more than fifty percentage points over the lowest percentage of value owned by the five percent shareholders at any time during the applicable testing period (an "**Ownership Change**"). The testing period generally is the shorter of (i) the three-year period preceding the testing date or (ii) the period of time since the most recent Ownership Change of the corporation.

Subject to the special bankruptcy rules discussed below, the amount of the annual limitation on a loss corporation's use of its pre-change NOLs (and certain other tax attributes) is generally equal to the product of the applicable long-term tax-exempt rate (as published by the IRS for the month in which the Ownership Change occurs) and the value of the loss corporation's outstanding stock immediately before the Ownership Change (excluding certain capital contributions). If a loss corporation has a net unrealized built-in gain ("**NUBIG**") immediately prior to the Ownership Change, the annual limitation may be increased as certain gains are recognized during the subsequent five-year period. If a loss corporation has a net unrealized built-in loss ("**NUBIL**") immediately prior to the Ownership Change, certain losses recognized during the subsequent five-year period also would be subject to the annual limitation and thus would reduce the amount of pre-change NOLs that could used by the loss corporation during the five-year period.

A NUBIG or NUBIL is generally the difference between the fair market value of a loss corporation's assets and its tax basis in the assets, subject to a statutorily-defined threshold amount. The amount of a loss corporation's NUBIG or NUBIL must be adjusted for built-in items of income or deduction that would be attributable to a pre-change period if recognized during the five-year period beginning on the Ownership Change date (the "**Recognition Period**"). The NUBIG or NUBIL of a consolidated group generally is calculated on a consolidated basis, subject to special rules. For example, certain corporations that joined the consolidated group within the preceding five years may not be able to be taken into account in determining whether the group has a NUBIL, but would be taken into account in determining whether the group has a NUBIG.

If a loss corporation has a NUBIG immediately prior to an Ownership Change, any recognized built-in-gains ("**RBIGs**") will increase the annual limitation in the taxable year the RBIG is recognized. An RBIG generally is any gain (and certain income) with respect to an asset held at the time of the Ownership Change that is recognized in any taxable year any portion of which is within the Recognition Period. The amount of an RBIG is limited to the lesser of (i) the excess of the fair market value of the asset over its tax basis immediately prior to the Ownership Change or (ii) the NUBIG less the amount of RBIGs from prior years ending during the Recognition Period. On the other hand, if a loss corporation has a NUBIL immediately prior to an Ownership Change, any recognized built-in-losses ("**RBILs**") will be subject to the annual limitation in the same manner as pre-change NOLs. An RBIL generally is any loss (and certain deductions) with respect to an asset held at the time of the Ownership Change that is recognized in any taxable year any portion of which is within the Recognition Period. The amount of an RBIL is limited to the lesser of (i) the excess of the tax basis of the asset over its fair market value immediately prior to the Ownership Change or (ii) the NUBIL less the amount of RBILs from prior years ending during the Recognition Period.

The Debtors believe they experienced an Ownership Change on December 10, 2007 and, as a result, the Debtors' use of their consolidated NOLs and AMT NOLs (and possibly other tax attributes) attributable to the period prior to such date are subject to an annual limitation. Another Ownership Change prior to the Effective Date similarly would result in an annual limitation on the Debtor's use of their consolidated NOLs and AMT NOLs (and

possibly other tax attributes) attributable to the period prior to such date, including their NOLs (and possibly other tax attributes) attributable to period prior to the December 10, 2007 Ownership Change. When NOLs and other tax attributes are subject to more than one IRC Section 382 annual limitation, the lowest annual limitation applies. It is likely that any Ownership Change occurring prior to the Effective Date will result in all or substantially all of the Debtors' existing NOLs (and possibly other tax attributes) being unusable in periods after such Ownership Change. The Debtors expect the consummation of the Plan on the Effective Date also will result in an Ownership Change of the Debtors' consolidated group. Because the Ownership Change will occur in a case brought under the Bankruptcy Code, one of the following two special rules will apply in determining the Debtors' ability to utilize NOLs (and possibly other tax attributes) attributable to tax periods preceding the Effective Date in post-Effective Date tax periods.

Under IRC Section 382(*l*)(5), an Ownership Change in bankruptcy will not result in any annual limitation on the debtor's pre-change NOLs if the stockholders or qualified creditors of the debtor receive at least 50% of the stock (by vote and value) of the reorganized debtor in the bankruptcy reorganization as a result of being shareholders or creditors of the debtor. Instead, the debtor's pre-change NOLs are reduced by the amount of any interest deductions with respect to debt converted into stock in the bankruptcy reorganization that were allowed in the three taxable years preceding the taxable year in which the Ownership Change occurs and in the part of the taxable year prior to and including the effective date of the bankruptcy reorganization. However, if any pre-change NOLs (and certain other tax attributes) of the debtor already are subject to an annual usage limitation under IRC Section 382 at the time of an Ownership Change subject to IRC Section 382(*l*)(5), those NOLs (and certain other tax attributes) will continue to be subject to such limitation.

