## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | : | Chapter 11 |
| In re: | : | |
| | : | Case No. 09-13449 (BLS) |
| ACCURIDE CORPORATION, | : | |
| et al.,[1] | : | (Jointly Administered) |
| | : | |
| | : | **Hearing Date: December 18, 2009 at 11:00 a.m.** |
| Debtors. | : | **Objection Deadline: December 15, 2009 at 4:00 p.m.[2]** |
| | : | |

## THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS COMBINED OBJECTION TO (I) THE DEBTORS' MOTION FOR APPROVAL OF THE DISCLOSURE STATEMENT AND (II) THE DEBTORS' MOTION FOR APPROVAL OF THE RIGHTS OFFERING

The Official Committee of Equity Security Holders (the "Equity Committee") in the chapter 11 cases of the above-captioned debtors (collectively, the "Debtors"), hereby files this combined objection to (i) the Debtors' motion for approval of the disclosure statement (the "Disclosure Statement", as amended) and (ii) objection to the rights offering motion (the "Rights Offering Motion").[3]  In support of its Objection, the Equity Committee respectfully represents as follows:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number are: Accuride Corporation, a Delaware corporation (9077); Accuride Cuyahoga Falls, Inc., a Delaware corporation (9556); Accuride Distributing, LLC, a Delaware limited liability company (3124); Accuride EMI, LLC, a Delaware limited liability company (N/A); Accuride Erie L.P., a Delaware limited partnership (4862); Accuride Henderson Limited Liability Company, a Delaware limited liability company (8596); AKW General Partner L.L.C., a Delaware limited liability company (4861); AOT Inc., a Delaware corporation (3088); Bostrom Holdings, Inc., a Delaware corporation (9282); Bostrom Seating, Inc., a Delaware corporation (7179); Bostrom Specialty Seating, Inc., a Delaware corporation (4182); Brillion Iron Works, Inc., a Delaware corporation (6942); Erie Land Holding, Inc., a Delaware corporation (8018); Fabco Automotive Corporation, a Delaware corporation (9802); Gunite Imperial Group Holding Corp. -2, a Delaware corporation (4009); Imperial Group, L.P., a Delaware limited partnership (4012); JAII Management Company, a Delaware corporation (N/A); Transportation Technologies Industries, Inc., a Delaware corporation (2791); and Truck Components Inc., a Delaware corporation (5407).

[2] The Equity Committee's Objection Deadline was extended to December 15, 2009 by the Debtors.

[3] The Equity Committee has also moved to adjourn the hearings on the Disclosure Statement and Rights Offering Motion. *See* Docket No. 369.

## BACKGROUND FACTS

1.      On October 8, 2009 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief in the United States Bankruptcy Court for the District of Delaware (the "Court").  The Debtors presented the case as a "pre-negotiated" plan (the "Pre-Negotiated Plan") which had the approval of certain major constituents of the Debtors, including a majority of their pre-petition lenders (the "Supporting Lenders") and noteholders (the "Supporting Noteholders").

2.      At the commencement of the case, the Debtors indicated that they would propose a plan that would restructure the prepetition term facility of approximately $375 million by extending the term of the facility and paying out in full the subordinated tranche of approximately $70 million (held by an affiliate of Sun Capital).  Trade creditors would also receive payment in full.  The Debtors' unsecured noteholders (holding $291 million in notes) would be equitized - they would receive roughly 98% of the reorganized company, subject to dilution.  Under the Pre-Negotiated Plan, current equity holders would receive 2% of the new equity, subject to dilution, and warrants (the "Warrants") exercisable for two years from the date of issuance.

3.      In addition, certain of the noteholders would be offered an opportunity to participate in a rights offering (the "Rights Offering") which would require an investment of $140 million in exchange for new notes convertible into 60% of the reorganized equity.  The $140 million is a material component of the Debtors' emergence and the Rights Offering is the lynchpin of the Debtors' plan of reorganization.  The Rights Offering is coupled with a backstop commitment pursuant to which certain of the noteholders (the "Backstop Investors") have agreed to backstop the Rights Offering in return for a "backstop fee" of up to 20% of the reorganized equity of the Debtors.

4.	On October 13, 2009, Trimaran Investments II, L.L.C. ("Trimaran"), a major shareholder of the Debtors, requested that the United States Trustee appoint an equity security holders committee.  *See Trimaran Letter to U.S. Trustee dated 10/13/09*, attached hereto as **Exhibit A**; *See Trimaran Response Letter to U.S. Trustee dated 10/27/09*, attached hereto as **Exhibit B**.  Trimaran's supporting materials included two preliminary analyses conducted by Trimaran and Jefferies (based solely on publicly available information as the date of each analyses), each showing that the Debtors had considerable residual equity value.  Trimaran's request was opposed by the Debtors and the Ad Hoc Committee of Noteholders (the "Noteholders Committee").[4]  *See Debtors' Objection to Appointment of Equity Committee, dated 10/19/09*, attached hereto as **Exhibit C**; *Debtors' Objection to Appointment of Equity Committee, dated 10/19/09*, attached hereto as **Exhibit D**.  As a result of these objections, the United States Trustee (the "U.S. Trustee") did not immediately appoint the Equity Committee.

