## THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ACCURIDE CORPORATION, *et al.*, | Case No. 09-13449 (BLS) |
| Debtors. | (Jointly Administered) |
| | Related to Docket No. 496 |
| | **Hearing Date: January 20, 2010 at 10:00 p.m. (ET)**<br>**Objection Deadline: January 13, 2010 at 4 p.m. (ET)** |

## OBJECTION OF THE *AD HOC* NOTEHOLDER GROUP TO THE MOTION OF THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS FOR AN ORDER (A) COMPELLING THE *AD HOC* NOTEHOLDER GROUP TO COMPLY WITH FED. R. BANKR. P. 2019; (B) PROHIBITING FURTHER PARTICIPATION IN THESE CASES BY THE *AD HOC* NOTEHOLDER GROUP PENDING COMPLIANCE WITH FED. R. BANKR. P. 2019; AND (C) DIRECTING THE DEBTORS TO WITHHOLD FURTHER PAYMENT TO OR ON BEHALF OF SUCH GROUP PENDING COMPLIANCE WITH FED. R. BANKR. P. 2019

The *Ad Hoc* Noteholder Group (the "Group") hereby objects, pursuant to 11 U.S.C. § 105(a) and Bankruptcy Rule 2019, to the "*Motion of the Official Committee of Equity Security Holders for an Order (A) Compelling the Ad Hoc Noteholder Group to Comply with Fed. R. Bankr. P. 2019; (B) Prohibiting Further Participation in These Cases by the Ad Hoc Noteholder Group Pending Compliance with Fed. R. Bankr. P. 2019; and (C) Directing the Debtors to Withhold Further Payment to or on Behalf of Such Group Pending Compliance with Fed. R. Bankr. P. 2019,*" dated January 4, 2010 [Docket No. 496] (the "2019 Motion").[1]

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed in the 2019 Motion.

TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ...................................................................................... 1

II. STATEMENT OF FACTS ............................................................................................ 3

    A.     THE CLAIMS AND INTERESTS OF THE GROUP AND ITS
           MEMBERS HAVE BEEN DISCLOSED PUBLICLY IN THIS CASE ............... 3

           (1)     Disclosure of the Identity and Address of Each Member of the
                    Group was Made on the Petition Date ....................................................... 3

           (2)     Disclosure that Members are Signatories to the Noteholder
                    Restructuring Agreement and Held 70% of the Subordinated Notes
                    was Made on the Petition Date. ................................................................. 4

           (3)     Disclosure of the Members' Claims under and Interests in the DIP
                    Credit Agreement was Made on the Petition Date. .................................... 4

           (4)     Disclosure of Claims under and Interest in the Commitment
                      Agreement. ................................................................................................. 6

           (5)     Disclosure of Transfers of Subordinated Notes Subsequent to the
                    Petition Date. .............................................................................................. 7

    B.     IN THE 2019 MOTION THE EQUITY COMMITTEE HAS MADE A
           NUMBER OF MATERIAL MISREPRESENTATIONS AND
            IRRELEVANT ALLEGATIONS CONCERNING THE ROLE OF THE
            GROUP WHICH DOES NOT PURPORT TO ACT ON BEHALF OF
            ANY OTHER ENTITY OR TAKE ACTIONS ADVERSE TO OTHER
           CREDITORS IN THIS CHAPTER 11 CASE ........................................................ 8

    C.     THE EQUITY COMMITTEE EFFECTIVELY SEEKS
           RECONSIDERATION OF THIS COURT'S FINAL ORDERS THAT
           PROVIDE FOR PAYMENT OF THE GROUP'S PROFESSIONAL
           FEES AND EXPENSES ..................................................................................... 12

III. OBJECTIONS ............................................................................................................ 13

    A.     RULE 2019 DOES NOT APPLY TO THE GROUP ........................................... 13

           (1)     The Group Is Not a "Committee" Within the Meaning of
                    Rule 2019 ................................................................................................... 13

            (2)     The Group Does Not Represent or Purport to Represent Any
                    Non-Member Entity .................................................................................... 15

            (3)     No Instrument Confers Or Purports To Confer Representative
                    Capacity On The Group For Any Reason. ................................................. 16

            (4)     The Relief Sought by the Equity Committee in this Case is
                    Inconsistent with the Purpose of Rule 2019. ........................................... 16

B.    THE VERY FEW CASES IMPOSING RULE 2019 DISCLOSURE
REQUIREMENTS ON AD HOC COMMITTEES ARE INAPPOSITE
HERE...................................................................................................................17

    (1)    *In re Northwest Airlines* is Distinguishable.................................................17

    (2)    *In re Washington Mutual* Likewise is Inapplicable.....................................19

C.    THE DECISIONS IN *PREMIER INT'L HOLDINGS* AND *SCOTIA*
WERE CORRECTLY REASONED AND ARE FACTUALLY SIMILAR
TO THIS CASE.....................................................................................................20

D.    APPLYING RULE 2019 IN THIS CASE WOULD BE BOTH
IRRELEVANT AND VIOLATE THE MEMBERS' RIGHT TO
CONFIDENTIALITY UNDER SECTION 107(B)(1) OF THE
BANKRUPTCY CODE AND THE NOTEHOLDER PLAN SUPPORT
AGREEMENT........................................................................................................21

E.    THE EQUITY COMMITTEE'S REQUEST TO BAR THE GROUP'S
PARTICIPATION IN THIS CASE VIOLATES THE BANKRUPTCY
CODE AND THE REQUEST TO PREVENT THE DEBTORS FROM
COMPLYING WITH PRIOR FINAL ORDERS AUTHORIZING
PAYMENT OF FEES AND EXPENSES VIOLATES THE GROUP'S
FUNDAMENTAL RIGHTS IN THIS CASE AND CONSTITUTES A
RECONSIDERATION OF THE COURT'S PRIOR ORDERS WITHOUT
ASSERTING ANY LEGAL BASIS THEREFOR ................................................22

    (1)    The Members' Right to Actively Participate in this Case at this
Critical Juncture.......................................................................................23

    (2)    Final Court Orders Providing for Payment of the Group's Fees and
Expenses. .................................................................................................23

F.    THE COURT HAS THE DISCRETION TO DENY THE 2019 MOTION
OR FASHION APPROPRIATE DISCLOSURE IF THE COURT
DETERMINES THAT RULE 2019 APPLIES .....................................................24

IV.    CONCLUSION ...............................................................................................................25

## I.   **PRELIMINARY STATEMENT**

1.     The 2019 Motion represents just one more ploy by which the out-of-the-money equity hopes to harass supporters of the Plan in an attempt to derail and delay the confirmation process to garner an unjustified recovery.