A qualified creditor is any creditor who has held the debt of the debtor for at least eighteen months prior to the petition date or who has held "ordinary course indebtedness" at all times since it has been outstanding. A creditor who does not become a direct or indirect five percent shareholder of the reorganized debtor generally may be treated by the debtor as having always held any debt owned immediately before the Ownership Change, unless the creditor's participation in formulating the plan of reorganization makes evident to the debtor that the creditor has not owned the debt for the requisite period.

A debtor may elect not to apply IRC Section 382(*l*)(5) to an Ownership Change that otherwise satisfies its requirements. This election must be made on the debtor's federal income tax return for the taxable year in which the Ownership Change occurs. If IRC Section 382(*l*)(5) applies to an Ownership Change (and the debtor does not elect out), any subsequent Ownership Change of the debtor within a two-year period will result in the debtor being unable to use any pre-change losses in any tax year ending after such subsequent Ownership Change to offset future taxable income. In this regard, sales or conversions of the Rights Offering Notes or exercise of the Warrants may increase the likelihood of an Ownership Change after the Effective Date.

If an Ownership Change pursuant to a bankruptcy plan does not satisfy the requirements of IRC Section 382(*l*)(5), or if a debtor elects not to apply IRC Section 382(*l*)(5), the debtor's use of its pre-change NOLs (and certain other tax attributes) will be subject to an annual limitation as determined under IRC Section 382(*l*)(6). In such case, the amount of the annual limitation generally will be equal to the product of the applicable long-term tax-exempt rate (4.33% for November 2009) and the value of the debtor's outstanding stock immediately *after* the bankruptcy reorganization, provided such value may not exceed the value of the debtor's gross assets immediately before the Ownership Change, subject to certain adjustments. As described above, depending on whether the debtor has a NUBIG or NUBIL immediately prior to the Ownership Change, the annual limitation would be increased by any RBIGs, or would also apply to any RBILs, during the Recognition Period. However, if any pre-change NOLs (and certain other tax attributes) of the debtor already are subject to an annual limitation at the time of an Ownership Change subject to IRC Section 382(*l*)(6), those NOLs (and certain other tax attributes) will be subject to the lower of the two annual limitations.

The Debtors are unable to determine at this time whether the Ownership Change expected to result from the consummation of the Plan may satisfy the requirements of IRC Section 382(*l*)(5), as such determination will depend on the extent to which Holders of the Old Subordinated Notes immediately prior to consummation of the Plan may be treated as qualified creditors for purposes of IRC Section 382(*l*)(5). If IRC Section 382(*l*)(6) applies, the Debtors' pre-change NOLs and certain other tax attributes remaining after reduction for excluded COD income will be subject to an annual limitation generally equal to the product of the long-term tax-exempt rate for the month

of the Effective Date and the value of the Debtors' outstanding stock immediately after consummation of the Plan, prior to giving effect to the NUBIG and NUBIL rules described above. At this time, the Debtors are unable to predict whether they will have a NUBIG or NUBIL that will exceed the statutorily-defined threshold amount on the Effective Date. NOLs (and certain other tax attributes) not utilized in a given year due to the annual limitation may be carried forward for use in future years until their expiration dates. To the extent the Reorganized Debtors' annual limitation exceeds the consolidated group's taxable income in a given year, the excess will increase the annual limitation in future taxable years.

### 3. Alternative Minimum Tax

In general, an alternative minimum tax ("**AMT**") is imposed on a corporation's alternative minimum taxable income ("AMTI") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the taxable year. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated, with further adjustments required if AMTI, determined without regard to adjusted current earnings ("**ACE**"), differs from ACE. In addition, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, only 90% of its AMTI generally may be offset by available AMT NOL carryforwards. Accordingly, for tax periods after the Effective Date, the Reorganized Debtors may have to pay AMT regardless of whether they generate non-AMT NOLs or have sufficient non-AMT NOL carryforwards to offset regular taxable income for such periods. In addition, if a corporation undergoes an Ownership Change within the meaning of IRC Section 382 and is in a NUBIL position on the date of the Ownership Change, the corporation's aggregate tax basis in its assets would be reduced for certain AMT purposes to reflect the fair market value of such assets as of the change date. A corporation that pays AMT generally is later allowed a nonrefundable credit (equal to a portion of its prior year AMT liability) against its regular federal income tax liability in future taxable years when it is no longer subject to the AMT.