5.	On November 18, 2009, the Debtors filed the Joint Plan of Reorganization for Accuride Corporation, *et al*. and the corresponding Disclosure Statement for the Joint Plan of Reorganization for Accuride Corporation, *et al*.  On December 11, 2009 the Debtors filed their First Amended Joint Plan of Reorganization for Accuride Corporation, et. al. (the "Plan") and Disclosure Statement thereupon (the "Disclosure Statement").  The Plan incorporates the terms of the Pre-Negotiated Plan that the Debtors had negotiated with the Supporting Lenders and Supporting Lenders.

6.	On November 19, 2009, the U.S. Trustee formed the Equity Committee over the objections of the Debtors and the Noteholders Committee.

---

[4]	Some or all of whom are also the Supporting Noteholders.

7.     On December 1, 2009, the Debtors filed a motion to approve the Rights Offering (the "Rights Offering Motion").[5]

8.     Since its formation on November 19, 2009, the Equity Committee and its professionals have worked diligently to come up to speed on the major issues presented by the Debtors' Plan and Disclosure Statement and the Rights Offering Motion.  Indeed, in the brief time since the Equity Committee was formed, the Equity Committee and/or its professionals have already (i) had two formal meetings and daily informal interaction, (ii) filed a substantive response to the Debtors' KEIP motion, (iii) visited the Debtors' headquarters and met with management, (iv) formulated their preliminary position on the Debtors' overall case strategy; and filed a substantive motion to adjourn the hearings on the Disclosure Statement and Rights Offering Motion.

9.     Notwithstanding the Equity Committee's efforts to get up to speed quickly as possible, it still needs critical information from the Debtors regarding the Debtors' brief and generic statement on valuation (See Ex. E to the Disclosure Statement, attached hereto as **Exhibit E**) and the rationale for the economic terms underlying the Rights Offering.  In particular, Exhibit E does not discuss, in any meaningful detail, the specifics used - which comparable companies, how those companies were weighed, what discount rate was applied, what sensitivity analysis (if any) was run to the companies projections, or other useful information that would inform parties-in-interest about the valuation metrics and methodology used by the Debtors.[6]

---

[5]     The Equity Committee will also be filing an objection to the Rights Offering Motion.
[6]     The Equity Committee acknowledges that the financial advisors for the Debtors and Equity Committee have had some preliminary discussions regarding these matters.

10.    The Equity Committee plans to serve discovery upon the Debtors, their experts, and others very shortly.  In addition, the Equity Committee is actively speaking to shareholders and third parties about a possible rival plan.

## PRELIMINARY STATEMENT

11.    The Disclosure Statement and Rights Offering should not be approved.  The Debtors seek approval of a Disclosure Statement that (i) fails to provide adequate information regarding (among other things) the value of the Debtors, the economic terms of the Rights Offering and the Warrants that are to be distributed to equity holders; (ii) presents a plan that, based on the analysis of members and professionals of the Equity Committee, perpetuates a faulty enterprise value (and thus share value) for the Debtors; (iii) presents a plan that is unconfirmable because it proposes to pay noteholders more than 100 cents on the dollar and also includes broad and unjustified releases; and (iv) presents a plan that is not being proposed in good faith.  The Rights Offering Motion is also flawed because it proposes economic terms that are in excess of market.

12.    The Debtors and their pre-petition lenders have concocted a low-ball valuation - the support for which remains to be seen - that significantly undervalues the Debtors.  What's more, despite the fact that the Disclosure Statement fails to include any information with respect to the calculation of enterprise value and other metrics used to validate the Debtors' conclusion, the Debtors now ask that this Court approve the Disclosure Statement premised upon such an unsupported valuation.  The Equity Committee also believes that the Plan may provide the Noteholders more than a full recovery to the detriment of equity holders and that the Rights Offering (including the backstop fee) is perhaps unnecessary and extremely excessive.

13.    Now that the Equity Committee finally has a chance to negotiate for its constituents, the message that is being conveyed is that they've arrived too late to the party; the

deal has been struck; the information will be provided, but on a timeline and terms that will likely preclude any effective action by the Equity Committee; and the current schedule for the case (which benefits all but the equity holders), agreed to by all of the parties but the Equity Committee, must be adhered to.

14.     Notwithstanding their fiduciary duties to *all* of the constituents in this case - including equity holders - the Debtors are unfortunately content to do the bidding of their pre-petition lenders.   At the behest of their creditors, the Debtors are compelling a fast-track bankruptcy that will substantially wipe out equity and turn over the reins of the reorganized company to certain of the noteholders.