2.     The Official Committee of Equity Security Holders (the "Equity Committee") has made no secret of its intention—to thwart the current plan of reorganization in an attempt to extort value for equity holders even though (a) the Debtors' independent valuation of their assets concludes that all creditors will not be paid in full and (b) the Equity Committee has yet to produce any evidence that the Debtors did not properly examine its various options and potential financing sources in formulating the proposed plan of reorganization (the "Plan").

3.     In furtherance of its attempt to extort value to which it is not legally entitled, the Equity Committee has filed applications seeking to employ professionals pursuant to which no less than $2,000,000 (which would otherwise be available for unsecured creditors and/or the reorganized debtors) would be spent by the Equity Committee EVEN IF the Equity Committee does not increase the recovery of equity holders one iota. Included in the Debtors' disclosure statement (the "Disclosure Statement") is the Equity Committee's manifesto of its strategy for upsetting the Plan by challenging valuation, seeking alternate financing and other actions to block timely confirmation of the Plan. *See* "Statement from Monika J. Machen to Shareholders" annexed as Exhibit "A" hereto.

4.     In essence, the Equity Committee is threatening to recreate work already performed by the Debtors' counsel, management and financial advisors despite the fact that the Equity Committee has not alleged that the Debtors, management and their advisors have shirked their responsibilities or fiduciary duties in any way.

1

5. The Court should deny the 2019 Motion because it is offered for an improper purpose and ignores the disclosures regarding the Group's claims and interest in this chapter 11 case (the "Chapter 11 Case") that have already been made. The Motion also fails to consider that the Group has not filed any post-petition pleading seeking to affect or influence the Plan or taken any action adverse to the Debtors in pursuit of Plan confirmation. Quite simply, this is not a case where a group of creditors is willing to risk the recoveries to all other creditors under a proposed plan in hopes of fostering an alternative plan; rather, in this case the Members of the Group (the "Members") have signed a plan support agreement, contributed to a DIP Loan, and agreed to backstop a rights offering. The Group does not represent any other creditors nor purports to speak on behalf of any other creditor.

6. The Equity Committee is laboring under the misimpression that the Debtors' reorganization has been orchestrated by the Group. In reality, and as set forth more fully herein, the Debtors are in charge of the reorganization, formulated the Plan, and asked the Group prepetition to support the Debtors' efforts. The Noteholder Plan Support Agreement, the DIP Credit Agreement and the Commitment Agreement (as each term is defined below) were all negotiated prepetition at arm's length and in good faith and premised upon the Debtors' valuation of their assets.[2] The Group has filed no pleading post-petition that seeks to effectuate any change to the Debtors' Plan nor filed any pleading that acts on behalf of, or purports to act on behalf of, any entity other than a Member of the Group. Moreover, its' actions do not pose any risk to any of the estates' creditors. Quite to the contrary, the Group has acted to support the Debtors' efforts to confirm the Debtors' Plan.

---

[2] Prior to the commencement of this Chapter 11 Case, the Debtors contended, as they do now, that holders of the Subordinated Notes (Class 7) will receive only between 32.2% and 42.9% of the money owed them, that no other funds or sources of DIP financing or exit financing were available to the Debtors and that the Debtors needed both the DIP funds and the Backstop Commitment (as defined below) in order to file for bankruptcy in October 2009 – when the Debtors insisted they had to file – and to successfully reorganize.

2

## II.    STATEMENT OF FACTS

8.    Throughout this Chapter 11 Case, the claims and interests of the Members have been disclosed publicly, the Group has filed no pleading representing or purporting to represent any entity other than the Group, the Group has filed no pleading seeking to challenge or change the Debtors' Plan or the Debtors' action during the Chapter 11 Case, and the Group has not taken any action that would impose any risk on any other creditor. Moreover, the agreements entered into by members of the Group (and the Lenders) just prior to the Petition Date – which form the basis of the Debtors' intended reorganization and expeditious emergence from chapter 11 – were formulated and promoted by the Debtors after the Debtors' investigation of all available options for reorganization, DIP financing and exit financing based on the Debtors' valuation of their assets and the projected recovery to unsecured creditors. In sum, the Group does not purport to act on behalf of or influence any decision of any other party. The Equity Committee has fundamentally misconstrued the actions and role of the Group in this Chapter 11 Case.

A.    **THE CLAIMS AND INTERESTS OF THE GROUP AND ITS MEMBERS HAVE BEEN DISCLOSED PUBLICLY IN THIS CASE**

(1)    Disclosure of the Identity and Address of Each Member of the Group was Made on the Petition Date.

9.    The nature of the claims and interests of the Members in this Case have been disclosed publicly. Specifically, on the Petition Date, counsel to the Group filed a notice of appearance identifying the name and address of each member of the Group. *See "Notice of Appearance and Request for Service of Notices and Papers by Milbank, Tweed, Hadley & McCloy LLP as Counsel for Ad Hoc Noteholder Group," dated October 8, 2009* [Docket No. 26].

(2) Disclosure that Members are Signatories to the Noteholder Restructuring Agreement and Held 70% of the Subordinated Notes was Made on the Petition Date.

10.     On the Petition Date, the Debtors also submitted the "*Declaration of James H. Woodward, Jr. in Support of Chapter 11 Petitions and First Day Motion*," dated October 8, 2009 Docket No. 3 (the "Woodward Decl."). Attached to the Woodward Decl. as Exhibit "C" is a copy of the Restructuring Support Agreement by and among the Debtors and the Members, dated October 7, 2009 pursuant to which the Member agreed, *inter alia*, to support the Debtors' Plan (the "Noteholder Plan Support Agreement"). The Noteholder Plan Support Agreement was entered into on the same day and under substantially the same terms and conditions as the Restructuring Support Agreement by and among the Debtors and certain of the Debtors' pre-petition lenders (the "Lenders"), dated October 7, 2009 (the "Lender Plan Support Agreement" and together with the Noteholder Plan Support Agreement, the "Plan Support Agreements"). In the Woodward Decl., the Debtors disclosed, *inter alia*, that the Members held, as of the Petition Date, at least 70% of the Subordinated Notes (as defined in the Noteholder Plan Support Agreement) or approximately $193,000,0000 in the aggregate. *See* Woodward Decl., p.17, ¶ 37, fn. 8; p. 19 ¶ 42.

(3) Disclosure of the Members' Claims under and Interests in the DIP Credit Agreement was Made on the Petition Date.