## C. FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CERTAIN CLAIMS

### 1. Holders of Prepetition First Out Credit Agreement Claims (Class 4)

#### (a) Exchange of Old Term Obligations for Restructured Credit Facility Notes

*Recognition of Gain or Loss.* Under applicable Treasury Regulations, the significant modification of a debt instrument will result in a deemed exchange of the "old" debt instrument for a "new" debt instrument and will be a taxable event upon which gain or loss may be recognized in certain circumstances. A modification of a debt instrument is significant if the modified instrument differs materially either in kind or extent from the original debt instrument. Pursuant to the Plan, the terms of the Old Term Obligations will be amended or otherwise modified, resulting in, among other things, significant increases in the applicable interest rates. Under the change in yield test in the Treasury Regulations, the change in the interest rate on the Old Term Obligations will be considered a significant modification, and thus the exchange of Old Term Obligations for Restructured Credit Facility Notes will be a taxable event upon which gain or loss may be recognized.

The federal income tax consequences of the exchange of Old Term Obligations for Restructured Credit Facility Notes depend, in part, on whether the Old Term Obligations and Restructured Credit Facility Notes constitute "securities" for purposes of the "reorganization" provisions of the Tax Code. The test of whether a debt obligation is a security involves an overall evaluation of the nature of the obligation, with the term of the obligation usually regarded as one of the most significant factors. Debt obligations with a term of five years or less generally have not qualified as securities, whereas debt obligations with a term of ten years or more generally have qualified as securities. Another important factor in determining whether a debt obligation is a security is the extent to which the obligation is subordinated to other liabilities of the issuer. Generally, the more senior the debt obligation, the less likely it is to be a security.

Because the Restructured Credit Facility Notes do not appear to constitute securities for federal income tax purposes, the Debtors intend to take the position that the exchange of the Old Term Obligations for Restructured Credit Facility Notes constitutes a taxable exchange upon which Holders must recognize gain or loss for federal income tax purposes. Subject to the "*Other Considerations—Accrued Interest*" discussion below, the amount of gain or loss recognized by a Holder would be equal to the difference between (i) the issue price of the Restructured

81

Credit Facility Notes (see "*Restructured Credit Facility Notes*" discussion below) and (ii) the Holder's adjusted tax basis in the Old Term Obligations exchanged therefor. Subject to the "*Other Considerations—Market Discount*" discussion below, any such gain or loss generally would be capital gain or loss, and would be long-term capital gain or loss if the Holder has held the Old Term Obligations for more than one year as of the Effective Date. A Holder's initial tax basis in the Restructured Credit Facility Notes would be equal to the debt's issue price, and its holding period would begin on the day after the Effective Date.

Holders should consult their tax advisors regarding the possibility that the Old Term Obligations and Restructured Credit Facility Notes each constitute a security and hence the exchange of such Obligations for such Notes would be treated as a reorganization in which no gain or loss would be recognized. In addition, Holders should consult their tax advisors regarding the character of any gain or loss recognized as long-term or short-term capital gain or loss, or as ordinary income or loss, as its character will be determined by a number of factors, including (but not limited to) the tax status of the Holder, whether the Old Term Obligations constitute a capital asset in the Holder's hands, whether the Old Term Obligations have been held for more than one year, whether the Old Term Obligations have bond premium or market discount, and whether and to what extent the Holder previously claimed a bad debt deduction with respect to the Old Term Obligations. Holders also should consult their tax advisors regarding the applicable tax rates and netting rules for capital gains and losses, and as to whether any resulting gain recognition may be deferred under the installment method until principal is repaid on the Restructured Credit Facility Notes. There are limitations on the deduction of capital losses by both corporate and noncorporate taxpayers.

(b)     Restructured Credit Facility Notes

*Interest and Original Issue Discount.* Payments of stated interest on the Restructured Credit Facility Notes will constitute payments of "qualified stated interest" and generally will be taxable to Holders as ordinary income at the time the payments are received or accrued, in accordance with the holder's method of tax accounting.

The preceding discussion assumes the Restructured Credit Facility Notes will not be issued with original issue discount ("**OID**"). The Restructured Credit Facility Notes generally would be treated as issued with OID if the principal amount of the Restructured Credit Facility Notes plus all scheduled interest payments thereon, other than payments of qualified stated interest, exceeded the issue price of the notes by more than a de minimis amount. The issue price of a debt instrument issued in exchange for another debt instrument depends on whether either debt instrument is considered publicly traded for purposes of the OID rules at any time during the sixty-day period ending thirty days after the issue date. If neither debt instrument is publicly traded, the issue price of the new debt instrument will be its stated principal amount if the new debt instrument provides for adequate stated interest (*i.e.*, interest at least at the applicable federal rate as of the issue date), or will be its imputed principal amount if the instrument does not provide for adequate stated interest. If the new debt instrument is publicly traded, its issue price generally will be its trading price immediately following issuance. If the old debt instrument is publicly traded, but the new debt instrument is not, the issue price of the new debt instrument generally will be the fair market value of the old debt instrument at the time of the exchange less the fair market value of the portion of the old debt instrument allocable to any other property received in the exchange.