15.     To add insult to injury, all of this is being done on terms that the Equity Committee views as simply egregious.  The Equity Committee's objections to the economic terms of the Pre-Negotiated Plan can be summarized as follows:

- The pricing on the Rights Offering Notes is higher than current market rates; specifically, the 7.5% coupon on the Rights Offering Notes represents a premium of 300 basis points when compared to recent convertible issuances.

- The Rights Offering Notes are immediately "in the money" upon issuance because the implied strike price on the conversion premium for the Rights Offering Notes is below the Plan value per share; thus the subscribing noteholders can convert to stock immediately upon issuance and do so at a <u>discounted</u> price.

- The Backstop Fee of up to 20% of the new equity is excessive and equates to 23% of the Plan's new money commitment; market comparables are in the 4% -5% range.

- The conversion premium for the Rights Offering Notes is at a <u>discount</u> of approximately 40%, which is a material deviation from market terms on similar securities which provide for a strike price at a 20-30% <u>premium</u> to the current value of the equity.

- The pricing on the restructured term loan credit facility is higher than market rates; specifically, the restructured credit facility is 75-100 basis points higher than yields on comparable first lien securities.

- Current equity receives only  2% of the new equity; after dilution for the Rights Offering Notes and Backstop Fee, that amounts to only .6% of the new equity.

- The New Warrants are exercisable for only two years after issuance and are at a strike price that is exponentially higher than the Debtors' asserted plan value which makes it highly doubtful that the Warrants will ever be exercised in such a short time frame.

16. To date, neither the pleadings (including the Disclosure Statement and Rights Offering Motion) filed by the Debtors nor the conversations had with their professionals have addressed why these terms are proper or justified (except to allege conclusory statements alleging that the afore-mentioned terms represent the best deal available to the Debtors). Without a meaningful explanation of why and how these terms were negotiated and proof that the Debtors have exhausted all other meaningful alternatives (which the Equity Committee doubts based on its own recent conversations with market participants), the Equity Committee simply cannot agree to the Debtors' plan or any component thereof.

17. The current plan proposal on the table proposes financial terms that are excessive, that were extracted from the Debtors possibly at a time when the Debtors were at their weakest, and fails to maximize value for all stakeholders. The Equity Committee posits that it is only proper that the Debtors should slow down this process and devote time to exploring other potential opportunities. While the Equity Committee appreciates that the Debtors believe they are tied to terms and a timeframe dictated by the Restructuring Support Agreements with their prepetition lenders, the Equity Committee respectfully submits that this Court should not permit their demands to dictate the outcome of these Chapter 11 cases to the detriment of the equity holders. The Debtors' outlook continues to improve and the Debtors' themselves forecast a sharp upswing in their financial performance in the near future. The Equity Committee invites the Debtors to engage with them in a constructive process that will result in value for all stakeholders.

<u>**RELIEF REQUESTED**</u>

18.    The Equity Committee respectfully requests that the Court decline entering an

order approving either the Disclosure Statement or the Rights Offering Motion.

<u>**BASIS FOR RELIEF**</u>

I.    **The Disclosure Statement Contains Inadequate Information Regarding the Debtors'
      Valuation and Does Not Rebut the Valuations Previously Proffered by Equity
      Holders.**

    A.    **The Disclosure Statement Contains Inadequate Information Regarding the
             Debtors' Valuation.**

19.    The fundamental purpose of a disclosure statement is to provide sufficient

information to enable an informed voting process.  *In re Phoenix Petroleum Co.*, 278 B.R. 385,

392 (Bankr. E.D. Pa. 2001); *In re Monroe Well Serv., Inc.*, 80 B.R. 324, 330 (Bankr. E.D. Pa.

1987).  Indeed, "disclosure is the 'pivotal' concept in chapter 11 reorganization." *Oneida Motor*

*Freights, Inc. v. United Jersey* Bank, 848 F.2d 414, 417 (3d Cir. 1988); In *re Lisanti Foods, Inc.*,

329 B.R. 491, 507 (D. N.J. 2005); *see In re H&L Developers, Inc.*, 178 B.R. 71, 74 (Bankr. E.D.

Pa. 1994) ("The Third Circuit Court of Appeals recognized that candid disclosure is the pivotal

concept in a reorganization case, noting the requirements for disclosure contained in … §1125

relating to the disclosure statement.").

20.    The Debtors' valuation, and the basis therefor, is an important disclosure item in

any disclosures statement.  *See In re Beltrami Enters., Inc.*, 191 B.R. 303, 304 (Bankr. M.D. Pa.

1995) ("A description of available assets and their value is a vital element of necessary

disclosure.").   Courts consider valuation to be a key component in determining whether to

approve a disclosure statement so that creditors and equity holders can make an informed

decision on whether to accept or reject a plan of reorganization.  *See id.* at 304; *In re Ligon*, 50

B.R. 127, 130 (Bankr. M.D. Tenn. 1985) ("Knowledge of the debtor's financial condition is

essential before any informed decision concerning the merits of a plan can be made.").   In this

case, where all parties except for the equity holders will receive a meaningful distribution, adequate disclosure regarding the Debtors' valuation is critical.