11.     Four of the members of the Group, Sankaty Advisors, LLC ("Sankaty"), BlackRock Financial Management, Inc. ("BlackRock"),[3] Brigade Capital Management, LLC ("Brigade"), and Tinicum Lantern II, L.L.C. ("Tinicum"), are also "Last Out DIP Lenders" (as that term is defined in the "*Final Order Pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure Authorizing the*

---

[3]     BlackRock is an investment adviser to the funds that hold Subordinated Notes. As a Member of the Group, BlackRock acts only in that capacity.

*Debtors to (I) Use Cash Collateral of the Prepetition Secured Parties, (II) Obtain Post-Petition Financing and (III) Provide Adequate Protection to the Prepetition Secured Parties,*" entered on November 2, 2009 Docket No. 182 (the "Final DIP Order") and in the Senior Secured Superpriority Debtor-in-Possession Credit Agreement, dated October 9, 2009 annexed to the Final DIP Order as Exhibit "A" (the "DIP Credit Agreement")). The identity of the Last Out DIP Lenders (including affiliates and funds) is set forth in Exhibit "A" to the "*Debtors' Motion for Interim and Final Orders Pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedures (A) Authorizing the Debtors to (I) Use Cash Collateral of the Prepetition Secured Parties, (II) Obtain Post-Petition Financing and (III) Provide Adequate Protection to the Prepetition Secured Parties, and (B) Providing Notice and Scheduling Final Hearing,*" dated October 8, 2009 Docket No. 20 (the "DIP Financing Motion").

12.     Under the Final DIP Order and DIP Credit Agreement, the Last Out DIP Lenders provided the Debtors with an aggregate of $25,000,000 in Advances (as defined in the DIP Credit Agreement) on a first in/last out, substantially silent basis and subordinated to the right of payment to the payment in full of the First Out Obligations (as defined in the DIP Credit Agreement). *See* Final DIP Order, fn. 3 and DIP Credit Agreement, Section 2.20.

13.     The Debtors, the DIP Agent and the First Out DIP Lenders are each fully familiar with the Last Out DIP Lenders' claims under and interests in the DIP Credit Agreement and under the Final DIP Order. Similarly, all parties in interest have had access to such information since the Petition Date when the Debtors filed, *inter alia*, the Woodward Decl. and the DIP Financing Motion.

5

(4)     Disclosure of the Members' Claims under and Interest in the Commitment
        Agreement was Made on October 9, 2009.

14.     In addition to the Lender Plan Support Agreement, the Noteholder Plan Support
Agreement and the DIP Credit Agreement, the Debtors also prepetition negotiated and entered
into the Convertible Notes Commitment Agreement with Sankaty, Blackrock, Brigade and
Tinicum (and affiliates) (collectively, the "Backstop Investors") on October 7, 2009 (the
"Commitment Agreement"). Under the Commitment Agreement, *inter alia*, the Backstop
Investors agreed to purchase all unsubscribed "new notes" to be issued by the Debtors pursuant
to a rights offering that will provide the Debtors with the requisite exit financing (the "Backstop
Commitment"). As set forth in detail in the "*Debtors' Motion for Order Authorizing the Debtors
to (I) Assume the Commitment Notes Commitment Agreement, and (II) Pay and Reimburse
Certain Fees and Expenses Incurred in Connection Therewith Including, Without Limitation, the
Backstop Fee, Transaction Expenses and Termination Fee*," dated October 9, 2009 (the
"Commitment Agreement Assumption Motion"), the Commitment Agreement was negotiated at
arms' length, in good faith and with active input from the Debtors and their financial advisors,
the Backstop Investors and their financial advisors and the Lenders and their financial advisors.

15.     The terms of the Commitment Agreement were fully vetted by and approved by
the Debtors' management. As the Debtors have represented to the Court, the Commitment
Agreement, and the related rights offering, were (and are) the Debtors' most viable option for
securing appropriate exit financing consistent with the Debtors' intended reorganization. *See*
Commitment Agreement Assumption Motion, p. 6, ¶ 12. The Debtors have represented to this
Court that all aspects of the Commitment Agreement are in the best interests of the estates and
that the financial terms and conditions of the Commitment Agreement were proper. Moreover,
the Debtors have repeatedly disclosed publicly that the commitment from the Backstop Investors

6

is the lynchpin in the Debtors' ability to raise $140,000,000 in order to exit chapter 11 with sufficient funds to confirm the Plan. In the unlikely event that no eligible subscriber elected to participate in the rights offering, the Backstop Investors are obligated to purchase all $140,00,000 of the "new notes."

16.     The specific percentage obligations under the Commitment Agreement of each Backstop Investor are expressly known to the Debtors. Thus, there is no secret as to the identities of the Backstop Investors nor of the claims and interests under the Commitment Agreement.

(5)     Disclosure of Transfers of Subordinated Notes Subsequent to the Petition Date Have Been Made to the Debtors.

17.     Under the Noteholder Plan Support Agreement, a signatory may transfer its Subordinated Notes provided the transferee agrees to be subject to the terms of the Noteholder Plan Support Agreement. *See* Noteholder Plan Support Agreement, p. 7, Section 5. In this manner, <u>Debtors</u> would continue to have the support they need for the Plan. Notice of a Member's trade of Subordinated Notes and of the acquirer's written consent to be bound by the terms of the Noteholder Plan Support Agreement are communicated to the Debtors in writing.[4] As a result, the Debtors are fully informed of all post-petition trades of Subordinated Notes subject to the Noteholder Plan Support Agreement and are aware of the exact holdings of Subordinated Notes of each Member of the Group.

---

[4]     The same restrictions apply to the Lenders under the Lender Plan Support Agreement. *See* Lender Plan Support Agreement at p. 8, Section 5.

B. **IN THE 2019 MOTION THE EQUITY COMMITTEE HAS MADE A NUMBER OF MATERIAL MISREPRESENTATIONS AND IRRELEVANT ALLEGATIONS CONCERNING THE ROLE OF THE GROUP WHICH DOES NOT PURPORT TO ACT ON BEHALF OF ANY OTHER ENTITY OR TAKE ACTIONS ADVERSE TO OTHER CREDITORS IN THIS CHAPTER 11 CASE**

18. In the 2019 Motion, the Equity Committee makes numerous allegations that are irrelevant to the substantive issues surrounding disclosure under Rule 2019 or simply mistaken.