A debt instrument will generally be considered to be publicly traded if certain pricing information related to the instrument is generally available on a quotation medium or readily available from dealers, brokers or traders. Because the relevant trading period is generally in the future, it is impossible to predict whether the Old Term Obligations or the Restructured Credit Facility Notes will be publicly traded during the relevant period. In the event that the Old Term Obligations or the Restructured Credit Facility Notes are determined to be publicly traded, the issue price of the Restructured Credit Facility Notes will be their trading price on or around the time of issuance. In general, if the issue price of the Restructured Credit Facility Notes is less than their principal amount by more than a de minimis amount, the Restructured Credit Facility Notes would be treated as issued with OID and the rules described in the "*Rights Offering Notes*" discussion below relating to OID and the election to treat all interest as OID would apply.

*Sale, Retirement or Other Taxable Disposition.* A Holder of Restructured Credit Facility Notes will recognize gain or loss upon the sale, redemption, retirement or other taxable disposition of the Restructured Credit Facility Notes equal to the difference between the amount realized upon the disposition (less a portion allocable to

any unpaid accrued interest and OID which generally will be taxable as ordinary income) and the Holder's adjusted tax basis in the Restructured Credit Facility Notes. Subject to the discussion below in "*Other Considerations – Market Discount*," any such gain or loss generally will be capital gain or loss (if the notes are held as a "capital asset" as discussed more fully above), and will be long-term capital gain or loss if the Holder has held the Restructured Credit Facility Notes for more than one year as of the date of disposition. Holders should consult their tax advisors regarding the applicable tax rates and netting rules for capital gains and losses. There are limitations on the deduction of capital losses by both corporate and noncorporate taxpayers.

*CPDI Rules.* The Debtors intend to treat the Restructured Credit Facility Notes as subject to the Treasury Regulations governing "variable rate debt instruments" (the "**VRDI Rules**"). If, however, the Restructured Credit Facility Notes are not subject to the VRDI Rules, the rules governing "contingent payment debt instruments" (the "**CPDI Rules**") may apply to the Restructured Credit Facility Notes. If the CPDI Rules apply to the Restructured Credit Facility Notes, the tax consequences of owning and disposing of such Notes may be materially different than those described above, including with respect to the character, timing, and amount of income, gain, or loss recognized. This discussion generally assumes that the CPDI Rules will not apply to the Restructured Credit Facility Notes, but there can be no assurance in this regard. Holders are urged to consult their own tax advisors with respect to the appropriate treatment of the Restructured Credit Facility Notes.

### 2. Holders of Prepetition Senior Subordinated Notes Claims (Class 7)

#### (a) Exchange of Old Subordinated Notes for New Common Stock

*Recognition of Gain or Loss.* The federal income tax consequences of the consummation of the Plan to Holders of Old Subordinated Notes depend, in part, on whether the Old Subordinated Notes constitute "securities" for purposes of the "reorganization" provisions of the Tax Code. As described above, the test of whether a debt obligation is a security involves an overall evaluation of the nature of the obligation, with the term of the obligation usually regarded as one of the most significant factors. Debt obligations with a term of five years or less generally have not qualified as securities, whereas debt obligations with a term of ten years or more generally have qualified as securities. Another important factor in determining whether a debt obligation is a security is the extent to which the obligation is subordinated to other liabilities of the issuer. Generally, the more senior the debt obligation, the less likely it is to be a security.

The Old Subordinated Notes should be treated as a security because the notes are unsecured subordinated obligations with an original term of ten years. Accordingly, the Debtors intend to take the position that the exchange of the Old Subordinated Notes for New Common Stock constitutes a recapitalization for federal income tax purposes. For these purposes, it appears that the receipt of the right to participate in the Rights Offering should not be considered a separate property right with independent value received in exchange for Old Subordinated Notes. As a result, subject to the "*Other Considerations—Accrued Interest*" discussion below, the Holders of Old Subordinated Notes should not recognize gain or loss upon the exchange of the Old Subordinated Notes for New Common Stock A Holder's basis in the New Common Stock should be equal to the Holder's basis in the Old Subordinated Notes exchanged therefore, and a Holder's holding period in such Stock will include the Holder's holding period in such Notes.