21.     The Debtors' plan and the distributions thereunder, including the insignificant proposed distribution to equity, are premised on the Debtors' valuation of the company. Yet the only discussion regarding the Debtors' valuation is provided in a bare-bones format in Exhibit E ["Reorganization Valuation Analysis"] to the Disclosure Statement. That section provides, in pertinent part:

> The Debtors have been advised by Perella Weinberg Partners LP ("PWP") regarding estimates of the reorganization value of the Reorganized Debtors on a going concern basis (the "Valuation"). PWP has determined the estimated range of reorganization enterprise value of the Reorganized Debtors to be approximately $491 million to $575 million (with a mid-point estimate of approximately $533 million) as of an assumed Effective Date of March 31, 2010. Adjusting for reorganized net debt of $374 million (prior to L/Cs and treating the New Notes as debt) implies an equity value range of $118 million to $201 million (with a mid-point estimate of approximately $159 million).

22.     This brief and non-substantive analysis of value can hardly be deemed "adequate information". *See In re Baltrami Enters., Inc.*, 191 B.R. at 304 (stating that mere statements of opinion or belief, without accompanying factual support, are inadequate);; *In re East Redley Corp.*, 16 B.R. 429, 430 (Bankr. Pa. 1982) (noting that the debtor's providing of an opinion in fixing the value to be assigned to property without factual support does not constitute adequate information). It is imperative that the Disclosure Statement address (among other things) recognized valuation methodologies, the comparables used, discuss key steps and assumptions, and provide a rational for its conclusions. Without the details, there is no meaningful basis for a voting constituent or this Court to evaluate the end result.

23.     Since the appointment of the Equity Committee, its proposed financial advisor, Jefferies, has reached out to the Debtors' financial advisors and to the Company in an effort to obtain substantive information regarding the Debtors' proposed valuation. To date, the Debtors

have provided only brief oral assessments and have refused to provide any written analysis. Particularly in a case where an equity committee has been appointed, valuation is the crux of the case. *See, e.g., In re Oneida Ltd.*, No. 06-10489, 2006 WL 1288576, at *2 (Bankr. S.D.N.Y. May 4, 2006) (noting that one of the key issues on any motion for the appointment of an equity committee is whether the debtor is solvent or it appears likely that there will be a return for equity). Without the benefit of the Debtors' valuation analysis, the Equity Committee cannot formulate its position on the validity of the Debtors' number or methodology.

24.     Jefferies also previously sent an informal information request to the Debtors on December 7, 2009. To date, very little information has been provided in response thereto. The Equity Committee intends to serve formal discovery very shortly.

25.      Based upon the scant information provided in the Disclosure Statement, equity holders will lack basic information regarding the Debtors' valuation which is critical to their making an informed decision when voting on the plan. Without this information, it is impossible for the equity holders to know whether the Debtors have conducted a proper valuation and whether the distribution currently proposed to them is sufficient or appropriate.

**B.      The Equity Committee Believes There Is Residual Equity Value and Its View is Supported by Actual and Substantive Analysis.**

26.     The Debtors' *own* recent 8-K filing on October 15, 2009 suggests a steep incline in projected revenue and operating profits over the next four years. In fact, the Debtors are forecasting that in 4 years (i.e., in 2013) they will *almost triple their revenue* from $575.8 million to $1.4561 billion. *See* Accuride Corp. 8-K dated as of Oct. 15, 2009, attached hereto as **Exhibit F**.

27.     *Using the very information publicly disclosed by the Debtors*, Trimaran prepared a preliminary valuation of the Company's common stock. *See* **Exhibit G**. That analysis concludes that "[t]he current restructuring proposal contemplated by the Company grossly

undervalues the Company" and that the shares are worth approximately $6.00 per share.[7] Trimaran used two methodologies to arrive at roughly the same share value:

        (a)    <u>Mid-Cycle Enterprise Value/EBITDA Multiple Valuation:</u>  Trimaran took the average EBITDA for the Debtors over the next 5 years per management's own projections and then applied a 7.0x enterprise value/EBITDA multiple to arrive at an implied enterprise value of $971.7 million.  The 7.0x multiple compares to a historical average of 7.3x for the broader Truck & Engine OEM industry (based on Goldman Sachs research dated 10/15/09). Trimaran then backed out net debt as of 6/30/09 of $584.9 million and an additional $100 million for other claims and restructuring related costs.  The remaining equity value was $286.9 million, which equates to $6.04 per share, assuming full dilution.

        (b)    <u>2010 and 2011 Enterprise Value/EBITDA Multiple Valuation:</u>  This approach applied current trading multiples of Accuride's competitors to management's forecast. As of 10/15/09, Goldman Sachs calculated that the average enterprise value/EBITDA multiple for Cummins, Navistar, Oshkosh and Paccar was 10.5x 2010 EBITDA and 7.2x 2011 EBITDA. These industry average multiples were applied to Accuride's 2010 and 2011 EBITDA projections to determine an implied enterprise  value for each of the years. Net debt and other claims/restructuring costs were backed out to calculate implied equity values for each of the years.  The equity value was divided by a share count of 47.5 million to arrive at an average share price of $5.87 for 2010 and 2011.