19. For example, the Equity Committee argues that the Chapter 11 Case is being run for the sole benefit of the Group. All pleadings filed by the Debtors to date establish otherwise. Based on the Debtors' filings and representations to the Court, the objective of the Chapter 11 Case is an expeditious, cost-effective balance sheet restructuring. As part of that restructuring, the Debtors are paying general unsecured creditors in full and improving relations with trade vendors, suppliers and customers. In addition, the Debtors have been able to maintain their operations without significant disruption during the pendency of the Chapter 11 Case

20. Further, contrary to the Equity Committee's assertion, the Group has filed no pleading in the Chapter 11 Case that purports to represent any entity other than the Group. Moreover, no pleading has been filed to date that seeks to challenge or otherwise alter the Plan or any of the actions taken by the Debtors during the pendency of the Chapter 11 Case because the Group support s the Debtors' reorganization efforts. The nature of the Members' commitment is to support the Debtors' Plan and some will provide DIP funding and exit financing as needed. The foregoing commitments do not preclude any other creditors similarly situated from participating in the rights offering or otherwise acting to protect their interests in this Chapter 11 Case; and it certainly does not prevent the Debtors from pursuing a different, superior plan of reorganization nor impose any risk on other creditors.

8

21.     The Equity Committee claims that the Group is engaged in tactics to prevent the Equity Committee from doing its job. That is inaccurate. The Group has filed pleadings to prevent the Equity Committee from pursuing an improper campaign to extort value to which it is not legally entitled and which would reduce the creditors' recovery and the Debtors' liquidity by more than $2,000,000. Specifically, the Group has filed: (a) a two-paragraph "joinder" in the Debtors' opposition to the Equity Committee's request that the hearings to approve the Debtors' disclosure statement and to approve the Debtors' rights offering be continued so that the Debtors can proceed to confirmation as scheduled;[5] (b) a motion to dissolve the Equity Committee *nunc pro tunc* (the "Dissolution Motion") because none is warranted;[6] (c) specific, limited objections to the Equity Committee's applications to retain counsel (the "Counsel Objections");[7] and (d) specific, limited objections to the Equity Committee's application to retain a financial advisor to prevent waste of estate assets unless the Equity Committee is successful (the "Financial Advisor Objections"[8] and together with the Dissolution Motion and the Counsel Objections, the "Opposition to the Equity Committee Requests").

---

[5]     *See "Joinder of Ad Hoc Noteholder Group in Objection of the Debtor to Motion of the Official Committee of Equity Security Holders to Adjourn Hearings on the Motions of the Debtors (I) for Entry of an Order (A) Approving the Disclosure Statement, Etc. and (II) for an Order (A) Authorizing The Debtors To Conduct The Rights Offering and (B) Approving Registration Agreement, Subscription Agreement And Subscription Form,"* dated December 15, 2009 [Docket No. 383].

[6]     *See "Motion of the Ad Hoc Noteholder Group for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a) and 1102(a) Dissolving the Official Committee of Equity Security Holders"* [Docket No. 391].

[7]     *See "Objections of the Ad Hoc Noteholder Group to (I) Application of the Official Committee of Equity Security Holders to Retain and Employ Sonnenschein Nath & Rosenthal LLP as Counsel Effective as of November 19, 2009 and (II) Application of the Official Committee of Equity Security Holders for an Order under Bankruptcy Code Sections 328(a) and 1103(a) and Bankruptcy Rules 2014(a) and 2016(b) Approving the Employment and Retention of Bayard, P.A. as Delaware Counsel for the Official Committee of Equity Security Holders Nunc Pro Tunc to November* 19, 2009" [Docket No. 474].

[8]     *See Objections of the Ad Hoc Noteholder Group to the Official Committee Of Equity Security Holders' Application For Order Under Sections 328 and 1103 of the Bankruptcy Code and Bankruptcy Rule 2014 Approving Retention of Jefferies & Company, Inc. as Financial Advisors to the Committee, Effective as of November 19, 2009, and Granting Waiver of Compliance With Certain Requirements under Del. Bankr. LR 2016-2* [Docket No. 523].

22.     The Opposition to the Equity Committee Requests is specific and direct in its focus and does not, as the Equity Committee argues in the 2019 Motion, seek to exert any influence over the outcome of this Chapter 11 Case or act on behalf of any entity other than the Group.  Indeed, the Group's actions do no adversely impact other creditors or put any risk upon them.  The Opposition to the Equity Committee Requests is the Group's efforts to ensure that the Equity Committee does not proceed unfettered in this Chapter 11 Case to employ tactics and diversions to derail the Debtors' reorganization or expeditious confirmation of the Plan, and most importantly, to prevent the Equity Committee from siphoning over $2,000,000 from the Debtors' liquidity and cash otherwise available to pay creditors.[9]

23.     The Equity Committee claims that no other party has objected to the formation of the Equity Committee.  That is false.  The Debtors objected and sent the US Trustee a letter disputing the formation on the same grounds that support the Group's pending Dissolution Motion.  Moreover, the deadline for a party in interest to file a joinder in the Dissolution Motion is January 29, 2010.

24.     The Equity Committee contends that the fact that no other party has opposed the Equity Committee's professional applications indicates that the Group is alone in its opposition. That is inaccurate.  The Debtors have indicated that they will reserve their rights *vis a vis* the counsel applications and have filed an objection to the Equity Committee's financial advisor application.  The Official Committee of Unsecured Creditors has filed a partial joinder in the Group's and the Debtors' objections to the financial advisor application as well.[10]  As set forth

---

[9]     The $2,000,000 estimate is based on the Equity Committee's fees and expenses alone; it does not include the marginal fees, costs and expenses incurred by the Debtors, the Official Committee of Unsecured Creditors, the Indenture Trustee or the Group – all of whom are compelled to respond to, participate in and defend against the Equity Committee's campaign.

[10]    See "*Joinder (Partial) In The Debtors' Limited Objection And The Ad Hoc Noteholder Group's Objection To The Official Committee Of Equity Security Holders Application For Order Under Sections 328 And 1103 Of The*

10

above, the Opposition to the Equity Committee Requests has been prosecuted by the Group because it is the creditors' recovery that is at risk of losing over $2,000,000 that would otherwise be available for creditors rather than being spent on the Equity Committee strategic maneuverings.

25.     There is no document or other instrument by which the Members of the Group operate. There is no document or instrument that dictates how the Members vote on any issue raised in the Chapter 11 Case or conduct business. For example, the Members are free to participate or not participate in any aspect of the Debtors' reorganization. There are no Group by-laws. No pleading or action is taken in the Chapter 11 Case unless such action is unanimous. There is no written or other obligation for the Members to share information with each other. In fact the Members are not obligated to share any commercial, confidential trading information among themselves or with the Group's professionals. The Members' only obligation is to support the Plan.