#### (b) New Common Stock

*Distributions.* A Holder of New Common Stock generally will be required to include in gross income as ordinary dividend income the amount of any distributions paid on the New Common Stock to the extent such distributions are paid out of the Reorganized Debtors' current or accumulated earnings and profits as determined for federal income tax purposes. Distributions not treated as dividends for federal income tax purposes will constitute a return of capital and will first be applied against and reduce a Holder's adjusted tax basis in the New Common Stock, but not below zero. Any excess amount will be treated as gain from a sale or exchange of the New Common Stock. Holders that are treated as corporations for federal income tax purposes may be entitled to a dividends received deduction with respect to distributions out of earnings and profits.

*Sale or Other Taxable Disposition.* A Holder of New Common Stock will recognize gain or loss upon the sale or other taxable disposition of New Common Stock equal to the difference between the amount realized upon

the disposition and the Holder's adjusted tax basis in the New Common Stock. Subject to the rules discussed below in "*Other Considerations—Market Discount*" and the recapture rules under IRC Section 108(e)(7), any such gain or loss generally will be capital gain or loss, and will be long-term capital gain or loss if the Holder has held the New Common Stock for more than one year as of the date of disposition. Under the IRC Section 108(e)(7) recapture rules, a Holder may be required to treat gain recognized on the taxable disposition of the New Common Stock as ordinary income if the Holder took a bad debt deduction with respect to the Old Subordinated Notes or recognized an ordinary loss on the exchange of the Old Subordinated Notes for New Common Stock. Holders should consult their tax advisors regarding the applicable tax rates and netting rules for capital gains and losses. There are limitations on the deduction of capital losses by both corporate and noncorporate taxpayers.

### 3. Holders of Accuride Other Equity Interests (Class 10)

#### (a) Old Common Stock Exchanged for New Equity Interests or Cancelled

*Recognition of Gain or Loss.* Holders of Old Common Stock who receive New Common Stock and New Warrants on the Effective Date in exchange for their Old Common Stock generally should not recognize gain or loss on the exchange. A Holder's tax basis in the New Common Stock and New Warrants received should be equal to its tax basis in the Old Common Stock exchanged therefor, allocated between the New Common Stock and New Warrants in accordance with their respective fair market values as of the Effective Date. A Holder's holding period with respect to the New Common Stock and New Warrants would include the holding period of its Old Common Stock. A Holder's tax basis and holding period in the New Common Stock and New Warrants would generally be required to be calculated separately for each block of Old Common Stock exchanged.

*Worthless Stock Deduction.* If the event Holders of Class 10 Claims vote to reject the Plan, the Old Common Stock will be cancelled and Holders of Old Common Stock will receive no distribution under the Plan. In such case, Holders of Old Common Stock may be entitled to claim a worthless stock deduction in an amount equal to the Holder's adjusted basis in the Old Common Stock. A worthless stock deduction is generally treated as a loss from the sale or exchange of a capital asset. Holders should consult their own tax advisers as to the appropriate tax year in which to claim a worthless stock deduction.

#### (b) New Common Stock

See the discussion above under "Holders of Prepetition Senior Subordinated Notes Claims (Class 7)—New Common Stock."

#### (c) New Warrants

A Holder of a New Warrant generally will not recognize gain or loss upon exercise. A Holder's tax basis in the New Common Stock received upon exercise of a New Warrant will be equal to the sum of the Holder's tax basis in the New Warrant and the exercise price. Generally, the Holder will commence a new holding period with respect to the New Common Stock received on the date of exercise.

In general, anti-dilution adjustments do not result in constructive distributions. However, an adjustment to the exercise price or conversion rate of the New Warrants, or the failure to make such adjustments, may, in certain circumstances, result in constructive distributions that could be taxable to the holder of the New Warrants. In such event, a Holder's tax basis in a New Warrant should generally be increased by the amount of any dividend.

Upon the lapse or disposition of a New Warrant, the Holder generally would recognize gain or loss equal to the difference between the amount received (zero in the case of a lapse) and its tax basis in the New Warrant. In general, such gain or loss would be a capital gain or loss, and would be long-term or short-term depending on the holding period of the New Warrant..

CH\1125862.14

## 4. Rights Offering Notes

*Original Issue Discount.* All stated interest on the Rights Offering Notes will be treated as OID because some of the interest on the Rights Offering Notes will not be unconditionally payable in cash or property (other than debt instruments of the issuer) at least annually at a single fixed rate. As a result, a Holder of a Rights Offering Notes will in certain circumstances be required to include OID in gross income annually on a constant yield basis in advance of the receipt of cash attributable to that income, regardless of the Holder's regular method of tax accounting. However, a Holder generally will not be required to include separately in income cash payments received on the Rights Offering Notes to the extent the payments constitute payments of previously accrued OID.