        28.    In order to test Trimaran's assessment through an independent source, Trimaran (through Sonnenschein) also asked Jefferies for their preliminary views.  Jefferies' work was based solely on public information and was not a formal valuation but a preliminary opinion based on one valuation methodology.  Without access to management or any non-public

---

[7]      Based upon approximately 47.5 million outstanding shares.

information and no ability to diligence the financial projections,[8] Jefferies prepared a *very preliminary* discounted cash flow analysis. *See* **Exhibit H.** Assuming the maximum amount of claims possible, Jefferies' preliminary discounted cash flow analysis estimated equity value of over $357 million and an implied stock price of **$9.86**. Jefferies' preliminary assessment did not ascribe value to any non-operating assets, such as real estate or NOLs, held by the Debtors.

29. The independent conclusions (each of which is already far more substantive than anything offered by the Debtors to date) of not one, *but two*, players in the financial industry that support the existence of equity value well beyond what the Debtors are proposing. Notwithstanding the fact that Trimaran and Jefferies analyses' have been available to the Debtors since October 27, 2009, the Debtors have not bothered to rebut the analysis or conclusions therein, nor are they disclosed, attached or discussed in the Disclosure Statement.

**C.    The Disclosure Statement Fails To Disclose Sufficient Information Regarding the Warrants.**

30. The proposed plan provides that *if* equity holders vote to accept the plan, they will receive 2% of the new common stock (subject to dilution) and new Warrants (the "Warrants") for an additional 6% of new common stock (on a fully diluted basis). The Warrants are exercisable for only two years from the date of issuance. The Equity Committee and its advisors have analyzed the terms of the Warrants and concluded that they are at a strike price that is exponentially higher than the Debtors' asserted plan value which makes it highly doubtful that the Warrants will ever be exercised in such a short time frame. Indeed, there is no detailed and substantive discussion of the Warrants and their value in the Disclosure Statement, another reason that it does not contain adequate information for equity holders to value.

---

[8] Since its appointment, the Equity Committee has sought to retain and employ Jefferies. Jefferies has signed a confidentiality agreement with the Debtors and has and will be receiving certain confidential information. Based on the confidential information that has been and is expected to be provided, Jefferies reserves the right to adjust its very preliminary valuation analysis that was conducted for the benefit of the US Trustee's consideration in appointing the Equity Committee.

31.     As presently drafted, the Disclosure Statement purports to give meaningful value to equity holders through the Warrants.  Of course, as with all of their other conclusions, this too is hardly supported.

C.     **The Disclosure Statement Fails To Disclose that the Terms of the Rights Offering and Restructured Term Facility Are Excessive and Why The Circumstances Justify Such Terms.**

32.     As discussed in the next section more fully, the terms of the Rights Offering and restructured credit facility are excessive.  The Debtors fail to indicate how the terms of each compare to currently available terms in the market and why the Rights Offering and restructured credit facility present the best opportunity for the estates and their shareholders.  The Debtors also fail to discuss what they have done to adequately test the markets for capital availability.

II.     **The Disclosure Statement Cannot Be Approved Because the Plan is Unconfirmable.**

33.     It is well-settled that where a plan is unconfirmable, the disclosure statement should not be approved.  *See In re Curtis Ctr. Ltd. P'ship*, 195 B.R. 631, 638 (Bankr. E.D. Pa. 1996); *In re Monroe Well Serv., Inc.*, 80 B.R. at 333.

34.     Undertaking the time and expense of plan solicitation where the plan is unconfirmable is a waste of the Court and estate's time and resources.  *See In re Phoenix Petroleum Co.*; 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001); *In re 266 Washington Assocs.*, 141 B.R 275, 288 (Bankr. E.D.N.Y. 1992) (quoting *In re Pecht*, 53 B.R. 768 (Bankr. E.D. Va. 1985)).

A.     **The Plan Violates the Absolute Priority Rule.**

35.     Typically, confirmation of a chapter 11 requires the acceptance of each class of impaired creditors.  See 11 U.S.C. § 1126(c) and 1129(a)(8).  However, even if an impaired class rejects the plan, the plan may still be confirmed so long as the other requirement of confirmation are satisfied and the plan is "fair and equitable" and does not discriminate unfairly with respect

to the rejecting class. *See* 11 U.S.C. § 1129(b)(1). Section 1129(b)(2) of the Bankruptcy Code

sets forth the absolute priority rule and provides that a dissenting class of unsecured creditors

must be provided for in full before any junior class can receive or retain any property under a

reorganization plan. *See Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202 (1988).