26.     At page 14, fn. 8 of the 2019 Motion, the Equity Committee intimates that the Group has refused to produce the engagement letter of Rothschild, Inc. They further contend that its' production was necessary to prove to the Equity Committee the reasonableness of Rothschild's fees. Those assertions are incorrect. The Group has in fact produced the Rothschild engagement letter to the Equity Committee (once appropriate confidentiality terms were agreed to) but did so at the request of the Debtors who were endeavoring to convince the Equity Committee that Jefferies & Co., Inc.'s requested fees are excessive.

27.     The Equity Committee attempts to paint the Group as somehow obstructing its ability to take discovery of the Debtors' Plan. This argument must be seen for what it is – bogus

*Bankruptcy Code And Bankruptcy Rule 2014 Approving Retention Of Jefferies & Company, Inc. As Financial Advisors To The Committee, Effective As Of November 19, 2009, And Granting Wavier Of Compliance With Certain Requirements Under Del. Bankr. LR 2016*" [Docket No. 532].

11

groundwork for the inevitable request by the Equity Commitment to continue the confirmation hearing. The Group has been responsive to the Equity Committee's document demands and produced over 65,000 pages of responsive documents. The Group has not resisted the scheduling of any depositions or otherwise failed to respond to requests from either the Debtors of the Equity Committee regarding procedural or substantive issues surrounding the Equity Committee's efforts to build its opposition to Plan confirmation.

28.     Finally, the Equity Committee would have the Court believe that the Group had ulterior motives for not filing a Rule 2019 statement. However, prior to the ruling in *In re Washington Mutual*, there was an unsettled debate in this District regarding whether informal groups are obligated to file a Rule 2019 statement. That debate has continued in light of Judge Sontchi's recent – and as of yet unpublished – decision in *In re Premier Holdings Int'l, Inc.* Thus, given the doctrinal history (and continuing debate), no such motive can reasonably be ascribed to the Group. Nonetheless, the Group has made no secret as to who the Members are and the Debtors have full access to all non-confidential information regarding the Members' claims and interests in the Noteholder Plan Support Agreement, the Commitment Agreement and the DIP Credit Agreement.

## C.   THE EQUITY COMMITTEE EFFECTIVELY SEEKS RECONSIDERATION OF THIS COURT'S FINAL ORDERS THAT PROVIDE FOR PAYMENT OF THE GROUP'S PROFESSIONAL FEES AND EXPENSES

29.     The Court approved the Commitment Agreement Assumption Motion on November 2, 2009. *See Order Approving Assumption of Commitment Agreement* [Docket No. 167] (the "Commitment Agreement Assumption Order"). Both the Commitment Agreement (*see* p. 4, ¶ 2(c)) and the Commitment Agreement Assumption Order provide for the payment of the Backstop Investors' professionals' fees and expenses incurred during the Chapter 11 Case.

30.     In addition, the Final DIP Order (and the interim order preceding it) and the DIP

Credit Agreement provide for the payment of the Last Out DIP Lenders' professionals' fees and

expenses and set a protocol for paying same on a current basis. *See* Final DIP Order, p. 41 ¶

20(b); *see also* DIP Credit Agreement, p. 86,¶ 3.01(i). To date, pursuant to the Final DIP Order,

the DIP Credit Agreement, and the Commitment Agreement Assumption Order, the Group has

complied with the protocol set forth in such order and agreement and in compliance with the

such orders, the Debtors have paid the Group's professional fees and expenses for the period

from the Petition Date up to and through November 30, 2009. In the 2019 Motion, the Equity

Committee is effectively seeking to obviate these orders.

## III.     OBJECTIONS

### A.     RULE 2019 DOES NOT APPLY TO THE GROUP

31.     Rule 2019(a) provides, in pertinent part:

> In a . . . chapter 11 reorganization case . . . every entity or
> <u>committee</u> <u>representing</u> more than one creditor or equity security
> holder . . . shall file a verified statement . . .. The statement shall
> include a copy of the <u>instrument,</u> if any, whereby the entity,
> committee . . . is empowered to act on behalf of creditors or equity
> security holders.

FRBP 2019(a) (emphasis added). The Group does not fall within the plain meaning of

Rule 2019(a) because: (a) the Group is not a committee or entity; (b) that represents or purports

to represent any non-member entity; and (c) is not bound by any "instrument" purporting to

empower the Group to act on behalf of any non-member. In addition, applying Rule 2019 to the

Group is inconsistent with the legislative purpose of Rule 2019.

(1)     The Group Is Not a "Committee" Within the Meaning of Rule 2019.

32.     The non-legal definition of "committee" is "a body of persons delegated to

consider, act, investigate, take action on, or report on some matter." *Merriam-Webster's*

*Collegiate Dictionary* 231 (10th ed. 1996). The Members of the Group have not been delegated

by any entity or group of entities to undertake any action nor do they purport to take action or

have influence on any other group. Likewise, their actions do not risk the proposed recovery of

other creditors. The Group is merely a group of individual creditors (signatories to the

Noteholder Plan Support Agreement, Last Out DIP Lenders and Backstop Investors) who agreed

to work together to further the common interests of aiding the Debtors' emergence from chapter

11 in as expeditious a manner as possible with an improved balance sheet, sufficient liquidity,

less debt, and talented management and board leadership.

33.     Consistent with the plain meaning of "committee," Judge Sontchi in *In re Premier*

*Int'l Holdings, Inc.*, No. 09-12019 (Bankr. D. Del. Jan. 8, 2009) recently held that such an

informal group is not a "committee" under Rule 2019. *See In re Premier Int'l Holdings, Inc.*,

No. 09-12019 (Bankr. D. Del. Jan. 8, 2009):

> I have tremendous respect for Judge Gropper. I have tremendous
> respect for Judge Walrath. But I fundamentally disagree with their
> opinions under this rule. I read committee under Rule 2019
> narrowly, and I read it according to the plain meaning of the
> words. Committee, represent, deputize, agent, I think they all
> contemplate a subset of a larger group authorized by the larger
> group to act on its behalf. That is not the case here. I don't think
> ad hoc or informal committees are subject to Rule 2019 . . . The
> problem with 2019 is it is a blanket rule that would be applicable
> to all committees. And I think, frankly, if one were to follow the
> WaMu or the Northwest decision, in every case where you had an
> ad hoc group of noteholders or an informal committee of equity or
> whatever we see, that that would require 2019s in instances – in
> most instances where it simply is unnecessary. That just doesn't
> make any sense to me.
>
> I think that this is an instance where plan meaning really can begin
> and end the analysis. . .. This is a group of noteholders who got
> together to share costs, to increase the weight of their authority in
> front of the Court in order to maximize their return, if you will, for
> the efforts they're going to make in the bankruptcy. I don't find
> that just doing that somehow puts them in a position to be a
> committee. And I'd be very concerned, again, because Rule 2019

14

> is a rule. It's a disclosure rule . . . an upfront rule. If on the back end we're going to say, well, its really only applicable if you look on it at a case by case basis, on the facts of individual cases based on what the committee has done, I find that completely inconsistent with the whole purpose of a rule like 2019.
>
> So I am going to deny the motion for these reasons.