The amount of OID on a Rights Offering Note will be equal to the excess of (i) the principal amount of the Rights Offering Notes due at maturity plus all scheduled interest payments thereon over (ii) the issue price of the Rights Offering Notes. The issue price for the Rights Offering Notes should be equal to their principal amount because the Notes are being purchased for cash in an amount equal to their face amount.

The amount of OID includible in gross income annually by a Holder of a Rights Offering Note will be the sum of the daily portions of OID with respect to the note for each day during the taxable year (or portion thereof) during which the Holder holds the Note. The daily portion is determined by allocating to each day of any accrual period a pro-rata portion of the OID that accrued during the period. The accrual period of a Rights Offering Note may be of any length and may vary in length over the term of the note, provided that each accrual period is no longer than one year and each scheduled payment of principal or interest occurs either on the first or last day of an accrual period. The amount of OID allocable to any accrual period will be an amount equal to the product of the adjusted issue price of the Rights Offering Note at the beginning of the accrual period and its yield to maturity (determined on a constant yield method, compounded at the close of each accrual period and properly adjusted for the length of the accrual period). The adjusted issue price of a Rights Offering Note at the beginning of any accrual period will be the issue price of the Note *plus* the aggregate amount of accrued OID for all prior accrual periods *minus* any payments previously made on the Note. Under these rules, a Holder will have to include an increasingly greater amount of OID in income in each successive accrual period.

A Holder's tax basis in a Rights Offering Notes will be increased by the amount of OID included in the Holder's gross income and will be decreased by the amount of any payments received by the Holder with respect to the note, whether the payments are denominated as principal or interest.

In certain circumstances, the Reorganized Debtors may be obligated to pay amounts in excess of stated interest or principal on the Restructured Credit Facility Notes. Under applicable Treasury Regulations, the possibility that any such excess amounts will be paid will not affect the amount or timing of interest income a Holder recognizes if there is only a remote chance as of the date the notes are issued that such payments will be made. The Debtors believe the likelihood they will be obligated to make any such payments is remote and, therefore, do not intend to treat the potential payment of these amounts as part of the yield to maturity of the notes. The Debtors' determination that these contingencies are remote is binding on a Holder unless the Holder discloses its contrary position in the manner required by applicable Treasury Regulations. The Debtors' determination, however, is not binding on the IRS. If the IRS were to challenge this determination, a Holder might be required to accrue income on its Restructured Credit Facility Notes in excess of stated interest, and to treat as ordinary income, rather than capital gain, any income realized on the taxable disposition of a note before the resolution of the contingencies. If any such amounts are in fact paid, Holders would be required to recognize such amounts as income.

*Backstop Commitment Fee.* The tax treatment of the Backstop Commitment Fee is not free from doubt. The Debtors intend to take the position that the Backstop Commitment Fee is a payment for services and thus taxable to the recipients of the fee as ordinary income.

*Constructive Distributions.* The conversion rate of the Rights Offering Notes will be adjusted in certain circumstances. Adjustments (or failures to make adjustments) that have the effect of increasing a Holder's proportionate interest in the Debtors' assets or earnings may in some circumstances result in a deemed distribution to a Holder for federal income tax purposes even though the Holder has not received any cash or property as a result of such adjustments. Adjustments to the conversion rate made pursuant to a bona fide reasonable adjustment formula that has the effect of preventing the dilution of the interest of the Holders of the Rights Offering Notes, however,

will generally not be considered to result in a deemed distribution to a Holder. Any deemed distributions should be taxable as a dividend, return of capital, or capital gain as described in "*Holders of Prepetition Senior Subordinated Notes Claims (Class 7)—New Common Stock—Distributions*" above. It is not clear whether a constructive dividend deemed paid to a noncorporate Holder would be eligible for the preferential rates of federal income tax currently applicable in respect of certain dividends received. It is also unclear whether corporate Holders would be entitled to claim the dividends received deduction with respect to any such constructive dividends. Because a constructive dividend deemed received by a Holder would not give rise to any cash from which any applicable withholding could be satisfied, if we pay backup withholding on behalf of a Holder (because such Holder failed to establish an exemption from backup withholding), we may, at our option, set off any such payment against payments of cash and New Common Stock payable on the Rights Offering Notes (or, in certain circumstances, against any payments on the New Common Stock).

    *Conversion.* Because the Rights Offering Notes should qualify as securities for federal income tax purposes, a conversion should be treated as a recapitalization in which no gain or loss would be recognized, assuming only New Common Stock is received on conversion. The tax basis of the shares of common stock received upon such a conversion should generally equal the tax basis of the note that was converted, and a Holder's holding period for shares of New Common Stock should include the period during which the Holder held the Rights Offering Notes. Holders should consult their own tax advisers as to the tax consequences of receiving or failing to receive New Common Stock in exchange for accrued OID and the tax consequences relating to fractional shares of New Common Stock, if any, deemed received or disposed of in connection with a conversion.