However, courts understand that implementation of the absolute priority rule is not exclusive of

the "fair and equitable requirement" of Section 1129(b)(1). Thus, courts have held that a

corollary to the absolute priority rule is that a senior class cannot receive more than full

compensation for its claims. *In re Exide Techs.*, 303 B.R. 48, 61 (Bankr. D. Del. 2003).

36.      Where a Debtor understates its enterprise value and then seeks to distribute shares

based on that value, unsecured creditors receive stock worth more than the full amount of their

claims, thereby causing a windfall at the expense of equity. As discussed above, the Debtors

have failed to ascribe the true enterprise value to the Debtors (as demonstrated in the Trimaran

and Jefferies' analyses) resulting in a skewed valuation which precludes any meaningful

recovery to shareholders.

37.      If the Equity Committee is correct, then the noteholders are getting a substantial

windfall by receiving shares worth considerably more than the value ascribed to them in the

Disclosure Statement and gives them an excess of a par recovery. This is a violation of the

absolute priority rule and renders the plan patently unconfirmable.

**B.      The Releases Proposed Under the Plan Are Unjustified, and In Any Event, Too Broad.**

38.      The Debtors Plan and Disclosure Statement provide for the global release and

exculpation of numerous participants from claims of the Debtors and third parties, regardless of

their contribution to the case or the timing of their participation in the case. *Zenith Elecs. Corp.*,

241 B.R. 92, 110 (Bankr. D. Del. 1999); *Gillman v. Continental Airlines (In re Continental*

*Airlines)*, 203 F.3d 203, 214 (3d Cir. 2000); *PWS Holding Corp.*, 228 F.3d 224 (3d Cir. 2000). In

this circuit, non-debtor releases are generally reserved for extraordinary cases. *Id; see also In re Congoleum Corp.*, 362 B.R. 167, 194 (Bankr. D.N.J. 2007) (nothing that using Chapter 11 to "eradicate even potential causes of action" against non-debtors is "simply bad policy").

39.     In the case of *Zenith Elecs. Corp.*, 241 B.R. 92, the court identified five factors which are relevant to determine whether a release of a non-debtor is appropriate; (i) an identity of interest between the debtor and non-debtor such that suit against the non-debtor will deplete the estate's resources; (2) a substantial contribution to the plan by the non-debtor; (3) the necessity of the release to the reorganization; (4) the overwhelming acceptance of the plan and releases by creditors *and interest holders*; and (5) the payment of all or substantially all of the claims of the creditors *and interest holders* under the plan.

40.     The Debtors have failed to show how they have satisfied the foregoing standard with respect to the non-debtor releases and why such broad releases are appropriate and in the best interests of the estates.

**III.    The Rights Offering Motion Should Not Be Approved Because Its Terms Are Excessive and The Debtors Fail to Provide Any Business Justification for Such Terms; The Disclosure Statement Does Not Contain Adequate Information Regarding the Rights Offering Motion.**

**A.     The Terms of the Rights Offering are Excessive.**

41.     The Rights Offering Motion is a fundamental feature of the proposed plan.  Its approval would mark this Court's authorization of a procedure which would dilute the already meager proposed recovery to equity.  The Equity Committee believes that terms of the Rights Offering Motion present an ultra-favorable deal to the subscribing noteholders.  In what can only be described as a glaring omission, the Rights Offering Motion makes no mention of the terms of the Rights Offering, the impact of such economic terms, and why these terms are justified in the current economic market.

42.     The Equity Committee, through its advisors, has requested that the Debtors provide for information relating to the necessity of the terms, the process by which the Rights Offering was considered and authorized, and the "market testing" that was done in connection therewith.  As of last evening, the Equity Committee's advisors heard a substantive explanation for the first time; yet more questions remain regarding the process used by the Debtors.  Although the Debtors have indicated that they will present a witness at the hearing to testify to the process leading up to the Rights Offering (Rights Offering Mot. ¶6), that is insufficient.  The Equity Committee should have the ability to review and analyze this information reasonably in advance of the hearing.

43.     Notwithstanding the information deficit in the Debtors' pleading, the Equity Committee, through its financial advisor, Jefferies, has prepared its own analysis of the terms of the Rights Offering.  Based on this analysis, the Equity Committee has concluded that the Rights Offering presents an especially lucrative deal to the subscribing noteholders on terms that are far in excess of market:

(i)     **The Rights Offering Notes Are Too Favorable to the Subscribing Noteholders.**  The implied plan value per share upon emergence is approximately $1.27/share.  The implied strike price of the Rights Offering Notes, however, is only $0.75/share.  Accordingly, the subscribing noteholders are immediately "in the money" as they can convert their notes into shares upon issuance and at a significant discount.

(ii)     **The Coupon on the Rights Offering Notes Are Excessive.**  The Debtors are offering a 7.5% coupon on the Rights Offering Notes.  Market comparisons for recently issued convertible securities are in neighborhood of 4.5%.  Thus, the coupon for the Rights Offering Notes is approximately 300 basis points higher than market comparables.