Hr'g Tr. p. 68, line 19 – p. 70, line 11; a copy of which is annexed hereto as Exhibit "B"; *see also In re Scotia Dev. LLC*, No. 07-20027 "Order Denying Scotia Pacific Company LLC's Motion for an Order Compelling the Ad Hoc Noteholder Group to Fully Comply with Bankruptcy Rule 2019(A) by Filing a Complete and Proper Verified Statement Disclosing its Membership and Their Interests," (Bankr. S.D. Tex. Apr. 18, 2007), a copy of which is annexed as Exhibit "C."

    (2)    The Group Does Not Represent or Purport to Represent Any Non-Member Entity.

34.    The word "represent" qualifies who must comply with Rule 2019; *i.e.* a committee that "represents…". *Black's Law Dictionary* does not define "represent," but defines "representative" as someone who "stands for or acts on behalf of another" and directs the reader to "See Agent." *Black's Law Dictionary* 1304 (7th ed. 1999). The non-legal definition of "represent" means "to act in the place of or for usually by legal right." *Merriam-Webster's Collegiate Dictionary* (10th ed. 1996); *see also American Heritage Dictionary of the English Language* (4th ed. 2004) (defining "represent" as, "[t]o serve as the official and authorized delegate or agent for.").

35.    The Group is neither "official" nor "authorized" nor a "delegate" or "agent" for any entity other than the Members of the Group. Nor is the Group imposing risk on other creditors by fighting Debtors' Plan in favor of an alternative.

(3)     No Instrument Confers Or Purports To Confer Representative Capacity
        On The Group For Any Reason.

36.     There is no "instrument" that binds the Group. Any member is free to quit. Any

member is free not to participate in the DIP Loan or the Backstop Commitment. All decisions

made by the Group have been unanimous. There are no controlling provisions, by-laws or other

document dictating that the Group must or may act for any entity. To the contrary, the Group

consists of individual creditors who each are trying to assist the Debtors' efforts by agreeing,

prepetition, to support a plan, provide DIP funding and provide exit financing. Certainly if

individual creditors each took such action, each represented by separate counsel, Rule 2019

would not apply. That the Debtors promoted efficiency by having the individuals work together

does not change that analysis.

(4)     The Relief Sought by the Equity Committee in this Case is Inconsistent
        with the Purpose of Rule 2019.

37.     The precursor to Rule 2019 was Rule 10-211 of Chapter X of the former

Bankruptcy Act. Rule 10-211 was a product of the post-Depression era in which the Securities

and Exchange Commission took legislative initiative as a result of its concerns that public

investors needed protection from a debtor's insiders in reorganization cases. *See* Sparkle L.

Alexander, *The Rule 2019 Battle: When Hedge Funds Collide with the Bankruptcy Code*, 73:4

Brook. L. Rev. 1411, 1419 (2008). At the time Rule 10-211 was enacted, it was common for

debtors to sponsor so-called "protective committees," which in fact were comprised of insiders

with significant debt holdings who sought deposit agreements from individual creditors. *Id.* at

1418. Through these deposit agreements, a protective committee gained control over claims held

by individual investors. *Id.* In a 1937 SEC Report, future Supreme Court Justice William O.

Douglas stated that Rule 10-211 "is designed to ensure that the inside group does not manipulate

a pre-petition committee to secure a dominant position in the reorganization and capture the

16

emoluments of control." *Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.*, 321 B.R. 147, 166 (D.N.J. 2005) (internal quotations omitted); *see also In re Phila. & Reading Coal & Iron Co.*, 105 F.2d 358, 359 (3d Cir. 1939) ("In too many of those proceedings it had appeared that unqualified and unrepresentative committees sought and obtained the right to represent defenseless securityholders while actually working in the interests of the debtor or other adverse parties.").

38.    The drafters of the Bankruptcy Code imported the substance of Rule 10-211 into Rule 2019 in order to comfort with the original intent of making disclosures to curb the power of committees that stand in a fiduciary and/or representative capacity on behalf of other creditors. *See* Fed. R. Bankr. P. 2019, Advisory Committee Notes. Thus, the origins of Rule 2019 confirm that it is not meant to apply to informal of individual groups of creditors, such as the members of the Group, who have merely retained common counsel and who do not hold themselves out as representing other parties or have any fiduciary duties to others. Indeed, the purpose of the original rule would not be satisfied by forcing disclosure here.

B.    **THE VERY FEW CASES IMPOSING RULE 2019 DISCLOSURE REQUIREMENTS ON AD HOC COMMITTEES ARE INAPPOSITE HERE**

39.    There are few cases imposing Rule 2019 disclosure on ad hoc committees. Those cases are inapposite here.

(1)    *In re Northwest Airlines* is Distinguishable.

40.    In *In re Northwest Airlines Corp.*, 363 B.R. 701 (Bankr. S.D.N.Y. 2007), the court held that an ad hoc equity committee comprising certain equity holders holding only 27% of the debtor's equity failed to comply with the disclosure requirements of Rule 2019, and ordered the committee to file a modified 2019 statement. The original 2019 statement disclosed the members' holdings in the aggregate. The Court directed the members to disclose the

17

amounts of their individual claims and interests, when the same were acquired, the amounts paid, and any sales or other dispositions. The enhanced disclosures were necessary, the court concluded, because even though the committee did not purport to act as the fiduciary for other shareholders, the committee injected itself into the reorganization process and was holding itself out as a collective group "purport[ed] to speak for a group" and thereby "implicitly ask[ed] the court and other parties to give their positions a degree of credibility appropriate to a unified group with large holdings." *Id.* at 703. The court found under such circumstances, a committee appearing in this capacity was required to provide the information under 2019 in order to permit the other parties in interest, including the debtor who was unaware of the members specific holdings, to assess whether the committee had the power it attempted to wield. *Id.*

41.    In this Chapter 11 Case, there are no analogous facts warranting application of *Northwest* to the 2019 Motion. In fact, here, the Debtors have full and unfettered access to all non-confidential information regarding the Members' claims and interests in this Case. Most critically, unlike the committee in *Northwest*, the Members do not act or purport to act for any entity other than the Members and are not seeking to improve or address any issues of the holders of Subordinated Notes as a group, the DIP Lenders as a group or any potential "new notes" participant or to risk any such parties' recovery under the Plan. To the contrary, Members have agreed to support the Plan and some have also agreed to provide DIP funding and exit financing to the extent that other similarly situated and eligible creditors do not do so. The Group has not sought recognition as an official committee and has never moved for the creation of a more broad-based group. The Group has not taken the same degree of action in this Chapter 11 Case as the shareholders in *Northwest* that would bring the members within the holding of *Northwest*.