    *Sale, Retirement or Other Taxable Disposition.* A Holder of Rights Offering Notes will recognize gain or loss upon the sale, redemption, retirement or other taxable disposition of the Rights Offering Notes equal to the difference between the amount realized upon the disposition (less a portion allocable to any accrued OID that has not yet been included in income by the Holder, which generally will be taxable as ordinary income) and the Holder's adjusted tax basis in the Rights Offering Notes. Any such gain or loss generally will be capital gain or loss, and will be long-term capital gain or loss if the Holder has held the Rights Offering Notes for more than one year as of the date of disposition. Holders should consult their tax advisors regarding the applicable tax rates and netting rules for capital gains and losses. There are limitations on the deduction of capital losses by both corporate and noncorporate taxpayers.

### 5. Other Considerations

    *Accrued Interest.* To the extent a Holder of Old Notes receives consideration that is attributable to unpaid accrued interest on the notes, the Holder may be required to treat such consideration as a payment of interest. There is general uncertainty regarding the extent to which the receipt of cash or other property should be treated as attributable to unpaid accrued interest. The Reorganized Debtors intend to take the position, and the Plan provides, that cash or property distributed pursuant to the Plan will first be allocable to the principal amount of a Holder's Claim and then, to the extent necessary, to any unpaid accrued interest thereon. The IRS, however, could take a contrary position.

    To the extent any property received pursuant to the Plan is considered attributable to unpaid accrued interest, a Holder will recognize ordinary income to the extent the value of the property exceeds the amount of unpaid accrued interest previously included in gross income by the Holder. A Holder's tax basis in such property should be equal to the amount of interest income treated as satisfied by the receipt of the property, and its holding period in the property should begin on the day after the Effective Date. A Holder generally will be entitled to recognize a loss to the extent any accrued interest previously included in its gross income is not paid in full. HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE EXTENT TO WHICH CONSIDERATION RECEIVED UNDER THE PLAN SHOULD BE TREATED AS ATTRIBUTABLE TO UNPAID ACCRUED INTEREST.

    *Market Discount.* A Holder will be considered to have acquired an Old Note at a market discount if its tax basis in the note immediately after acquisition is less than the sum of all amounts payable thereon (other than payments of qualified stated interest) after the acquisition date, subject to a statutorily-defined *de minimis* exception. Market discount generally accrues on a straight line basis from the acquisition date over the remaining term of the obligation or, at the Holder's election, under a constant yield method. A Holder that acquired an Old Note at a

market discount previously may have elected to include the market discount in income as it accrued over the term of the note.

A holder that acquires a debt instrument at a market discount generally is required to treat any gain realized on the disposition of the instrument as ordinary income to the extent of accrued market discount not previously included in gross income by the holder. However, special rules apply to the disposition of a market discount obligation in certain types of non-recognition transactions, such as a recapitalization. Under these rules, a Holder that acquired an Old Subordinated Note at a market discount generally should not be required to recognize any accrued market discount as income at the time of the exchange of Old Subordinated Notes for New Common Stock. Rather, on a subsequent taxable disposition of the New Common Stock received in the exchange, any gain realized by the Holder on a disposition of the Stock will be ordinary income to extent of the market discount accrued on the Old Subordinated Note prior to the exchange.

*Amortizable Bond Premium.* If a Holder's initial tax basis in an Old Subordinated Note was greater than the sum of all amounts payable on the Note (other than payments of qualified stated interest) after the acquisition date, the Holder generally will be considered to have acquired the Note with amortizable bond premium. A Holder that acquired an Old Subordinated Note at a premium previously may have elected to amortize the premium over the term of the Note. A Holder that elected to amortize bond premium on an Old Subordinated Note should have reduced its tax basis in the Note by the amount of amortized bond premium used to offset interest income and may, in certain circumstances, be entitled to a deduction for any unamortized bond premium in the taxable year of the exchange.

6. **Information Reporting and Backup Withholding**

The Reorganized Debtors (or their paying agent) may be obligated to furnish information to the IRS regarding the consideration received by Holders (other than corporations and other exempt Holders) pursuant to the Plan. In addition, the Reorganized Debtors will be required to report annually to the IRS with respect to each Holder (other than corporations and other exempt Holders) the amount of interest paid and OID accrued on the New Notes, the amount of dividends paid on the New Common Stock, and the amount of any tax withheld from payment thereof.