(iii) **The Backstop Fee is Excessive**. The Equity Committee is aware that prior to its appointment, the Court approved the Backstop Commitment. Notwithstanding, the Equity Committee would be remiss if it did not point out that the backstop fee sought by the Backstop Investors - and (unbelievably) supported by the Debtors - provides that the Backstop Investors will receive up to 20% of the new equity. Assuming the Debtors' midpoint plan value of $159 million, that equates to a fee of _**23%**_ of the Plan's new money commitment. This is outrageously high in any context, but especially in comparison to other recent backstop fees that average around 4.5%.

(iv) **The Conversion Premium for the Rights Offering Notes is at a Considerable Discount**. An analysis of the conversion premium for the Rights Offering Notes shows that it is at a <u>discount</u> of approximately 40%, which is a material deviation from market terms on similar securities which provide for a strike price at a 20-30% premium to the current value of the equity.

44. The Rights Offering Motion and Disclosure Statement also fail to disclose that the "rights" being offered under the Rights Offering Motion themselves constitute "value" that is being given to noteholders on account of their claims and which should be accounted for when considering the distribution that is being made to the noteholders.

45. Based on the foregoing, the Rights Offering Motion should not be approved.

**C. The Disclosure Statement Does Not Provide Adequate Information Regarding the Rights Offering.**

46. The Disclosure Statement fails to meaningfully discuss the substance and economics of the Rights Offering. The overarching purpose of a Disclosure Statement is to give creditors and shareholders information necessary to decide whether to accept a plan. *See In re Lisanti Foods., Inc.*, 329 B.R. at 507 (Bankr. D. N.J. 2005). The Disclosure Statement's failure (i) to indicate that the Rights Offering Notes are immediately convertible based on the Debtors'

ascribed share value and that the terms of the Rights Offering and Backstop Commitment are significantly over market and (ii) to provide a sound business justification for these terms constitute significant omissions that prevent approval of the Disclosure Statement.

## III.   The Plan Is Not Being Proposed In Good Faith.

### A.   The Debtors Are Running The Process Solely For Their Lenders And Without Regard to the Interests of Equity Holders.

47.    Section 1129(a)(3) provides that "[t]he court shall confirm a plan only if . . .[t]he plan has been proposed in good faith and by any means forbidden by law." 11 U.S.C. § 1129(a)(3). *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000); *In re Oneida Ltd.*, 351 B.R. 79, 84-85 (Bankr. S.D.N.Y. 2006).

48.    The Debtors filed for bankruptcy protection at a time when the company was in a deep cyclical trough.  The terms of the deal with the prepetition lenders were negotiated in the midst of this trough when the financial climate likely appeared bleak for the Debtors.   Yet, as the Debtors acknowledge in their own recent public filings, the going forward outlook for the company is vibrant and shows continued growth in the company's profits (especially once restructuring costs are backed out).  CITE TO 8-K.  Additionally, since the time that the Debtors negotiated the going forward restructured credit facility and Rights Offering Notes, the credit markets have loosened significantly and there is more credit available to companies with positive forecasts like Accuride.

49.    The Debtors have been required by their prepetition lenders to pursue a plan of reorganization that provides them with immensely favorable financial treatment, hands them the keys to the company at what amounts to a deeply discounted price, and virtually erases the interests of equity holders.  All of this is being done without the Debtors forwarding any shred of evidence for their purported valuation of the Debtors.   While this route may be the most beneficial for the Debtors' prepetition lenders, it is neither acceptable to the Equity Committee

nor is it consistent with the Debtors' fiduciary responsibility which is to maximize the value of the estates for the benefit of all stakeholders, and not just select constituents. *In re Lionel*, 722 F.2d 1063, 1071 (2d. Cir. 1983) (holding that a debtor must "further the diverse interests of the debtor, creditors and equity holders, alike.").

50.     The Equity Committee believes that superior plan alternatives exist to the current plan proposal. The Equity Committee has already had preliminary discussions with at least [one/two] parties who may be interested in providing the Debtors with a term facility, rights offering, or both on much cheaper terms. The Equity Committee believes that an alternative plan with less onerous terms is not only available but would also provide for a reorganized business that would have sufficient value for a return to the bondholders while preserving equity value for the Debtors' public shareholders. The Equity Committee is committed to assisting the Debtors with finding an appropriate exit package. However, this effort cannot be undertaken on the timetable demanded by the Restructuring Support Agreements. Indeed, that timetable will likely yield only a singular result that will be to the ultimate detriment of equity holders.

51.     The Debtors filed for bankruptcy protection at a time when the company was in a deep cyclical trough. The terms of the deal with the prepetition lenders were negotiated in the midst of this trough when the financial climate likely appeared bleak for the Debtors. Yet, as the Debtors acknowledge in their own recent public filings, the going forward outlook for the company is vibrant and shows continued growth in the company's profits (especially once restructuring costs are backed out). CITE TO 8-K. Additionally, since the time that the Debtors negotiated the going forward restructured credit facility and Rights Offering Notes, the credit markets have loosened significantly and there is more credit available to companies with positive forecasts like Accuride.