(2)    *In re Washington Mutual* Likewise is Inapplicable.

42.    Relying on *Northwest*, the bankruptcy court in *Washington Mutual* recently compelled a noteholder group to make disclosures under Rule 2019(a)(4). *See In re Wash. Mutual, Inc.*, 2009 WL 4363539, at \*3-6 (Bankr. D. Del. Dec 2, 2009). The *Washington Mutual* decision, like the *Northwest* decision, is inapplicable to the facts of this Chapter 11 Case.

43.    First, the Group has not been active in this Chapter 11 Case to the same degree that the noteholders were in *Washington Mutual*. Second, the noteholders in *Washington Mutual* purported to affect the results for all similarly situated creditors and to alter the course of the case, often touting the $1.1 billion in claims the group represented as a means to lend credence to their pleadings.

44.    In *Washington Mutual*, the Court also reached the unprecedented conclusion, in dicta, that "collective action by creditors in a class implies some obligation to other members of that class." (*see Wash. Mutual*, 2009 WL 4363539, at \*7) and that such implied obligation warranted disclosure of commercially confidential information. Both cases cited by the *Washington Mutual* court in support of such proposition, however, addressed the possibility that stockholders acting in concert might owe a fiduciary duty to the other members of their class and therefore have no application to this Chapter 11 Case. *See Young v. Higbee Co.*, 324 U.S. 204, 210 (1945) (finding that stockholders, "by appealing from a judgment which affected a whole class of stockholders owed an obligation to them, the full extent of which we need not now delineate. Certainly, at the very least they owed them an obligation to act in good faith."); *In re Mirant Corp.*, 334 B.R. 787, 793 (Bankr. N.D. Tex. 2005) (finding that when an equity committee purported to act for the benefit of a class, the equity committee assumed a fiduciary role as to the class). Importantly, the *Washington Mutual* court did not point to any case in which noteholders were found to owe a fiduciary duty to other members of their class. Indeed,

19

members of an hoc group of noteholders who do not constitute a committee, do not purport to represent any other creditors and are not empowered by any instrument to undertake such a representation, cannot be said to have violated an amorphous obligation to others members of the same class.

C.   **THE DECISIONS IN *PREMIER INT'L HOLDINGS* AND *SCOTIA* WERE CORRECTLY REASONED AND ARE FACTUALLY SIMILAR TO THIS CASE**

45.   Recently, in *In Premier Int'l Holdings, Inc.*, Judge Christopher Sontchi ruled that an informal committee is not a "committee" subject to Rule 2019 disclosure. *See* Point A.(1), *supra.*

46.   Similarly, in *Scotia*, the debtor sought to compel an informal group of noteholders that held more than 95% in principal of the aggregate amount of notes to submit a Rule 2019 statement.   The debtor argued that the committee had interfered with the reorganization process by adopting an aggressive and improper litigation posture and filing absurd pleadings with the court, while hiding behind a veil of secrecy that was patently contrary to the open disclosure policies underlying the Bankruptcy Code.   In response, the committee argued that it did not fall within the dictates of Rule 2019 because it did not purport to represent any others who were not a member of the committee. The court found that the group was "not a 'committee' within the meaning of Bankruptcy Rule 2019" and therefore was not subject to Rule 2019's disclosure requirements. *See In re Scotia Development, LLC*, No. 07-20027 (Bankr. S.D. Tex. April 18, 2007) (Docket No. 492), a copy of which is annexed as Exhibit "C".

20

D.   **APPLYING RULE 2019 IN THIS CASE WOULD BE BOTH IRRELEVANT AND VIOLATE THE MEMBERS' RIGHT TO CONFIDENTIALITY UNDER SECTION 107(B)(1) OF THE BANKRUPTCY CODE AND THE NOTEHOLDER PLAN SUPPORT AGREEMENT**

47.   In a "debt for equity" reorganization such as the Plan, the price paid for debt is not relevant because it is well-established that the consideration paid for a claim or interest is irrelevant to the treatment of such claim or interest in bankruptcy. *See, e.g., Shropshire, Woodliff & Co. v. Bush*, 204 U.S. 186, 189 (1907) (holding that senior bankruptcy claims (there, priority wage claims "due to workmen, clerks or servants") "did not cease to be within that description by their assignment to another" as "[t]he character of the debts was fixed when they were incurred, and could not be changed by an assignment."); *Texas Hotel Secs. Corp. v. Waco Dev. Co.*, 87 F.2d 395, 399 (5th Cir. 1936) (transfer of claim during bankruptcy "usually does not deprive the claim of any of its incidents"); *Resurgent Capital Servs. v. Burnett (In re Burnett)*, 306 B.R. 313, 319 (B.A.P. 9th Cir. 2004) (claim filed in bankruptcy case by an assignee may not, in absence of evidence of breach of some specialized duty of assignee, be disallowed solely because assignee does not reveal consideration it paid to assignor) ("[T]he consideration paid by [the assignee] is, as a matter of law, irrelevant to the allowance of [its] claims"), *aff'd*, 435 F.3d 971 (9th Cir. 2006); *In re Executive Office Ctrs., Inc.*, 96 B.R. 642, 649 (Bankr. E.D. La. 1988) ("Once a claim is assigned, the assignee succeeds to all rights of his transferor.") (internal citations omitted).