Holders may be subject to backup withholding (currently, at a rate of 28%) on the consideration received pursuant to the Plan. Backup withholding may also apply to interest, OID and principal payments on the New Notes, dividends paid on the New Common Stock and proceeds received upon sale or other disposition of the New Notes or New Common Stock. Certain Holders (including corporations) generally are not subject to backup withholding. A Holder that is not otherwise exempt generally may avoid backup withholding by furnishing to the Reorganized Debtors (or their paying agent) its taxpayer identification number and certifying, under penalties of perjury, that the taxpayer identification number provided is correct and that the Holder has not been notified by the IRS that it is subject to backup withholding.

Backup withholding is not an additional tax. Taxpayers may use amounts withheld as a credit against their federal income tax liability or may claim a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.

THE FOREGOING DISCUSSION OF FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. EACH HOLDER SHOULD CONSULT ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN DESCRIBED HEREIN. NEITHER THE PROPONENTS NOR THEIR PROFESSIONALS WILL HAVE ANY LIABILITY TO ANY PERSON OR HOLDER ARISING FROM OR RELATED TO THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN OR THE FOREGOING DISCUSSION.

CH\1125862.14

## RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the Debtors' creditors and interest holders than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code. In addition, any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims and Allowed Equity Interests than that which is proposed under the Plan. Accordingly, the Debtors recommend that Holders of Claims and Equity Interests entitled to vote on the Plan support confirmation of the Plan and vote to accept the Plan.

Respectfully submitted,

/s/ _____

Accuride Corporation, on behalf of itself and its direct and indirect subsidiaries listed below

By: _____

Title: _____

Dated: _____ ____, 2009

Accuride Cuyahoga Falls, Inc., a Delaware corporation
Accuride Distributing, LLC, a Delaware limited liability company
Accuride EMI, LLC, a Delaware limited liability company
Accuride Erie L.P., a Delaware limited partnership
Accuride Henderson Limited Liability Company, a Delaware limited liability company
AKW General Partner L.L.C., a Delaware limited liability company
AOT Inc., a Delaware corporation
Bostrom Holdings, Inc., a Delaware corporation
Bostrom Seating, Inc., a Delaware corporation
Bostrom Specialty Seating, Inc., a Delaware corporation
Brillion Iron Works, Inc., a Delaware corporation
Erie Land Holding, Inc., a Delaware corporation
Fabco Automotive Corporation, a Delaware corporation
Gunite Corporation, a Delaware corporation
Imperial Group Holding Corp. -1, a Delaware corporation
Imperial Group Holding Corp. -2, a Delaware corporation
Imperial Group, L.P., a Delaware limited partnership
JAII Management Company, a Delaware corporation
Transportation Technologies Industries, Inc., a Delaware corporation
Truck Components Inc., a Delaware corporation

Prepared by:

**LATHAM & WATKINS LLP**
David S. Heller
Josef S. Athanas
Caroline A. Reckler
Suite 5800 Willis Tower
233 South Wacker Drive
Chicago, Illinois 60606
Telephone:      (312) 876-7608
Facsimile:      (312) 993-9767

CH\1125862.14

- and -

**YOUNG, CONWAY, STARGATT & TAYLOR LLP**
Michael R. Nestor
Kara H. Coyle
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone:     (302) 571-6600
Facsimile:      (302) 571-1253

*Co-Counsel for the Debtors and Debtors in Possession*

# SCHEDULE 1

## The Debtors

The Debtors, along with the last four digits of each Debtor's federal tax identification number, are: Accuride Corporation, a Delaware corporation (9077); Accuride Cuyahoga Falls, Inc., a Delaware corporation (9556); Accuride Distributing, LLC, a Delaware limited liability company (3124); Accuride EMI, LLC, a Delaware limited liability company (N/A); Accuride Erie L.P., a Delaware limited partnership (4862); Accuride Henderson Limited Liability Company, a Delaware limited liability company (8596); AKW General Partner L.L.C., a Delaware limited liability company (4861); AOT Inc., a Delaware corporation (3088); Bostrom Holdings, Inc., a Delaware corporation (9282); Bostrom Seating, Inc., a Delaware corporation (7179); Bostrom Specialty Seating, Inc., a Delaware corporation (4182); Brillion Iron Works, Inc., a Delaware corporation (6942); Erie Land Holding, Inc., a Delaware corporation (8018); Fabco Automotive Corporation, a Delaware corporation (9802); Gunite Corporation, a Delaware corporation (9803); Imperial Group Holding Corp. -1, a Delaware corporation (4007); Imperial Group Holding Corp. -2, a Delaware corporation (4009); Imperial Group, L.P., a Delaware limited partnership (4012); JAII Management Company, a Delaware corporation (N/A); Transportation Technologies Industries, Inc., a Delaware corporation (2791); and Truck Components Inc., a Delaware corporation (5407).