52.     Accordingly, the Court should not allow the Debtors (who are acting upon the demands of the prepetition lenders) to continue with a process that does not bear the hallmarks of a plan proposed in good faith, misuses the resources of the reorganized company, and fails to maximize estate value for all stakeholders.

**B.     The Terms of the Rights Offering Notes and Backstop Fee Are Not Proposed in Good Faith.**

53.      As discussed above, a valuable form of consideration being provided to the Debtors' bondholders is the opportunity to participate in a rights offering to acquire a total of $140 million in new debt securities of reorganized Accuride.  These debt securities are 10-year unsecured notes that bear interest at an annual rate of 7.5%.  As discussed above, Jefferies has conducted an analysis of the terms and determined that (i) the pricing on the new notes is significantly higher than current market rates and the Rights Offering Notes are "in the money" upon issuance because the implied strike price on the Rights Offering Notes is below the Plan value per share.  This expensive deal can only be rationalized as a means to surreptitiously confer additional value upon the Debtors' bondholder creditors.

54.     In addition, the Debtors have agreed to transfer further value to certain of the bondholders through a Backstop Fee associated with the rights offering for those notes.  Under the Plan, certain of the bondholder creditors are to share in a fee which will give them up to 20% of the stock in the reorganized debtor upon emergence, which represents 23% of the Plan's new money commitment.

55.     Nowhere in the Plan or the Disclosure Statement do the Debtors make any effort to explain how they arrived at the 7.5% coupon for the Rights Offering Notes as being an appropriate interest rate, or how they determined that the Backstop Fee was an appropriate amount.

56.     In sum, the convertible notes to be issued in connection with the Rights Offering are priced with an unnecessarily high interest rate and have a strike price that is well below the plan value per share, thus putting the new notes immediately "in the money". What's more, the Rights Offering is coupled with an exorbitant backstop commitment that equates to 23% of the Plan's new money commitment. The excesses of the Rights Offering and Backstop Commitment - proposed at the expense of equity holders - are proof that these fundamental components have not been proposed in good faith.

### C.     The Terms of the Restructured Facility Are Also Not Proposed in Good Faith.

57.     The Equity Committee also believes that the Restructured Credit Facility is extremely expensive. Jefferies has conducted an analysis of the terms of the new facility and determined that it is between 75 and 100 basis points higher than yields on recently issued similar first lien securities.

58.     The favorable treatment that is being conferred to the Debtors' pre-petition lenders, while equity is being more or less trampled, is egregious given the likely solvency of these estates (and the Debtors' failure to present any compelling evidence to the contrary). Any excess value in the estates should not be turned over to the lenders; rather, it should be preserved for the true stakeholders of the Debtors, i.e., the shareholders. The Debtors' willingness to enter into yet another rich deal for the benefit of their prepetition lenders is a further example of the Debtors' failure to propose its plan in good faith.

## NOTICE

59.     The Equity Committee has provided notice of this Application via United States Mail and electronic mail to (a) the U.S. Trustee, (b) counsel to the Debtors, (c) counsel the Creditors' Committee, (d) counsel to the Ad Hoc Noteholders' Committee; (e) the Debtors' lenders; and (f) all parties requesting notices pursuant to Bankruptcy Rule 2002 via hand delivery to the local parties and United States Mail to the others.  The Equity Committee submits that, in light of the nature of the relief requested herein, no other or further notice is necessary.

## CONCLUSION

WHEREFORE, for the reasons stated above, the Equity Committee submits that (i) the Disclosure Statement fails to provide adequate information and is unconfirmable; (ii) the Rights Offering is excessive and not in the best interests of the estate; and requests that the Court decline to approve the Disclosure Statement and Rights Offering Motion.


Date:   December 15, 2009
        Wilmington, Delaware                          BAYARD, P.A.

                                                      */s/  Justin R. Alberto*
                                                      Charlene Davis (No. 2336)
                                                      Justin R. Alberto (No. 5126)
                                                      222 Delaware Avenue, 9th floor
                                                      Wilmington, Delaware 19801
                                                      Telephone: (302) 655-5000
                                                      Facsimile:  (302) 658-6395

                                                             -and-

                                                      SONNENSCHEIN NATH &
                                                      ROSENTHAL LLP
                                                      Peter D. Wolfson
                                                      1221 Avenue of the Americas
                                                      New York, NY 10022
                                                      Telephone: (212) 768-6700
                                                      Facsimile: (212) 768-6800

                                                             -and-

Robert E. Richards
Monika J. Machen
Stefanie Wowchuk
233 S. Wacker Drive
Suite 7800
Chicago, Illinois 60606
Telephone: (312) 876-8000
Facsimile: (312) 876-7934

*Proposed Counsel for the Official
Committee of Equity Security Holders of
Accuride Corp., et al.*