48.   Moreover, such information is protected. Specifically, Section 107(b)(l) of the Bankruptcy Code provides that "[t]he bankruptcy court may . . . protect an entity with respect to a trade secret or confidential research, development, or commercial information." 11 U.S.C. §107(b)(l). "Commercial information" is defined as "information which would cause 'an unfair advantage to competitors by providing them information as to the commercial operations of the

21

[party]." *Video Software Dealers Ass'n v. Orion Pictures Corp.* (*In re Orion Pictures Corp.*), 21 F.3d 24, 27 (2d Cir. 1994). Courts have an obligation to protect commercial information. *See id.* at 27 ("[I]f the information fits any of the specified categories [in section 107(b)(l)], the court is required to protect a requesting interested party and has no discretion to deny the application") (internal citations omitted).

49.     Disclosure of confidential commercial trading information is also improper because under the Noteholder Plan Support Agreement, the Debtors are contractually obligated to keep such information confidential (*see* Noteholder Plan Support Agreement p. 1) and because due process protects the Group against disclosure of such information. *See Int'l Dairy Foods Assoc. v. Amestoy*, 92 F.3d 67, 71-72 (2d Cir. 1996) (statute compelling disclosure of commercial information infringed upon defendants companies' First Amendment "right not to speak"); *see also Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (stating that "the First Amendment[s protection] against state action includes both the right to speak freely and the right to refrain from speaking at all.").

E.     **THE EQUITY COMMITTEE'S REQUEST TO BAR THE GROUP'S PARTICIPATION IN THIS CASE VIOLATES THE BANKRUPTCY CODE AND THE REQUEST TO PREVENT THE DEBTORS FROM COMPLYING WITH PRIOR FINAL ORDERS AUTHORIZING PAYMENT OF FEES AND EXPENSES VIOLATES THE GROUP'S FUNDAMENTAL RIGHTS IN THIS CASE AND CONSTITUTES A RECONSIDERATION OF THE COURT'S PRIOR ORDERS WITHOUT ASSERTING ANY LEGAL BASIS THEREFOR**

50.     The Equity Committee's efforts to bar the Group from participating in this Chapter 11 Case or preventing the Debtors from complying with prior Court orders authorizing the payment of the Group's professional fees and expenses pending the filing of Rule 2019 disclosures violate the fundamental rights of the Group's members to participate in this Case

22

under Section 1109(b) of the Bankruptcy Code and constitute an improper motion to reconsider previous orders of the Court without any basis.

> (1)     The Members' Right to Actively Participate in this Case at this Critical Juncture.

51.     With confirmation a few weeks away, the Equity Committee seeks to prevent the Group from actively participating in this Chapter 11 Case in violation of Section 1109(b) of the Bankruptcy Code. Section 1109(b) of the Bankruptcy Code provides, in pertinent part, that "a party in interest, including . . . a creditor . . . may raise and may appear and be heard on any issue in a case under this chapter." 11 U.S.C. § 1109(b). The Equity Committee request disregards the fundamental rights of the Members under Section 1109(b). Participating and taking an active role in a reorganization proceeding is a basic right granted under the Bankruptcy Code, and courts should encourage such participation. *See In re Szostek*, 886 F.2d 1405, 1414 (3d Cir. 1989) ("creditors are obligated to take an active role in protecting their claims"). As stated above, the Group has not challenged the Debtors' actions or the Plan, thus what the Equity Committee is really seeking is to prevent the Group from reminding the Court and parties in interest that equity is out-of-money and that the Equity Committee's scheme is unfounded and deleterious to the Debtors' liquidity.

> (2)     Final Court Orders Providing for Payment of the Group's Fees and Expenses.

52.     The Final DIP Order and the Commitment Agreement Assumption Order are final orders. As such, they are not subject to collateral attack by the Equity Committee, and certainly not in the context of an unsupportable 2019 Motion. Aside from the fact that the Group's disclosures to date have been adequate and forthright, the Equity Committee has no grounds to deny the Group the substantive benefits of two final court orders. If the Equity Committee wants

23

those orders reconsidered, it should file an appropriate motion under the Federal Rules of Bankruptcy Procedure.

F.    **THE COURT HAS THE DISCRETION TO DENY THE 2019 MOTION OR FASHION APPROPRIATE DISCLOSURE IF THE COURT DETERMINES THAT RULE 2019 APPLIES**

53.    Even assuming *arguendo* that Rule 2019 applies to the Group, application of the Rule is discretionary and the Court should exercise its discretion to protect the Group from the unnecessary disclosure of highly confidential and proprietary information that can serve no useful purpose in this Chapter 11 Case. Bankruptcy Rule 2019(b) only provides that the court "may" order various remedies for a failure to comply with Rule 2019, not that it "shall" order such remedies. FRBP 2019(a) (emphasis added). *See In re Kaiser Aluminum Corp.*, 327 B.R. 554, 559 (D. Del. 2005) ("It has been recognized that Rule 2019 need not always be strictly applied."); *In re Hudson Shipbuilders*, No. Civ. S 84-0757, 1985 U.S. Dist. LEXIS 17654, at *14 (S.D. Miss. July 22, 1985) (holding that "Bankruptcy Rule 2019(b) affords the court the discretion, and does not mandate" that the court must order a remedy).

54.    The Court also has the authority and discretion under Section 105 to protect the Members from the unwarranted application of Rule 2019, particularly where it is being invoked as a tactic, tortures the Rule's actual purpose, and has no practical effect in this Chapter 11 Case. *See generally In re I. G. Servs. Ltd.*, 244 B.R. 377, 389 (Bankr. W.D. Tex. 2000), *rev'd on other grounds*, 263 B.R. 505 (W.D. Tex. 2000) (holding that § 105 provided power to protect party against application of Rule 2019 where application of the rule did not serve the purpose of protecting against improper participation in bankruptcy proceedings). Where, as here, application of Rule 2019 would not serve the purpose of protecting investors there is no rational purpose to apply it. *See id.* at 389-90 (denying motion by press to require strict public disclosure

24

of Rule 2019 information because rule was designed to protect investor participation in

bankruptcy, not the press).

## IV. <u>CONCLUSION</u>

For the all of the reasons set forth herein, the Group respectfully requests that the 2019

Motion be denied in its entirety.

Dated: January 13, 2010

PACHULSKI STANG ZIEHL & JONES LLP

_____
Laura Davis Jones (Bar No. 2436)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

-and-

MILBANK, TWEED, HADLEY & McCLOY LLP

Paul S. Aronzon
Robert C. Shenfeld (admitted _pro hac vice_)
Daniel M. Perry (_admitted pro hac vice_)
601 S. Figueroa Street, 30th Fl
Los Angeles, CA 90017
Telephone: (213) 892-4000
Facsimile: (213) 892-4732

_Attorneys for Ad Hoc Noteholder Group_